# ORAL ARGUMENT NOT YET SCHEDULED
## No. 26-5123

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL TRUST FOR HISTORIC PRESERVATION
IN THE UNITED STATES,

Plaintiff-Appellee,

v.

NATIONAL PARK SERVICE, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

## RENEWED EMERGENCY MOTION
## FOR A STAY PENDING APPEAL

BRETT A. SHUMATE
*Assistant Attorney General*

ADAM R.F. GUSTAFSON
  *Principal Deputy Assistant*
*Attorney General*

PETER M. TORSTENSEN, JR.
  *Deputy Assistant Attorney*
*General*

MARISSA A. PIROPATO
  *Deputy Chief*
  *Environment and Natural*
  *Resources Division*
  *Natural Resources Section*

YAAKOV M. ROTH
  *Principal Deputy Assistant*
  *Attorney General*

MARK R. FREEMAN
BRANTLEY T. MAYERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 3632*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 890-9874*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A. Parties and Amici

Plaintiff-appellee is the National Trust for Historic Preservation in the United States. Defendants-appellants are the National Park Service; Jessica Bowron, in her official capacity as Acting Director, National Park Service; John Stanwich, in his official capacity as Superintendent, the White House and President's Park; the Department of the Interior; Douglas Burgum, in his official capacity as Secretary of the Interior; the General Services Administration; Michael J. Rigas, in his official capacity as Acting Administrator, General Services Administration; Donald J. Trump, in his official capacity as President of the United States; Executive Office of the President; Susie Wiles, in her official capacity as White House Chief of Staff; Office of the Executive Residence; and Robert B. Downing, in his official capacity as White House Chief Usher.

## B. Rulings Under Review

The ruling under review (issued by Judge Richard J. Leon) is a memorandum opinion and accompanying order filed April 16, 2026,

granting Plaintiff's motion for clarification and entering an amended preliminary injunction. Add.4-16.

**C. Related Cases**

This case was previously before this Court. *See National Trust for Historic Preservation in the United States v. National Park Service*, Nos. 26-5101, 26-5108. Undersigned counsel is unaware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

/s/ Brantley T. Mayers
BRANTLEY T. MAYERS

## INTRODUCTION

On April 3, Defendants requested that this Court (in No. 26-5101) stay pending appeal an extraordinary injunction largely prohibiting President Donald J. Trump from renovating, improving, and modernizing the East Wing of the White House (the "Project"). Defendants set forth why they are likely to prevail on appeal (because Plaintiff lacks Article III standing and Congress has authorized this project twice over) and why the balance of harms overwhelmingly favors a stay. On April 11, however, the panel remanded to the district court to clarify the scope of an exception to the injunction that the district court had included in its ruling. On April 16, the district court issued an amended injunction and accompanying opinion. *See* Add.4-16.

The amended injunction is even more damaging than the first. It indefinitely and unlawfully delays and threatens to completely derail the Project, which is absolutely necessary to protect the personal safety and security of the President, who has already been the target of, and survived, multiple assassination attempts, as well as his family, staff, and visitors, together with the safety and security of future Presidents, their families, staffs, and those visiting them. The wrongful injunction

1

also imposes massive, unrecoverable financial costs. As undisputed evidence in the record demonstrates, the Project is required for national security. It will shield the now-exposed East Room of the Executive Mansion and provide best in class, modern security to the President and his family, his staff, and visitors. This "fixed structure"—constructed using "threat-resistant materials" including missile-resistant steel columns, military-grade venting, drone-proof ceilings, and bullet, ballistic and blast proof glass—will form "a fortified structural buffer" protecting "both the main White House and West Wing." Add.2-3. Together, the ballroom and secure facilities throughout the Project—including bomb shelters, a state-of-the-art hospital and medical facilities, military installations, and more—form a single integrated, complex unit that is vital for the national security of the United States. *Id.* For example, features such as military-grade ventilation systems are integrated for the whole project, below-ground and above, making the project "a single, coherent whole." *Id.* at 2. Indeed, without the ballroom, the underground portions of the Project become significantly less useful and effective.

Yet the unjust injunction purports to halt Defendants from continuing the ballroom construction, even after extensive materials have been ordered and paid for (almost entirely by patriotic private donors). Blocking construction of the ballroom will prevent Presidents, Members of Congress, and world leaders from having a secure, large-scale meeting place for future events, such as inaugurations and global summits. The injunction thus jeopardizes the safety of the current President and future Presidents, as well as their families, visitors, and all who work in the White House.

Defendants have appealed from the revised injunction, and now renew their motion for a stay pending appeal. For the reasons already explained and detailed—which Judge Rao endorsed in her prior opinion—Defendants are likely to prevail on the merits. Defendants incorporate by reference their original stay motion (in No. 26-5101). Further, for reasons elaborated below, the district court's clarification does not eliminate the irreparable harm—in actuality, it *compounds* the harms. This Court should now issue a stay, before expiration of the extended administrative stay on April 23. At minimum, the Court should extend the administrative stay to allow for Supreme Court review.

**ARGUMENT**

**A.** **The Revised Injunction Continues To Impose Serious Irreparable Harm Warranting a Stay.**

In clarifying the wrongful injunction, the district court provided that Defendants could continue "below-ground construction of national-security facilities, work necessary to provide for presidential security, and construction necessary to protect and secure the White House and the construction site itself." Add.6. But, the court added, "the injunction does, in fact, stop construction of the above-ground ballroom." *Id.* at 13. That order continues to impose serious irreparable harm on Defendants, in at least four respects. Each is more than sufficient to warrant a stay.

*First,* there is no question that the injunction will delay above-ground ballroom construction for an extended period of time. That harm is irreparable—when Defendants prevail on the merits, they will have no way to recoup that lost time, the added costs associated with delay, or the benefits that the project would have conferred on the complex and the Nation in the interim. *See Trump v. Sierra Club*, 588 U.S. 930, 930 (2019) (staying injunction that would delay construction of border wall); *Columbia Gas Transmission, LLC v. 1.01 Acres*, 768 F.3d 300, 315 (3d Cir. 2014) (finding irreparable harm from a delay in construction).

*Second*, there is no dispute that the above-ground construction ties together with the below-ground build out, to render a combined, single Project with critical security features, such as "bullet-proof windows and a drone-proof roof," as well as missile-resistant steel columns, protective portioning, and other fortifications, that are vital to the security of the President. Add.9. Indeed, the ballroom structure's height is itself a critical feature that protects not just the ballroom but also the Executive Mansion and the entire White House complex. *See* Add.20 (Secretary of the Army explaining why the contemplated "height and mass of the completed East Wing are crucial").

