**[ORAL ARGUMENT SCHEDULED FOR JUNE 5, 2026]**

**Nos. 26-5123, 26-5134**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL TRUST FOR HISTORIC PRESERVATION
IN THE UNITED STATES,
Plaintiff-Appellee/Cross-Appellant,

v.

NATIONAL PARK SERVICE, *et al.*,
Defendants-Appellants/Cross-Appellees.

On Appeal from the United States District Court
for the District of Columbia

## BRIEF FOR APPELLANTS/CROSS-APPELLEES

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant
Attorney General*

*Environment and Natural
Resources Division*

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant
Attorney General*

BRANTLEY T. MAYERS
*Attorney
Civil Division, Room 3632
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202)890-9874*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel certifies as follows:

## A.    Parties and Amici

Plaintiff-appellee/cross-appellant is the National Trust for Historic Preservation in the United States.

Defendants-appellants/cross-appellees are the National Park Service; Jessica Bowron, in her official capacity as Acting Director, National Park Service; John Stanwich, in his official capacity as Superintendent, the White House and President's Park; the Department of the Interior; Douglas Burgum, in his official capacity as Secretary of the Interior; the General Services Administration; Michael J. Rigas, in his official capacity as Acting Administrator, General Services Administration; Donald J. Trump, in his official capacity as President of the United States; Executive Office of the President; Susie Wiles, in her official capacity as White House Chief of Staff; Office of the Executive Residence; and Robert B. Downing, in his official capacity as White House Chief Usher.

No amici have appeared to date in this Court or the district court.

**B.     Rulings Under Review**

Defendants appeal from the memorandum opinion (Dkt. 72) and order (Dkt. 73) issued by the district court (Leon, J.) on April 16, 2026, granting plaintiff's motion for clarification and entering an amended preliminary injunction.    Plaintiff conditionally cross-appeals from the memorandum opinion (Dkt. 47) and order (Dkt. 48) issued on February 26, 2026, denying its first motion for a preliminary injunction.

**C.     Related Cases**

This case was previously before this Court.  *See National Trust for Historic Preservation in the United States v. National Park Service*, Nos. 26-5101, 26-5108.  Undersigned counsel is unaware of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

*/s/ Brantley T. Mayers*
BRANTLEY T. MAYERS

**TABLE OF CONTENTS**

**Page**

GLOSSARY

INTRODUCTION ............................................................................................1

STATEMENT OF JURISDICTION ...............................................................7

STATEMENT OF THE ISSUE ......................................................................8

PERTINENT STATUTES AND REGULATIONS .......................................8

STATEMENT OF THE CASE .......................................................................8

    A.    Statutory And Historical Background ..........................................8

    B.    Factual Background ......................................................................11

    C.    Procedural Background ................................................................14

SUMMARY OF ARGUMENT ......................................................................18

STANDARD OF REVIEW ...........................................................................22

ARGUMENT .................................................................................................22

I.    The Trust Unquestionably Lacks Article III Standing .........................22

    A.    The Psychological Harm Of Being Offended Is
        Not An Injury-In-Fact ..................................................................26

    B.    The White House Is Not Germane To The Trust's
        Purposes .......................................................................................29

II. The Trust Cannot Succeed On The Merits Because Congress Has Doubly Authorized The President To Renovate The White House ........................................................34

A. 3 U.S.C. § 105(d) Expressly Authorizes The President To "Alter" And "Improve" The White House................................35

B. The NPS Organic Act Permits Construction In National Parks, Including President's Park...................................43

C. The Project Does Not Violate 40 U.S.C. § 8106 ............................49

III. The Balance Of Equities Independently Compels Reversal..................53

CONCLUSION....................................................................................60

CERTIFICATE OF COMPLIANCE

ADDENDUM

**TABLE OF AUTHORITIES**

**Cases:** **Page(s)**

*Ali v. Federal Bureau of Prisons,*
552 U.S. 214 (2008) ............................................................................ 40

*Ateba v. Leavitt,*
133 F.4th 114 (D.C. Cir. 2025) ........................................................ 51

*Bicycle Trails Council of Marin v. Babbitt,*
82 F.3d 1445 (9th Cir. 1996) ............................................................ 49

*Center for Biological Diversity v. U.S. EPA,*
937 F.3d 533 (5th Cir. 2019) ..................................................... 25, 27

*Center for Biological Diversity v. U.S. Fish & Wildlife Serv.,*
146 F.4th 1144 (D.C. Cir. 2025) ......................................................29

*Center for Sustainable Economy v. Jewell,*
779 F.3d 588 (D.C. Cir. 2015).........................................................29

*\*Changji Esquel Textile Co. v. Raimondo,*
40 F.4th 716 (D.C. Cir. 2022) .................................................... 35, 41

*Columbia Gas Transmission, LLC v. 1.01 Acres,*
768 F.3d 300 (3d Cir. 2014) ............................................................. 58

*Dalton v. Specter,*
511 U.S. 462 (1994) ...................................................................... 14-15

*DOT v. Association of Am. R.Rs.,*
575 U.S. 43 (2015).............................................................................32

*\*Environmental Def. Fund v. FERC,*
2 F.4th 953 (D.C. Cir. 2021) .............................. 24, 25, 26, 28, 29

*\*FDA v. Alliance for Hippocratic Med.,*
602 U.S. 367 (2024) .................................................... 24, 27, 31

*\*Federal Express Corp. v. U.S. Dep't of Com.,*
39 F.4th 756 (D.C. Cir. 2022) ................................................ 19, 35

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ............................................................ 51

*Global Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ..................................... 22, 52

*Hunt v. Washington State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ............................................................ 23

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)......................................................26, 27

*Murthy v. Missouri*,
603 U.S. 43 (2024) ............................................................ 31

*National Fam. Plan. & Reprod. Health Ass'n v. Gonzales*,
468 F.3d 826 (D.C. Cir. 2006) ...................................... 27

*National Tr. for Historic Pres. v. NPS*, No. 26-5101,
2026 WL 980554 (D.C. Cir. Apr. 11, 2026) ..... 6, 16, 17, 24, 26, 32, 33, 34, 36,
37, 38, 39, 49, 53, 56, 57, 59

*National Tr. for Historic Pres. v. NPS*, No. 26-5123,
2026 WL 1097554 (D.C. Cir. Apr. 17, 2026) ................................ 18

*Natural Res. Def. Council Inc. v. Hodel*,
865 F.2d 288 (D.C. Cir. 1988) ...................................... 52

*NIH v. American Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) ...................................................... 57

*Nken v. Holder*,
556 U.S. 418 (2009) ............................................................ 60

*NTE Conn., LLC, In re*,
26 F.4th 980 (D.C. Cir. 2022) ......................................57

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) ............................................ 5, 34, 35, 42

*S.D. Warren Co. v. Maine Bd. of Env't Prot.*,
547 U.S. 370 (2006) ................................................... 40-41

*Sierra Club v. DOT,*
125 F.4th 1170 (D.C. Cir. 2025) ...................................28

*Sierra Club v. FERC,*
827 F.3d 59 (D.C. Cir. 2016) .................................... 28

*Steel Co. v. Citizens for a Better Env't,*
523 U.S. 83 (1998) ................................................ 30, 31

*Tennessee Valley Auth. v. Hill,*
437 U.S. 153 (1978) ................................................ 41

*TransUnion LLC v. Ramirez*
594 U.S. 413 (2021) ................................................ 22

*The White House—The Vice President—Gifts,*
2 Op. O.L.C. 349 (1977) ............................................ 46

*Torres v. Lynch,*
578 U.S. 452 (2016) ................................................ 38

*Trump v. Sierra Club,*
588 U.S. 930 (2019) ................................................ 58

*Trump v. United States,*
603 U.S. 593 (2023) ................................................ 59

*United States v. Richardson,*
418 U.S. 166 (1974) ................................................ 7

*Utility Air Regul. Grp. v. EPA,*
573 U.S. 302 (2014) ................................................ 39

*\*Valley Forge Christian Coll. v. Americans United for
Separation of Church & State, Inc.,*
454 U.S. 464 (1982) ................................................ 4, 24, 27

*Washington State Dep't of Licensing v. Cougar Den, Inc.,*
586 U.S. 347 (2019) ................................................ 37

*\*Winter v. Natural Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ................................................ 53, 59

**Statutes:**

Act of Sept. 4, 1841,
Pub. L. No. 27-16, 5 Stat. 453 ......................................................37

Act of Apr. 28, 1902,
Pub. L. No. 57-81, 32 Stat. 120 .....................................................50

Act of April 28, 1942,
Pub. L. 77-528, 56 Stat. 226, 236....................................................9

Act of Apr. 14, 1949, ch. 51, 63 Stat. 45 ......................................43

*Pub. L. No. 87-286, 75 Stat. 586 (1961)..........................10, 45, 49

Pub. L. No. 95-570, 92 Stat. 2445 (1978)...............................10, 35

Pub. L. No, 103-111, 107 Stat. 1046 (1993).................................50

Pub. L. No. 119-74, div. C, tit. I, 140 Stat. 5 .............................47

*3 U.S.C. § 105(d)............................5, 10, 15, 19, 20, 34, 35, 39

25 U.S.C. § 293b ...........................................................................37

28 U.S.C. § 1292(a)(1) ................................................................7, 8

28 U.S.C. § 1331 .............................................................................7

*31 U.S.C. § 1535 ............................................................13, 46, 48

40 U.S.C. § 8106 ...................................................................... 20, 49

41 U.S.C. § 12 ........................................................................... 37

42 U.S.C. § 4652(a)................................................................... 37

43 U.S.C. § 316j ........................................................................ 37

*54 U.S.C. § 100101(a).....................5, 10, 15, 20, 34, 44

*54 U.S.C. § 101101(2).........................................13, 45

54 U.S.C. § 312102 ...........................................32, 33

54 U.S.C. § 312105(g)...............................................32

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ........................................ 7

