**ORAL ARGUMENT SCHEDULED FOR JUNE 5, 2026**

Nos. 26-5123, 26-5134

United States Court of Appeals
*for the*
District of Columbia Circuit

——————————————————————————————

NATIONAL TRUST FOR HISTORIC PRESERVATION
IN THE UNITED STATES,
*Plaintiff-Appellee/Cross-Appellant*

v.

NATIONAL PARK SERVICE; JESSICA BOWRON, in her official capacity as ACTING DIRECTOR, NATIONAL PARK SERVICE; JOHN STANWICH, in his official capacity as SUPERINTENDENT, THE WHITE HOUSE AND PRESIDENT'S PARK; DEPARTMENT OF THE INTERIOR; DOUGLAS BURGUM, in his official capacity as SECRETARY OF THE INTERIOR; GENERAL SERVICES ADMINISTRATION; MICHAEL J. RIGAS, in his official capacity as ACTING ADMINISTRATOR, GENERAL SERVICES ADMINISTRATION; DONALD J. TRUMP, in his official capacity as PRESIDENT OF THE UNITED STATES; EXECUTIVE OFFICE OF THE PRESIDENT; SUSIE WILES, in her official capacity as WHITE HOUSE CHIEF OF STAFF; OFFICE OF THE EXECUTIVE RESIDENCE; and ROBERT B. DOWNING, in his official capacity as WHITE HOUSE CHIEF USHER,
*Defendants-Appellants/Cross-Appellees*

——————————————————————————————

On Appeal from the United States District Court
for the District of Columbia

——————————————————————————————

**BRIEF OF APPELLEE/CROSS-APPELLANT
NATIONAL TRUST FOR HISTORIC PRESERVATION
IN THE UNITED STATES**

——————————————————————————————

Gregory B. Craig (*counsel of record*)
FOLEY HOAG LLP
1717 K Street N.W.
Washington, DC 20006
Tel. (202) 223-1200
gcraig@foleyhoag.com

Thaddeus A. Heuer
Matthew F. Casassa
Kevin Y. Chen
Jack C. Smith
FOLEY HOAG LLP
155 Seaport Boulevard, Suite 1600
Boston, MA 02210
Tel. (617) 832-1000
theuer@foleyhoag.com
mcasassa@foleyhoag.com
kchen@foleyhoag.com
jcsmith@foleyhoag.com

*Attorneys for National Trust for Historic Preservation in the United States*

## CERTIFICATES AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

Plaintiff-appellee/cross-appellant is the National Trust for Historic Preservation in the United States ("National Trust"). The National Trust is a congressionally chartered charitable, educational, and nonprofit corporation, *see* 54 U.S.C. §312102, which has no parent company, and in which no publicly held company has a 10% or greater ownership interest. The National Trust was established by Congress to "facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest." *Id.* §312102(a).

Defendants-appellants/cross-appellees are the National Park Service; Jessica Bowron, in her official capacity as Acting Director, National Park Service; John Stanwich, in his official capacity as Superintendent, the White House and President's Park; the Department of the Interior; Douglas Burgum, in his official capacity as Secretary of the Interior; the General Services Administration; Michael J. Rigas, in his official capacity as Acting Administrator, General Services Administration; Donald J. Trump, in his official capacity as President of the United States; the Executive Office of the President; Susie Wiles, in her official capacity as White House Chief of Staff; the Office of the Executive Residence; and Robert B. Downing, in his official capacity as White House Chief Usher.

The American Conservative Union has appeared as amicus before this Court and filed a brief in support of Defendants. The American Institute of Architects, the American Society of Landscape Architects, the Association for Preservation Technology, the Committee of 100 on the Federal City, the Cultural Landscape Foundation, the DC Preservation League, the National Mall Coalition, the National Preservation Partners Network, the Olmsted Network, and the Society of Architectural Historians have appeared as amici and noticed their intent to file a brief in support of the National Trust.

No amici curiae or intervenors appeared before the district court.

## B. Rulings Under Review

Defendants appeal from the memorandum opinion (Dkt.72) and order (Dkt.73) issued by the district court on April 16, 2026, granting the National Trust preliminary injunctive relief and superseding the district court's prior order (Dkt.60), which had likewise granted the National Trust preliminary injunctive relief. The National Trust conditionally cross-appeals from the memorandum opinion (Dkt.47) and order (Dkt.48) issued on February 26, 2026, denying the Trust's first motion for a preliminary injunction.

**C. Related Cases**

This case was previously before the Court. *Nat'l Tr. for Hist. Pres. v. Nat'l Park Serv.*, Nos. 26-5101, 26-5108. To counsel's knowledge, there are no other related cases within the meaning of Circuit Rule 28(a)(1)(C).

 */s/ Gregory B. Craig*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATEMENT OF THE ISSUE ..............................................................................4

PERTINENT STATUTES AND REGULATIONS ................................................5

STATEMENT OF THE CASE ...............................................................................5

I.   Defendants Demolish The East Wing And Begin Unlawfully Constructing The Ballroom. .................................................................................................5

II.  The National Trust Sues And The District Court, Relying On Defendants' Representations, Declines To Grant A Temporary Restraining Order.............7

III. After The District Court Denies The National Trust's First Preliminary-Injunction Motion, The Trust Amends Its Complaint And Renews Its Motion. ...........................................................................................................9

IV.  The District Court Enjoins Construction Of The Ballroom. ..........................12

V.   Defendants Claim, For The First Time, That The Ballroom Itself Is Necessary For National Security. ...................................................................14

SUMMARY OF THE ARGUMENT......................................................................17

ARGUMENT ........................................................................................................21

I.   The National Trust Has Standing....................................................................21

   A.  The Ballroom Project Injures Professor Hoagland. ..................................22

   B.  This Suit Is Germane To The National Trust's Purposes. ........................27

II.  The National Trust Is Likely To Succeed On The Merits. ............................29

   A.  The National Trust Is Likely To Succeed On Its Claim That Construction Of The Ballroom Is *Ultra Vires*. .........................................29

   B.  The National Trust Is Likely To Succeed On Its APA Claim. .................39

   C.  The National Trust Is Likely To Succeed On Its Property Clause Claim..44

III. The Remaining Factors Strongly Favor Affirmance. ....................................47

CONCLUSION .....................................................................................................55

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                          **Page(s)**

*In re Aiken Cty.*,
    725 F.3d 255 (D.C. Cir. 2013)..................................................................................55

*Ashwander v. Tenn. Valley Auth.*,
    297 U.S. 288 (1936)..........................................................................................1, 37

*Bicycle Trails Council v. Babbitt*,
    No. C-93-0009, 1994 U.S. Dist. LEXIS 12805 (N.D. Cal. Sept. 1,
    1994) ...............................................................................................................42

*Boumediene v. Bush*,
    553 U.S. 723 (2008)...................................................................................4, 54, 55

*Changji Esquel Textile Co. v. Raimondo*,
    40 F.4th 716 (D.C. Cir. 2022)........................................................................33, 36

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006)...........................................................................48

*Clark v. Cmty. for Creative Non-Violence*,
    468 U.S. 288 (1984)..........................................................................................48

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
    601 U.S. 416 (2024)..........................................................................................31

*Corley v. United States*,
    556 U.S. 303 (2009).........................................................................................43

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
    146 F.4th 1144 (D.C. Cir. 2025).................................................................22, 23

*Ctr. for Nat'l Sec. Stud. v. Dep't of Just.*,
    331 F.3d 918 (D.C. Cir. 2003)...........................................................................52

*Ctr. for Sustainable Econ. v. Jewell*,
    779 F.3d 588 (D.C. Cir. 2015).....................................................................24, 27

*Dalton v. Specter*,
    511 U.S. 462 (1994).....................................................................10, 20, 44, 45

*Deal v. United States*,
    508 U.S. 129 (1993)..........................................................................................33

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)..........................................................................................53

*Envtl. Def. Fund v. FERC*,
  2 F.4th 953 (D.C. Cir. 2021)..................................................................25

*FDA v. R.J. Reynolds Vapor Co.*,
  606 U.S. 226 (2025).............................................................................38

*Fed. Express Corp. v. Dep't of Com.*,
  39 F.4th 756 (D.C. Cir. 2022)...............................................................33

*Food Mktg. Inst. v. Argus Leader Media*,
  588 U.S. 427 (2019).......................................................................37, 40

*Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*
  528 U.S. 167 (2000).............................................................................23

*Global Health Council v. Trump*,
  153 F.4th 1 (D.C. Cir. 2025)....................................................10, 20, 44

*Greenlaw v. United States*,
  554 U.S. 237 (2008).............................................................................46

*Haitian Refugee Ctr. v. Gracey*,
  809 F.2d 794 (D.C. Cir. 1987)..............................................................38

*Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*,
  71 F.4th 59 (D.C. Cir. 2023).................................................................33

*Home Bldg. & Loan Ass'n. v. Blaisdell*,
  290 U.S. 398 (1934)..........................................................................4, 54

*Kellogg Brown & Root Servs. v. United States ex rel. Carter*,
  575 U.S. 650 (2015).............................................................................36

*King v. St. Vincent's Hosp.*,
  502 U.S. 215 (1992).............................................................................34

*Kleppe v. New Mexico*,
  426 U.S. 529 (1976)..........................................................................1, 53

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)..................................................................48

*Learning Res., Inc. v. Trump*,
  146 S. Ct. 628 (2026)...........................................................................39

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
  523 U.S. 26 (1998)...............................................................................40

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992).............................................................................22

vi

*Mahmoud v. Taylor*,
   606 U.S. 522 (2025)..................................................................................47

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012)..................................................................................38

*Medellín v. Texas*,
   552 U.S. 491 (2008)..................................................................................54

*Mexichem Specialty Resins, Inc. v. EPA*,
   787 F.3d 544 (D.C. Cir. 2015)..................................................................47

*Ex parte Milligan*,
   71 U.S. 2 (1866)........................................................................................54

*Nat'l Lime Ass'n v. EPA*,
   233 F.3d 625 (D.C. Cir. 2000)..................................................................27

*Nat'l Parks Conservation Ass'n v. Manson*,
   414 F.3d 1 (D.C. Cir. 2005)......................................................................24

*Nat'l Parks Conservation Ass'n v. Semonite*,
   422 F. Supp. 3d 92 (D.D.C. 2019)............................................................48

*Nat'l Treas. Empls. Union v. Vought*,
   149 F.4th 762 (D.C. Cir. 2025)............................................................45, 46

*Nat'l Wildlife Fed'n v. Burford*,
   835 F.2d 305 (D.C. Cir. 1987)..................................................................47

*New Comm Wireless Servs. v. Sprintcom, Inc.*,
   287 F.3d 1 (1st Cir. 2002)........................................................................46

*Nken v. Holder*,
   556 U.S. 418 (2009)..................................................................................48

*NLRB v. Noel Canning*,
   573 U.S. 513 (2014)..................................................................................39

*NLRB v. SW Gen., Inc.*,
   580 U.S. 288 (2017)..................................................................................41

*Nuclear Reg. Comm'n v. Texas*,
   605 U.S. 665 (2025)......................................................................30, 36, 38