The district court responded that those features would not be installed "immediately" regardless. Add.9. That misses the point and actually militates toward a stay. However long it would take to fully implement those security measures, the injunction adds an indefinite delay, extending the time during which the President will lack the benefit of those protections and instead be left with a dangerous void next to the Executive Mansion. Every day of such delay constitutes irreparable harm to the President's safety and security, and therefore a stay must issue.

*Third*, although the clarification permits Defendants to continue the construction of below-ground national-security installations, there is no dispute that those installations cannot serve their purpose without their above-ground components, including the ballroom as a whole, which will cover the Project with a drone-proof roof. Add.2. The President and his staff designed the above-ground structure accordingly. *See id.* Recognizing this critical need, the district court clarified that Defendants may "cover and secure the below-ground construction" with a "slab and topping structure" that is "strictly necessary to cover, secure, and protect" the below-ground facilities. Add.9, 11-12. But as Secretary of the Army Driscoll explains, not just any "topping structure" will do. Add.18-19. Instead, the ballroom's "height and mass" are "crucial" to protecting the below-ground portions of the project. Add.20. The ballroom's design, a product of extensive consultation with the United States Army and other entities, employs a "dual-layered system compromising a sacrificial outer cover coupled with a hardened inner structural element" that requires the use of specialized construction materials. Add.21-24. "[T]hese structural hardening and counter-threat integrations are essential" to national security," and finalizing the Project is therefore a "prerequisite

6

to ensure the President can maintain continuity of government and operations." *Id.* at 24. When viewed from this vantage, it is not just that the ballroom is justified by national security, it is that there exists a national security need for a specific type of above-ground structure, and the President is using that structure to fill the parallel need for an above-ground structure to host events at the White House.

Even if an alternative "topping structure" were possible (it is not), that only *exacerbates* the harm: To ensure safety and security, Defendants would need to design and build a new structure that meets security needs—which cannot be "the proposed 90,000-square-foot ballroom," *id.* at 6, but the details of which are otherwise unspecified—only to then *demolish it and start over* when they prevail on appeal. Taking that tenuous course would also require returning to the National Capital Planning Commission and Commission of Fine Arts, both of which have already approved the current designs as part of the proper process followed by Defendants, for fresh review.

Similarly, the district court recognized that some construction will be necessary to "preserve and protect the structural integrity of the White House," Add.11, such as to protect the now-exposed East Room. That will

require above-ground construction that abuts the East Room (while also protecting the below-ground installations). Add.2. The proposed ballroom is, of course, designed, and approved, to do that—including by using missile-resistant columns to better secure the entire structure, and to safeguard the White House from attack. But the district court now states that Defendants *cannot* construct the ballroom. Accordingly, under the district court's wrongful order, Defendants are authorized to build a significant above-ground structure (despite the court's misguided ruling that any such structure would be *ultra vires*)—but only a structure that is *not* the one Defendants designed, and therefore that will have to be torn down after Defendants ultimately prevail on appeal.

Beyond making no equitable sense, this imposes additional harm in the form of time and money that will be wasted when Defendants prevail. That is the very definition of irreparable harm. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (irreparable harm means harm that is "beyond remediation"); *In re NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022) ("financial injury can be irreparable where no adequate compensatory or other corrective relief will be available at a later date" (alteration adopted)).

*Finally*, the clarification imposes irreparable harm by subjecting Defendants to a contempt trap. Despite the attempt at clarification, the order remains exceptionally vague on core points: What types of above-ground construction are "strictly necessary to cover, secure, and protect" the below-ground facilities? Add.11-12. What steps are "necessary to protect the project site and to protect the structural integrity of the White House complex"? *Id.* at 12. Which "temporary" Secret Service security "measures" are permissible? *Id.* at 10-11. Notwithstanding the district court's protests, answering these questions will inevitably place the judge in the role of "construction manager," *id.* at 13—and refusing to answer them will leave Defendants facing impossible vagueness and uncertainty.

All the district court truly makes clear is that "the injunction does *not* permit above-ground construction of the proposed ballroom." *Id.* at 12. As to the rest, Defendants are left to implement the order "in good faith," *id.* at 13—subject, of course, to the constant threat of contempt if the district judge later finds they overstepped. That is untenably broad and vague, and alone imposes irreparable harm. *Cf. Tincher v. Noem*, 164 F.4th 1097, 1100 (8th Cir. 2026) ("A wrong call could end in contempt, yet there is little in the order that constrains the district court's power to

9

impose it. … [T]o the extent the injunction's breadth and vagueness cause federal agents to hesitate in performing their lawful duties, it threatens to irreparably harm the government and undermine the public interest.").

## B. The District Court's Contrary Rationales Are Wrong.

The district court discounted these obvious irreparable harms for two principal reasons, both of which are completely misguided.

The court first claimed that "Defendants themselves distinguished between below-ground and above-ground construction" for purposes of national security. Add.7. But Defendants *never* suggested in any way that the below-ground facilities were independent of the overall structure or could exist without appropriate above-ground building. Quite the opposite. Plaintiff repeatedly worried that the below-ground work would "lock in" the design and render futile any feedback that Defendants may receive from the National Capital Planning Commission or Commission of Fine Arts. Defendants responded that Plaintiff's fear was unwarranted: below-grade construction could accommodate "potential modifications" to the design, Dkt. 30-2, ¶ 12, such as relocating doors and stairs, Dkt. 30-4, ¶¶ 9-11. The point was that the minor design decisions

10

on which Plaintiff was focused were not driving below-ground construction (which was instead driven by national-security needs "independent" of those design choices, Dkt. 30 at 39), and would not be "locked in" by it, *id.* at 4. None of that suggests that the below-ground facilities could exist alone. They cannot, as clearly outlined here and in the original stay papers. Moreover, none of this discussion detracts from the critical security objectives served by the Project as an integrated whole.

The district court also rested heavily on the notion that "Defendants forged ahead and created" the safety hazards by demolishing the old East Wing—even calling this "the bottom line" of the analysis. Add.10. That improperly infects the equities with the court's (flawed) view of the merits. Defendants acted lawfully, and well within their congressionally delegated authority, by demolishing the old East Wing and beginning the construction of a modern, secure replacement. By freezing and delaying that much-needed Project, the injunction imposes irreparable harm. The district court's mistaken ruling on the merits is not a basis to discount the serious practical harms threatened by its order.