**Legislative Materials:**

*Authorization for the White House Staff: Hearing Before
the Subcomm. on Emp. Ethics & Utilization of the H.
Comm. on Post Off. & Civ. Serv.*, 95th Cong. 21 (Apr. 26, 1977)..................46

112 Cong. Rec. 25,942 (1966) (statement of Rep. Saylor) ................................33

*District of Columbia Appropriation Bill for 1927:
Hearings Before the Subcomm. of the H. Comm. on
Appropriations*, 69th Cong. 533 (1927)...........................................51

H.R. Rep. No. 95-979, at 8 (1978).........................................................36

*To Establish a Program for the Preservation of Additional
Historic Properties throughout the Nation, and for Other
Purposes: Hearing on S. 3035 Before the H. Comm. on
Interior & Insular Affs.*, 89th Cong. 67 (Aug. 9, 1966) ................................33

**Other Authorities:**

*Acting Comptroller Gen. Elliott to the Sec'y of War,*
18 Comp. Gen. 489 (1938) ........................................................ 48

Alter, *Oxford English Dictionary* (2d ed. 1989) ...................................................36

Exec. Order No. 6,166 (June 10, 1933) ..................................................44

Exec. Order No. 6,228 (July 28, 1933) ................................................. 44

Improve, *Oxford English Dictionary* (2d ed. 1989) .....................................36, 38

Improved Land, *Black's Law Dictionary* (5th ed. 1979) ............................ 36-37

Steve Inskeep, Nat'l Pub. Radio, *This Woman Is at the
Center of the Legal Claim Against Trump's Ballroom
Project* (Apr. 3, 2026), https://perma.cc/3Z2M-276G ...................................26

Land, *Black's Law Dictionary* (12th Ed. 2024) ......................................36

Nat'l Cap. Plan. Comm'n, Executive Director's Recommendation
(Jan. 7, 2016), https://perma.cc/8D47-BNV6 ............................................ 44-45

Program Comment on Stewardship and Management of
National Park Service Mission 66-Era Facilities (1945-1972),
89 Fed. Reg. 97631 (Dec. 9, 2024)........................................................44

Brian Sawers, *The Right to Exclude from Unimproved
Land*, 83 Temple L. Rev. 665 (2011)......................................................36

2 William Seale, *The President's House: A History*
(2d ed. 2008) ...........................................................................8, 9

3 Joseph Story, *Commentaries on the Constitution*
(1st ed. 1833)...........................................................................38

Mariah Timms, *White House Correspondents' Shooting
Suspect Took Selfie With Weapons Before Dinner*,
Wall St. J. (Apr. 30, 2026)...............................................................1

3 U.S. Gov't Accountability Off., GAO-08-978SP,
Principles of Federal Appropriations Law (3d ed. 2008) .......................37, 46

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| EXR | Executive Residence at the White House |
| JA | Joint Appendix |
| NPS | National Park Service |
| Project | East Wing Modernization Project |
| Trust | National Trust for Historic Preservation in the United States |

# INTRODUCTION

Just two weeks ago, on April 25, 2026, a politically radicalized assassin armed with a 12-gauge pump-action shotgun, a .38-caliber pistol, dozens of extra rounds of ammunition, and six knives and daggers breached a security perimeter at the Washington Hilton—the site of President Reagan's 1981 near-assassination—determined to murder President Trump, First Lady Melania Trump, Cabinet officials, senior staff, and others in the administration attending the White House Correspondents' Dinner. The assassin charged toward the ballroom, firing the shotgun, and was subdued only yards from the President. That marked the *third* attempt to assassinate President Trump since a bullet struck his ear in Butler, Pennsylvania in July 2024.[1]

None of that should have been remotely possible. If the citizen complainer, and her "guardian," the National Trust for Historic Preservation, get their way, however, such unacceptable threats to the President's life and to the continuity of government will persist, because the President has no secure facility capable of hosting large-scale events on the White House grounds. Asserting the personal preferences of one pedestrian who walks

---

[1] *See* Mariah Timms, *White House Correspondents' Shooting Suspect Took Selfie With Weapons Before Dinner*, Wall St. J. (Apr. 30, 2026).

near the White House once a month, who had no idea what we were building, and who has absolutely NO STANDING, the Trust sued to block President Trump from constructing an historic ballroom in the new East Wing of the White House.  The ballroom is a knitted, unified, cohesive part of the East Wing Modernization Project, and is vital to national security and the safety of all Presidents, both current and future, their families, Cabinet members, and staff—as numerous declarations from top officers and leaders of the military and Secret Service have strongly attested to in papers submitted.

The state-of-the-art structure includes bomb shelters, medical facilities, communications infrastructure, military installations, and more, constructed using "threat-resistant building materials" like missile resistant strengthened columns, military grade venting, drone proof ceilings, and bullet, ballistic, and blast proof glass—all to form "a fortified structural buffer" protecting "the main White House and West Wing." Stay.Add.2-3.  The upgrades also include protective partitioning, and top-secret military installations, air conditioning, heating, venting, and more.  These upgrades, alterations, and improvements are essential to protecting the President, his family, and his staff, as well as the White House itself, and the entire project flows from them.

The Project is a highly integrated unit: The lower section of the building does not work without the upper section and the upper section does not work without the lower. Meanwhile, the cost to taxpayers will be ZERO; donors and American patriots are funding the Project, which is already hundreds of millions of dollars underway, and ahead of schedule.

As the April 25 attempt to assassinate President Trump demonstrates, this President, and all future Presidents, need a secure location to host major events such as inaugurations, global summits, and meetings with foreign leaders, among others—as soon as possible. The Secret Service and U.S. military have explained in sworn testimony that the old East Wing's aging, cramped, and dilapidated physical structure was "not designed to withstand modern asymmetric attacks" from modern day weapons like drones and heavy artillery. Stay.Add.28. Nor are venues outside of the security perimeter equipped to handle the task. Once completed, the new ballroom's state-of-the-art security features will protect this President, all future Presidents, their families, Cabinet members, and all who work in and visit the White House. The President is really making this contribution for future Presidents because President Trump will only have the opportunity to use it for a few months prior to the expiration of his term. Others will use it for years.

Nonetheless, the district court issued an astonishing, egregious, grossly flawed injunction against the ballroom's construction.  To begin, the district court jettisoned bedrock principles of Article III standing to decide a case that has no business being in a federal court.  The court found that the Trust had standing to sue based on a single pedestrian's claim that she occasionally walks near President's Park and worries she will not like the ballroom.  JA77.  That ludicrous "feelings are standing" theory flies in the face of longstanding Supreme Court precedent, which holds that the "psychological consequence … produced by observation of conduct with which [one] disagrees … is not an injury sufficient to confer standing."  *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982).  The district court's approach to standing is also untenable because it would allow any pedestrian to sue to stop any construction project, including those such as this, which is being built for the purpose of national, and even international, security of Presidents, foreign leaders, and others, based solely on their own personal preferences.  This is absurd!

The district court then badly erred again in endorsing the Trust's claims on the merits.  The Trust, which has lost its funding from the United States Government due to lack of credibility, and the fact that Congress did not agree

with its mission, asserts an *ultra vires* claim—a "Hail Mary pass … [that] rarely succeeds." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (*NRC*). This one does not even reach "the line of scrimmage," because two different statutes independently authorize the Project. *First*, 3 U.S.C. § 105(d) authorizes the appropriation of funds for the President to engage in "alteration[s]" and "improvement[s]" to the White House, to be "expended as the President may determine." The Project is undeniably a "improvement" to the White House grounds. Section 105(d) reflects Congress's long-held understanding that the White House serves as the President's home and office, and that Presidents have made unilateral changes to the White House for over 200 years, and have rarely gone to Congress for approval. *Second*, the National Park Service's Organic Act separately authorizes the Project. Congress has designated the White House as a national park, and the National Park Service (NPS) is broadly authorized to engage in construction in national parks. *See* 54 U.S.C. § 100101(a). That embraces the Project too. In rejecting these authorities, the district court's unsustainable reasoning ignores the plain language of the statutes as well as decades of historical practice and precedent. Very importantly, this ruling is turning down a major gift to the United States of America, one made by great patriots and people who truly love our Country.

5

Finally, the injunction involves an egregious misbalancing of the equities, and warrants reversal for that reason alone. The Trust is pressing a single person's concern that she may be displeased with the ballroom, which she has never seen or studied, during a monthly stroll past the White House. On the other side of the ledger, every day the Project is delayed is massive additional cost, and severely threatens the safety of all Presidents, their families, staff, Cabinet members, and even dignitaries from other Countries. It is another day the President will be left without a White House complex where Presidents can safely perform their job. *National Tr. For Historic Pres. v. NPS*, No. 26-5101, 2026 WL 980554, at \*7 (D.C. Cir. Apr. 11, 2026) (Rao, J., dissenting). This should have been an easy call for the district court, a 400 Million Dollar gift, yet it wrongly dismissed these national security concerns and the continuity of government with a, "Please!" JA493.

After its initial injunction proved incomprehensible, the district court modified it to allow national security related construction, but apparently *not* construction of the ballroom that is actually structured to accomplish all the national security objectives as part of a unified, cohesive structure. That modified injunction puts the President and all those on the White House complex in danger, and it also guarantees "repeated and essentially head-on

confrontations between the life-tenured branch and the representative branch[] of government." *United States v. Richardson*, 418 U.S. 166, 188 (1974).

The day after the assassin came moments away from shooting bullets at President Trump and the First Lady on April 25, Senator John Fetterman, a Democrat from Pennsylvania, emphasized: "After witnessing last night, drop the [Trump Derangement Syndrome] and build the White House ballroom for events exactly like these."[2] The district court has failed to get that commonsense message. This Court should reverse the district court's indefensible injunction and maintain the stay. The United States of America will never have an opportunity to build such a facility on the White House grounds again.

## STATEMENT OF JURISDICTION

Plaintiff invoked the jurisdiction of the district court under 28 U.S.C. § 1331. JA349. The district court entered an amended preliminary injunction on April 16, 2026. JA512-14. Defendants filed a timely notice of appeal on April 16, 2026. JA515-16; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction over that appeal under 28 U.S.C. § 1292(a)(1).