*United States ex rel. O'Connor v. USCC Wireless Inv., Inc.*,
   128 F.4th 276 (D.C. Cir. 2025)................................................................49

*United States ex rel. Oliver v. Philip Morris USA Inc.*,
   763 F.3d 36 (D.C. Cir. 2014)....................................................................52

*Reid v. Inch*,
    920 F.3d 828 (D.C. Cir. 2019)......................................................................53

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011)......................................................................46

*Sullivan v. Finkelstein*,
    496 U.S. 617 (1990)....................................................................................38

*Sweetland v. Walters*,
    60 F.3d 852 (D.C. Cir. 1995)........................................................................8

*United States v. Chromalloy Am. Corp.*,
    158 F.3d 345 (5th Cir. 1998) ......................................................................43

*United States v. U.S. Dist. Court*,
    407 U.S. 297 (1972)....................................................................................53

*United States v. Laslie*,
    716 F.3d 612 (D.C. Cir. 2013)....................................................................44

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001)....................................................................................33

*WildEarth Guardians v. Jewell*,
    738 F.3d 298 (D.C. Cir. 2013)....................................................................21

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008)............................................................................25, 54, 55

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985)....................................................................50

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)................................................................................4, 54

## Constitutional Provisions

U.S. Const. Art. IV, §3, cl. 2..........................................................1, 5, 17, 53

## Statutes and Regulations

3 U.S.C. §105(d) ..........................................2, 7-12, 18, 19, 29-36, 45, 46

31 U.S.C. §1301(a) ............................................................................8, 30, 31

31 U.S.C. §1321(a)(17)................................................................................32

31 U.S.C. §1321(b) ................................................................32

31 U.S.C. §1535 ....................................................................43

40 U.S.C. §8106 ......................................... 2, 5, 12, 18, 19, 30, 36-40

40 U.S.C. §8722(b) ..................................................................6

40 U.S.C. §8722(d) ..................................................................6

42 U.S.C. §4332(2) ..................................................................6

42 U.S.C. §4336 ......................................................................6

42 U.S.C. §4336(b) ................................................................7, 8

54 U.S.C. §100101 .................................................................2, 39

54 U.S.C. §100101(a) ............................................................11, 40

54 U.S.C. §100101(b) ..................................5, 11, 19, 39, 41, 42

54 U.S.C. §304101(a) ..............................................................29

54 U.S.C. §307104 ..................................................................28

54 U.S.C. §308602(b) ...........................................................28, 29

54 U.S.C. §308703 ..................................................................29

54 U.S.C. §312102(a) ........................................18, 21, 27, 39

54 U.S.C. §312102(b) ..............................................................28

45 C.F.R. §2101.1(a) .................................................................6

45 C.F.R. §2101.2(b) ................................................................6

45 Stat. 534 (1928) .................................................................35

46 Stat. 229 (1930) .................................................................35

Pub. L. 81-759, 64 Stat. 595 (1950) .......................................35

Pub. L. 88-39, 77 Stat. 58 (1963) ...........................................35

Pub. L. 93-143, 87 Stat. 510 (1973) .......................................35

Pub. L. 95-570, 92 Stat. 2445 (1978) .....................................35

Pub. L. 101-121, 103 Stat. 707 (1989) ...................................29

Pub. L. 118-47, 138 Stat. 460 (2024) .......................2, 8, 18, 31

**Other Authorities**

52 Comp. Gen. 128 (1972) ....................................................................................43

*D.C. Approp. Bill, 1927, Hrg. Before a Subcomm. of H. Comm. on Approps., 68th Cong.* (1926) ............................................................37, 38

Dan Diamond et al., *Thousands of Public Comments Slam Trump's Ballroom*, Wash. Post, https://www.washingtonpost.com/politics/2026/03/05/white-house-ballroom-public-comments/ (Mar. 5, 2026) ......................................................26

*Dep't of Interior and Related Agencies Approps. for 1963, Hr'gs Before a Subcomm. of H. Comm. on Approps.*, 87th Cong., 2d Sess. 652 (Jan. 17, 1962) ................................................................................41

*Dep't of Interior and Related Agencies Approps. for 1964: Hr'g Before a Subcomm. of the H. Comm. on Approps.*, 88th Cong., 1st Sess., 1628 (Jan. 28, 1963) ..............................................................................41

Gov't Accountability Office, *Principles of Federal Appropriations Law* (3d & 4th eds.) ..............................................................30, 31, 43

H.R. Subcomm. on Nat'l Parks & Insular Affairs, 95th Cong., *Legislative History of Redwood Nat'l Park Expansion Act of 1978* (Pub. L. 95-250) (Comm. Print 1978) ............................................................42

Jonathan Edwards & Dan Diamond, *Trump's White House Ballroom Rises Aboveground, But the Legal Battle Isn't Over*, Wash. Post (May 15, 2026).....................................................................................48

Jordain Carney & Jennifer Scholtes, Ballroom Won't Be Funded After Senate GOP Drops $1 Billion Trump Security Request, Politico (May 20, 2026), *available at* https://www.politico.com/news/2026/05/20/ballroom-security-funding-reconciliation-00930193 ........................................................39

Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES, §1319..............................................................................................53

NPS, Cultural Landscape Inventory, *available at* https://irma.nps.gov/DataStore/DownloadFile/581450 (last accessed May 26, 2026)........................................................................41

NPS, *Foundation Document: The White House & President's Park*
(Sept. 2014), *available at*
https://www.nps.gov/whho/planyourvisit/upload/WHHO_FD_201
5-508-accessible-resize.pdf (last accessed May 26, 2026)....................................2

NPS, The White House Is A National Park, *available at*
https://www.nps.gov/whho/index.htm (last accessed May 26,
2026) ........................................................................................................................25

## GLOSSARY OF TERMS

| Term | Definition |
|---|---|
| Stay.Add. | Addendum to Defendants' Renewed Emergency Motion for a Stay Pending Appeal |
| APA | Administrative Procedure Act, 5 U.S.C. §551 *et seq.* |
| Br. | Brief for Appellants/Cross-Appellees |
| CFA | Commission of Fine Arts |
| Dkt. | Docket in *National Trust for Historic Preservation in the United States v. National Park Service*, No. 25-cv-04316 (D.D.C.). |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EXR | Office of the Executive Residence |
| FOIA | Freedom of Information Act |
| JA | Joint Appendix |
| National Trust or Trust | National Trust for Historic Preservation in the United States |
| NCPC | National Capital Planning Commission |
| NEPA | National Environmental Policy Act, Pub. L. 91-190, 83 Stat. 832 (1970) |
| NPS | National Park Service |
| The Red Book | *Principles of Federal Appropriations Law*, published by Gov't Accountability Office (available at https://www.gao.gov/legal/appropriations-law/red-book) (last accessed May 26, 2026) |

## **INTRODUCTION**

This case is about who controls federal property. Is it Congress, in which the Property Clause of the Constitution vests the "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States"? U.S. Const. Art. IV, §3, cl. 2. Or is it Defendants—the President and various executive-branch entities and officials—who demolished the East Wing of the White House and are constructing a massive ballroom on its site without any authorization from Congress whatsoever?

The answer is Congress, as the Constitution, numerous federal statutes, and longstanding Supreme Court precedent regarding the President's supposed emergency powers all make clear. The Constitution entrusts Congress with "complete" and preclusive power, *Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976), over all "personal and real property rightfully belonging to the United States," *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 331 (1936). As Defendants concede, the Constitution gives the President no authority to build the ballroom. JA337. And Congress has not delegated power to construct the ballroom to the President, either. Rather, as the district court correctly concluded, no statute even "comes close to giving the President" the authority required. JA461.

The two statutes upon which Defendants rely certainly do not. The first, 3 U.S.C. §105(d), authorizes Congress to appropriate funds for White House upkeep,

1

and permits the President to expend only those funds—and, even then, only on the terms set by Congress. Here, Congress appropriated $2.475 million for "required maintenance, resolution of safety and health issues, and continued preventative maintenance" at the White House, Pub. L. 118-47, 138 Stat. 460, 532 (2024)—not the demolition of the East Wing and the construction of a $400 million ballroom. Plainly, that is not the "express authority" of Congress that Defendants need. 40 U.S.C. §8106 ("A building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress.").

The second statute, NPS's Organic Act, 54 U.S.C. §100101, gets Defendants no further. Far from providing the requisite "express authority" for the ballroom, the Act reinforces that Defendants are prohibited from derogating the fundamental resources of national parks—which NPS's own foundational document for President's Park states is the White House, including "the Wings"[1]—without Congress's "direct[] and specific[]" approval, 54 U.S.C. §100101.

Because Congress has not authorized the ballroom, and because the National Trust has made a clear showing that it likely has standing and will be irreparably harmed by continued construction, the district court rightly enjoined the project. The

---

[1] NPS, *Foundation Document: The White House & President's Park* (Sept. 2014), *available at* https://www.nps.gov/whho/planyourvisit/upload/WHHO_FD_2015-508-accessible-resize.pdf, 11-12 (last accessed May 26, 2026).

public's interest in its government following the law, and the maintenance of the President's proper role in our system of separated powers, underscore that the district court did not abuse its discretion.

Defendants, however, have refused to accept the preliminary injunction. They first tried to misinterpret it out of existence, claiming—in an argument that the district court described as "unreasonabl[e]" and "incredible, if not disingenuous," JA502; JA504—that the injunction actually *allowed* them to build the entire ballroom. Then, they sought to undo the injunction, asserting for the first time—and in "direct conflict" with what they had represented to the district court for months, JA506—that supposed national-security imperatives required them to continue building not just their underground bunker, but the ballroom itself.

But as the district court twice determined after considering voluminous evidence—including four declarations submitted by Defendants *ex parte* for *in camera* review over the course of four months—the absence of a massive ballroom on the White House grounds is not a national-security emergency. That commonsense conclusion is not clearly erroneous, and there is no basis to disturb it.

The "balance of equities" therefore does not "independently compel[] reversal" here, Br.53—far from it. While the President insists that he must be allowed to build the ballroom notwithstanding Congress's preclusive constitutional authority over federal property, neither this Court nor the Supreme Court has ever

3

permitted the President to usurp powers vested in Congress by the Constitution based on nothing more than his claim of necessity. To the contrary, the Supreme Court has refused to allow the President to exercise Congress's powers even in the face of his claim that a "national catastrophe" "endanger[ing] the well-being and safety" of the country required it. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582, 583-84, 589 (1952) (affirming preliminary injunction).

And for good reason. The Constitution itself "was adopted in a period of grave emergency." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 425 (1934). Its "grants of power … were determined in the light of emergency" and "are not altered by emergency." *Id.* Allowing the President, for the first time, to arrogate to himself constitutional powers exclusively vested in another branch of government simply because he asserts that an emergency demands it would undermine the separation of powers and gravely endanger the continuity of government "within the framework of the law." *Boumediene v. Bush*, 553 U.S. 723, 798 (2008).

The preliminary injunction should be affirmed.

## STATEMENT OF THE ISSUE

The issue presented is whether the district court abused its discretion in enjoining construction of the ballroom after concluding that the two statutes relied upon by Defendants did not authorize its construction, and after finding no national-security justification for the President to usurp powers that the Constitution vests

exclusively in Congress. The district court did not abuse its discretion.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addendum to Defendants' brief.