\*   \*   \*

Like the original injunction, the "clarified" one will cause multiple forms of serious irreparable harm if not stayed—incalculable harm to national security, months (at least) of added delay, tens of millions of dollars, or more, in extra cost, and an unsustainable and unlawful dynamic where the President's, his family's, and his staff's safety and security requirements are left at the mercy of a district judge enforcing a vague injunction. And, on the other side of the ledger, a stay will not work *any* harm to Plaintiff. The Trust concededly lacks a "personal or financial stake" in this litigation. Dkt. 2-2 ¶16, Instead, its declarant simply believed the renovation would cause aesthetic "harm to the White House." Dkt. 2-3 ¶13. That is not irreparable harm to the *plaintiff*. Besides, demolition of the old East Wing is complete, and leaving a gaping hole on White House grounds would exacerbate any supposed aesthetic harms. Particularly in light of the strength of Defendants' appeal on the merits, and the inability of Plaintiff to show any cognizable harm, the factors lopsidedly favor staying this unprecedented order pending appeal.

## CONCLUSION

The Court should enter a stay by April 21, 2026.  At a minimum, the Court should extend the administrative stay for an additional 14 days to allow the Solicitor General to seek relief in the Supreme Court.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ADAM R.F. GUSTAFSON
  *Principal Deputy Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant Attorney General*

PETER M. TORSTENSEN, JR.
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
 */s/ Brantley T. Mayers*
BRANTLEY T. MAYERS
  *Attorneys, Appellate Staff
  Civil Division, Room 3632
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 890-9874
  brantley.t.mayers@usdoj.gov*

MARISSA A. PIROPATO
  *Deputy Chief
    Environment and Natural
    Resources Division
    Natural Resources Section*

APRIL 2026

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion satisfies the type-volume requirements set out in Rule 27(d)(2)(A) because it contains 2337 words. This motion was prepared using Microsoft Word in Century Schoolbook, 14-point font, a proportionally spaced typeface.

/s/ Brantley T. Mayers
Brantley T. Mayers



ADDENDUM

# TABLE OF CONTENTS

Declaration of Matthew C. Quinn
(April 13, 2026) (Dkt. No. 69-1)..............................................Add.1

Memorandum Opinion Granting Motion to Clarify Preliminary
Injunction
(April 16, 2026) (Dkt. No. 72)...............................................Add.4

Amended Order Granting Second Preliminary Injunction
(April 16, 2026) (Dkt. No. 73)...............................................Add.14

Declaration of Daniel P. Driscoll
(April 17, 2026).......................................................................Add.17

Attachment A to Declaration of Daniel P. Driscoll:
Technical Analysis of Proposed East Wing Facility
(April 17, 2026).......................................................................Add.25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

       Plaintiff,

v.

NATIONAL PARK SERVICE, *et al.*,

       Defendants.

Case No. 1:25-cv-04316-RJL

## DECLARATION OF U.S. SECRET SERVICE
## DEPUTY DIRECTOR MATTHEW C. QUINN

I, **Matthew C. Quinn** declare as follows:

1. I am the Deputy Director of the United States Secret Service (Secret Service).

2. I previously submitted two declarations in this matter, filed on December 15, 2025, and January 15, 2026. Those declarations are incorporated herein by reference and, except as expressly stated below, to the best of my knowledge the statements contained in those declarations remain true and correct.

3. The Secret Service's mission, as codified at 18 U.S.C. §§ 3056, 3056A, is to protect the President (POTUS) and his family and secure the White House (WH) Complex. Protecting POTUS includes fortifying and strengthening structures to defend against current and future threats that our protectees visit, including WH grounds.

4. At this stage of the Project, numerous security risks are present. Specifically, the current unfinished construction site compromises the ability of Secret Service personnel, including Emergency Response Teams and tactical K-9 handlers, to readily traverse the White House Complex for evacuation or other protective security operations. Personnel also risk physical injuries from uncovered rebar and exposed cables around the site. The prolonged exposure of current obstructions creates a danger for USSS personnel to holistically provide a secure 360-degree perimeter to safely protect the President, First Family, and residence.

Add.1

5. The unfinished construction site also presents greater exposure to safety and security threats directed at the main White House and West Wing structures, as well as the underground construction. Specifically, Uniformed Division personnel will be hindered to effectively secure/defend the east side of the White House Building from an attack or security breach due to the current construction debris and large holes.

6. Given these security risks, along with the vulnerabilities of the already-constructed below-ground structures, leaving nothing on top of the below-ground construction is not an option.

7. The project is a single, coherent whole. An above-ground slab and topping structure is needed to ensure that key underground structures with a security purpose are properly protected and strengthened. Specifically, protective operations require an above-ground slab and topping structure that can accommodate the below ground structure with interoperable communications and infrastructure security systems relative to flood management and other utilities. In this way, below- and above-ground projects technically and structurally complement each other, and the below-ground construction has already been done with that expectation of what would go above. As the below-ground construction nears completion, it is critical to resolve the above-ground enclosure for cohesive construction that allows safe passage and accommodates the protective security measures relied upon by the Secret Service, including fortified security screening stations, barriers, gates, guard booths, and alarm and camera systems.

8. Current plans include security features that are critical to the protection of the President, his family, his staff, and the WH Complex, including security features that support below-ground elements that enhance overall safety for all WH occupants. For example, the current plans include threat resistant building materials such as bullet- and blast-proof glass and windows that enhance security measures at the WH Complex and improve upon prior East Wing capabilities.

9. Leaving the project site unfinished imperils the ability of the Secret Service to meet its statutory mission to protect the President, First Family, and White House Complex. The current unfinished construction site is, in and of itself, a coordinated and managed safety hazard for the reasons stated above. While the entire Project will not be completed for some time, the known vulnerabilities in the prior East Wing, and the ongoing vulnerabilities from entertaining foreign leaders and others in soft tents demand resolution without delay. Every day added to the Project is another day impairing full security.

10. For these reasons, completion of an enclosed above-ground structure on the East Wing will strengthen the ability of the Secret Service to protect the President and secure the Complex because it will provide a fixed structure equipped with the above-mentioned modern protective security measures, including threat-resistant building materials, and serve as a

Add.2

fortified structural buffer that better insulates and supports both the main White House and West Wing structures.