---

[2] https://x.com/SenFettermanPA/status/2048390030561812902

On April 21, 2026, the Trust filed a timely conditional cross-appeal, *see* JA517-18, from the district court's February 26, 2026, opinion and order denying its first motion for a preliminary injunction, *see* JA318-40. This Court has jurisdiction over the cross-appeal under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Acting at the behest of a single pedestrian who is concerned that she will dislike it, the district court enjoined defendants from continuing a construction project at the White House that is indispensable to national security. The question presented is whether that injunction represented an abuse of discretion. The answer is yes, many times over.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Statutory And Historical Background

Presidents have long directed major changes to the White House and its grounds without project-by-project approval from Congress. In 1942, President Franklin D. Roosevelt tore down much of the East Wing and replaced it with a completely remodeled building. 2 William Seale, *The President's House: A History* 227-33 (2d ed. 2008). Acting on his own plan to "enlarge the east wing" to fit the demands of his office, President Roosevelt

ordered "major construction" with crews working "twenty-four hours a day," while the President "personal[ly]" supervised "every detail," including its long-neglected "air-raid shelter," and an overdue presidential emergency operations bunker. *Id.* at 227-30; JA207; *see also* Act of April 28, 1942, Pub. L. 77-528, 56 Stat. 226, 236 (generally appropriating funds for "public buildings and grounds in the District of Columbia").

Other examples of President-directed construction at the White House abound. *See* JA199-212 (collecting history). President Roosevelt himself had overhauled the West Wing in 1934. *See* Seale, *supra*, at 189-99. President Ford ordered that a pool be "dug" a "stone's throw from the Oval Office"—over the objection of "[a]cademics and historians" who "took immediate exception to this location." *Id.* at 432-33. In his first term, President Trump constructed a pavilion next to the White House tennis court. *See* JA212. Historically, while Congress has sometimes specifically appropriated for certain renovations, Presidents have elsewhere relied on general funds to make necessary changes to the White House. Per the Trust itself, none of the above examples involved specific authorizations from Congress, and President Ford's pool and President Trump's tennis pavilion were funded using private donations. *See* JA209-10; JA212.

Against this backdrop, Congress in 1978 authorized appropriations to the President for "the care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence at the White House." 3 U.S.C. § 105(d)(1); Pub. L. No. 95-570, 92 Stat. 2445, 2446 (1978). Congress added that such funds "may be expended as the President may determine, notwithstanding the provisions of any other law." 3 U.S.C. § 105(d).

Congress also chose to designate President's Park, which includes the White House and its grounds, as a national park. Pub. L. No. 87-286, 75 Stat. 586, 586 (1961). In so doing, Congress recognized that the White House's fundamental purposes include serving as "the Executive offices of the President," "as the home of the President and his family," and "for his official purposes." *Id.* That designation brought the President's Park (and the White House) within the Executive's authorities under the NPS Organic Act to "promote and regulate" the national park system, including by constructing buildings that are consistent with the "fundamental purpose" of the park unit. 54 U.S.C. § 100101(a); JA245.

**B.     Factual Background**

In 2025, President Trump undertook a project to modernize the East Wing of the White House and address its myriad longstanding problems.  Most critically, the Project will ensure the continuity of government in the event of an attack upon the White House, which is "not designed to withstand modern asymmetric attacks."  Stay.Add.28.

As the Secretary of the Army explained, a significant portion of the Project involves "harden[ing] the Presidential Emergency Operations Center (PEOC) against modern multi-domain threats," as "modern command and control must be moved underground and remain entirely self-sufficient to survive."  Stay.Add.19.  Securing the White House requires work both below- and above-grade work as part of a single integrated facility, because "one of the most effective passive design measures to defeat emerging kinetic threats" is a "sacrificial outer cover coupled with a hardened inner structural element."  Stay.Add.21.  Accordingly, the critical features of the contemplated ballroom—including its height and size, and the selection of materials for its construction—reflect security needs and are necessary to protect the entire complex.

11

Related problems include the pressing need for "expanded event space to address growing visitor demand and provide a venue suitable for significant events," which NPS had identified as early as 2000.  JA222.  Without such a space, large events are hosted in temporary tents on the White House lawn, which are unsecure, costly, and harmful to the infrastructure.  JA246.  The Project addresses many other long-neglected needs at the East Wing too: among them, "Secret Service upgrades"; correcting a "network of fragmented, incompatible, and obsolete systems"; "reducing degradation of the Executive Mansion's historic structure caused by hosting events larger and more frequently than it was structurally designed for"; fixing a degraded foundation; and eliminating mold contamination and other toxic substances. JA222-23.

The President designated the Executive Residence at the White House (EXR)—the internal White House office most familiar with the unique needs and deficiencies of the existing structure—to manage the Project.  JA223.  In consultation with other agencies (including the U.S. Army, the Secret Service, and NPS), EXR determined that "demolition of the existing East Wing structure and reconstruction of a new East Wing" was the only workable approach.  JA224.

NPS then determined that the Project impacts "do not prevent [NPS] from fulfilling the park's purpose or result in impairment of park resources." JA112. NPS therefore undertook to accept private donations for the Project under its longstanding authority to accept gifts "for the purposes of" the national park system. 54 U.S.C. § 101101(2). NPS also determined that EXR was best suited to "directly manage the Project." *See* JA247. It therefore contracted with EXR under the Economy Act, 31 U.S.C. § 1535, transferring the donated funds to support EXR's work. *See* JA247. The "use of the Economy Act has long been standard operating procedure" for projects at the White House—where agencies often contract with a component of the Executive Office of the President (or vice versa) to complete projects on White House grounds—and the "Economy Act agreement concerning the Project, in which EXR acts as the servicing agency for NPS, is consistent with this precedent." JA422; *see* JA225-26 (same). Throughout, defendants have been clear that, though the Project is being funded with NPS donations, EXR is the entity in charge of the Project. *See* JA223; JA225; JA422.

Demolition began on October 20, 2025, and finished on December 5, 2025. JA148-51. Active construction has been ongoing since then.

## C.    Procedural Background

1.    On December 12, 2025—after demolition of the old East Wing had been completed—the Trust sued to enjoin the Project.  The Trust brought Administrative Procedure Act (APA) and constitutional claims challenging the President's authority to renovate the East Wing, but it did not raise an *ultra vires* claim.  JA53-65.  It sought a temporary restraining order and preliminary injunction to forestall the Project.  Dkt. 2.

In December 2025, the district court denied the temporary restraining order because the Trust had failed to show imminent irreparable harm.  JA156-59.  Then, in February 2026, the court denied the Trust's (first) preliminary injunction motion.  JA340.  It held that the Trust had established associational standing because one member, Alison Hoagland, claimed that she planned to walk in the area near the White House about once monthly and expected to dislike the new East Wing.  JA325-29.  The court deemed these amorphous interests germane to the Trust's purposes.  JA329.  The court denied relief, however, because the Trust failed to plead a viable cause of action under the APA or Constitution.  EXR is not an "agency" subject to the APA, and the Trust's supposed constitutional claims all contended that the government exceeded its statutory authority, thus falling within *Dalton v.*

14

*Specter*, 511 U.S. 462 (1994). JA330-39. Nonetheless, the court invited the Trust to amend its complaint to press an *ultra vires* claim so that the court could reach the merits. JA339.

2. The Trust took up the district court's invitation, Dkt. 20, and the district court granted preliminary relief at the end of March. JA461-98.

The court held that 3 U.S.C. § 105(d) only applies to "ordinary maintenance and repair of the White House." JA473. It further concluded that the statute "does not speak to the President's authority to spend funds *not* appropriated under the statute." JA477. Because the court found that 3 U.S.C. § 105(d) did not authorize the Project, it also found that the Project violated 40 U.S.C. § 8106, which requires congressional authorization for certain construction within parks in the District of Columbia. JA479-85. The district court also dismissed the NPS Organic Act, 54 U.S.C. § 100101(a). Notwithstanding defendants' demonstration that NPS had long relied on this provision for construction within national parks, the court held that "nothing in the text of the statute grants NPS blanket authority to engage in construction." JA487. Instead, the court believed, Congress "has given *limited* authority to NPS to construct by authorizing appropriations for those purposes." JA487.

Finally, the district court found that the equitable factors favored the Trust because continued construction would irreparably alter the "form and scale" of the White House contrary to Hoagland's preferred vision, JA489-90, whereas the "safety and security" issues that defendants identified with leaving a large hole adjacent to the White House were purportedly "of the President's own making!" JA493. The court dismissed—"Please!"—the notion that delays would "undermine national security." JA493. It thus ordered a halt to "physical development of the proposed ballroom" except for "actions strictly necessary to ensure the safety and security of the White House and its grounds … and provide for the personal safety of the President and his staff." JA497. The court granted a 14-day stay to permit emergency appellate review. *See* JA497.

3.    Defendants sought a stay from this Court, which extended the district court's temporary stay and remanded to the district court to clarify the scope of its injunction. *National Tr. for Historic Pres. v. NPS*, No. 26-5101, 2026 WL 980554, at *1 (D.C. Cir. Apr. 11, 2026) (per curiam). This Court identified "factual questions" about the security-related concerns posed by a halt in construction and the ambiguous scope of "the district court's 'necessary for safety and security' exception." *Id.* at *3.

16

Judge Rao would have granted the stay without further factfinding. *National Tr.*, 2026 WL 980554, at \*3-8 (Rao, J., dissenting). She explained that the Trust lacked Article III standing. *Id.* at \*5-6. She further explained that the *ultra vires* claim fails "[b]ecause the East Wing project is likely authorized under section 105(d)(1)." *Id.* at \*6-7. Finally, "[t]he government … easily prevails on the balance of the equities and the public interest factors," especially given the irreparable harm from the injunction's intrusion on the Executive Branch. *Id.* at \*7-8.