## STATEMENT OF THE CASE

### I. Defendants Demolish The East Wing And Begin Unlawfully Constructing The Ballroom.

On July 31, 2025, a White House press release announced plans for a 90,000-square-foot ballroom on the White House grounds. JA81. The press release stated that, "[i]n recent weeks," the President had "held several meetings" with NPS, White House staff, and others to discuss "design features and planning," and announced that the project would "begin in September 2025." JA82.

Like every federal construction project, the ballroom must be authorized by Congress, in which the Property Clause of the Constitution vests plenary control over federal property and lands. U.S. Const. Art. IV, §3, cl. 2. Where the project involves erection of a "building or structure" on D.C. federal parkland, that authorization must be "express."[2] 40 U.S.C. §8106. Independently, where the project impairs the fundamental resources of a national park—which for President's Park is the "White House and the [East and West] Wings," *supra* n.1—Congress must "directly and specifically" authorize it, 54 U.S.C. §100101(b)(2).

---

[2] Defendants concede that the White House is located in President's Park (an NPS unit) and that the ballroom is a "structure." JA480.

5

That is not all. Projects authorized by Congress must be carried out in accordance with numerous federal laws. Before plans are finalized or work begins, the lead agency must conduct and publish NEPA reviews, consult with NCPC and CFA, and secure NCPC approval. 40 U.S.C. §8722(b), (d); 42 U.S.C. §§4332(2), 4336; 45 C.F.R. §§2101.1(a)(1), 2101.2(b). The commission reviews are iterative, multi-stage processes during which the commissions and the public provide feedback on project proposals, ensuring that projects conform to NCPC's comprehensive plan for D.C.'s development, benefit from the commissions' expertise, and take public opinion into account. It is not unusual for even minor projects—like the recent replacement of the White House fence, JA211-12—to undergo extensive review, from which they emerge in a final and improved form befitting the nation's capital.

On October 20, 2025, despite not having received congressional authorization for the ballroom; not having sought review from either NCPC or CFA; not having obtained NCPC approval; not having published an EA or prepared an EIS; and not having given any advance public notice, Defendants began demolishing the East Wing and the east colonnade, which connected the East Wing and the Executive Residence. Within days, both were destroyed.

The National Trust wrote Defendants urging them to pause the ballroom project and allow public input, to no avail. JA86-87. In the following weeks,

6

Defendants began construction at the East Wing site. Yet they still had not begun most of the required reviews—having completed only an inadequate EA, which they unlawfully failed to publish, *see* 42 U.S.C. §4336(b)(2)—and had not obtained the necessary NCPC approval or the required authorization from Congress.

**II.    The National Trust Sues And The District Court, Relying On Defendants' Representations, Declines To Grant A Temporary Restraining Order.**

On December 12, 2025, with no sign that Defendants would comply with the law or permit meaningful public participation regarding the most significant exterior change to the White House in over a century, the National Trust sued. The Trust alleged that Defendants were violating the Property Clause and the separation of powers by constructing the ballroom without Congress's authorization, and also asserted claims under the APA. JA53-64. The National Trust simultaneously moved for a temporary restraining order and a preliminary injunction.

In the months that followed, Defendants advanced a series of shifting and contradictory positions regarding the nature of—and their authority for—the ballroom project. Initially, in their opposition to the National Trust's motion for a temporary restraining order, Defendants claimed authority to construct the ballroom under the Constitution's Reception Clause and 3 U.S.C. §105(d). Dkt.15-1. Section 105(d)(1) authorizes Congress to appropriate funds for "care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures)" of the White House, and limits the President

7

to spending only "[s]ums appropriated under" §105(d) for those purposes, subject to any further restrictions imposed by the relevant appropriating act, 31 U.S.C. §1301(a). In 2024, Congress appropriated $2.475 million under §105(d) for the specified purposes of "required maintenance, resolution of safety and health issues, and continued preventative maintenance." 138 Stat. 532.

Although the ballroom was planned to be built in a national park that has been under NPS jurisdiction since 1933, Defendants asserted—in a transparent attempt to evade APA review—that the President had placed the project under the control of EXR, an office within the Executive Office of the President traditionally responsible for tasks like "greet[ing] visitors" to the White House, "prepar[ing] and serv[ing] meals," floral arrangements, and calligraphy, *Sweetland v. Walters*, 60 F.3d 852, 854 (D.C. Cir. 1995) (citation omitted) (concluding, based on these and similar hospitality responsibilities, that EXR was not a FOIA agency). Dkt. 15-1 at 6.

According to Defendants, NPS was engaged in mere "continued consultation" on the project, *id.*, even though documents appended to their opposition revealed that NPS had prepared an EA months earlier, JA97-144. That review, had Defendants not flouted their obligation to publish it, would have informed the National Trust and the public that Defendants were planning to demolish the East Wing before it was too late to stop them. *See* 42 U.S.C. §4336(b)(2) (EA must be a "concise *public* document" (emphasis supplied)).

After a hearing on December 16, 2025, the district court denied the National Trust's motion insofar as it sought a temporary restraining order, concluding that the Trust had not shown it would be irreparably harmed without immediate injunctive relief. JA156-59. Crucially, the district court reached that conclusion largely due to Defendants' representations: that "nothing about the ballroom ha[d] been finalized" and that ongoing below-grade work would *not* lock in the ballroom's above-grade features. JA158. The court affirmatively declined to reach the other factors, including the National Trust's likelihood of success on the merits. *Id.* And it deferred ruling on the Trust's request for a preliminary injunction. JA158-59.

### III. After The District Court Denies The National Trust's First Preliminary-Injunction Motion, The Trust Amends Its Complaint And Renews Its Motion.

After the hearing, the district court directed the parties to submit supplemental briefs. JA159. In their supplemental brief, Defendants shifted positions, *disclaiming* constitutional authority and relying solely on §105(d), which they contended empowered EXR to build the ballroom at the President's direction. *See* Dkt.30 at 12 ("Nor is the President relying here on constitutional authority; he is relying on a delegation of authority from Congress."); *id.* at 16. Defendants also asserted that NPS was "indisputably not" in charge of the project, *id.* at 17 n.7, and that NPS had "no role" beyond funneling hundreds of millions of dollars in private donations accepted under the agency's gift statute to EXR's maintenance account, *id.* at 23.

9

The National Trust objected to EXR's supposed project-management authority. It also objected to the project's byzantine funding structure—intended to bridge the $2.475 million appropriated under §105(d) and the ballroom's $400 million cost—which the Trust explained was "illegal," Dkt.33 at 9.

On January 22, 2026, the district court heard argument on the National Trust's motion, which it denied the next month. After concluding that the National Trust likely had associational standing, JA324-30, the district court held that EXR was likely not an "agency" under the APA, and the Trust was therefore unlikely to succeed on its APA claims, JA330-33. Accepting and relying on Defendants' representations about NPS's role, the district court did not separately address the National Trust's APA claims against NPS. *See* JA330-33; JA486.

The district court also held that because Defendants conceded they lacked constitutional authority to build the ballroom, the National Trust was foreclosed from asserting constitutional claims per *Dalton v. Specter*, 511 U.S. 462 (1994), and *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025), a result the court admitted was "incongruous," JA337. But, noting Defendants' shifting litigation position—initially asserting constitutional authority before summarily disclaiming it, JA337—the district court allowed the Trust to amend its complaint to add *ultra vires* counts.

The National Trust promptly amended its complaint and again moved for a preliminary injunction. *See* JA15; JA341-400. In their opposition, Defendants shifted positions yet *again*, asserting—for the first time—a second and supposedly "independent" source of statutory authority for the ballroom: NPS's Organic Act. *Compare* Dkt.52 at 9 (asserting two sources of authority), *with* Dkt.30 at 18 ("Defendants respond that the necessary statutory authority [for the project] is found in 3 U.S.C. §105(d).").

Defendants' eleventh-hour pivot to the Organic Act was puzzling. The Organic Act requires NPS to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose" of each park, obligating the agency to "*conserve*" "historic objects … in such manner … as will leave them unimpaired for the enjoyment of future generations"—not to destroy them. 54 U.S.C. §100101(a) (emphasis supplied). The Organic Act's so-called "Redwood Amendment" reinforces those obligations, prohibiting administration of national parks "in derogation of the values and purposes for which the [parks] have been established, ***except as directly and specifically provided by Congress***." *Id.* §100101(b)(2) (emphasis supplied). And because the *NPS* Organic Act does not authorize *EXR* to do anything, any supposed Organic Act authority must be exercised by NPS—despite Defendants having insisted for months that NPS was *not involved with the project*. *See, e.g.*, Dkt.15-1 at 6; JA181; Dkt.30 at 3, 17 n.7, 23, 42.

11

**IV.     The District Court Enjoins Construction Of The Ballroom.**

On March 31, 2026, after another hearing, the district court granted the National Trust's second preliminary-injunction motion in a memorandum opinion and accompanying order. JA461-498.

The district court concluded the National Trust was likely to succeed on the merits for two separate reasons. *See* JA469-88. First, the district court held that construction of the ballroom was likely *ultra vires* of Defendants' authority under §105(d), and that §8106's "affirmative[] prohibit[ion]" of the erection of a building or structure in D.C. federal parks "without express authority of Congress" "underscore[d] Defendants' lack of statutory authority" to build the ballroom. JA471-85.

Second, the district court held the National Trust was likely to succeed on the merits of its §8106-based APA claim against NPS. JA486-88. Expressing "surprise" at Defendants' late-breaking reliance on the Organic Act, and observing that Defendants "ha[d] not been entirely consistent in this litigation as to which entities remain involved with the ballroom," the district court concluded that the project likely was contrary to §8106. JA486-88. Nothing in the Organic Act, the district court reasoned, provided the express authorization that §8106 demanded. *Id.*

Regarding the other factors, the district court held that the National Trust had demonstrated that it would suffer "imminent, irreparable harm" without a

12

preliminary injunction. JA488-92. And the district court concluded that the equities and the public interest also favored preliminary injunctive relief. JA492-94. Defendants would not be harmed by "an injunction that merely ends an unlawful practice," JA492 (citation omitted), whereas permitting construction to continue would deprive the public and their "collective voice" in Congress of the "authority over federal property, including the White House," that "the Constitution *itself* vests" in Congress," JA492-93.

The district court directly acknowledged that Defendants had asserted that "any delay to construction would imperil national security." JA493-94. But, based on its review of "classified *ex parte* declarations submitted by Defendants" regarding those concerns, the district court concluded that "an injunction halting construction" would not "in any way jeopardize national security." JA493. And "[b]ald assertions of 'national security,'" the district court explained, could not "excuse [Defendants'] failure to follow the law and then insulate those failures from judicial review." JA493.

The district court then enjoined Defendants from "taking any action in furtherance of the physical development of the proposed ballroom … other than actions strictly necessary to ensure the safety and security of the White House and its grounds … and provide for the personal safety of the President and his staff." JA497. To permit Defendants to seek review from this Court, the district court

13

ordered that the preliminary injunction take effect fourteen days after its issuance. JA494; JA497.