11. Consistent with its statutory protection mission, the Secret Service provided fulsome input for the protective security elements of the East Wing construction project. The existing construction plan incorporates all Secret Service security requirements. Any deviations from the construction plan and its prescribed timeline may change the type of building materials, including windows, steel, and/or other security systems that are currently contemplated in the plan. Delays may cause a decrease in the overall security of the complex if the USSS is not allotted sufficient time to order, produce, and install recommended security systems and infrastructure components.

12. Uncertainty about what work is permissible and the need for constant approvals is extremely difficult. The security design was carefully developed and vetted. Stop-and-start delays as each ensuing portion of the project must get litigated would compromise the timeline of the Project and unduly prolong critically necessary security steps. Moreover, any delay in construction of the project may permit adversaries to view the elements of construction, identify vulnerabilities, and pose ongoing national security risks to a critical piece of White House infrastructure that is necessary to safeguarding the President on a prospective basis. Judicial pre-approval also might require the need to divulge classified information about presidential protection or to otherwise disclose the exact function served by each portion of the design, which raises concerns about ensuring presidential safety.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 13, 2026.

Matthew C. Quinn
Deputy Director
United States Secret Service

Add.3

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES, <br>         Plaintiff, <br><br>     v. <br><br> NATIONAL PARK SERVICE, *et al.*, <br><br>         Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Case No. 25-4316 (RJL)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OPINION**
April 16ᵗʰ, 2026 [Dkt. #65, 71]

On March 31, 2026, I granted the motion of the National Trust for Historic Preservation in the United States ("National Trust") for a preliminary injunction to halt construction of a ballroom on White House grounds as *ultra vires*. In recognition of the national security and presidential security concerns raised by the ongoing construction project, I excluded from the scope of the injunction "actions strictly necessary to ensure the safety and security of the White House and its grounds, including the ballroom construction site, and provide for the personal safety of the President and his staff." Defendants now seek to turn this exception on its head and unreasonably insist that the entire ballroom project may proceed. Based on the record before me, I cannot possibly agree, but I will clarify the scope of the injunction as described below.

1

Add.4

## BACKGROUND

On March 31, 2026, I granted the National Trust's motion for a preliminary injunction. *See* Mem. Op. [Dkt. #60]; Prelim. Inj. Order [Dkt. #61]. The Order preliminarily enjoined Defendants (excluding the President) from "taking any action in furtherance of the physical development of the proposed ballroom at the former site of the East Wing of the White House, including but not limited to any further demolition, site preparation work, landscape alteration, excavation, foundation work, or other construction or related work[.]" Prelim. Inj. Order at 2. My Order excluded from the scope of the injunction "actions strictly necessary to ensure the safety and security of the White House and its grounds, including the ballroom construction site, and provide for the personal safety of the President and his staff" (the "safety-and-security exception"). *Id.*

On April 1, the National Trust, citing public statements by the President interpreting my Order, filed a motion for clarification of the preliminary injunction ("Motion to Clarify"). *See* Mot. for Clarification [Dkt. #65]. Defendants meanwhile, not surprisingly, filed an appeal and an emergency motion to stay. *See* Emergency Mot. for Stay Pending Appeal, *Nat'l Tr. for Hist. Pres. v. NPS*, No. 26-5101 (D.C. Cir. Apr. 3, 2026) [Dkt. #2167119]. On April 11, our Circuit Court remanded the case "with instructions to promptly address the pending motion to clarify how the injunction and its exception ensure safety and security pending litigation" and extended my temporary stay of the preliminary injunction to April 17, 2026. Order, *Nat'l Tr. for Hist. Pres. v. NPS*, No. 26-5101 (D.C. Cir. Apr. 11, 2026) ("Per Curiam Order") [Dkt. #2168165]. On April 13, Defendants filed their opposition ("Defs.' Opp'n") [Dkt. #69] to the National Trust's motion to clarify and

2

Add.5

attached a Secret Service declaration. *See* Decl. of U.S. Secret Service Deputy Director Matthew C. Quinn ("Third Quinn Decl.") [Dkt. #69-1]. On April 14, the National Trust filed a reply in support of its motion. Reply in Supp. of Mot. for Clarification ("Reply") [Dkt. #70]. That same day, Defendants filed a motion seeking a further 14-day stay of the preliminary injunction. Mot. to Extend Administrative Stay of Prelim. Inj. [Dkt. #71]. The motions are now ripe for decision.

## DISCUSSION

Defendants argue that the entire ballroom construction project, from tip to tail, falls within the safety-and-security exception and therefore may proceed unabated. That is neither a reasonable nor a correct reading of my Order! My Order preliminarily enjoined Defendants (excluding the President) from "taking any action in furtherance of the physical development of the proposed ballroom." Prelim. Inj. Order at 2. The accompanying opinion stated that "the ballroom construction project must *stop* until Congress authorizes its completion." Mem. Op. at 1 (emphasis added). It is, to say the least, incredible, if not disingenuous, that Defendants now argue that my Order does *not* stop ballroom construction because of the safety-and-security exception!

For the reasons that follow, I will further clarify and amend my Order to stop only above-ground construction of the planned ballroom. My Amended Order does not, however, stop below-ground construction of national security facilities, work necessary to provide for presidential security, and construction necessary to protect and secure the White House and the construction site itself.

*First*, limiting the scope of the injunction to above-ground construction directly

3

Add.6

addresses the National Trust's irreparable harm, which stems from the above-ground, visible construction of the ballroom. *See* Mem. Op. at 29–32; *see also* Pl.'s Mem. in Supp. of Prelim. Inj. [Dkt. #51-1] at 24–25 ("[T]he National Trust has never requested . . . that the Court enjoin construction of a *bunker*. The National Trust is simply requesting that the Court enjoin construction of the *Ballroom*."). My Order barring above-ground construction provides "complete relief" to the National Trust, while minimizing the "burden[]" to Defendants through the safety-and-security exception. *See Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

*Second*, the injunction excludes only below-ground construction because, throughout this case, Defendants raised discrete national security concerns about construction of *underground* elements. Early on, Defendants argued that "security concerns . . . warrant[ed] permitting the current below-grade construction to continue." Defs.' TRO Opp'n [Dkt. #15-1] at 27; *see also* TRO Hr'g Tr. [Dkt. #18] at 20:22-24 ("[T]he below-ground work that's occurring now has nothing to do with Plaintiff's asserted aesthetic injury, and that work must continue for national security reasons."). Specifically, Defendants indicated that national security-related facilities are being constructed below ground. *See, e.g.*, Defs.' Suppl. Br. [Dkt. #30] at 41 (referencing a "security bunker" and stating that "an injunction halting construction would endanger national security").