4. On remand, the district court amended its injunction. JA512-14. In the revised order, the district court enjoined "any action in furtherance of the above-ground, physical construction of the proposed ballroom." JA513. The court permitted "below-ground construction" to proceed. JA513. The court also permitted "measures strictly necessary to provide for the personal safety of the President and his staff" and "construction strictly necessary to ensure the safety, security, and structural integrity of the White House, the White House grounds, and the below-ground construction site"—including a "topping structure" for the underground facilities and a structure to shield the now-exposed East Room of the Executive Mansion—as long as those measures were "short of constructing the proposed above-ground ballroom."

17

JA507, 513-14. Each of these exceptions applies only insofar as "any such construction will not lock in the above ground size and scale of the ballroom." JA513-14.

5. Defendants again appealed and sought a stay pending appeal. This Court granted an administrative stay, carried the stay motion with the case, and set the case for expedited briefing and argument. *National Tr. for Historic Pres. v. NPS*, No. 26-5123, 2026 WL 1097554 (D.C. Cir. Apr. 17, 2026).

## SUMMARY OF ARGUMENT

To perform his constitutional functions, the President requires a secure facility to ensure the continuity of government in the event of an attack upon the White House and a secure space to host diplomatic and other ceremonial events. The Project is structured to achieve both goals as a unified whole. At least two statutes authorize the Project. The district court's indefensible injunction interfering with this vital Project must be reversed.

I. The Trust unquestionably lacks Article III standing to bring this suit. The district court found standing because Alison Hoagland, one Trust member, fears she may not like features of the ballroom during monthly strolls nearby. The Supreme Court and this Court, however, have consistently and resoundingly rejected such generalized offense-based grievances as

18

inadequate for standing.  Neither the Trust nor Hoagland has any cognizable interest in White House renovations, and both have effectively admitted as much.  This case should never have progressed beyond the threshold.

**II.**    The Trust's claims independently fail on the merits.  The Trust has brought *ultra vires* claims challenging whether Congress has authorized the Project—so the Trust must show that the government has "plainly and openly crossed a congressionally drawn line in the sand."  *Federal Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022).  The Trust does not come close.  Congress has doubly authorized the President to renovate the White House, and the Trust's contrary theories flatly contradict a long history of similar building projects.

*First*, in 3 U.S.C. § 105(d), Congress authorized appropriations for the "alteration" and "improvement" of the White House, in keeping with a long line of Presidential renovations. Although the district court understood this authority to be limited to garden-variety maintenance, the text includes no such limit.  Indeed, Presidents have long made significant alterations to the White House—including construction of the old East Wing—without express congressional approval.  It defies credulity that this authority should suddenly become suspect only for the White House's current occupant.

*Second*, in the NPS Organic Act, Congress authorized the Executive Branch to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units." 54 U.S.C. § 100101(a). NPS has used that authority for decades to engage in major construction in national parks, again without any further congressional approval and without any controversy. The same authority authorizes construction at the White House, which sits within President's Park. The district court and Trust disagree, but cannot agree on why—each adopting a novel theory the other refuses to defend. At minimum, that is not the stuff of a sound *ultra vires* claim.

Because the Project is authorized by both 3 U.S.C. § 105(d) and the NPS Organic Act, it does not violate 40 U.S.C. § 8106. That statute, which was enacted to stop then-widespread private encroachment onto public land, at most requires general authority to build, not authority to build a particular structure—a proposition that the district court did not dispute. Regardless, there is substantial reason to doubt that Section 8106's general terms even apply to the White House, given the inevitable constitutional clashes that would follow from that novel interpretation.

**III.** The lopsided equities independently require reversal. On the one hand, sworn testimony from high-ranking Secret Service and U.S. Army officials establishes that the Project is necessary to the President's performance of his constitutional functions—both so that the President has a an updated and secure facility that is capable of ensuring the continuity of government in the event of an attack on the White House, as well as to provide a secure location to host large events within the White House security perimeter. The Project is thus essential to the safety of the President, future Presidents, their families, Cabinet members, senior staff, and White House guests. On the other hand, the Trust invokes one bystander's concern that she may not be happy with features of the ballroom as she passes nearby on a monthly trip—a non-cognizable harm that certainly pales relative to the major national security risks presented by the district court's injunction. Indeed, the amended order exacerbates the irreparable harm to defendants and the public, because it is both unworkable as to what it allows, and intolerable as to what it still enjoins and thus inevitably delays. The Court should grant a stay and reverse this untenable injunction.

This Court reviews entry of a preliminary injunction for abuse of discretion, with the underlying legal conclusions reviewed *de novo* and any factual findings reviewed for clear error. *Global Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025).

## ARGUMENT

### I. The Trust Unquestionably Lacks Article III Standing.

This injunction should have been denied at the threshold because the Trust lacks Article III standing to challenge White House improvements. Federal courts "do not possess a roving commission to publicly opine on every legal question" and "do not exercise general legal oversight of the Legislative and Executive Branches." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021). Instead, "[f]or there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case." *Id.* at 423. Yet the Trust itself admitted it has "no personal or financial stake," JA71, and its attempt to rely on associational standing is obviously deficient.

Associational standing requires showing that one of the association's members would have standing in her own right; that the interests asserted are germane to the association's purposes; and that participation of individual

members is not required. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Here, the district court grievously erred in holding that a single member of the Trust, Hoagland, would have standing because she expected to walk by the White House once monthly and feels that "a ballroom of the proposed form and scale" might inflict "professional and personal injuries" on her by "diminish[ing] the primacy" of the White House and disrupting the message "that 'our president lives in a *house*.'" JA77. Accepting that literal passing grievance as enough for Article III would allow every drive-by observer to sue over subjectively defined eyesores. Moreover, Hoagland's professed injury cannot support standing for the *Trust*, whose historic preservation functions specifically *exclude* the White House. That failure of germaneness is independently fatal.

### A. The Psychological Harm Of Being Offended Is Not An Injury-In-Fact.

Hoagland's asserted harm to her personal visual, "cultural, and historical interests," JA76-77, is not an injury-in-fact. Passersby cannot parlay subjective preferences into standing. Article III does not open the courthouse doors to every would-be critic of a federal building, any more than it allows other plaintiffs to sue based on mere feelings.

**1.** The Supreme Court has long held that the mere "psychological consequence presumably produced by observation of conduct with which one disagrees" is "not an injury sufficient to confer standing"—whether based on moral, political, or visual displeasure. *Valley Forge*, 454 U.S. at 485. As the Court more recently reiterated, "distress at or disagreement with the activities of others is not a basis under Article III for a plaintiff to bring a federal lawsuit." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 390 n.3 (2024). Or, as this Court has put it, there is "nothing in the existing case law to suggest that a person who incidentally views something unpleasant has suffered an injury-in-fact." *Environmental Def. Fund v. FERC*, 2 F.4th 953, 969-70 (D.C. Cir. 2021) (*EDF*); *see also National Tr.*, 2026 WL 980554, at *6 (Rao, J., dissenting).

In *EDF*, this Court thus held that a plaintiff objecting to construction of a new gas pipeline lacked standing when she did "not even allege that she c[ould] see the new [construction] from her property," which was more than "half a mile" away, and attested only that "she must look at an 'eyesore' several times per week while driving past." 2 F.4th at 968, 970. That rule controls here. Like the *EDF* plaintiff, Hoagland cannot see the East Wing from her property; she lives "about 2 miles away from the White House." JA75. It was

not enough that the *EDF* plaintiff planned to visit "several times per week," 2 F.4th at 969-70—so Hoagland's plans to see the White House when she visits nearby about "once a month" are by definition inadequate. JA76. Likewise, just as in *EDF*, Hoagland has not alleged that she uses or enjoys the White House in a way that is unique from the general public and that the Project would disrupt. Indeed, she never even alleges that she actually views the Project site during these neighborhood visits. JA75-76. Of course, if Hoagland does not like the look of the new ballroom, she is free to shift her gaze to the National Mall or Lafayette Park as she makes her way through the area unimpeded on her monthly trip. A "person cannot manufacture standing by voluntarily setting aside potential aesthetic interests (like viewing a pristine expanse of ocean) to pursue an incompatible interest (like viewing oil spills)." *Center for Biological Diversity v. U.S. EPA*, 937 F.3d 533, 541 (5th Cir. 2019).

Like the plaintiff in *EDF*, Hoagland is thus not asserting a concrete, particularized injury to herself, but rather an abstract, generalized grievance that would be held by anyone who disagrees with the President's choice to modernize the East Wing. That much is clear from her declaration, and any doubt would be resolved by her own public admission that she is asserting harm "to everybody" and not "just me"—in her words, she is "just the symbol

25

here."[3]  Article III requires more than symbolism to support a federal lawsuit. "Viewed in full frame," Hoagland's alleged injuries "reflect nothing more than generalized grievances, which cannot support standing." *EDF*, 2 F.4th at 969–70; *see also National Tr.*, 2026 WL 980554, at *6 (Rao, J., dissenting).

**2.**     In holding otherwise, the district court dismissed *EDF* and overread other precedents.  *See* JA327-28.  None of those cases supports standing here because none involved plaintiffs who merely objected to seeing things they disliked.  Rather, each of them involved plaintiffs who had concrete and particularized plans to do or see things that, as a result of the challenged actions, they would no longer be able to see or do.  Extending those authorities to confer standing here would conflate concrete injuries with psychological ones and expand Article III beyond recognition.

Quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-63 (1992), the district court repeated that "the 'desire to use or observe' something … is undeniably a cognizable interest.'"  JA326.  Here, however, Hoagland is not being deprived of the ability to "use or observe" anything; she asserts an interest in *not* observing something she expects to dislike.   As *EDF*

---

[3] Steve Inskeep, Nat'l Pub. Radio, *This Woman Is at the Center of the Legal Claim Against Trump's Ballroom Project* (Apr. 3, 2026), https://perma.cc/3Z2M-276G.

recognized, no authority supports that "see no evil" theory of injury. Unlike a plaintiff who wants to watch an endangered leopard and is deprived of that opportunity, a plaintiff who does *not* want to look at something need not do so. *Center for Biological Diversity*, 937 F.3d at 541. Any harm is self-inflicted and thus non-cognizable. *See, e.g.*, *National Fam. Plan. & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006). Moreover, a plaintiff who is merely visually offended faces only subjective, psychological harm, not tangible injury. *See Valley Forge*, 454 U.S. at 485. Whether a plaintiff views the offending sight in person, sees a picture of it in the newspaper, or imagines it in her mind's eye, the harm is the same—a subjective feeling that cannot support standing. *Alliance*, 602 U.S. at 390 n.3.[4]

Moreover, *Lujan* does not eliminate Article III's requirement that any injury be particularized. In *Lujan* itself, the Court found no standing because the party seeking review was not "among the injured." 504 U.S. at 563. So too here. Hoagland points to nothing to distinguish her supposed injury from that of anyone else who lives in, works in, or visits the District.

---

[4] Insofar as Hoagland claims injury because she can no longer observe the old East Wing, any such harms are no longer redressable given that the demolition has already occurred and cannot be undone.

The circuit cases that the district court cited are all similarly distinguishable. None involved plaintiffs who claimed visual offense alone. Rather, they involved projects that either required the plaintiff to alter her behavior in a meaningful way or diminished the plaintiff's property value or other economic interests. Take *Sierra Club v. FERC*, 827 F.3d 59 (D.C. Cir. 2016), where this Court found standing for an individual who "fishes, boats, and seasonal[ly] duck hunts" in an area that was slated to experience increased tanker traffic, including a "large exclusion zone" that "the Coast Guard maintains around tankers." *Id.* at 66 (alterations and quotation omitted). Those impacts required the plaintiff to move his boat out of the area he regularly used, *id.*—and that harm is categorically different from merely seeing something visually displeasing. *Id.*; *see also EDF*, 2 F.4th at 970 (distinguishing this case on similar grounds).

Similarly, in *Sierra Club v. DOT*, this Court found standing because individuals who "live" and "work" along a rail route would face "disruption to the peace and quiet" they "enjoy in their homes" as a result of increased traffic. 125 F.4th 1170, 1180 (D.C. Cir. 2025). In *Center for Sustainable Economy v. Jewell*, the individuals used "specific marine and coastal ecosystems for commercial and recreational purposes," and a planned project threatened to

28

impair their "economic" interests, not merely offend them. 779 F.3d 588, 596 (D.C. Cir. 2015). Finally, in *Center for Biological Diversity v. U.S. Fish & Wildlife Service,* the member would visit "every summer for a family vacation and search[] for and photograph[] the Beetle," and the challenged actions scuttled those plans and prevented him from engaging in that specific activity. 146 F.4th 1144, 1157 (D.C. Cir. 2025).

Hoagland is not similarly situated. The White House is not a lake where she swims or a park where she hunts for rare species. She has suffered no financial harm to her property. She is not suffering discomfort from the Project in the way that a nuisance plaintiff might be if unavoidably exposed to an offensive odor or toxic smog. She can still walk in the vicinity of the White House and observe the Executive Mansion, and she does not claim that she has in any respect "altered her behavior," *EDF*, 2 F.4th at 970, due to the Project. Her putative psychic distress from occasionally seeing a building she expects to dislike is not a cognizable Article III injury.

Nothing in Hoagland's declaration, or the district court's analysis of it, bridges this gap. The court claimed the Project would affect Hoagland's "research." JA327. Hoagland's declaration, however, asserted that the White House "affects [her] own research" in two ways: because it "drove

development" of the rest of the capital, and was on the "leading edge of all improvements" as D.C. grew. JA76. Those historical facts involve the White House's influence on the District's development generations ago, not the building's current structure. Nobody has explained how Hoagland's ability to research the White House would be affected at all by whether she approved of how it currently looks. Indeed, it is unclear whether Hoagland actively researches the White House *at all*. Her declaration mentions books on "vernacular architecture" like row houses; articles on such subjects as 19th century building codes and the Washington Public Library; and prior appointments to groups and boards, none of which has an apparent connection to the White House (like the Keweenaw National Historical Park Advisory Commission in Calumet, Michigan). JA74-75.

Hoagland's objection to how the Project might change the "architectural statement" of the White House does not help. *Contra* JA327. These asserted harms to *the White House* are not harms to *her*; like the Trust, she is pursuing an "undifferentiated public interest" in a visually pleasing White House. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106 (1998). Even if it would bring her "psychic satisfaction," *id.* at 107, to know the East Wing's structure aligns with her personal tastes, that does not create a justiciable case or controversy.

That is so no matter how strongly Hoagland feels about the new East Wing. A person cannot "establish standing simply based on the intensity of [her] interest." *Alliance*, 602 U.S. at 394.

At bottom, if the district court were right that Hoagland has standing to challenge the appearance of a building miles from her home just by virtue of viewing it approximately once per month and objecting to its likely structure, anyone who lives or works in D.C. could challenge any construction project in the District. The "startlingly broad" reach of that theory is reason enough to reject it. *Murthy v. Missouri*, 603 U.S. 43, 75 (2024). Nor would this problem be limited to federal property: The Trust's theory would confer standing on a dogwalker unhappy with the installation of a new fence in a yard along her normal route and on a fan of classical architecture who does not want to see an avant-garde building near his Metro stop.

Nor is this problem hypothetical, for this is not the only litigation in which Hoagland has sought to leverage her personal preferences into a role as Architectural-Ombudsman-in-Chief for the District. In another pending case, Hoagland has asserted that she was injured when brass columns were repainted white because the new color rendered them "less defined and less purposeful." Decl. of Alison K. Hoagland in Support of Motion for Preliminary

Injunction, ¶ 13, *D.C. Pres. League v. Board of Trs. of the John F. Kennedy Ctr. for the Performing Arts*, No. 26-cv-00981 (D.D.C. Mar. 31, 2026), Dkt. 24-49.  More extensive renovations, she alleged, would cause "both professional and personal injuries, including to [her] aesthetic, cultural, and historical interests."  *Id.* ¶ 15.  Article III requires more than a car and a fill-in-the-building declaration.

### B. The White House Is Not Germane To The Trust's Purposes.

Even setting Hoagland's lack of standing aside, the Trust itself lacks associational standing because the lawsuit is not germane to the purposes that Congress assigned to it.

"[A]s a congressionally chartered nonprofit, the Trust 'is required to pursue … goals defined by statute.'"  *National Tr.*, 2026 WL 980554, at *5 (Rao, J., dissenting) (quoting *DOT v. Association of Am. R.Rs.*, 575 U.S. 43, 53 (2015)).  As relevant here, the Trust's functions are to "receive donations of sites, buildings, and objects significant in American history and culture" and to "preserve and administer" those sites "for public benefit."  54 U.S.C. § 312102(b)(1)-(2).  The White House has obviously not been donated to the Trust; indeed, the Trust is *forbidden* from acquiring property in a National Park "System unit."  *Id.* § 312105(g).  Congress has specifically "carved the

White House out of" the Trust's mandate, and has "expressly withheld" that interest from the Trust. *National Tr.*, 2026 WL 980554, at *5 (Rao, J., dissenting). That was no coincidence: Congress consistently warned that the Trust has no role to play in White House affairs and should not "busy itself with the White House." 112 Cong. Rec. 25,942 (1966) (statement of Rep. Saylor); *see also, e.g.*, *To Establish a Program for the Preservation of Additional Historic Properties throughout the Nation, and for Other Purposes: Hearing on S. 3035 Before the H. Comm. on Interior & Insular Affs.*, 89th Cong. 67 (Aug. 9, 1966) (Rep. Saylor) (statement at hearing that National Historic Preservation Act, which granted certain matching funds to the Trust, would not apply to "homes" of "three branches of the government").

The district court nevertheless believed that the Project was germane to the Trust's interests, because Congress established the Trust "to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest." 54 U.S.C. § 312102(a); *see* JA329. That is incorrect. It conflates why *Congress* chose to *create* the Trust (as provided in subsection (a)), with *the Trust's own duties*, which are narrower and carefully exclude the White House (as spelled out in subsection (b)). "Congress has specifically defined the Trust's purposes and powers, none of which are

germane to a lawsuit challenging the building of a ballroom and updated security facilities on White House grounds." *National Tr.*, 2026 WL 980554, at *5 (Rao, J., dissenting). That too defeats standing here.

## II. The Trust Cannot Succeed On The Merits Because Congress Has Doubly Authorized The President To Renovate The White House.

Even if the Trust had standing, its challenge fails twice over. Congress authorized the Project in 3 U.S.C. § 105(d), which expressly acknowledges the President's authority to "alter" and "improve" the White House. Congress did so again by designating the White House as a national park, because 54 U.S.C. § 100101(a) has long been understood to authorize NPS to engage in a wide variety of construction in national parks.

Those dual founts of authority would defeat the Trust's challenge in any posture, but here, the Trust presses an *ultra vires* claim—a "Hail Mary pass … [which] rarely succeeds." *NRC*, 605 U.S. at 681-82. *Ultra vires* relief requires more than a "typical statutory-authority argument," and instead demands that the plaintiff show the challenged act is "entirely in excess of [an entity's] delegated powers and contrary to a *specific prohibition* in a statute." *Id.* at 681; *see also Federal Express Corp.*, 39 F.4th at 765 ("*ultra vires* claimants must demonstrate that the agency has plainly and openly crossed a

congressionally drawn line in the sand"); *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022). The Trust comes nowhere close to meeting that standard.

### A. 3 U.S.C. § 105(d) Expressly Authorizes The President To "Alter" And "Improve" The White House.

Presidents have long directed major renovations of the White House. *See, e.g.*, JA199-212. Against that backdrop, Congress in 1978 formally authorized appropriations to the President for "the care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence at the White House." 3 U.S.C. § 105(d)(1); Pub. L. No. 95-570, 92 Stat. at 2446. Congress also provided that such sums "may be expended as the President may determine, notwithstanding the provisions of any other law." 3 U.S.C. § 105(d).