### V.    Defendants Claim, For The First Time, That The Ballroom Itself Is Necessary For National Security.

Within hours, Defendants began to attempt to evade the preliminary injunction. Characterizing the *ballroom itself* as "necessary to … the safety and security of the White House and its grounds," JA497, the President stated that Defendants did not "need" the fourteen-day stay of the preliminary injunction because they were "allowed to continue building as necessary" under the injunction's safety-and-security exception. Dkt.65 at 1-2. Concerned that Defendants would continue building the entire ballroom based on their patent and intentional misconstruction of the district court's preliminary injunction, the National Trust moved for an order clarifying that the injunction's safety-and-security exception did *not* permit Defendants to construct the ballroom—although no clarification should have been necessary. Dkt.65.

The National Trust's concerns proved prescient. Several days later, Defendants sought emergency relief from this Court. Emergency Mot. for Stay Pending Appeal, *Nat'l Tr. for Hist. Pres. v. Nat'l Park Serv.*, No. 26-5101 (D.C. Cir., filed Apr. 3, 2026). Echoing the President's assertions, Defendants' motion claimed for the first time that the ballroom *itself* was necessary for national security and to ensure the personal safety of the President. *See id.* at 3. The motion was challenging

14

to follow and contradicted Defendants' prior representations, *see, e.g.*, *id.* at 1-5, and many of its claims had no apparent connection to national security at all, *see, e.g.*, *id.* at 5 (asserting the East Wing "suffered from … mold").

Nevertheless, in view of the unsettled factual questions raised by Defendants' motion, this Court remanded to the district court to address the National Trust's motion for clarification and Defendants' newly asserted national-security concerns. *See* Order, *Nat'l Tr. for Hist. Pres. v. Nat'l Park Serv.*, No. 26-5101 (D.C. Cir. Apr. 11, 2026). Judge Rao, dissenting, would have granted a stay pending appeal. *See id.*

On April 16, 2026, the district court issued a memorandum opinion clarifying that its preliminary injunction did *not* permit Defendants to build the very same ballroom that the district court had enjoined Defendants from constructing. JA502-11. Describing Defendants' position as "unreasonabl[e]," "extraordinary," and "incredible, if not disingenuous," the district court amended its preliminary-injunction order to explicitly "stop only above-ground construction of the planned ballroom." JA502; JA504; JA506. The district court exempted from its amended injunction all "below-ground construction of national security facilities, work necessary to provide for presidential security, and construction necessary to protect and secure the White House and the construction site itself." JA504; *see* JA512-14.

Addressing Defendants' contention that national-security imperatives necessitated construction of the entire ballroom, the district court explained that

15

"throughout this case, Defendants raised discrete national security concerns about construction of *underground* elements." JA505. The district court concluded that Defendants' new position—that the ballroom *itself* was necessary for national security—was not only "in direct conflict with Defendants' prior representations that the above-ground and below-ground portions of the project were 'independent of' one another," but was also unsupported by the *ex parte* evidence Defendants had submitted. JA506-08 (citation omitted).

Defendants again appealed, and again moved for emergency relief from this Court on April 17, 2026. Together with their second motion, Defendants submitted another new affidavit. *See* Stay.Add.17-25. Based on a memorandum drafted that same day—April 17, 2026—the affidavit claimed that a ballroom of the "height and mass" desired by the President was a necessary "sacrificial outer cover" for the bunker below, Stay.Add.21—an argument Defendants had never previously advanced, despite ample opportunity.

Without ruling on the merits of Defendants' second stay motion, this Court issued an administrative stay, consolidated the motion with its consideration of the merits of the appeal, and set the case for expedited briefing and argument. Order, *Nat'l Tr. for Hist. Pres. v. Nat'l Park Serv.*, No. 26-5123, 2026 LX 122215 (D.C. Cir. Apr. 17, 2026).

16

## SUMMARY OF THE ARGUMENT

The Property Clause vests the "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States" exclusively in Congress. U.S. Const. Art. IV, §3, cl. 2. The district court correctly concluded that Congress did not delegate to Defendants the authority to construct the ballroom through either statute upon which they relied below. And the district court did not clearly err in finding that claimed national-security exigencies failed to justify construction of the ballroom, correctly rejecting Defendants' attempt to use a self-serving claim of necessity to arrogate another branch's constitutional powers to themselves.

**I.** The National Trust has associational standing. Construction of the ballroom injures Professor Alison K. Hoagland, a longtime member (and board member) of the National Trust and resident of the District of Columbia. In a detailed declaration, Professor Hoagland recounted her frequent and continued use of President's Park, and her deep appreciation of the White House and the park's historic character. And she explained how the ballroom would affect that use, harming her aesthetic interests. Contrary to Defendants' claims, that is not a "psychological harm of being offended," Br.23, but is instead exactly the sort of individual use of a particular place that constitutes an injury-in-fact under longstanding precedent.

17

Professor Hoagland's injury is also germane to the National Trust's purposes. The National Trust was established by Congress to "to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest," 54 U.S.C. §312102(a). That easily encompasses the White House—perhaps the most historically significant building in the country—and Defendants' claim that the National Trust's purposes are limited to acquiring property is belied by both statutory text and the Trust's history.

**II.** The district court correctly concluded that the National Trust was likely to succeed on the merits. To start, the ballroom is *ultra vires* of §105(d)(1), which authorizes Congress to appropriate funds for designated statutory purposes and permits the President to expend only the sums appropriated thereunder. Congress appropriated $2.475 million for "required maintenance, resolution of safety and health issues, and continued preventative maintenance," 138 Stat. 532—not the demolition of the East Wing and the construction of a $400 million ballroom. And even if §105(d) somehow gave the President freestanding authority to "alter[]" or "improve[]" the White House with privately donated funds, as Defendants claim, context makes clear that such authority would not extend to building the ballroom.

While that is more than enough for the National Trust to prevail on its *ultra vires* claim, the President's lack of authority to build the ballroom is further confirmed by 40 U.S.C. §8106, which prohibits Defendants from "erect[ing]" "[a]

18

building or structure" "on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress."

The National Trust is also likely to succeed on its §8106-based APA claim against NPS, which provides a second, independent basis to affirm the injunction. Even if §105(d) authorized the President to expend $2.475 million on the ballroom, he would need another source of "express" statutory authority, 40 U.S.C. §8106, to carry out the rest of the $400 million project. NPS's Organic Act does not provide it. The Act "does not say anything about NPS's authority to construct buildings," JA487, and silence cannot provide the "express authority" that §8106 demands. Defendants' examples of prior NPS projects in D.C. federal parks fail to move the needle; many were authorized by Congress, and even if some were not, mixed historical evidence cannot overcome §8106's clear command as to the present case.

Defendants' reliance on the Organic Act also fails for a second reason. The Act's Redwood Amendment requires "direct[] and specific[]" authorization from Congress to impair the fundamental resources of national parks, 54 U.S.C. §100101(b)(2), which is precisely what the ballroom project does, *see, e.g.*, JA103. Consequently, even if the Organic Act constituted sufficiently "express authority" for the purposes of §8106 as to the *other* NPS projects Defendants cite, the Act could not possibly authorize a ballroom that the Act itself precludes.

19

The National Trust's constitutional claim provides a third basis to affirm the injunction. Relying on *Dalton* and *Global Health Council*, the district court felt compelled to conclude that the Trust's constitutional claim was foreclosed because Defendants had disclaimed constitutional authority to build the ballroom—a result the district court admitted was "incongruous," JA337. But unlike in *Dalton* and *Global Health Council*, here the President has not merely failed to properly discharge authority *actually* delegated to him; instead, he is building the ballroom *without any authority whatsoever*—violating the Property Clause and the separation of powers.

**III.** The remaining factors—irreparable harm to the National Trust, the balance of the equities, and the public interest—strongly favor affirmance. The National Trust will be irreparably injured without a preliminary injunction, as the district court correctly concluded. The equities and the public interest likewise support relief: Defendants have no legitimate interest in violating the law, and the public has a strong interest in pausing a project that will irreparably damage what is perhaps the most significant historic site in the country, unless and until Defendants secure the necessary approvals from Congress.

Defendants' late-breaking assertion that the ballroom *itself* is necessary for national security does not change the calculus. The district court considered Defendants' evidence—including four separate declarations submitted *ex parte* for

*in camera* review—and twice concluded that the ballroom itself was not necessary for national security. That conclusion was not clearly erroneous. The new evidence introduced by Defendants for the first time on appeal cannot be considered as a matter of black-letter law, and would not undermine the district court's conclusion in any event. Nor could Defendants' nebulous claim of necessity permit them to usurp powers that the Constitution vests exclusively in Congress, a step neither the Supreme Court nor this Court has ever permitted.

## ARGUMENT

### I.   The National Trust Has Standing.

The district court correctly determined that the National Trust has a "substantial likelihood" of associational standing. JA324 (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)); JA324-30; JA489-90. Construction of the ballroom impairs Professor Hoagland's regular use and enjoyment of President's Park—a national park maintained by NPS since 1933. And this suit is germane to the National Trust's purposes, which include "facilitat[ing] public participation in the preservation of sites, buildings, and objects of national significance or interest," 54 U.S.C. §312102(a).[3]

---

[3] Defendants do not dispute that "neither the claim asserted nor the relief requested requires the participation of individual [National Trust] members in the lawsuit," *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013) (citation omitted), and the district court correctly concluded neither did, JA329. Nor do they contest that Professor Hoagland's injury is traceable to the ballroom or redressable

21

## A. The Ballroom Project Injures Professor Hoagland.

The district court determined that the National Trust had demonstrated a substantial likelihood of associational standing through the concrete aesthetic injury to Professor Hoagland, a longtime Trust member and current Trust board member. JA329-30; *see Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1157 (D.C. Cir. 2025) (associational standing requires that "at least one member has standing to sue in her own right"). That conclusion was correct. The National Trust has shown Professor Hoagland "could sue in her own right," JA326, and Defendants provide no basis to disturb the district court's sound application of well-established standing principles.

**1.** The "desire to use or observe" something, "even for purely [a]esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562-63 (1992). Professor Hoagland regularly uses President's Park for aesthetic purposes. She lives less than two miles away in Capitol Hill, travels to the area about once a month, including for National Trust board meetings at the nearby Decatur House (owned by the Trust), and regularly walks through "President's Park, including Lafayette Square, in order to enjoy the historic

---

by an injunction, as the district court also correctly concluded, JA328-29. And notwithstanding Defendants' consternation over a "single person's" injuries, Br.6, the law does not require multiple, redundant member declarations to establish associational standing.

buildings, [and] the beauty of the L'Enfant Plan (which placed the President's House on axis with 16th Street)." JA75; *see* JA326. It cannot be seriously disputed that Professor Hoagland is among those "for whom the aesthetic and recreational values of the area will be lessened" by the ballroom, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (citation omitted)—a massive structure that even Defendants admit will cause enduring, irreversible harm to the fundamental resources of a national park, *see, e.g.*, JA124 (determining in their EA that the ballroom "would have permanent adverse effects on the cultural landscape" of President's Park); JA127-28 (similar).