The exception for underground national security facilities does not include the proposed ballroom because Defendants themselves distinguished between below-ground and above-ground construction, stating that "the below-surface work is driven by national security concerns *independent of* the above-grade construction." Defs.' Suppl. Br. at 39

4

Add.7

(emphasis added); *see also* Decl. of Professional Engineer [Dkt. #30-4] at ¶ 5 (referencing the "national security concerns with aspects of the below grade structure"). Defendants also repeatedly represented that the project's below-ground elements do not "lock in" the design of the above-ground ballroom. Defs.' Suppl. Br. at 4; *see also* Defs.' Mot. to Modify Schedule [Dkt. #22] ¶ 4; Defs.' Mot. to Stay [Dkt. #39] at 2; *cf.* Decl. of John Stanwich ("Stanwich Decl.") [Dkt. #14-6] ¶ 21 (noting the below-ground elements could be "constructed as planned while the above grade design is finalized").

Defendants now brazenly assert that below-ground construction has "been done with th[e] expectation of what would go above," and that the "project is a single, coherent whole." Third Quinn Decl. ¶ 7. Defendants argue that security-related elements of the ballroom, such as "missile-resistant steel columns and beams, drone-proof roofing, and bullet- and blast-proof glass windows" will "advance safety and security interests as part of an inseparable whole." Defs.' Opp'n at 3. Defendants further argue that "leaving the site as it stands poses serious safety and security threats that can only be addressed by proceeding with construction as planned." *Id.* In my view, these arguments fail to justify Defendants' extraordinary, if not disingenuous, reading of my preliminary injunction Order.

Indeed, Defendants' latest representations that "the entire project advances critical national-security objectives as an integrated whole," *see* Defs.' Opp'n at 1, are in direct conflict with Defendants' prior representations that the above-ground and below-ground portions of the project were "independent of" one another, *see* Defs.' Suppl. Br. at 39. Defendants now insist that the "overall above-ground ballroom is necessary to

5

Add.8

accommodate and effectuate the below-ground additions (including by providing adequate, reinforced cover)." Defs.' Opp'n at 3. But Defendants do not explain why the proposed 90,000-square-foot ballroom—the source of the National Trust's claimed injury and likely unauthorized by statute—is required for security purposes *now*. Instead, the supporting declaration states merely that an "above-ground slab and topping structure is [sic] needed" to protect the underground elements. Third Quinn Decl. ¶ 7; *see also id.* ¶ 6 ("[L]eaving nothing on top of the below-ground construction is not an option."). As I clarify below, Defendants may, consistent with the injunction, cover and secure the below-ground construction while litigation proceeds. Further, while Defendants predicted in December that above-ground construction would begin, at the earliest, this month, *see* Stanwich Decl. ¶ 20, Defendants, to date, have not provided any updates on whether the below-ground facilities are ready for a "topping structure."

The fact that the ballroom is planned to include security features such as bullet-proof windows and a drone-proof roof does not bring the structure within the scope of the exception. While these features may well be beneficial, Defendants have not provided any national security justification for why these features must be installed *immediately* such that they should be excluded from the scope of the injunction. Nor does it appear Defendants could install these features immediately even if they wanted to. As noted by our Circuit Court, the ballroom's planned security features are still months, if not years, away from being realized—belying Defendants' argument that an inability to implement those features *now* imposes irreparable harm. Per Curiam Order at 3; Defs.' Opp'n at 4 (acknowledging that "the project is expected to take another two years until completion").

6

Add.9

Defendants' insistence that leaving the site "dormant" poses additional security risks also fails. As an initial matter, my Amended Order permits below-ground construction, measures for presidential security, and measures to secure the grounds. Further, I previously rejected Defendants' argument that "any construction delay will undermine national security," Mem. Op. at 33, because—and here is the bottom line—Defendants themselves forged ahead and created this "coordinated and managed safety hazard" on White House grounds, *id.* (quoting Decl. of U.S. Secret Service Deputy Director Matthew C. Quinn ("Second Quinn Decl.") [Dkt. #30-5] ¶ 8).

Defendants' four classified *ex parte* declarations, all of which I reviewed and have taken into consideration, *see* Mem. Op. at 33 n.20, shed no further light on the question of whether the above-ground ballroom is necessary for national security. Without more, I cannot find that above-ground construction of the proposed ballroom *must* proceed.[1]

Apart from the below-ground national security facilities, Defendants have identified two additional categories of construction "necessary" for presidential security and the safety of the White House grounds. Second Quinn Decl. ¶ 6. Defendants indicated that the Secret Service is "coordinat[ing] with the [ballroom] contractor on . . . temporary measures to ensure the security and safety of the President, the First Family, and the White House complex." Decl. of U.S. Secret Service Deputy Director Matthew C. Quinn ("First

---

[1] To be sure, Defendants have, at times, represented that it would be "unworkable to distinguish between construction elements that are national-security related and those that are not." Defs.' Mot. to Stay [Dkt. #39] at 2; Defs.' Opp'n to Renewed Mot. for Prelim. Inj. at 36. Arguments about workability are distinct from asserting that the entire ballroom is a national security imperative. In any event, my Amended Order permitting below-ground construction mitigates at least some workability concerns.

Add.10

Quinn Decl.") [Dkt. #14-11] ¶ 7.  According to the Secret Service, "[t]hese outstanding security projects are expected to require additional weeks or months to complete." Second Quinn Decl. ¶¶ 5–6.

Defendants have also indicated a need to preserve and protect the structural integrity of the White House and to protect the construction site itself from deterioration due to the elements. *See* Second Quinn Decl. ¶ 6 (noting that "continued waterproofing and water management is necessary to maintain the integrity of security elements throughout the Complex as flooding poses risks to infrastructure, utilities, and other critical systems"); Defs.' Suppl. Br. at 40 (explaining that "below-ground work on waterproofing, security improvements, and utility infrastructure will have to take place at some point regardless of what is erected above-ground"); Defs.' Opp'n to Renewed Mot. for Prelim. Inj. [Dkt. #52] at 34 (halting all construction "would expose the Executive Mansion to damage").  Both categories of construction activities may proceed.