Section 105(d) thus confirms that the President possesses operational control over the White House and vests in him, notwithstanding other statutes, the discretion to determine necessary alterations and improvements. Indeed, Congress intentionally limited its role in this space to "avoid an overly broad intrusion into this area of Executive discretion." H.R. Rep. No. 95-979, at 8 (1978). The Trust and district court quibble over the scope of this statute and

how the President exercised his "broad" "discretion" here, but none of that comes anywhere close to the sort of extreme error necessary for *ultra vires* review.

1.    The Project fits comfortably within Section 105(d)'s capacious text.  To "alter" is to "make (a thing) otherwise or different in some respect; to make some change in character, shape, condition, position, quantity, value, etc. without changing the thing itself for another."  Alter, *Oxford English Dictionary* (2d ed. 1989).  To "improve" means to "advance or raise to a better quality or condition; to bring into a more profitable or desirable state; to increase the value or excellence of; to make better; to better, ameliorate." Improve, *Oxford English Dictionary* (2d ed. 1989).  Moreover, in the "real property context," *National Tr.*, 2026 WL 980554, at *7 (Rao, J., dissenting), to "improve" means to build structures on land.  Indeed, "improved" land is land that "has been developed" or is "occupied by buildings and structures." Land, *Black's Law Dictionary* (12th Ed. 2024); *see* Improved Land, *Black's Law Dictionary* (5th ed. 1979); *see also* Brian Sawers, *The Right to Exclude from Unimproved Land*, 83 Temple L. Rev. 665, 666 (2011).

Improvement has long been understood to include erecting buildings. *See, e.g.*, Act of Sept. 4, 1841, Pub. L. No. 27-16, § 10, 5 Stat. 453, 455 (granting

public lands to persons "who shall inhabit and improve the same"). The term "public improvement" in 41 U.S.C. § 12, for instance, has been interpreted to mean "major alterations or renovations to a public building." 3 U.S. Gov't Accountability Off., GAO-08-978SP, Principles of Federal Appropriations Law 13-170 (3d ed. 2008) (Red Book); *see also, e.g.*, 25 U.S.C. § 293b (discussing "any parcel or tract of land and the improvements thereon"); 43 U.S.C. § 316j (authorizing lessees to construct "fence, building, corral, reservoir, well or other improvement"); 42 U.S.C. § 4652(a) (where agency acquires interest in real property, it "shall acquire at least an equal interest in all buildings, structures, or other improvements"); *see also National Tr.*, 2026 WL 980554, at *6 n.2 (Rao, J., dissenting) (collecting statutes). Courts have understood "improve" in the same manner. *See, e.g.*, *Washington State Dep't of Licensing v. Cougar Den, Inc.*, 586 U.S. 347, 351-52 (2019) (plurality op.) (describing "improvements to the remaining Yakama land, such as building a hospital and schools"). This usage has been commonplace for centuries. *See, e.g.*, 3 Joseph Story, *Commentaries on the Constitution* 149 (1st ed. 1833) (discussing the "authority of congress to make roads, canals, and other internal improvements").

Modernizing the East Wing to address urgent security needs, update infrastructure, and better allow the President to carry out his constitutional duties falls naturally within the statutory text. *National Tr.*, 2026 WL 980554, at *7 (Rao, J., dissenting). Indeed, measures to make an overall building safer—from fixing its foundation, to fortifying its structure, to altering its windows and supports with features to withstand attack—are the very definition of "improvements." Here, replacing one wing of the White House—one that had grown dilapidated and vulnerable to modern threats—fits exactly the concept of "chang[ing]" property to bring it into a "more profitable or desirable state" and enhance its "quality [and] condition." Improve, *Oxford English Dictionary*, *supra*.

2.  The district court read Section 105(d) as only "authorizing the President to conduct ordinary maintenance and repair of the White House." JA473. But by singling out "maintenance" and "repair," the Court ignored the seven other words Congress included in the statute. *See Torres v. Lynch*, 578 U.S. 452, 463 n.8 (2016) ("ordinary assumption" is "Congress" gives "each provision independent meaning"). That list of terms underscores that Section 105(d) covers a wide array of projects, large and small, so that each President has flexibility to adapt the White House to the needs of the office at that

38

particular time. Sometimes, that may involve smaller tasks like basic wear-and-tear "refurnishing" and "repair." 3 U.S.C. § 105(d)(1). Other times—for example, if the White House roof unexpectedly collapsed, or if its interior had to be gutted to replace its "air-conditioning" and "heating" to accommodate security-grade ventilation—more major construction would be involved. *Id.* But if, as the district court concluded, "'improvement' means only 'maintenance and upkeep,' it is redundant with 'maintenance' and 'repair' in section 105(d)(1)." *National Tr.*, 2026 WL 980554, at \*7 (Rao, J., dissenting).

Giving independent content to Section 105(d)'s separate words hardly involves "hid[ing] elephants in mouseholes." JA475. Defendants' reading is not some late-breaking assertion of "unheralded power" or a "transformative expansion" of presidential power. *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). To the contrary, Presidents have long directed major changes to the White House based on similarly general authorities, *see supra* pp. 8-10, not specific authorization, *contra* JA478-79. As the Trust admits, that includes the East Wing itself—where President Roosevelt demolished and rebuilt the prior historic structure and installed "a presidential emergency operations bunker," authorized by nothing more than a general appropriations statute for national defense. JA207. If anything, it would be remarkable if Congress

intended to *change* its longstanding acquiescence in presidential control over White House renovations by enumerating nine different ways in which the President may, at his discretion, change the structure.

Nor do other canons of construction refute this natural reading. The district court cited *noscitur a sociis*, but Section 105(d)'s verbs do not share the common denominator that the court read into it. *See Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 225 (2008). Some of the words do suggest upkeep (like "maintenance") and others seem to contemplate potentially smaller projects (like small-scale "lighting" fixes). At the same time, "alteration" and "improvement" both imply changes—and potentially major ones—rather than merely maintaining the prior condition. So too the other terms: It is equally possible that projects involving the White House's "lighting," "heating," or "air-conditioning" are major projects, including where (as here) it is necessary to install military-grade ventilation. The takeaway from this list is that Congress sought to cover the waterfront. Using certain words to nullify others is an abuse of the canon. *See, e.g.*, *S.D. Warren Co. v. Maine Bd. of Env't Prot.*, 547 U.S. 370, 379 (2006) (rejecting argument that "pairing a broad statutory term with a narrow one shrinks the broad one").

In all events, canons "can resolve statutory ambiguity in close cases, but they do not allow [a court] to discern any clear and mandatory prohibition" for purposes of *ultra vires* view. *See Changji Esquel*, 40 F.4th at 725. If one canon thrusts and another parries, the *ultra vires* plaintiff loses.

The district court also reasoned that Section 105(d) must be narrow because the "[s]ums appropriated under" it can be relatively small. JA477. The meaning of a statutory authorization, however, does not expand or contract based on annual appropriations. The availability of funding may affect how much of the activity can be done at a particular time, but the authority to act is not dependent on the amount Congress chooses to appropriate. *Cf. Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978) ("purpose" of appropriations is to provide "funds" for "authorized programs"). As relevant here, Section 105(d) gives the President authority to undertake alterations and improvements to the White House. How he pays for those alterations and improvements is a separate question. At any rate, the answer is the same: As explained further below, it is lawful to supplement the Section 105(d) appropriated funds with funds donated to NPS, and the district court properly noted that the legality of that funding mechanism is "not squarely at issue" in this case regardless. JA478.

Finally, the concern that a broader reading of Section 105(d) would lack "discernible limits," JA476, does not justify engrafting textually unsound limits. More fundamentally, the district court's and the Trust's position fares even worse by leaving limits completely undefined. Neither the Trust nor the court offered any principled way to distinguish permissible "comparatively minor" projects from forbidden major ones. Dkt. 51 at 9. Under the district court's understanding, could the President keep the walls of the East Wing but gut the interior? Build an extension? A new story? The Trust supplied more doubt than certainty: It said that a new balcony should be fine, but a new building is a stretch. Dkt. 33 at 11 n.7. It conceded that large "temporary" structures are likely okay, but deemed small permanent structures doubtful. *Id.* at 14 n.9. The only clear thing about that position is that it cannot support a viable *ultra vires* claim, which requires a "specific prohibition" that the Project clearly violated. *NRC*, 605 U.S. at 681.

Ultimately, it is the political process that checks the President's authority, as history illustrates. When Congress has become concerned that a White House improvement may go too far, it has not hesitated to act. For instance, in 1949, Congress created a "Commission on Renovation of the Executive Mansion" to supervise how funding was being spent on the White

House remodel.  *See, e.g.*, Act of Apr. 14, 1949, ch. 51, 63 Stat. 45, 45-47 (1949). That exception proves the rule: absent such intervention, the President has the statutory authority to alter or improve the White House at his discretion.

**B.     The NPS Organic Act Permits Construction In National Parks, Including President's Park.**

Congress also chose to designate the White House and President's Park as a unit of the national park system.  That brings to bear Congress's separate, general authorization of construction in national parks—authority that the Executive Branch has relied on for over a century to build significant structures across national parkland.  The Project is just the latest example: It is a structure built within President's Park to advance the purposes of that park unit.  The district court held otherwise by adopting an indefensible interpretation of the NPS Organic Act that no party had urged, and once more misunderstood the role of congressional appropriations.

1.     In the NPS Organic Act, Congress authorized the Secretary of Interior, through NPS, to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such

manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). NPS has used that authority for decades to engage in major construction in national parks. For instance, over the twentieth century, NPS engaged in a major campaign to build "new facilities including comfort stations, picnic shelters, campgrounds, visitor centers, park staff housing, maintenance buildings, warehouses, roads, and other infrastructure." Program Comment on Stewardship and Management of National Park Service Mission 66-Era Facilities (1945-1972), 89 Fed. Reg. 97631, 97631 (Dec. 9, 2024); *see* JA402-03.