There is more. Professor Hoagland is also an architectural historian and professor of historic preservation who has written six books (most recently on D.C. architecture) and served as senior historian for NPS's Historic American Buildings Survey. JA74. That "professional capacity" augments her deep appreciation of President's Park. *See Ctr. for Biological Diversity*, 146 F.4th at 1157 (concluding that plaintiff with professional and personal interest in observing a unique beetle had standing). Professor Hoagland has attested to the unique value of the White House as "one of the most historically significant buildings in the country," "designed to be a symbol of the new nation." JA76. The ballroom, however, would "overshadow[]" the White House and "diminish [its] primacy," thereby disrupting the central architectural message that "our president lives in a *house*." JA77.

The aesthetic injury to Professor Hoagland's use and enjoyment of President's Park easily clears the injury-in-fact bar; indeed, this Court has previously found standing based on much less. *See, e.g.*, *Nat'l Parks Conserv. Ass'n v. Manson*, 414 F.3d 1, 4 (D.C. Cir. 2005) (injury-in-fact from marginal degradation in air quality at Yellowstone); *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596-97 (D.C. Cir. 2015) (injury-in-fact where "marine and coastal ecosystems" might be affected by leases for drilling). The district court's conclusion that Professor Hoagland had standing to sue in her own right, JA325-29, is not a "grievous[] err[or]," Br.23, but instead an ordinary and correct application of basic case-or-controversy principles.

**2.** Defendants nonetheless attempt to reduce Professor Hoagland's regular and well-substantiated use of President's Park to the mere "observation of conduct with which one disagrees," Br.24 (citation omitted), or the "incidental[] view[ing of] something unpleasant," *id.* (quoting *Envtl. Def. Fund v. FERC*, 2 F.4th 953, 969-70 (D.C. Cir. 2021) (*EDF*)), claiming that Professor Hoagland is "not being deprived of the ability to 'use or observe' anything," because she can "shift her gaze" away from the ballroom, Br.25-26.

Not so. Professor Hoagland has detailed her substantial and continuing use of President's Park, JA75-77; *see* JA326-27, and it is no more of an answer to say that she should avoid looking at the White House—***the park's fundamental resource and principal attraction***, *supra* n.1—than it would be for a plaintiff to be told to

look away from a billboard installed atop Mount Rushmore, or from a skyscraper erected in Redwood National Park.

*EDF*, upon which Defendants principally rely, Br.24-26, in fact illustrates why the National Trust has standing. Unlike a "metering station" for a pipeline, the White House and President's Park is not a nuisance, causing cognizable harm only to those who have the misfortune of living near it. *EDF*, 2 F.4th at 968-70. Rather, it is an attraction, just like Yosemite or the Statue of Liberty, which when damaged harms those like Professor Hoagland who use and enjoy it. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). And put plainly, the way visitors like Professor Hoagland "use" President's Park—*and the way NPS itself intends President's Park to be used*—is by observing the White House, its wings, and the park's grounds, appreciating its architecture and its place "as one of the most iconic sites in the country," and reflecting upon its role not only as "the President's residence," but as a central element of the "national discourse about what it means to be American."[4]

In sharp contrast to the affiant in *EDF*, Professor Hoagland has affirmatively articulated "how she derived aesthetic value from the land as it had existed before the construction" and explained how "she intended to use the land in the future."

---

[4]   NPS, The White House Is A National Park, *available at* https://www.nps.gov/whho/index.htm (last accessed May 26, 2026)

*EDF*, 2 F.4th at 969. Professor Hoagland and the National Trust have shown, in detail and at length, the "ways in which [the project] injures [Professor Hoagland's] specific aesthetic interests," *id.*; have explained "how she derive[s] aesthetic value from" President's Park, *id.*; and have described her regular, planned use of the park going forward, JA75-77; JA325-27.

None of this amounts to a "generalized grievance" or harm to an "undifferentiated public interest," despite Defendants' protestations. Br.25, Br.30 (citation omitted). No one disputes that the ballroom is massively unpopular. Indeed, approximately 97% of the 35,000 people who submitted comments to NCPC, for example, opposed the changes Defendants are illegally making to the White House and President's Park.[5] Nor does broad public disapproval somehow insulate the project from challenges from those like Professor Hoagland who regularly use and enjoy the park, and who will be harmed by the construction of the ballroom. Unsurprisingly, Defendants offer no support for the proposition that a plaintiff with a particularized and concrete injury *loses* standing because others would *also* be harmed by that same illegal act.

Defendants' parade of horribles does not deny the National Trust standing either. *See* Br.27, 31. The fact that someone who regularly uses and enjoys a

[5] Dan Diamond et al., *Thousands of Public Comments Slam Trump's Ballroom*, Wash. Post, https://www.washingtonpost.com/politics/2026/03/05/white-house-ballroom-public-comments/ (Mar. 5, 2026) (last accessed May 26, 2026).

26

particular national park suffers an injury-in-fact when that park is damaged by a massive construction project plainly does not mean that standing will be extended to anyone who simply "does *not* want to look at something," "sees a picture of [an offending sight] in the newspaper," "imagines it in her mind's eye," or has a "subjective feeling" of dislike, Br.27. Nor should it come as a surprise that Professor Hoagland, an architectural historian who lives in D.C. and regularly uses its historic public spaces, might be injured by more than one of the President's illegal efforts to remake those spaces to suit his own personal preferences. Br.31-32.

### B. This Suit Is Germane To The National Trust's Purposes.

This suit is also "germane" to the National Trust's purposes—an "undemanding" standard that serves "'the modest yet important' purpose of 'preventing litigious organizations from forcing the federal courts to resolve numerous issues as to which the organizations themselves enjoy little expertise and about which few of their members demonstrably care.'" *Jewell*, 779 F.3d at 597 (quoting *Humane Soc'y v. Hodel*, 840 F.2d 45, 56-57 (D.C. Cir. 1988)).

Nothing could be further from the case here. The National Trust was established by Congress "to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest." 54 U.S.C. §312102(a). And for decades, the National Trust has done so by maintaining historic properties, suing to protect others, and assisting in administration of federal historic

27

preservation programs, JA67-69, *see, e.g.*, 54 U.S.C. §308602(b). As the district court correctly concluded, the National Trust has an "'obvious interest' in challenging the construction of a massive new ballroom on White House grounds that could likely alter the aesthetic, cultural, and historical integrity of one of the most historic sites in the country." JA329 (quoting *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017)).

None of Defendants' efforts to undermine that "obvious interest" hold water. *Id.* Congress has not "carved the White House out of" the National Trust's mandate, Br.33 (quoting *National Tr.*, 2026 LX 103332, at *17 (Rao, J., dissenting)); to the contrary, the legislative history Defendants cite pertains to the National Historic *Preservation Act*—an entirely separate statute from which the White House is exempt, *see* 54 U.S.C. §307104, and which is not at issue in this case for precisely that reason.

Nor does the fact that Congress granted the National Trust other enumerated statutory purposes (principally concerning acquisition and maintenance of historic properties, *id.* §312102(b)), mean that this suit is not pertinent to the purposes of "preservation of sites, buildings, and objects of national significance or interest," for which Congress expressly established the Trust, *id.* §312102(a). Indeed, even *Congress* demonstrably disagrees with Defendants' contention (Br.33-34) that the National Trust's interests are limited to the acquisition and maintenance of the

Trust's own property. *See, e.g.*, 54 U.S.C. §308602(b) (assistance in the development of a grant program for preservation of historic African-American burial grounds); *id.* §308703 (making subgrants as part of a maritime-heritage program); *id.* §304101(a)(9) (designating the Trust's chair as a member of the Advisory Council of Historic Preservation); Pub. L. 101-121, 103 Stat. 701, 707 (1989) (consulting regarding a lighthouse-preservation grant program).

*****

Because Professor Hoagland has standing to sue, and because this suit is germane to the National Trust's purposes, the district court correctly concluded that the Trust demonstrated a substantial likelihood of associational standing.

## II.    The National Trust Is Likely To Succeed On The Merits.

The district court correctly held that the National Trust was likely to succeed on the merits of its *ultra vires* claim against EXR and its APA claim against NPS. JA469-88. Each claim is separately and independently sufficient to support the injunction. While that is more than enough to conclude that the National Trust is likely to succeed on the merits, the Trust's Property Clause claim provides a third basis to pause the project.

### A. The National Trust Is Likely To Succeed On Its Claim That Construction Of The Ballroom Is *Ultra Vires*.

The District Court correctly concluded that §105(d)—which authorizes Congress to appropriate funds for the White House's upkeep—did not even "come[]

29

close" to permitting the President to spend $400 million in other funds appropriated under a different statute to tear down a third of the White House and replace it with a massive ballroom. JA461. While that alone amply supported the district court's conclusion that the National Trust was likely to succeed on its *ultra vires* claim, the district court also correctly determined that §8106's "specific prohibition," *Nuclear Reg. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (quoting *Leedom v. Kyne*, 358 U.S. 184, 188 (1958)), against the erection of any "building or structure" in President's Park without express authorization of Congress "underscore[d] Defendants' lack of statutory authority" for the project, JA480 (quoting 40 U.S.C. §8106).

Defendants offer no sound basis to disturb those conclusions.

**1.** As relevant here, §105(d) does two things. First, and primarily, it serves as an authorization for Congress to appropriate funds for the "care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence at the White House." 3 U.S.C. §105(d); *see* Red Book 2-56 ("An authorization act is basically a directive to Congress itself, which Congress is free to follow or alter … in the subsequent appropriation act.").

Second, §105(d) authorizes the President to spend those congressionally appropriated funds—and *only* those funds—"for expenses described" in §105(d), subject to the terms of the pertinent appropriating act, *see* 31 U.S.C. §1301(a)

30

("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."). But that is all. Section 105(d) does not allow the President to disregard additional limitations imposed by Congress in the appropriating act. *Id.*; *see* Red Book 2-65 ("Congress can expressly restrict the use of an appropriation for a purpose or purposes included in the authorization."). Nor does it afford him any power to expend funds appropriated under *other* statutes. 3 U.S.C. §105(d) ("Sums appropriated *under this subsection* … may be expended as the President may determine …." (emphasis supplied)); *see* Dkt.30 at 34 (conceding that NPS private donations were "appropriated to be disbursed" under a different statute).

Pursuant to §105(d)'s authorization, Congress appropriated $2.475 million for an *even more limited* set of purposes than those authorized by §105(d): "required maintenance, resolution of safety and health issues, and continued preventative maintenance" at the White House, 138 Stat. 532. In doing so, Congress did not permit the President to spend any more than $2.475 million, *see Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024), nor did it authorize him to put the appropriated funds toward projects outside those stated purposes, like a massive ballroom, 31 U.S.C. §1301(a).