*        *        *

In light of the National Trust's motion and the parties' arguments, and in consideration of Defendants' concerns about national security and presidential security, I will hereby clarify and amend my preliminary injunction Order to specify that *below-ground construction* may proceed, including the construction of any "top-secret excavations, bunkers, bomb-shelters, protective partitioning, military installations, and hospital and medical facilities," as well as such above-ground construction strictly

8

Add.11

necessary to cover, secure, and protect such facilities. Defs.' Opp'n at 2. The Amended Order permits "temporary measures," First Quinn Decl. ¶ 7, which have already been in place, to provide for the personal security of the President. The Amended Order also permits construction necessary to protect the project site and to protect the structural integrity of the White House complex, including waterproofing, water management, and resolving construction risks such as "uncovered rebar and exposed cables around the site." Third Quinn Decl. ¶ 4. However, the injunction does *not* permit above-ground construction of the proposed ballroom.

The Court has taken Defendants' invocation of national security and presidential security seriously throughout this case, which is why I included a safety-and-security exception in my original Order. But national security is not a blank check to proceed with otherwise unlawful activity, and belated assertions that the above-ground ballroom is "inseparable" from an array of security features, *see* Defs.' Opp'n at 3, are not an occasion for this Court to reweigh the equities or reconsider the preliminary injunction! In my view, the safety-and-security exception, as clarified, permits measures critical to national and presidential security to move forward pending final resolution of this case and any appeal.[2]

---

[2] Defendants insist that their arguments about national security cannot be subject to "judicial second-guessing." Defs.' Opp'n at 4. Indeed, precedent "counsel[s] deference in national security matters." *Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 927 (D.C. Cir. 2003). But judicial deference is not the same as withholding judicial review altogether. *See id.* at 928 (applying deference "so long as the government's declarations raise *legitimate* concerns [about] national security" (emphasis added)); *see also United States v. Zubaydah*, 595 U.S. 195, 205 (2022) (in context of military secrets privilege, a "court must decide for itself whether the occasion is appropriate for claiming the privilege"); *TikTok Inc. v. Garland*, 604 U.S. 56, 82 (2025) (Gorsuch, J., concurring in the judgment) (noting that the Supreme Court "decline[d] to consider the classified evidence the government has submitted to us"). Indeed, two of my colleagues recently granted preliminary injunctions notwithstanding the Government's invocation of national security concerns and reliance on classified declarations. *See* Hr'g Tr. at 43:11–14, 44:4–10, *Rhode Island v. U.S.*

9

I will close by noting that I have no desire or intention to be dragooned into the role of construction manager. Contrary to Defendants' suggestion, I have never required Defendants to "request and receive written approval" before proceeding with construction. Defs.' Opp'n at 4. The purpose of this opinion is merely to clarify that the injunction does, in fact, stop construction of the above-ground ballroom. I trust that Defendants will be able to implement my Amended Order in good faith and with the benefit of this clarification once my Amended Order goes into effect. In recognition of Defendants' concerns and for the reasons stated in my opinion, *see* Mem. Op. at 34, I will extend the temporary stay by seven (7) days after the issuance of this opinion and Amended Order.[3]

For the foregoing reasons, it is hereby **ORDERED** that the National Trust's Motion to Clarify [Dkt. #65] is **GRANTED**, and Defendants' Motion to Extend Administrative Stay of Preliminary Injunction [Dkt. #71] is **GRANTED** in part and **DENIED** in part. An Amended Order will issue contemporaneously with this opinion.

RICHARD J. LEON
United States District Judge

---

*Dep't of Interior*, No. 25-cv-4328 (D.D.C. filed Jan. 12, 2026) [Dkt. #55] (noting government's "failure to explain or apply . . . [the] stated national security reason"); Min. Order, *Empire Leaseholder LLC v. Burgum*, No. 26-cv-4 (D.D.C. filed Jan. 15, 2026).

[3] The Court gives fair notice to Defendants, however, that any above-ground construction over the next seven days that is not in compliance with my Amended Order is at risk of being taken down pending the resolution of this case.

10

Add.13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,
          Plaintiff,

      v.

NATIONAL PARK SERVICE, *et al.*,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Case No. 25-4316 (RJL)

## AMENDED ORDER
April 16ᵗʰ, 2026 [Dkt. #65, 71]

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the Court's March 31, 2026 Order [Dkt. #61] is **VACATED** and

**SUPERSEDED** by this Order; and it is further

**ORDERED** that Plaintiff's Second Motion for Preliminary Injunction [Dkt. #51] is

**GRANTED**; and it is further

**ORDERED** that Plaintiff's Motion to Clarify [Dkt. #65] is **GRANTED**; and it is

further

**ORDERED** that the National Park Service; Jessica Bowron, in her official capacity

as Acting Director, National Park Service; John Stanwich, in his official capacity as

Superintendent, the White House and President's Park; the Department of the Interior;

Douglas Burgum, in his official capacity as Secretary of the Interior; the General Services

1

Add.14

Administration; Michael J. Rigas, in his official capacity as Acting Administrator, General Services Administration; the Executive Office of the President; Susie Wiles, in her official capacity as White House Chief of Staff; the Office of the Executive Residence; and Robert B. Downing, in his official capacity as White House Chief Usher (together, "Defendants"), and any agents of Defendants or any other persons working at their direction or in active concert therewith, are preliminarily **ENJOINED** from taking any action in furtherance of the above-ground, physical construction of the proposed ballroom at the former site of the East Wing of the White House; and it is further

**ORDERED** that this Order does not prohibit below-ground construction, including below-ground construction of national security facilities, as well as above-ground construction short of constructing the proposed above-ground ballroom that is strictly necessary to cover, secure, and protect such national security facilities, provided that any such construction will not lock in the above-ground size and scale of the ballroom; and it is further

**ORDERED** that this Order does not prohibit measures strictly necessary to provide for the personal safety of the President and his staff short of constructing the proposed above-ground ballroom and provided that any such construction will not lock in the above-ground size and scale of the ballroom; and it is further

**ORDERED** that this Order does not prohibit construction strictly necessary to ensure the safety, security, and structural integrity of the White House, the White House grounds, and the below-ground construction site—including waterproofing, water management, structural reinforcement, and sealing off exposed construction areas—short

2

Add.15

of constructing the proposed above-ground ballroom and provided that any such construction will not lock in the above-ground size and scale of the ballroom; and it is further