Especially relevant here, NPS has exercised its Organic Act authority to build numerous structures across national parks within the District of Columbia, ever since those parks were transferred to its jurisdiction in 1933. *See* Exec. Order No. 6,166 (June 10, 1933); Exec. Order No. 6,228 (July 28, 1933). For example, in the 1960s, NPS constructed the National Capital Region Headquarters, the U.S. Park Police Headquarters, and some 74,000 square feet of administrative facilities in East Potomac Park. *See* Nat'l Cap. Plan. Comm'n, Executive Director's Recommendation, at 1 (Jan. 7, 2016), https://perma.cc/8D47-BNV6. More recently, NPS built new U.S. Park Police Stables on the National Mall; erected a 7,500-seat tennis stadium in Rock

Creek Park; and conducted major renovations to golf courses at Langston, Rock Creek, and East Potomac. None of these projects was specifically authorized by an act of Congress; all were completed pursuant to the NPS Organic Act's general authorization. *See* JA404-06.

The NPS Organic Act equally authorizes the Project. Congress in 1961 designated the White House and President's Park a unit of the National Park System. *See* Pub. L. No. 87-286, 75 Stat. at 586. NPS "determined that the Project was consistent with the [White House and President Park's] enabling legislation." JA246; *see generally* JA108-12. It found the Project addresses a longstanding need for a permanent secure space at the White House for large events and would replace temporary tents that damage the White House grounds and NPS infrastructure. JA116-17; JA222-23. In line with the park's enabling legislation, NPS concluded the Project "will continue to preserve and interpret the museum corridor and principal public rooms of the White House, ensuring that visitor access and the park's core interpretive mission are maintained." JA106; *see* JA246.

Further, because the Project is authorized by the NPS Organic Act, it can be funded under 54 U.S.C. § 101101(2), which allows donations "for the purposes of the [National Park] System." Since the Carter Administration, it

has been established that NPS has "authority for the acceptance of gifts in connection with the Department of the Interior's general statutory responsibility … for maintenance of the White House and its grounds." *The White House—The Vice President—Gifts*, 2 Op. O.L.C. 349, 350 (1977) (addressing White House swimming pool); *see also, e.g., Authorization for the White House Staff: Hearing Before the Subcomm. on Emp. Ethics & Utilization of the H. Comm. on Post Off. & Civ. Serv.*, 95th Cong. 21 (Apr. 26, 1977) (statement of Rep. Harris) (explaining that there are "two ways" the "Executive Residence is taken care of": the appropriated "account" under Section 105(d), and "Interior's own account"). That donation authority is available even where, as here, NPS is not itself running the project that is funded. The Economy Act authorizes one agency to transfer authority and funding to another, where the latter can more efficiently accomplish the project. *See* 31 U.S.C. § 1535; Red Book 12-64. Here, "NPS determined that it was in the best interest of the United States for EXR to contract for and directly manage the Project," JA247, "consistent" with existing Executive Branch "precedent," JA422. Thus, while the funding mechanism is not "squarely at issue" here, JA478, it is also plainly lawful.

**2.** The district court doubted the Act provides the "authority to engage in construction in national parks" at all. JA487. But even the Trust never made that sweeping, historically unsustainable argument, which would mean that NPS has been violating the law for decades.

Flinching from the far-reaching consequences of its novel construction, the district court speculated that "Congress was aware of [prior] projects and at least indirectly authorized them." JA488. The court appears to have reasoned that Congress authorized those past projects by appropriating lump sums for NPS construction. JA487. That hardly helps. Those appropriations *confirm* NPS's construction authority under the Organic Act. The fact that Congress appropriates tens of millions of dollars annually for NPS "construction" proves that Congress understands NPS to be authorized to build. Further, Congress just this year appropriated $88 million to NPS for general construction, and in doing so expressly confirmed those funds could be supplemented by "National Park Service Donations." Pub. L. No. 119-74, div. C, tit. I, 140 Stat. 5, 100-01 (2026). Using the district court's own logic, Congress was thus "aware" that NPS had the power to build on parkland, including on White House grounds, and "indirectly authorized" as much.

47

JA488. So even if both the NPS Organic Act and a general appropriation were required before engaging in construction, the Project is *still* lawful.[5]

The district court further suggested that defendants could not rely on NPS's statutory authorities given that EXR is running the Project. JA486-87. Under the Economy Act, however, NPS could and did contract with EXR to manage the Project, as is "consistent" with longstanding Executive Branch "precedent" involving analogous projects on White House grounds. *See* JA246-47; 31 U.S.C. § 1535. By doing so, EXR was able to rely on NPS's statutory authorities in addition to NPS's funding sources. JA420; *Acting Comptroller Gen. Elliott to the Sec'y of War*, 18 Comp. Gen. 489, 490-91 (1938) (funds transferred under the Economy Act are "available for the purposes for which the appropriation from which transferred are available"). Moreover, it is entirely proper for EXR to lead the Project. Indeed, the 1961 statute making the White House a unit of the National Park System is explicit that nothing done by NPS "shall conflict with the administration of the Executive

---

[5] The district court believed recent appropriations bills limit the use of donated funds to projects "within the original scope of effort for projects funded by the [NPS] Construction appropriation." JA488 n.16. It is far from clear that this language implicitly repeals or restricts NPS's long-extant donation authority, but regardless that would at most suggest NPS could solve any problem by dedicating some appropriated construction funds to the Project and using donations for the remainder.

offices of the President or with the use and occupancy of the buildings and grounds as the home of the President and his family and for his official purposes." Pub. L. No. 87-286, 75 Stat. at 586.[6]

### C. The Project Does Not Violate 40 U.S.C. § 8106.

The district court compounded its errors by finding a likely violation of 40 U.S.C. § 8106, which requires "express authority of Congress" before any "building or structure" may be "erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia." As set out above, Congress *has* expressly authorized the erection of structures on the White House grounds twice over. Nothing in Section 8106 thus stands in the way of using those express powers to carry out the Project. *See National Tr.*, 2026 WL 980554, at *7 (Rao, J., dissenting).

---

[6] The Trust acknowledged below that NPS generally has statutory authority to build in national parks, but argued that the Project was unlawful because it was "in derogation of the values and purposes" of President's Park, and therefore violated the NPS Organic Act. Dkt. 51 at 14-16 (quoting 54 U.S.C. § 100101(b)(2)). Even the district court did not adopt this argument. Rightly so: Congress vested the Executive with "broad discretion" in deciding how best to serve the fundamental purpose of a national park, *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1454 (9th Cir. 1996), and the Trust never bothered to engage with NPS's comprehensive analysis of how the Project advanced the fundamental purposes of President's Park.

The Trust argued below that Section 8106 should be read to require express congressional authorization for *each particular structure*, rather than merely general authority to build. Even the district court declined to adopt that reasoning, which would defy how Section 8106 has been applied for decades and require Congress's express sign-off for every concession stand in every federal park in the District. The district court instead correctly held that Section 8106 requires only general authority from Congress to build—not to build a specific structure.[7] The court's conclusion thus turned entirely on its mistaken view that no statute authorized any construction, rendering this theory entirely redundant.

In actuality, the history of Section 8106 confirms that it was concerned with stopping construction by unauthorized third parties—not interfering with lawful construction by park authorities. It followed a series of similar measures focused on preventing "unlawful occupation" of "public lands in the District of Columbia." Act of Apr. 28, 1902, Pub. L. No. 57-81, 32 Stat. 120, 152. In 1926, the Director of Public Buildings and Public Parks of the National

---

[7] That distinction explains the Trust's *one* example where Congress did authorize a given structure (a facility for bonsai), which was managed by the Department of Agriculture, an agency lacking comparable construction authority. Pub. L. No. 103-111, 107 Stat. 1046, 1051 (1993).

Capital was asked how the government could build a "field house at Anacostia Park … in the face of" Section 8106; he responded that the provision was passed at his office's request "for the purpose of preventing encroachments upon park property by other Government offices or by the public, and has never been construed to prevent such construction by the park authorities within the limits of the appropriations." *District of Columbia Appropriation Bill for 1927: Hearings Before the Subcomm. of the H. Comm. on Appropriations*, 69th Cong. 533 (1927). That is not, as the district court thought, irrelevant "post-enactment legislative history," JA483, but rather near-contemporaneous evidence of what the legislation was understood to mean. Congress has been on notice of how the Executive Branch understands this provision for a century.

Finally, wherever else Section 8106 applies, it should not be understood to apply to the White House, because a generally applicable statute should not be construed as restricting the President without a clear statement to that effect. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). That canon has full purchase here, given that the White House is the President's "official residence." *Ateba v. Leavitt*, 133 F.4th 114, 117 (D.C. Cir. 2025). The district court seemed to think the President would only have a constitutional interest

in how the White House is managed if he asserted some Article II power over its construction. JA337. That defies common sense. The President of course would have an interest if he discovered the East Wing was riddled with black mold or that the West Wing had an urgent security vulnerability. These hypotheticals are versions of real concerns underlying the Project. *See* JA223-24. Forcing the President to come hat-in-hand to Congress so the White House could remain safe and habitable gives the Legislature dangerous leverage over the Presidency, inviting a serious constitutional clash. Until now, Section 8106 has never been read to force such conflict.

All else aside, Section 8106 does not "confer rights upon the individual"—*i.e.*, the Trust—"seeking ultra vires review." *Global Health Council*, 153 F.4th at 20. It is intended to protect Congress's institutional interests, not private visual ones. Whether Congress authorized the Project is "a judgment peculiarly for Congress to make in carrying on its own functions in our constitutional system, not for non-congressional parties to carry on as an ersatz proxy for Congress itself." *Natural Res. Def. Council Inc. v. Hodel*, 865 F.2d 288, 318 (D.C. Cir. 1988). Equity does not supply the Trust with a cause of action to inject itself (and this Court) into that back-and-forth reserved exclusively for the political branches.