Ignoring §105(d)'s plain text, Defendants assert that the statute vests "operational control" in the President to "alter[]" and "improve[]" the White House,

Br.35, and they insist that "[h]ow he pays for those alterations and improvements is a separate question," Br.41. Convenient as that would be for Defendants, that is not what the statute says. Section 105(d) gives the President no freestanding power to "alter[]" or "improve[]" anything. To the contrary, his authority under §105(d) extends only to the limits of the "[s]ums appropriated under th[at] subsection." 3 U.S.C. §105(d). As for funds appropriated under different statutes—like the $400 million privately donated for the ballroom, *see* 31 U.S.C. §1321(a)(17), (b)(1); Dkt.30 at 34 (citing same)—§105(d) provides the President no authority whatsoever to spend them on White House projects.

Nor is it a remotely close call. Without any textual basis, Defendants would transform §105(d) from a garden-variety authorization for *Congress* to appropriate funds for the upkeep of the White House into a roving license for the *President* to unilaterally undertake whatever construction he wants, with whatever funds he can muster. That is a "patent[] … misconstruction" of the statute. *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (citation omitted). And because the ballroom is "plainly beyond the bounds" of the limited authority actually extended to the President by §105(d), it is *ultra vires* for that reason alone. *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (citation omitted).

But even if §105(d)'s authorization of congressional appropriations could

32

somehow be read to allow the President to "alter[]" or "improve[]" the White House with whatever funds he can cobble together, as Defendants claim, Br.36-38, it still would not allow construction of the ballroom. Relying on dictionary definitions, Defendants assert that "alteration" and "improvement" encompass the entire project. Br.36-38. But it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal v. United States*, 508 U.S. 129, 132 (1993). And no "[o]rdinary reader[] of English" would understand Congress to have authorized the President to demolish and rebuild a third of the White House in the same breath as it authorized itself to appropriate sums to pay his utility bills. *Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*, 71 F.4th 59, 68 (D.C. Cir. 2023). Congress "does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Resisting this obvious conclusion, Defendants assert that §105(d) "covers a wide array of projects, large and small." Br.38. But try as they might, they cannot actually turn up a large one. Defendants admit that "[s]ome of the words do suggest upkeep" or "potentially smaller projects." Br.40 (citing "maintenance" and "lighting fixes"); *see also* 3 U.S.C. §105(d) (listing "electric power," "fixtures," and "refurnishing"). And they concede that fixes to "lighting," "heating" and "air-conditioning" are not themselves large projects, either. Br.40 (speculating that such

33

work might be "involv[ed]" in major projects).

Yet Defendants insist that unless "alteration" and "improvement" are read to encompass everything up to and including the demolition and reconstruction of one third of the White House, both words will be rendered "redundant." Br.39 (quoting *Nat'l Tr.*, 2026 LX 103332, at *22 (Rao, J., dissenting)). Hardly. The President might "alter[]" the White House with funds appropriated under §105(d) by renovating a bathroom, or "improve[]" it with such funds by adding a patio. That does not "nullify" the statute, Br.40; to the contrary, it gives §105(d)'s plain language its only sensible meaning, *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1992).

If any doubt remains, history dispels it. Contrary to Defendants' claims, Congress did not enact §105(d) "[a]gainst th[e] backdrop" of presidential control over major White House construction. Br.10. Rather, as the district court correctly concluded, there is "a nearly unbroken history of congressional authorization for construction and major renovations at the White House" dating back over 235 years, to the Residence Act of 1790. JA478 (citing JA199-212 (historical annex of White House projects)). The only two unauthorized projects—a swimming pool and cabana built by President Ford and a tennis pavilion built by President Trump during his first term, neither of which were challenged in court, *see* JA209-12—no more disprove Congress's control over the White House than driving a few miles per hour above the speed limit without getting a ticket proves that the speed limit does not

34

apply. As for the others (Br.8-9), the 1934 renovation and the 1942 bunker project—also never challenged in court—were likely authorized by a Depression-era statute that provided the President extraordinary discretion to select public works programs, and a national-defense appropriation, respectively. *See* JA205-09. President Truman's likewise-unchallenged balcony was authorized by his annual allowance, JA207-08. While Defendants protest that there is no way to distinguish between that project and this one, Br.42, a new *balcony* is plainly not a massive new *building*.

Defendants' own hypotheticals simply hammer the point home. *See* Br.39. When the West Wing's roof was damaged by a fire, Congress passed a statute to fix it, *see* JA205. When it was discovered that the building was structurally unsound and had to be gutted, Congress did the same, *see* JA208-09. All the while, however, Congress separately made appropriations for more minor "care, maintenance, repair and alteration, refurnishing, [and] improvement," JA208*; see, e.g.*, 45 Stat. 534, 574 (1928); 46 Stat. 229, 230 (1930); Pub. L. 81-759, ch. 896, 64 Stat. 595, 698 (1950); Pub. L. 88-39, 77 Stat. 58, 64 (1963); Pub. L. 93-143, 87 Stat. 510, 514 (1973)—language that was substantially carried forward into §105(d) when that statute was enacted in 1978, *see* Pub. L. 95-570, 92 Stat. 2445, 2446 (1978).

So in the end, "text, structure," history, and multiple canons of construction all direct the same conclusion: Congress did not cede "operational control," Br.37, over the White House to the President by authorizing itself to appropriate funds for

35

the building's upkeep. *Kellogg Brown & Root Servs. v. United States ex rel. Carter*, 575 U.S. 650, 656 (2015). Defendants' claim that the President is authorized to unilaterally construct the ballroom "patently … misconstru[es]" §105(d), and the project is *ultra vires* of their authority under the statute. *Changji Esquel Textile*, 40 F.4th at 722 (citation omitted).

**2.** While no more is needed, further confirmation that the ballroom is *ultra vires* of Defendants' statutory authority is provided by §8106, which "specific[ally] prohibit[s]," *Nuclear Reg. Comm'n*, 605 U.S. at 681 (citation omitted), the "erect[ion]" of any "building or structure" "on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress," 40 U.S.C. §8106. As explained, §105(d) does not "express[ly] authori[ze]" the ballroom. Nor does it give Defendants "general authority … to build," as they claim, Br.50; rather, the statute permits the President to spend specific funds for purposes that *exclude* the ballroom, *see supra* pp.29-35.[6]

Unable to show that the ballroom has been "express[ly] authori[zed]" by Congress, 40 U.S.C. §8106, Defendants advance a succession of theories for why

---

[6] Defendants incorrectly assert that the district court held that §8106 "requires only general authority from Congress to build." Br.50. The district court did not adopt that interpretation. Rather, the court declined to opine on "the level of specificity that §8106 requires," JA481, and neither of its examples—"a lump sum for construction or a specific appropriation for a particular project," *id.*—are present here.

36

§8106 does not apply. Each lacks merit.

*First*, Defendants' assertion that §8106 does not apply to the President, Br.51-52, is irrelevant because the district court did not enjoin the President, JA512-14. And while they insist that it would "def[y] common sense" for the President to be required to ask Congress for funds to repair the White House, Br.51-52, presidents have done exactly that for more than 235 years, *see generally* JA199-212. The only "serious constitutional" concern here, Br.52, is the President's effort to arrogate Congress's Property Clause powers to himself. *See Ashwander*, 297 U.S. at 331 (Congress controls all "personal and real property rightfully belonging to the United States" (citation omitted)).

*Second*, §8106's "clear statutory language" forecloses Defendants' resort to post-enactment legislative history—a single statement made in a hearing over a decade after the enactment of §8106's predecessor statute by someone who was not, and had never been, a legislator. *Food Mktg. Inst. v. Argus Leader Media,* 588 U.S. 427, 436 (2019); *see Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J., concurring) ("Arguments based on subsequent legislative history … should not be taken seriously …."). In any event, the statement undermines their contention that §8106 applies only to "unauthorized third parties," Br.50, not the government. *See D.C. Approp. Bill, 1927, Hr'g Before a Subcomm. of H. Comm. on Approps., 68th Cong.* (1926) (statement of Maj. Ulysses S. Grant III) (explaining that the "field

house" had been presented to Congress, which had appropriated funds for it).

*Third*, Defendants' claim that the Trust is outside §8106's zone of interests is meritless twice over. Br.52. To start, the test asks "whether the *statute* grants the plaintiff the cause of action that [the plaintiff] asserts," *FDA v. R.J. Reynolds Vapor Co.,* 606 U.S. 226, 232 n.3 (2025) (emphasis supplied) (citation omitted), making it irrelevant to these "nonstatutory *ultra vires*" claims, *Nuclear Reg. Comm'n*, 605 U.S. at 680-81; *see Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 812 n.14 (D.C. Cir. 1987) (explaining that an *ultra vires* plaintiff's "interest normally will not fall within the zone of interests of the very statutory or constitutional provision that he claims does not authorize action concerning that interest").

Moreover, even if the zone-of-interests test applied here, the National Trust would only need to "arguably" fall within §8106's zone of interests—a "not … especially demanding" hurdle the Trust would easily clear. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). The National Trust was congressionally chartered to facilitate "preservation of sites, buildings, and objects of national significance or interest," 54 U.S.C. §312102(a), and §8106 protects D.C.'s federal parks and lands—encompassing perhaps the greatest concentration of historic and cultural "sites, buildings, and objects of national significance or interest" in the country, *id.*—from unapproved development.

*Finally*, if a lurking "institutional interest[]" of a political branch were enough

38

to prevent litigants like the National Trust from suing, as Defendants claim, Br.52, scores of Supreme Court decisions would never have issued, *see, e.g.*, *Learning Res., Inc. v. Trump*, 146 S. Ct. 628 (2026) (tariff power); *NLRB v. Noel Canning*, 573 U.S. 513 (2014) (recess appointments). And Defendants' insistence that it is up to Congress to stop the project, Br.42-43, ignores the fact that Congress has already done so twice: first by never appropriating funds for the ballroom, and second by passing statutes requiring specific congressional approval before it may be built, 40 U.S.C. §8106; 54 U.S.C. §100101(b)(2).[7]

### B.  The National Trust Is Likely To Succeed On Its APA Claim.

The District Court also correctly concluded that the National Trust was likely to succeed on the merits of its §8106-based APA claim against NPS—a claim Defendants completely ignore. JA486-88. The Trust's APA claim provides a second, independent basis for the preliminary injunction, since even if §105(d) authorized the President to spend the $2.475 million "appropriated under" that statute on the ballroom, Defendants would need another source of funding and "express authority," 40 U.S.C. §8106, to carry out the remainder of their $400 million project.

---

[7] Moreover, the Senate recently withdrew—due to insufficient support—a proposal the President claimed would authorize the ballroom. *See* Jordain Carney & Jennifer Scholtes, Ballroom Won't Be Funded After Senate GOP Drops $1 Billion Trump Security Request, Politico (May 20, 2026), *available at* https://www.politico.com/news/2026/05/20/ballroom-security-funding-reconciliation-00930193.

Defendants' only other source of supposed authority—NPS's Organic Act, 54 U.S.C. §100101—does not authorize the ballroom, "express[ly]" or otherwise, 40 U.S.C. §8106. The Organic Act obligates NPS to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of" each park, 54 U.S.C. §100101(a). But the Act "does not say anything about NPS's authority to construct buildings." JA487. And, as the district court correctly concluded, that silence cannot possibly provide the "express authority" to build the ballroom that §8106 demands. JA487-88.