**ORDERED** that, subject to the safety-and-security exceptions above, no such work shall proceed absent express authorization from Congress; and it is further

**ORDERED** that Defendants' counsel shall provide written notice of this Order to all officers, agents, successors, servants, employees, and attorneys of Defendants, as well as any other persons working at their direction, in active concert therewith, or subject to Defendants' control; and it is further

**ORDERED** that Defendants' Motion to Extend Administrative Stay of Preliminary Injunction [Dkt. #71] is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that this Order shall take effect seven (7) days after its issuance; and it is further

**ORDERED** that Defendants shall file a status report apprising the Court of the status of their compliance with this Order no later than twenty-one (21) days after the date the Order takes effect; and it is further

**ORDERED** that the security requirement is hereby waived, *see* Fed. R. Civ. P. 65(c).

**SO ORDERED.**

RICHARD J. LEON
United States District Judge

3

Add.16

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

NATIONAL TRUST FOR HISTORIC PRESERVATION
IN THE UNITED STATES,

Plaintiff-Appellee,

v.

NATIONAL PARK SERVICE, et al.,

Defendants-Appellants.

---

On Appeal from the United States District Court
for the District of Columbia

---

## DECLARATION OF DANIEL P. DRISCOLL

---

I, Daniel P. Driscoll, declare as follows:

1. I currently serve as the 26th Secretary of the Army and Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). I submit this declaration based upon my personal knowledge, my professional experience, and information made available to me in my official capacity. This includes technical input and assessments provided by the Commanding General of the U.S. Army Corps of Engineers, as detailed in the memorandum dated 17 April 2026, which is appended hereto as Attachment A.

2. The United States Army is the United States Government's foremost authority in three critical domains: air and missile defense, as the world's pre-eminent land-based air defender; structural hardening, through the U.S. Army Corps of Engineers (USACE); and Unmanned Aircraft System (UAS) threat assessment, as the lead executive agent for Joint Interagency Task Force 401 (JIATF-401). The U.S. Army's Engineer Research and Development Center (ERDC) is the world's premier expert in military engineering, installations and operational environments, civil works, geospatial research and engineering, and engineered resilient systems. In fact, U.S. Central Command leveraged the ERDC to bolster critical infrastructure protection in its theater of operations against Iranian missile and drone threats.

3. While the East Wing construction project has been the subject of political discourse, this declaration is driven exclusively by the objective national security imperative to protect our nation's pinnacle command and control node.

4. This declaration addresses the district court's suggestion that the new below-ground facilities can be adequately secured by placement of a slab and "topping structure" rather than the structure that has been

designed for that purpose. For the reasons explained below, that is not sufficient, and the Department of the Army therefore recommends immediate completion of White House East Wing construction as designed to mitigate identified threat vulnerabilities and resolve what is fundamentally a defensive posture emergency.

5. Planned construction and security enhancements establish a robust, defense-in-depth architecture designed to harden the Presidential Emergency Operations Center (PEOC) against modern multi-domain threats. This is a necessary security improvement to face a modern UAS threat that did not exist at scale until recent years, providing a vital capability that will benefit all Americans and all future administrations.

6. The world is becoming more dangerous, with adversaries employing commercially available and military-grade UAS capable of precision strikes, delayed-fuze penetrators, and swarm tactics. As observed in the current conflict in Ukraine, modern command and control must be moved underground and remain entirely self-sufficient to survive. However, these below-grade portions do not exist in a vacuum; the structure of the entire building plays a role in the

defensive design. Attempting to complete only the subterranean portion of this facility is not a viable engineering approach. To provide adequate subterranean protection without the above-ground structure, engineers would need to dig impractically deep. The height and mass of the completed East Wing are crucial, providing both the physical layers to shield the complex from kinetic impacts and the essential elevated platform to engage and neutralize aerial systems at standoff distances. It is a simple fact in warfare that an elevated position provides superior observation and fields of fire, guaranteeing a defensive advantage.

7. The United States Army has been deeply involved in the East Wing construction project throughout the critical design phases given that protection of the PEOC directly affects the ability to command and control the United States military. The Army has maintained an interagency agreement with the United States Secret Service for decades, and they specifically asked for ERDC support with this project. Applying our unique proficiency in threat reduction and advanced engineering, we can confidently validate the East Wing's proposed design. This validation is further detailed and technically

supported by the accompanying assessment by the Chief of Engineers. In this heightened threat environment, the equities of protecting national leadership and strategic command and control unequivocally outweigh other equities.

8. One of the most effective passive design measures to defeat emerging kinetic threats, particularly explosively armed UAS, is the implementation of a dual-layered system comprising a sacrificial outer cover coupled with a hardened inner structural element. The sacrificial overhead cover serves as a triggering layer designed to pre-detonate the explosive charge before it can reach the primary inhabited structure. From a civil engineering perspective, this outer layer forces the detonation to occur at a designated distance, creating a critical air gap known as standoff or "attic depth." By enforcing this geometry, the system effectively converts a localized, high-intensity near-contact detonation into a distributed, lower-magnitude blast wave that decays exponentially over distance.

9. To achieve this pre-detonation, the sacrificial outer cover acts as a "burster slab" or triggering mechanism to initiate point-detonating or variable-time fuzes upon impact. This layer is constructed from

materials specifically selected to function or dud the expected incoming fuzes. The material must possess sufficient areal density and structural hardness to impart the necessary shock and deceleration to reliably trigger the fuze before the weapon can perforate the layer. Even though the outer cover is fully expected to be sacrificed during the explosive event, its initial resistance is critical to the system's overall success.

10. Beneath this outer cover lies the standoff distance, or attic depth, which leverages the cube-root scaling law of blast dynamics. This critical air gap provides the necessary volume for the high-velocity explosive gases to expand while allowing both primary weapon fragmentation and secondary debris to disperse. By enforcing this separation, the equivalent static blast pressure and localized density of fragment impacts are significantly reduced before interacting with the primary structural shield. The minimum required air gap must be dynamically designed based on the expected threat payload size and fragmentation matrix.