### III. The Balance Of Equities Independently Compels Reversal.

Apart from everything else, the gross imbalance of equities requires reversal. The passing architectural objection of a single passerby is "clearly" dwarfed by "the security vulnerabilities at the White House that would be prolonged by halting construction," *National Tr.*, 2026 WL 980554, at *8 (Rao, J., dissenting), and the district court's attempts to ameliorate those harms in its amended order are unworkable and ineffective. On the equities, this is not a close call, and the Court can reverse on this ground alone. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 33 (2008) (vacating injunction where "ecological, scientific, and recreational interests" were "plainly outweighed by the Navy's need to conduct realistic training exercises to ensure that it is able to neutralize the threat posed by enemy submarines").

**1.** The Project and its timely completion are critical to national security. As the Secret Service has attested, the White House Complex is currently ill-equipped to safeguard the President, his family, his Cabinet, and his staff from modern-day threats. JA252 (old East Wing was "outdated in terms of security and support for Secret Service operations"). Moreover, halting the Project in its current state will compound these security vulnerabilities, for reasons described in greater detail in classified

declarations lodged with this panel. *See* Classified Ex Parte Supplement, *National Tr.*, No. 26-5101 (Apr. 3, 2026). The district court was inappropriately dismissive of these national-security concerns. *See, e.g.*, JA493.

In amending its injunction on remand, the district court purported to alter course—in particular, by authorizing national security related work such as "below-ground construction" plus "above-ground construction strictly necessary to cover, secure, and protect such [underground] facilities." But the court continued to insist that there be no "above-ground, physical construction of the proposed ballroom" and that "any such construction will not lock in the aboveground size and scale of the ballroom." JA513-14. That modification further misapprehends the Project and the paramount security considerations at issue.

Most fundamentally, the Project is a single, unified, and cohesive structure that cannot be sliced-and-diced by judicial fiat. The military facility needs a sufficient structure atop it, and the ballroom's entire structure is to accommodate critical security features for the Project, such as "bullet-proof windows and a drone-proof roof," as well as missile-resistant steel columns, protective partitioning, and other fortifications, that are vital to the security of the President. *See* JA507. Perhaps most important, the ballroom's height-

and-massing is essential to safeguard not just the ballroom but also the Executive Mansion and the entire White House complex. *See* Stay.Add.20.

The district court failed to account for these issues in any practical way. While the district court begrudgingly accepted that the military installation would need *something* atop it, it declared that a "slab and topping structure" should do the trick—and that nothing more was "strictly necessary to cover, secure, and protect" those facilities. JA507; JA509-10. That is wrong. As the Secretary of the Army explained, not just any "topping structure" will do. Stay.Add.18-19. The ballroom's "height and mass" are "crucial" to protecting the specific military installation being built here. Stay.Add.20. The ballroom's structure employs a "dual-layered system compromising a sacrificial outer cover coupled with a hardened inner structural element" that requires the use of specialized construction materials. Stay Add. 21-24. "[T]hese structural hardening and counter-threat integrations are essential" to safeguarding what is currently being constructed. Stay.Add.23-24. The district court's blithe assumption that tossing a "slab" on top would adequately protect a state-of-the-art military installation over months (or years) of litigation should further disqualify the court from overseeing White House construction.

The district court also recognized that the east side of the Executive Mansion cannot be indefinitely exposed and *something* may need to be built alongside it—but refused to countenance *this* ballroom. *See* JA509. This is even less workable. A significant structure the scope and size of the ballroom is necessary to adequately protect the exposed flank of the Executive Mansion. Under the court's injunction, defendants will need to pour time and resources into a temporary structure that is both major (to the detriment of Hoagland's monthly stroll) yet still not major enough (to the detriment of the President's safety and the integrity of the Project). Compelling an ineffective and wasteful project is not the tailored work of a court sitting in equity.

Finally, the district court brushed off any concerns about its injunction, because the ballroom, even if itself necessary for national security, could not be built "immediately." JA507. That misses the point: The President (and future Presidents) need a secure East Wing as soon as possible, as the most recent assassination attempt on President Trump's life makes inescapable. Even if a state-of-the-art ballroom cannot be conjured with a finger snap, the injunction "inevitably extends the time during which" the ballroom remains unavailable, and that the "President's residence remains less secure." *See National Tr.*, 2026 WL 980554, at *7 (Rao, J., dissenting). "Every additional

56

day of White House vulnerability harms the government." *Id.* An injunction premised on the assertion that the complete safety of the White House can wait another number of months (or years) because it cannot be improved overnight has no support in equity.

Beyond making no equitable sense, that order imposes additional harm by squandering time and money that cannot be recovered when defendants prevail on the merits. That is the very definition of irreparable harm. *In re NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022) ("financial injury can be irreparable where no adequate compensatory or other corrective relief will be available"); *see also NIH v. American Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025).

2. The injunction also imposes irreparable harm on defendants and the public interest more broadly. Ensuring that the Project continues on schedule advances the public interest because the new East Wing's expanded capacity for receiving foreign dignitaries and visitors will benefit the President, other governmental offices and agencies with a White House presence, and the American people. The past practice of pitching temporary tents on the South Lawn was costly and cumbersome, did not comport with the dignity due to the White House, and "caused substantial damage to NPS

resources on the grounds." JA147; *see* JA252-53. The Project also resolves other problems that have long plagued the East Wing, such as an unstable roof on the colonnade, water infiltration causing mold and deterioration of structural and historic elements, and the presence of asbestos and lead-based paint. JA222; JA223-24. Indeed, modernization of the East Wing will relieve strain on the more historic portions of the Executive Mansion, preserve the integrity of the entire complex, and thus advance the public interest.

The entire point of the district court's injunction is to delay the construction of the ballroom. JA510. That harm is irreparable—when defendants prevail on the merits, they will have no way to recoup that lost time, the added costs associated with delay, or the benefits that the project would have conferred on the complex and the Nation in the interim. *See Trump v. Sierra Club*, 588 U.S. 930, 930 (2019) (staying injunction that would delay construction of border wall); *Columbia Gas Transmission, LLC v. 1.01 Acres*, 768 F.3d 300, 315 (3d Cir. 2014) (finding irreparable harm from a delay in construction). Meanwhile, the injunction puts the sitting President to an intolerable choice. He might choose to risk his safety by attending events in unsecure venues—be it the tents on the White House lawn, or places like the Washington Hilton (now home to two attempted presidential assassinations).

Or the President must forgo those events entirely, to the detriment of his constitutional responsibilities to conduct foreign relations, meet domestic dignitaries, and "speak[] to and on behalf of the American people," *Trump v. United States*, 603 U.S. 593, 617-18 (2023).

3.      It is hard to fathom any collection of private harms that could offset these paramount national-security interests.  It is obvious, however, that the personal preferences of a single pedestrian are woefully insufficient.  *See National Tr.*, 2026 WL 980554, at *8 (Rao, J., dissenting).  In *Winter*, the Supreme Court held that the ecological and recreational interests of a group of environmentalists in some whales and sea lions were dwarfed by the national-security needs of the Navy to conduct training exercises in certain waters.  555 U.S. at 23-24, 33.  This case follows *a fortiori. See National Tr.*, 2026 WL 980554, at *8 (Rao, J., dissenting).  If the military needed to build a windowless compound next to the Executive Mansion to secure the President, no court sitting in equity would afford a veto to a passerby's eyesore-grievance; the fact that the President was able to accomplish the same ends through a classical ballroom that naturally adjoins the existing structure makes this an easy case.

## CONCLUSION

This Court should reverse the injunction and continue the stay pending appeal. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

ADAM R.F. GUSTAFSON
   *Principal Deputy Assistant Attorney General*

   *Environment and Natural Resources Division*

BRETT A. SHUMATE
   *Assistant Attorney General*

YAAKOV M. ROTH
   *Principal Deputy Assistant Attorney General*

*/s/ Brantley T. Mayers*
BRANTLEY T. MAYERS
   *Attorney*
   *Civil Division, Room 3632*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202)890-9874*

May 2026

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,513 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Expanded BT 14-point font, a proportionally spaced typeface.

*/s/ Brantley T. Mayers*
BRANTLEY T. MAYERS

**ADDENDUM**

# TABLE OF CONTENTS

3 U.S.C. § 105 ......................................................................................A1

40 U.S.C. § 8106 ..................................................................................A2

54 U.S.C. § 100101 ..............................................................................A3

54 U.S.C. § 312102 ..............................................................................A4

**3 U.S.C. § 105**

### § 105. Assistance and services for the President

\*\*\*

(d) There are authorized to be appropriated each fiscal year to the President such sums as may be necessary for—

(1) the care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence at the White House;

(2) the official expenses of the White House Office;

(3) the official entertainment expenses of the President;

(4) the official entertainment expenses for allocation within the Executive Office of the President; and

(5) the subsistence expenses of persons in the Government service while traveling on official business in connection with the travel of the President.

Sums appropriated under this subsection for expenses described in paragraphs (1), (3), and (5) may be expended as the President may determine, notwithstanding the provisions of any other law. Such sums shall be accounted for solely on the certificate of the President, except that, with respect to such expenses, the Comptroller General may inspect all necessary books, documents, papers, and records relating to any such expenditures solely for the purpose of verifying that all such expenditures related to expenses in paragraph (1), (3), or (5). The Comptroller General shall certify to Congress the fact of such verification, and shall report any such expenses not expended for such purpose.

\*\*\*

**40 U.S.C. § 8106**

### § 8106. Buildings on reservations, parks, or public grounds

A building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress.

**54 U.S.C. § 100101**

## § 100101. Promotion and regulation

(a) In General.— The Secretary, acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

\*\*\*

**54 U.S.C. § 312102**

## § 312102. Establishment and purposes

(a) Establishment.— To further the policy enunciated in chapter 3201 of this title, and to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest, there is established a charitable, educational, and nonprofit corporation to be known as the National Trust for Historic Preservation in the United States.

(b) Purposes.— The purposes of the National Trust shall be to—

(1) receive donations of sites, buildings, and objects significant in American history and culture;

(2) preserve and administer the sites, buildings, and objects for public benefit;

(3) accept, hold, and administer gifts of money, securities, or other property of any character for the purpose of carrying out the preservation program; and

(4) execute other functions vested in the National Trust by this chapter.