In response, Defendants rely principally on past NPS construction projects in federal parks in the District of Columbia which they claim were undertaken pursuant to the Organic Act despite the absence of separate §8106 authorization. Br.44-45. But that gets them nowhere. Even if it had been NPS's "longstanding practice" not to adhere to the prohibitions of §8106, that would not relieve the Court of its obligation "to give effect to [the statute's] plain command" now. *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998); *Food Mktg. Inst.*, 588 U.S. at 436 ("[J]udges must stop" where statutory text "yields a clear answer").

In any event, it is by no means clear that any such "longstanding practice" exists. *Id.* The National Capital Region Headquarters, for example, was presented to a House appropriations committee as part of NPS's Mission 66 projects, and

40

Congress later approved funds for the project.[8] Similarly, NPS does not appear to have erected any "building or structure" at the Rock Creek golf course until Congress approved a new clubhouse as part of Mission 66, the prior one having been adapted from an existing farmhouse.[9] While the provenance of other structures is somewhat obscure, all that means is that Defendants' evidence is at best mixed—and inconsistent historical evidence is no match for a clear statutory prohibition, *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017) (rejecting use of "extra-textual evidence," including "post-enactment practice," when "[t]he text is clear").

Defendants' historical evidence is no help for a second reason. The Organic Act's Redwood Amendment prohibits the administration of national parks in derogation of the purposes for which they were established without "direct[] and specific[]" approval of Congress, 54 U.S.C. §100101(b)(2). Unlike each of Defendants' examples, the ballroom project does precisely that.

---

[8] *See* JA484; *Dep't of Interior and Related Agencies Approps. for 1963, Hr'gs Before a Subcomm. of H. Comm. on Approps.*, 87th Cong., 2d Sess. 652 (Jan. 17, 1962) (allocating $1.129 million of Mission 66 funding for the construction of a park operations building in Region 6, also known as the National Capital Parks region).

[9] NPS, Cultural Landscape Inventory, 2, 23-24, 34, 46, *available at* https://irma.nps.gov/DataStore/DownloadFile/581450 (last accessed May 26, 2026) ("[A]t least part of the Cowden farmhouse was probably built prior to 1857. After the founding of Rock Creek Park, it was reused … as the golf course clubhouse."); *Dep't of Interior and Related Agencies Approps. for 1964: Hr'g Before a Subcomm. of the H. Comm. on Approps.*, 88th Cong., 1st Sess., 1628 (Jan. 28, 1963) (Congress gave NPS "money for a new clubhouse on Rock Creek" the previous year).

NPS's official Foundation Document for President's Park declares that "[t]he White House and the Wings" are the "[f]undamental resources … essential to achieving the purpose of the park." *See supra* n.1. Yet even Defendants admit the ballroom project will "permanent[ly] and adverse[ly]" affect President's Park, JA124, "disrupt[ing] the historical continuity of the White House grounds," "alter[ing] the architectural integrity of the east side of the property," and "adversely alter[ing] the design, setting, and feeling of the White House and the grounds over the long-term." JA103; *see also* JA102; JA112; JA124.

NPS's "broad discretion," Br.49, in routine park-management matters—determining "what uses of park resources are proper and what proportion of the park's resources are available for each use," *Bicycle Trails Council v. Babbitt*, No. C-93-0009, 1994 U.S. Dist. LEXIS 12805, at *24 (N.D. Cal. Sept. 1, 1994), *aff'd*, 82 F.3d 1445 (9th Cir. 1996)—does not excuse it from obtaining Congress's "direct[] and specific[]" approval to permanently impair the fundamental resources of a national park, 54 U.S.C. §100101(b). Congress enacted the Redwood Amendment precisely *because* the Organic Act's general mandate proved insufficient to protect park resources from degradation—a lesson Congress learned the hard way after NPS's general Organic Act authority failed to prevent irreversible harm to Redwood National Park. *See* H.R. Subcomm. on Nat'l Parks & Insular Affairs, 95th Cong., *Legislative History of Redwood Nat'l Park Expansion Act of*

*1978* (Pub. L. 95-250) (Comm. Print 1978), at 1 (describing the imperative of correcting "a pattern of indifference, indecisiveness, and frustration" in NPS's conduct). Plainly, the Organic Act cannot provide the very congressional authorization that its Redwood Amendment requires Defendants to obtain. *See Corley v. United States*, 556 U.S. 303, 314 (2009) (holding statutes should not be read to render provisions "inoperative or ... void").

Finally, even if the Organic Act somehow gave NPS express authority to construct the ballroom—and the Act does no such thing—NPS could not use the Economy Act, 31 U.S.C. §1535, to offload its project-management responsibilities wholesale to EXR. Br.46, 48-49. The Economy Act is a procurement tool, allowing agencies to contract for services from other agencies when doing so is cost-efficient. *See United States v. Chromalloy Am. Corp.*, 158 F.3d 345, 349 (5th Cir. 1998). It does not permit NPS to "delegat[e]" "statutory duties vested in it" by the Organic Act to EXR, 52 Comp. Gen. 128 (1972), or "give [EXR] any authority which it would not otherwise have" under its own authorizing statutes, Red Book 12-28 (citing 18 Comp. Gen. 262, 266 (1938)); *see also id.* at 12-27 ("The objective of the [Economy Act] is to permit an agency to take advantage of another agency's experience or expertise, not merely to 'dump' either work or funds or to avoid legislative restrictions.").

And even if NPS could delegate the project, EXR would be a patently

43

unsuitable delegee. EXR has "little if any experience managing construction projects of any size" and "no experience at all managing a project the size and importance" of the ballroom, JA262; *see* JA422 (EXR "install[ed] … security windows" and "improv[ed] … paving" under prior Economy Act arrangements).

### C. The National Trust Is Likely To Succeed On Its Property Clause Claim.

The National Trust's Property Clause claim separately supports the preliminary injunction. Relying on *Dalton v. Specter*, 511 U.S. 462 (1994), and *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025), the district court reasoned that by abruptly disclaiming any constitutional authority to build the ballroom, Defendants had unilaterally foreclosed the National Trust's claim that the ballroom violated the Property Clause and the separation of powers.[10] JA333-39. The district court acknowledged that this result was "incongruous." JA337. It was also wrong.

In both *Dalton* and *Global Health Council*, a delegating statute contemplated that the executive could undertake the challenged action (the closure of a shipyard and the impoundment of budget authority, respectively), so long as he complied with

---

[10] Defendants suggest that the ballroom is "require[d]" for the President "[t]o perform his constitutional functions." Br.18; *see also* Br.38, 51, 59. It is not. Moreover, by disclaiming constitutional authority for the ballroom, *see supra* p.9; JA337, Defendants have waived any argument that the Constitution justifies or requires it, *United States v. Laslie*, 716 F.3d 612, 614-15 (D.C. Cir. 2013).

the statute's terms. *Dalton*, 511 U.S. at 464-66; *Global Health Council*, 153 F.4th at 15-16. Consequently, if the plaintiffs in *Dalton* or *Global Health Council* had prevailed on their nominally constitutional claims, they would have at most demonstrated that the executive had failed to properly discharge authority *actually delegated to him*—that is, that the executive had violated a statute. *See Nat'l Treas. Empls. Union v. Vought*, 149 F.4th 762, 821-22 (D.C. Cir. 2025) (Pillard, J., dissenting) (explaining that in *Dalton* and *Global Health Council* "a statute directly contemplated the presidential action under consideration"), *vacated and reh'g en banc granted*, 2025 LX 380822 (D.C. Cir. Dec. 17, 2025).

In sharp contrast, the National Trust's claim concerns whether Congress ever delegated any Property Clause authority to Defendants to build the ballroom *in the first place*. Of course, resolving that claim will require litigating Defendants' statutory defenses—namely, that §105(d) and the Organic Act authorize the project. But if there has not been any such delegation (there has not, *supra* pp.29-44), the result would be that Defendants have also violated the Constitution, as they would be arrogating Congress's Property Clause powers without any authority whatsoever.

Neither the Supreme Court nor this Court has applied *Dalton* to foreclose genuinely constitutional claims like the National Trust's simply because the executive disclaimed constitutional authority for the challenged action. And it is not difficult to see why. Defendants' expansive reading of *Dalton* would insulate a wide

45

swath of genuinely constitutional claims from review simply because the President has conceded that he lacks constitutional authority and invoked a statute—*any* statute, even a patently irrelevant one—to justify his actions. Neither precedent nor logic supports that result. *See Nat'l Treas. Empls. Union*, 149 F.4th at 821-22 (Pillard, J., dissenting).

Nor is there any reason to believe that the district court would have exercised its "discretion" to enjoin the project differently if it had based its ruling on Defendants' lack of Property Clause authority, *Sherley v. Sebelius*, 644 F.3d 388, 397-98 (D.C. Cir. 2011) (ordinary rule against affirming preliminary injunction on alternate grounds), since Defendants *conceded* they had no such authority, JA337, and advanced the exact same defense—that §105(d) authorized the project—that the district court rejected in the context of their *ultra vires* claims, *see New Comm Wireless Servs. v. Sprintcom, Inc.*, 287 F.3d 1, 13 (1st Cir. 2002) (exception to ordinary rule for "alternate theories that present abstract legal questions").

The National Trust is therefore likely to succeed on its Property Clause claim, and the injunction should be affirmed on that ground as well.[11]

---

[11] Because affirming the injunction based on the National Trust's Property Clause claim does not require "alter[ation]" of the district court's order, *Greenlaw v. United States*, 554 U.S. 237, 244-45 (2008), the Court may affirm on this ground without reaching the Trust's conditional cross-appeal. However, if the Court does reach the National Trust's cross-appeal, it should reverse the denial of preliminary injunctive relief on the Trust's Property Clause claim for the same reasons.

### III.    The Remaining Factors Strongly Favor Affirmance.

The other factors—the irreparable harm to the National Trust, the balance of the equities, and the public interest—also decidedly favor affirmance of the preliminary injunction. *See Mahmoud v. Taylor*, 606 U.S. 522, 546 (2025).

**1.** The National Trust will be irreparably harmed without a preliminary injunction. As Professor Hoagland's declaration details, and as the district court correctly concluded, JA489-92, construction of the ballroom will cause "permanent and irreparable harm to the White House and President's Park" and, in turn, to Professor Hoagland's "aesthetic, cultural, and historical interests," in using and enjoying the park, JA489-91 (citation omitted); *see Nat'l Wildlife Fed'n v. Burford,* 835 F.2d 305, 323 (D.C. Cir. 1987) (affirming preliminary injunction based on irreparable harm to "aesthetic values and interests").

The harm in this case is not just imminent; it is now underway. *See Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (irreparable harm must be imminent). While the district court's injunction has been administratively stayed, Defendants have begun significant above-ground construction of the ballroom.[12] Without effective preliminary injunctive relief, the National Trust and

---

[12] *See* Jonathan Edwards & Dan Diamond, *Trump's White House Ballroom Rises Aboveground, But the Legal Battle Isn't Over*, Wash. Post (May 15, 2026), https://www.washingtonpost.com/politics/2026/05/14/white-house-ballroom-rises-above-ground-legal-fight-funding-dispute-cloud-project/.