11. The hardened inner shielding layer is engineered to absorb the residual blast load and arrest any fragmentation that penetrates the

attic space. Designed using blast-resistant engineering principles consistent with Unified Facilities Criteria (UFC) 3-340-01 (Design & Analysis of Hardened Structures), this inner layer prioritizes mass and ductility to yield without catastrophic rupture. A critical design requirement is the prevention of spalling or scabbing, the violent ejection of material from the interior face caused by reflecting stress waves. To mitigate this, the inner shield utilizes specialized construction materials, such as reinforced concrete detailed with interior spall plates or heavy structural steel. Furthermore, the primary support structure is dynamically analyzed to withstand progressive collapse, dynamic rebound forces, and potential post-attack fires. Because the hardened inner shield will rapidly accelerate and decelerate while absorbing blast energy, the structural design accounts for severe in-structure shock.

12. This assessment reflects the Army's continuous, deeply integrated role in the facility's development throughout its critical design phases, rather than an isolated or retroactive review. Ultimately, these structural hardening and counter-threat integrations are essential to national security. As modern asymmetric threats have rapidly

evolved, they have surpassed the defensive design parameters of legacy campus infrastructure, necessitating a purpose-built, hardened East Wing to protect the President and key staff. Furthermore, relying on evacuation is tactically flawed; moving the President off-site activates highly sensitive Continuity of Operations (COOP) assets and movement protocols that are inherently degraded once exposed. Securing this reinforced subterranean node is essential to ensure uninterrupted command and control in place. Finalizing this defense-in-depth architecture is a prerequisite to ensure the President can maintain continuity of government and operations, and effectively exercise National Command Authority during an attack or global crisis.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 17, 2026.

DANIEL P. DRISCOLL

*Secretary of the Army*

**ATTACHMENT A**



**DEPARTMENT OF THE ARMY**
U.S. ARMY CORPS OF ENGINEERS
441 G STREET, NW
WASHINGTON, DC 20314-1000

CECG

17 April 2026

MEMORANDUM FOR SECRETARY OF THE ARMY

SUBJECT: Technical Analysis of Proposed East Wing Facility and Passive Design Measures to Defeat Emerging Kinetic Threats

1. I have reviewed and am personally familiar with the current and proposed national security protection measures integrated into the White House Campus complex, including the Presidential Emergency Operations Center (PEOC). These measures are designed to ensure both the physical protection of the occupants of the White House campus complex and to ensure the seamless continuity of government during the Nation's times of most exigent crisis. Based on my professional review of the current and proposed national security facilities within the White House East Wing construction project, I recommend the immediate completion of the White House East Wing construction project in its entirety.

2. Because of the national security implications of the PEOC, the U.S. Army Corps of Engineers, Engineer Research and Development Center (ERDC) has reviewed the aboveground construction documents and advised from a civil engineering and force protection perspective. ERDC is the Army's preeminent R&D capability for protective measures. ERDC combines advanced engineering techniques with high-performance computing to develop concepts and tools that significantly amplify design options examined during early stages of the acquisition process. I have also personally conducted an on-site assessment of the current construction operations.

3. Planned construction and security enhancements establish a robust, defense-in-depth architecture designed to harden the PEOC against modern multi-domain threats. This is a necessary security improvement to face a modern Unmanned Aerial System (UAS) threat that did not exist at scale until recent years, providing a vital capability that will benefit all Americans and all future administrations.

4. The world is becoming more dangerous, with adversaries employing commercially available and military-grade UAS capable of precision strikes, delayed-fuze penetrators, and swarm tactics. As observed in the current conflict in Ukraine, modern command and control must be moved to a location with sufficient overhead structure and remain entirely self-sufficient to survive. Combat experience has proven, however, that any below-grade portions do not exist in a vacuum; the structure of the entire building plays an indispensably crucial role in the defensive design. To provide adequate subterranean protection without the above-ground covering structure, engineers would need to dig impractically deep to achieve sufficient protection. The height and mass of the completed proposed East Wing facility both provide crucial, physical layers to shield the complex from kinetic impacts and the essential elevated platform to engage and neutralize aerial systems at standoff distances.

Add.26

5. One of the most effective passive design measures to defeat emerging kinetic threats, particularly explosively armed UASs, is the implementation of a dual-layered system comprising a sacrificial outer cover coupled with a hardened inner structural element. The sacrificial overhead cover serves as a triggering layer designed to pre-detonate the explosive charge before it can reach the primary inhabited structure. From a civil engineering perspective, this outer layer forces the detonation to occur at a designated distance, creating a critical air gap known as standoff or "attic depth." By enforcing this geometry, the system effectively converts a localized, high-intensity near-contact detonation into a distributed, lower-magnitude blast wave that decays exponentially over distance.

6. To achieve this pre-detonation, the sacrificial outer cover acts as a "burster slab" or triggering mechanism to initiate point-detonating or variable time fuzes upon impact. This layer is constructed from materials specifically selected to function or dud the expected incoming fuzes. The material must possess sufficient areal density and structural hardness to impart the necessary shock and deceleration to reliably trigger the fuze before the weapon can perforate the layer. The initial resistance of the outer cover is critical to the system's overall success.

7. Beneath this outer cover lies the standoff distance, or attic depth, which leverages the cube-root scaling law of blast dynamics. This critical air gap provides the necessary volume for the high-velocity explosive gases to expand while allowing both primary weapon fragmentation and secondary debris to disperse. By enforcing this separation, the equivalent static blast pressure and localized density of fragment impacts are significantly reduced before interacting with the primary structural shield. The minimum required air gap must be dynamically designed based on the expected threat payload size and fragmentation matrix.

8. The hardened inner shielding layer is engineered to absorb the residual blast load and arrest any fragmentation that penetrates the attic space. Designed using blast-resistant engineering principles consistent with Unified Facilities Criteria 3-340-01 (Design & Analysis of Hardened Structures), this inner layer prioritizes mass and ductility to yield without catastrophic rupture. A critical design requirement is the prevention of spalling or scabbing, the violent ejection of material from the interior face caused by reflecting stress waves. To mitigate this, the inner shield utilizes specialized construction materials, such as reinforced concrete detailed with interior spall plates or heavy structural steel.

9. The primary support structure must be dynamically analyzed to withstand progressive collapse, dynamic rebound forces, and potential post-attack fires. Because the hardened inner shield will rapidly accelerate and decelerate as it absorbs the blast energy, the design must carefully account for severe in-structure shock.

10. Ultimately, these structural hardening and counter-threat integrations are essential to national security and cannot be dissected from the proposed structure in its entirety. The West Wing is not designed to withstand modern asymmetric attacks.

WILLIAM H. GRAHAM, JR.
Lieutenant General, USA
Commanding