47

Professor Hoagland will be irreparably injured—and by the time the Trust prevails on the merits, the harm done to the White House and President's Park (including further harm to the Executive Residence's east façade, JA119-20) may well be "beyond remediation," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *see Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 94 (D.D.C. 2019) (declining to order removal of electrical towers after the National Trust prevailed on the merits because of cost). That was precisely the district court's concern when it entered the injunction in the first place. JA491-92.

The public interest and the balance of the equities—which "merge" when an injunction is entered against the government, *Nken v. Holder*, 556 U.S. 418, 435 (2009)—likewise favor relief. The White House and President's Park do "not belong to any one man—not even a president[.]" JA493. Rather, they belong to the public, for which they are "h[eld] in trust" by Congress. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 290 (1984). And it is plainly not in the public's interest for it and its representatives in Congress to be systematically and unlawfully excluded from the decisionmaking processes involving the most transformative exterior construction project at one of the nation's most historically significant sites in over a century, just so Defendants can continue building the ballroom in violation of the law. *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

The ballroom's supposed benefits do not tip the scales. *See* Br.57-58. Damage

48

to the White House "turf" and "irrigation systems" that might be caused by temporary tents, JA147; *see* Br.57-58, does not come close to outweighing the public's interest in ensuring that large-scale modifications to the White House itself are made only after Congress has authorized them. The reduction of unidentified "strain" on the White House does not move the needle either, Br.58, and most of the other supposed "improvements" cited by Defendants pertain to the already-completed demolition of the East Wing, *see id.*

**2.** Despite lacking any authority whatsoever to build the ballroom, Defendants nonetheless assert that national-security imperatives require that construction be allowed to continue.[13] Br.53-57. But the record evidence rebuts their claim, and the Constitution requires that it be rejected.

As the National Trust has stated repeatedly, it takes national security and the President's safety seriously. *See, e.g.*, Dkt.70 at 5 (collecting National Trust's statements to that effect). But no matter how much Defendants insist otherwise, the lack of a massive ballroom on the White House grounds is not a national-security

---

[13] In passing, Defendants claim they will suffer "irreparable" "financial injury" from incidental costs that they might incur in connection with a pause in the project. Br.57 (citation omitted); *see* Br.58. Defendants never identify what those costs might be, or why they would prove irreparable even if incurred, and the argument is forfeited for lack of development, *United States ex rel. O'Connor v. USCC Wireless Inv., Inc.*, 128 F.4th 276, 287 (D.C. Cir. 2025). In any event, simple "economic loss does not, in and of itself, constitute irreparable harm," and Defendants offer no reason to diverge from that rule here. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674, (D.C. Cir. 1985) (per curiam).

emergency. Its absence has not prevented any past president from residing in the White House over the past two centuries, or prevented this President from residing there in the seven months since the East Wing was demolished. The carefully tailored injunction entered by the district court ensures that Defendants can continue work on their underground bunker, JA513—which the National Trust has never challenged, *see* JA504-05—and secure the East Wing site to ensure the safety of the President, his family, and his staff, JA513-14. But as the district court correctly concluded, no more is necessary to address Defendants' national-security concerns. JA506-08.

That conclusion was not clearly erroneous—far from it. Rather, it was firmly grounded in what ***Defendants themselves had told the district court for months***. *See* JA505-06. From the outset, Defendants represented that below-ground work would *not* lock in above-ground aspects of the ballroom. *See, e.g.*, JA180 (counsel stating that "[t]here's nothing here to suggest that it would be impossible to change the size of the ultimate structure …."); JA157-58 (denying the Trust's motion for a temporary restraining order in express reliance on these representations). They stated in no uncertain terms that the "national security concerns" that drove the "below-surface work" were "*independent of the above-grade construction.*" Dkt.30 at 39 (emphasis supplied). Their publicly filed declarations did not claim that the ballroom itself was a national-security necessity. JA153-55; JA251-53. And declarations they

repeatedly submitted *ex parte* for *in camera* review over four months "shed no further light on the question." JA508.

Only after the district court enjoined construction of the ballroom did Defendants change their position. In a transparent bid to continue building, they suddenly asserted that the ballroom and the bunker had become an "integrated whole," inseparably necessary for national security. Emergency Mot. for a Stay Pending Appeal, *Nat'l Tr. for Hist. Pres. v. Nat'l Park Serv.*, No. 26-5101 (D.C. Cir., filed Apr. 3, 2026).

But when this Court gave them another chance to present national-security evidence to the district court, Defendants failed to show anything of the sort. Instead, they simply asserted that various features of the project were "integrated into the entire structure and cannot exist in isolation." Dkt.69 at 2; JA499-501. None of the below-ground features—like "bunkers, bomb-shelters," and "hospital and medical facilities," Dkt.69 at 2—have any obvious connection to the above-ground features, and were unaffected by the injunction in any event, *see* JA513. And while those above-ground features—"missile-resistant steel columns and beams, drone-proof roofing, and bullet- and blast-proof glass windows," Dkt.69 at 3—might make for a more secure ballroom *if one had been expressly approved by Congress*, they do not transform the ballroom itself into a national-security necessity.

Nor, as the district court correctly concluded, did the fact that Defendants had

51

dug a large hole on the White House grounds create a national-security crisis that only an illegal ballroom could solve. JA508; *see* Br.56. And pausing a project that Defendants commenced knowing it would not be completed for years will not put the President to any "intolerable choice[s]." Br.58-59. Rather, he will continue to host state dinners, travel abroad, and make public appearances, just as he has done in the past month alone, and just as his predecessors did.

Having twice failed to come up with any explanation for why the President's *ballroom* is necessary for a military *bunker*, for the first time on appeal Defendants deploy yet another new theory, backed by yet another new declaration: A ballroom of the dimensions desired by the President is supposedly needed as a "sacrificial structure" for attacks on the bunker. Br.54-56; *see* Stay.Add.17-28. But Defendants' "new evidence" cannot be considered, *United States ex rel. Oliver v. Philip Morris USA Inc.,* 763 F.3d 36, 44 (D.C. Cir. 2014), and their argument—which they never raised below, despite many opportunities—is forfeited, *Reid v. Inch*, 920 F.3d 828, 833 n.4 (D.C. Cir. 2019).[14]

Even if Defendants' belated argument could be considered, it should not be

---

[14] Nor, despite having made several subsequent filings in the district court, have Defendants pressed the argument since. *See* Dkt.79; Dkt.81; Dkt.82. Instead, they have largely reprised their prior arguments, claiming, for example, that "the upper section of the building does not work without the lower" because of various allegedly integrated building systems, Dkt.79 at 1-2, mentioning the ballroom's supposed function as a "shield" as an afterthought, if at all.

credited. True, the President is afforded "deference in national security matters," *Ctr. for Nat'l Sec. Stud. v. Dep't of Just.*, 331 F.3d 918, 927 (D.C. Cir. 2003). But that deference is not limitless, *see, e.g.*, *United States v. U.S. Dist. Court*, 407 U.S. 297, 313-14 (1972), and courts are never "required to exhibit a naiveté from which ordinary citizens are free," *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (citation omitted). Defendants' new argument not only strains the bounds of credibility, but in seeking to elevate the exact ballroom desired by the President to a national-security imperative, it contradicts representations Defendants made to the district court for months that the ballroom was "independent" of national-security concerns involving the bunker. JA505-06. That the "sacrificial-structure" explanation was arrived at only *after* every other gambit to stop the preliminary injunction had failed—and that it still is hardly mentioned by Defendants, except when they need this Court to vacate an injunction that they have never accepted, *see supra* n.14—only offers more reason for skepticism.

**3.** Ultimately, however, Defendants' claims of a national-security emergency miss the point, because they could not permit the President to build the ballroom in any event. The Property Clause gives Congress exclusive control over all federal property, including the White House and President's Park. U.S. Const. Art. IV, §3, cl. 2; *see Kleppe*, 426 U.S. at 540; Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES, §1319 (Congress's Property Clause power

"applie[s] to the due regulation of all … personal and real property rightfully belonging to the United States"). And when the framers of the Constitution "entrusted … power to the Congress alone," they did so for "both good and bad times." *Youngstown*, 343 U.S. at 589. Those choices—with all "the fears of power and the hopes for freedom that lay behind" them, *id.*—were made "in the light of emergency," and are "not altered by emergency," *Blaisdell*, 290 U.S. at 425. To the contrary, the Constitution is "designed to survive, and remain in force" even under "extraordinary" circumstances, *Boumediene*, 553 U.S. at 798.

It is for that reason that the Supreme Court has affirmed preliminary injunctive relief prohibiting the President from exercising Congress's exclusive constitutional powers despite the President having claimed, as he does here, that a "grave emergency" required the injunction to be vacated. *Youngstown*, 343 U.S. at 582-84, 589 (holding that the President could not exercise lawmaking power despite asserting that a "national catastrophe" "endanger[ing] the well-being and safety" of the country and "immediately jeopardiz[ing]" national defense required it). And it is for that reason that neither the Supreme Court nor this Court has ever permitted the President to arrogate another branch's constitutional powers to himself based on nothing more than his own claim of necessity. *See, e.g.*, *id.*; *cf. Ex parte Milligan*, 71 U.S. 2, 121-22 (1866) (judicial power); *Medellín v. Texas*, 552 U.S. 491, 523-30 (2008) (treaty power).

54

*Winter* is not to the contrary. *See* Br. 59. The fact that the balance of equities there excused the executive from his statutory obligation to prepare an EIS in connection with military training exercises does not countenance his efforts here to usurp powers the Constitution vests exclusively in Congress. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 23-24, 33 (2008). While equity does not "mechanically obligate[]" courts to "grant an injunction for every violation of law," *id.* at 32 (citation omitted), neither does it permit looking past "serious implications for our constitutional structure," *In re Aiken Cty.*, 725 F.3d 255, 266-67 (D.C. Cir. 2013).

Permitting the President to build the ballroom—to exercise Property Clause powers granted to Congress by the Constitution, and withheld by Congress from him, *supra* pp.29-44—would undermine the separation of powers and gravely endanger the continuity of government "within the framework of the law." *Boumediene*, 553 U.S. at 798. The President may ask Congress for the ballroom. He may ask Congress because he believes that the ballroom is necessary for national security, or simply because he wants it. But the President is a temporary tenant of the White House, not its owner. What he cannot do—what the Constitution, federal law, and equity all prohibit him from doing—is build the ballroom on his own.

## <u>CONCLUSION</u>

The Court should affirm the preliminary injunction.

55

Respectfully submitted,


 */s/ Gregory B. Craig*
Gregory B. Craig
FOLEY HOAG LLP
1717 K Street N.W.
Washington, DC 20006
Tel: (202) 223-1200

Thaddeus A. Heuer
Matthew F. Casassa
Kevin Y. Chen
Jack C. Smith
FOLEY HOAG LLP
155 Seaport Boulevard
Suite 1600
Boston, MA 02210
Tel. (617) 832-1000

Dated: May 27, 2026

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that the preceding document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because the document contains 12,990 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f). I further certify that the document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

*/s/ Gregory B. Craig*

Dated: May 27, 2026

57

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2026, I caused this document to be filed through the ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Gregory B. Craig*

Dated: May 27, 2026