*[Oral argument scheduled for June 5, 2026]*

**Nos. 26-5123, 26-5134**

---

**United States Court of Appeals**
for the District of Columbia Circuit

_____

**NATIONAL TRUST FOR HISTORIC PRESERVATION
IN THE UNITED STATES**,
*Plaintiff-Appellee/Cross-Appellant*,

v.

**NATIONAL PARK SERVICE, *et al*.**,
*Defendants-Appellants/Cross-Appellees*.

---------------

On Appeal from the United States District Court for the District of Columbia

**BRIEF OF *AMICI CURIAE***

**VARIOUS ORGANIZATIONS ADVANCING PROTECTION OF
NATIONAL PARKS, HISTORIC PRESERVATION, AND NATIONAL
CAPITAL PLANNING IN SUPPORT OF PLAINTIFF-APPELLEE/CROSS-
APPELLANT**

ANDREA C. FERSTER
COUNSEL OF RECORD
Law Offices of Andrea C Ferster
68 Beebe Pond Road
Canaan, NY 12029
Phone: 202-669-6311
Emailandreaferster@gmail.com

OF COUNSEL
PHILIP ALLEN LACOVARA                    PAUL W. EDMONDSON
9101 Southmont Cove                      6129 33rd St. NW
Fort Myers, FL 33908                     Washington, DC 20015
Phone: 917-412-9766                      Phone: 202-270-3276
Email: placovara@gmail.com               Email: paul@preservationlaw.com

*Counsel for* Amici Curiae

## CERTIFICATE AS TO
## PARTIES, RULINGS, AND RELATED CASES

### Parties and *Amici*

Except for the *Amici Curiae* in support of Appellee identified in the

Appendix attached to this brief, all parties, intervenors, and *amici curiae* appearing

before the district court below and this Court are listed in the briefs for the parties.

### Rulings under Review and Related Cases

Counsel adopt and incorporate by reference parties' statements with respect

to rulings under review and related cases.

# RULE 26.1. DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1. and D.C. Cir. Rule 29(b), the following organizations who are participating as *amici curiae* are non-profit organizations incorporated under the laws of the District of Columbia and other jurisdictions as more fully described in the Appendix.  These organizations are without any parent corporation, and no publicly held corporation owns these organizations or any portion of these organizations.

American Institute of Architects
American Society of Landscape Architects
Association for Preservation Technology
Coalition to Protect America's National Parks
Committee of 100 on the Federal City
Cultural Landscape Foundation
DC Preservation League
National Mall Coalition
National Preservation Partners Network
Olmsted Network
Society of Architectural Historians

Respectfully submitted.

/s/_Andrea C. Ferster_____

- ii -

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND
RELATED CASES.............................................................................................-i-

CORPORATE DISCLOSURE STATEMENT....................................................-ii-

TABLE OF CONTENTS....................................................................................-iii-

TABLE OF AUTHORITIES............................................................................ -v-

STATEMENT OF IDENTITY, INDEPENDENCE, AND
AUTHORIZATION ...........................................................................................1

SUMMARY OF ARGUMENT...........................................................................3

ARGUMENT .......................................................................................................4

    **I.**     The PRESIDENT HAS NO INHERENT AUTHORITY TO DIRECT
    DESTRUCTION OF HISTORIC FEDERAL PROPERTY WITHIN A
    NATIONAL PARK AND THEN USE PRIVATE FUNDS TO SATISFY HIS
    PERSONAL QUEST TO BUILD A MASSIVE, DISCORDANT, ABOVE-
    GROUND BALLROOM ...................................................................4

        **A.**     **Congress Has Primary Constitutional Authority to Regulate
        Use of Federal Property; a President Has No Inherent
        Authority to Do So Without Congressional Approval**....................4

        **B.**     **Federal Law Actually Prohibits the President's Actions** ................8

        **C.**     **Solicitation of Private Donors Does Not Allow Construction
        of an Otherwise-Unauthorized Ballroom Building** ........................16

        **D.**     **Historic Practice Shows That All Major Projects on White
        House Grounds Were Approved and Funded by Congress**...........18

II.     THE HISTORY OF CAREFUL PLANNING FOR WHITE HOUSE FACILITIES AS PART OF THE LARGER PLAN FOR THE NATION'S CAPITAL DEMONSTRATES A PUBLIC INTEREST IN UPHOLDING THE INJUNCTION AGAINST CONSTRUCTING THE BALLROOM ................19

III.    CONGRESSIONAL ENACTMENTS RELATING TO THE WHITE HOUSE AND SURROUNDING NATIONAL PARK CREATE INTERESTS THAT PLAINTIFF HAS STANDING TO PROTECT IN COURT ................................24

CONCLUSION...............................................................................................30

CERTIFICATE OF COMPLIANCE ................................................31

CERTIFICATE OF SERVICE ........................................................31

APPENDIX – LIST OF AMICI ........................................................ A-1

<u>T</u><u>ABLE OF</u> <u>A</u><u>UTHORITIES</u>

<u>C</u><u>ASES</u>

*Changji Esquel Textile Co.* v. *Raimondo*,
  40 F.4th 716 (D.C. Cir. 2022) ................................................................24
*City of Port Isabel* v. *FERC*,
  111 F.4th 1198 (D.C. Cir. 2024).............................................................23
*Department of Homeland Security* v. *Regents of University of California*,
  519 U.S. 1 (2020).................................................................................23
*Federal Communications Commission* v. *Prometheus Radio Project*,
  592 U.S. 414 (2021).............................................................................23
*Federal Educ. Ass'n* v. *Trump*,
  2025 U.S. App. LEXIS 25013 (D.C. Cir. Sept. 25, 2025)......................24
*Fontem US, LLC* v. *FDA*,
  82 F.4th 1207 (D.C. Cir. 2023) ...........................................................23
*Kleppe* v. *New Mexico*,
  426 U.S. 529 (1976)…………………………………………………...…5
*Marbury* v. *Madison*,
  5 U.S. 137 (1803)................................................................................29
*National Association of Postal Supervisors* v. *USPS*,
  26 F.4th 960 (D.C. Cir. 2022)) ...........................................................25
*National Trust for Historic Preservation v. Department of State,*
  834 F. Supp. 453 (D.D.C. 1993);.........................................................28
*National Trust for Historic Preservation v. U.S. Army Corps of Engineers*,
  552 F. Supp. 784 (S.D. Ohio 1982) .....................................................28
*Nuclear Regulatory Comm'n* v. *Texas*,
  605 U.S. 665 (2025)............................................................................26
*Sierra Club* v. *FERC,*
  827 F.3d 59 (D.C. Cir. 2016)...............................................................27
*Sierra Club* v. *Morton*,
  405 U. S. 727 (1972)...........................................................................27
*Starbucks Corp.* v. *McKinney*,
  602 U.S.339 (2024).............................................................................24
*Summers* v. *Earth Island Inst.*,
  555 U.S. 488 (2009).............................................................................28
*WildEarth Guardians v. Jewell,*
  738 F.3d 298, 305 (D.C. Cir. 2013*)*.....................................................27

## U.S.  Constitution

Article IV, Section 3, Clause 2....................................................................................5
Article I, Section 8, Clause.17, ...................................................................................5

## Statutes

2 U.S.C.  §4110.........................................................................................................28
3 U.S.C.  §105(d) ...............................................................................................9, 10, 11

## Administrative Procedures Act

5 U.S.C.  §701(b)(1) .................................................................................................26
5 U.S.C, §706(2)(A) .................................................................................................16
5 U.S.C.  §706(A)(2) .................................................................................................26

## 40 USC Chapter  87

40 U.S.C.  §8106.........................................................................................................8
40 U.S.C.  §8722.......................................................................................................22
40 USC Chapter  87 ..................................................................................................20
40 USC §8701(a)(4)...................................................................................................21
40 USC  § 8711(b) .....................................................................................................21
40 USC §8722...........................................................................................................22
40 USC §8722(b)(2) ..................................................................................................21
40 USC §8722(d) .......................................................................................................21

## U.S. Code, Title 54

54 U.S.C,. §100101(a) ..............................................................................................12
54 U.S.C,. §100101(a) ..............................................................................................12
54 U.S.C.  §304101(a)(9)............................................................................................2
54 U.S.C. §308602(b).................................................................................................28
54 U.S.C. §308702.....................................................................................................28
54 U.S.C.  §312102(a) ...............................................................................................28
54 USC §100101(b) .............................................................................................. 14, 17
54 U.S.C.  §101101(2) ...............................................................................................16

Pub.  L.  No.  87-286, 75 Stat.  586 (1961)................................................................26

**News Stories**

*New York Times*

Emily Bader, Junho Lee, and Larry Buchanan, *Trump's Ballroom Design Has Barely Been Scrutinized,* March 29, 2026, hulking ballroom building..13

Luke Broadwater, A*rts Panel Packed With Trump Allies Approves White House Ballroom Project,* Feb. 19, 2026 https://www.axios.com/local/washington-dc/2025/07/11/trump-deputies-take-over-powerful-dc-planning-commission ...............................................22

*Washington Post*

Riley Beggin & Dan Diamond, *Hundreds of millions of dollars for Trump's ballroom ruled out of order in Senate,* Wash. Post (May 17, 2026),  https://www.washingtonpost.com/politics/2026/05/17/hundreds-millions-trumps-ballroom-ruled-out-order-senate/ .......................................10

Dan Diamond, Jonathan Edwards, and Riley Beggin, *GOP offers $1B for White House security, sparking dispute over ballroom,* Wash. Post (May 5, 2026), https://www.washingtonpost.com/politics/2026/05/05/senate-budget-bill-trump-ballroom/ ....................................................10

Jonathan Edwards & Dan Diamond, *Trump's White House ballroom rises above ground, but the legal battle isn't over*, Wash. Post (May 15, 2026), https://www.washingtonpost.com/politics/2026/05/14/white-house-ballroom-rises-above-ground-legal-fight-funding-dispute-cloud-project/ ...10

Jonathan Edwards & Dan Diamond, *Ballroom commission changed documents at White House's request*, Wash. Post (April 2, 2026), https://www.washingtonpost.com/politics/2026/04/02/white-house-ballroom-documents-changed/ ................................................21

Dan Diamond & Jonathan Edwards, *Federal commission, packed with Trump allies, approves his towering triumphal arch*, Wash. Post (May 21, 2026), https://www.washingtonpost.com/politics/2026/05/21/commission-fine-arts-approves-trump-250-foot-triumphal-arch/ ....................................24

*Wall Street Journal*

Editorial Board, *Trump's Big, Beautiful Ballroom,* Oct. 23, 2025 big, beautiful ballroom, https://www.wsj.com/opinion/donald-trump-white-house-ballroom-74dfbc56.................................................................13

*Fortune*

Nina Paoli, *Meet all 37 White House ballroom donors funding the $400 million build, including Silicon Valley tech giants, crypto bros and the Lutnicks*, April 29, 2026, https://fortune.com/article/who-has-donated-trump-white-house-ballroom/.................................................17

*The Times*

*Trump angers Eisenhower family with plans for 'ugly' building* (May 8, 2026) Eisenhower Old Executive Office Building, https://www.thetimes.com/us/american-politics/article/trump-angers-eisenhower-family-with-plans-for-ugly-building-vs7rsnbr0.......................24

*Time*

Solcyré Burga, *When Americans Stopped Trusting the Government,* Time Magazine (Jan. 6, 2026), https://time.com/7343346/americans-trust-us-government-history-vietnam-war-watergate/ .............................................29

*Associated Press*

Darlene Superville and Jacquelyn Martin, *White House East Wing demolished as Trump moves forward with ballroom construction, AP photos show* (Oct. 23, 2025) overnight *https://apnews.com/article/trump-white-house-ballroom-57512e0d91432f75529946fddfbfe2c5*.................................13

*Architectural Digest*

Elizabeth Stamp, The White House: Everything You Need to Know About the US President's Residence (Oct. 10, 2024) three components https://www.architecturaldigest.com/story/everything-you-need-to-know-about-the-white-house .................................................................10

*Cable News Network*

Betsy Klein, Sunlen Serfaty, and Casey Tolan, *Soulless hotel conference space': Approval for Trump's East Wing ballroom delayed amid scathing public feedback*, March 5, 2026, https://www.cnn.com/2026/03/05/politics/trump-east-wing-ballroom-commission-vote.................................................................22

Betsy Klein, Sunlen Serfaty, and Casey Tolan, *It's not supposed to look like you're going to dive in': Historians criticize Trump's Reflecting Pool makeover as group sues*, May 18 2026  at p. 24  Reflecting Pool ................24

*NBC News*

Julie Tsirkin, Megan Shannon, and Peter Nicholas, *Camouflage and crudites: Trump wages war and hosts parties at Mar-a-Lago* (March 7, 2026)  feels comfortable, *https://www.nbcnews.com/politics/donald-trump/trump-wages-iran-war-situation-room-mar-lago-rcna261389* ...........................................8

*National Public Radio*

Tamara Keith, *Why Trump is obsessed with building a White House ballroom* (July 29, 2025), summarized  https://www.npr.org/2025/07/30/nx-s1-5425497/trump-whitehouse-ballroom  ......................................7

*Public Broadcasting Stations*

*Historic preservation groups sue Trump to block Kennedy Center changes*, (March 23, 2026), p 24 Kennedy Center https://www.pbs.org/newshour/nation/historic-preservation-groups-sue-trump-to-block-kennedy-center-changes.......................................24

*WBRC 6 News*

Molly Martinez, *Democracy Forward tees up legal challenge to Trump's D.C. golf takeover*. (May 19, 2026), golf course https://www.wbrc.com/2026/05/19/democracy-forward-tees-up-legal-challenge-trumps-dc-golf-takeover/ ...........................................24

*Politico*

Jordan Carney and Jennifer Scholtes, *Ballroom won't be funded after Senate GOP drops $1 billion Trump security reques*t, May 20, 2026. https://www.politico.com/news/2026/05/20/ballroom-security-funding-reconciliation-00930193 ................................................................................10

Jennifer Yachnin, *Trump's ballroom design gets final OK from planning commission*, April 2, 2026 https://www.politico.com/news/2026/04/02/trump-ballroom-planning-commission-approval-00856353 ................................................................ 23

*Axios*

Cuney Dil, "Trump deputies take over powerful D.C. planning commission" (July 11, 2025) stacked ...............................................................................22

*Funds from Forced Labor: What The Daily Missed about the Fanjuls' Donation to the White House Ballroom,* Nov. 12, 2025.................................16

**Websites**

*National Park Service website*

*The White House is a Presidential Park national park,* https://www.nps.gov/whho/index.htm.............................................. 5, 13, 16

Edwin Batemen Morris, *The Secretary of the Interior's Standards for the Treatment of Historic Properties***,** historic properties https://parkplanning.nps.gov/document.cfm?documentID=148193 .. 12,15-16

*White House East Wing Modernization and State Ballroom Environmental Assessment,* https://parkplanning.nps.gov/document.cfm?documentID=148193 ...... 13-14

*The White House & President's Park, Comprehensive Design Plan* (2000) https://parkplanning.nps.gov/document.cfm?documentID=40077 ....... 15, 20

Foundation Document: *The White House and President's Park* (Sept. 2014), *Foundation Document* https://npshistory.com/publications/foundation-documents/whho-fd-overview.pdf.................................................. 13, 20, 26

*The White House & President's Park, Design Guidelines* (1997), https://parkplanning.nps.gov/document.cfm?documentID=40347 ....... 15, 20

*The Secretary of the Interior's Standards for the Treatment of Historic Properties with Guidelines for the Treatment of Cultural Landscapes. 1996*, https://www.nps.gov/subjects/culturallandscapes/preservation.htm ............16

*Explore President's Park,* https://www.nps.gov/whho/planyourvisit/explore-president-s-park.htm....................................................................16

*White House Fence Design Receives Final Approval* (Feb. 2, 2017)**,** https://www.nps.gov/whho/learn/news/white-house-fence-design-receives-final-approval.htm .................................................................22

White House East Wing Modernization and State Ballroom Environmental Assessment https://parkplanning.nps.gov/document.cfm?documentID=148193....... 13-14

*White House East Wing Modernization and State Ballroom*, https://parkplanning.nps.gov/projectHome.cfm?projectID=133780 ...........20

**The White House**

*The White House Announces White House Ballroom Construction to Begin* (July 21, 2025) official announcement...................................................6

*White House Historical Society*

*Fact Sheet: Decorating the White House.* living quarters https://www.whitehousehistory.org/press-room-old/press-collection/decorating-the-white-house .......................................................11

*Frederick Law Olmstead's Plans for the White House Grounds* https://www.whitehousehistory.org/photos/olmstead-plans-for-the-white-house-grounds.................................................................16

Stewart McLauren, *An Ever-Changing White House,* *https://www.whitehousehistory.org/an-ever-changing-white-house* ............18

*White House swimming pool during Kennedy administration*,
https://www.whitehousehistory.org/photos/white-house-swimming-pool-during-kennedy-administration ................................................................18

*Truman Library*

*White House Balcony, South Portico,*
https://www.trumanlibrary.gov/photograph-records/64-275 ........................18

*Records of Temporary Committees, Commissions and Boards: Records of the Commission on the Renovation of the Executive Mansion,*
https://www.trumanlibrary.gov/library/federal-record/records-temporary-committees-commissions-and-boards-records-commission ........................18

*Other websites*

https://corpaccountabilitylab.org/calblog/2025/11/12/funds-from-forced-labor-what-the-daily-missed-about-the-fanjuls-donation-to-the-white-house-ballroom ................................................................................................17

https://www.cfa.gov/ ................................................................................22

https://www.appropriations.senate.gov/about/budget-process ........................9

https://www.trumpgolf.com/Our-Courses ..........................................4

https://www.trumpinternationalrealty.com/property-portfolio ........................4

Susan Calafate Boyle, *The White House & President's Park: cultural landscape report, site history and evaluation, 1791-1994,*
https://archive.org/details/prpa_clr/mode/2up ................................8

Society of Architectural Historians, *Statement on the Proposed Ballroom Addition at the White House*, Oct 16, 2025,
https://sah.org/2025/10/16/statement-on-theproposed-ballroom-addition-at-the-white-house/ ................................................................16

https://www.tclf.org/white-house-grounds ..........................................16

*Report of the Commission on the Renovation of the Executive Mansion* (1952)..................................................................................................20

## <u>STATEMENT OF IDENTITY, INDEPENDENCE,<br>AND AUTHORIZATION</u>

*Identity*.  The *amici curiae* and their affiliations appear in the Appendix. *Amici* consist of non-profit organizations dedicated to advancing and protecting policies established by law or professional practice in such fields as historic preservation, civic planning, architectural standards, and protection of national parks.

*Independence*.  No counsel for a party has drafted this brief in whole or in part.  No party or entity other than *amici curiae* or their counsel has made any financial contribution toward the preparation and submission of this brief.

*Authorization*.  Counsel for all parties consented to the filing of this brief.

All *amici* have authorized participation.

- 2 -

## INTERESTS OF *AMICI CURIAE*

*Amici Curiae* ("*Amici*") are nonprofit organizations dedicated to advancing a variety of related public interests, including preservation and informed stewardship of landmarks and landscapes of cultural, architectural, and historic value, and protection of America's National Parks. These organizations have a common interest in ensuring that legal, planning, and regulatory standards developed to protect those public interests are followed.

*Amici* share the view that the government officials in this case have failed to meet those standards with respect to the plan to erect a huge ballroom on the White House grounds, a congressionally-established national park.

## SUMMARY OF ARGUMENT

1. This case is not about national security. It is purely about President Trump's quest to tear down federal property to realize his personal goal of creating a lavish ballroom on White House grounds.

No President has the legal authority to alter federal property in this imperious way and undertake a massive building project on historic National Park land without congressional approval. Federal law clearly prohibits the President's actions and his attempt to proceed with the massive, above-ground ballroom. Each statute on which the President relies is inapplicable by its clear terms.

2. The Constitution assigns to Congress the responsibility for acquiring and controlling federal property, including property in the seat of government such as the White House complex. Congress designated the White House as a culturally significant national park. The White House is subject to constraints on new, discordant construction within this designated park.

Entities such as the plaintiff National Trust for Historic Preservation ("National Trust") (as well as the *amici*) are within the zone of interests protected by the various federal statutes designating White House facilities as part of a national park and regulating certain alterations to these facilities. Accordingly, the plaintiff has standing to seek and obtain injunctive relief.

3.    The White House complex and the national park in which it is situated have long been part of a comprehensive planning process to ensure that the White House complex and its environs are part of a coherent and thoughtful plan for the Nation's Capital.  The President's unilateral and unlawful decision to tear down the East Wing and to construct a massive ballroom creates an important public interest in upholding the preliminary injunction against further above-ground construction.

## ARGUMENT

This brief provides full context explaining why President Trump's project to erect a massive new ballroom – in place of the now-demolished East Wing of the White House complex – falls outside the President's limited authority and departs materially from prior presidential initiatives regarding White House renovations.

**I.    The PRESIDENT HAS NO INHERENT AUTHORITY TO DIRECT DESTRUCTION OF HISTORIC FEDERAL PROPERTY WITHIN A NATIONAL PARK AND THEN USE PRIVATE FUNDS TO SATISFY HIS PERSONAL QUEST TO BUILD A MASSIVE, DISCORDANT, ABOVE-GROUND BALLROOM.**

**A.    Congress Has Primary Constitutional Authority to Regulate Use of Federal Property; a President Has No Inherent Authority to Do So Without Congressional Approval**.

Although the President lives and works in the White House during his term, the facility is federal property owned by the United States.  A President has no inherent constitutional authority to destroy any portion of the White House complex merely because he is living and working there.  Nor does he have inherent authority to mount a huge construction project in this federal enclave.  Rather, any authority

to do so must be sought from Congress.  As discussed *infra*, the President searches in vain for congressional permission to proceed with his project.  Instead, federal law actually prohibits his project.

1.    The Property Clause of the U.S.  Constitution (Article IV, Section 3, Clause 2) gives Congress plenary authority over the lands and other property of the United States.  The Supreme Court has "repeatedly observed" that Congress's authority "over the public land thus entrusted to Congress is without limitations." *Kleppe* v.  *New Mexico*, 426 U.S.  529, 539 (1976)

Also pertinent here, Article I, Section 8, Clause.17, entrusts to Congress "Power *** To exercise exclusive Legislation in all Cases whatsoever, over such District *** as may *** become the Seat of Government of the United States."  In the exercise of this exclusive constitutional power, and as discussed in Section II of this brief, *infra,* Congress enacted various statutes governing the permissible treatment of the White House and surrounding federal property in the seat of government.  Congress declared the White House to be important cultural property and part of a surrounding national park.  The importance of this designation is discussed at greater length below.

While President Trump may have complete discretion to reconfigure his own personal real estate holdings to his taste, his role as President does not confer comparable authority to do with public property whatever he likes.  Just as a tenant

occupying a private house under a four-year lease lacks lawful authority to tear down a wing that he does not like and to build some personal monument in its place, neither does a President.

2.    The government's brief makes it seem as if this case is about national security and protection of the presidential family.  But this line of argument is transparently an afterthought.  When the President announced his project in July 2025, he presented it to the American people as exclusively a reflection of his personal vision for new *entertainment* space on a gigantic scale.  Thus, the official announcement declared:

> "For 150 years, Presidents, Administrations, and White House Staff have longed for **a large event space** on the White House complex that can hold substantially more guests than currently allowed.  President Donald J. Trump has expressed his commitment to solving this problem on behalf of future Administrations and the American people.
>
> "***  The White House State Ballroom will be a much-needed and exquisite addition of approximately 90,000 total square feet of ornately designed and carefully crafted space, with a seated capacity of 650 people — a significant increase from the 200-person seated capacity in the East Room of the White House.
>
> ***
>
> "President Trump, and other patriot donors, have generously committed to donating the funds necessary to build this approximately $200 million dollar structure.
>
> ***
>
> "The White House Chief of Staff Susie Wiles said the following: '***President Trump is a builder at heart and has an extraordinary eye for detail***.  ***'"… (Emphasis added.)

- 6 -

She described his goal as "building a beautiful ballroom that can be enjoyed by future Administrations and generations of Americans to come."

This project reflects President Trump's personal sense of aesthetics, not a national security imperative. As one analysis of his obsession summarized:

> "The White House ballroom is something that Trump has been talking about for at least 15 years, actively pitching himself to manage the project long before he ran for office."

3.    The recent assault at the Washington Hilton during a private dinner that the President and other officials chose to attend, and almost a year after the President launched his project, does not change the legal issues posed by the President's unauthorized, unilateral decision to tear down the East Wing of the White House complex. Nor does the regrettable and unacceptable event at a public hotel entitle the President to proceed with a huge building project that, as the President's own statement acknowledged, Congress had never decided to authorize over the past "150 years."

The government's brief (at pp. 2-3) tries to link the ballroom to legitimate security concerns. The brief emphasizes that the ballroom would have state-of-the-art protection against terrorist or "asymmetric" attacks. Yet, the President's schedule is replete with appearances at hundreds of locations around the country that, while subject to security measures by the Secret Service, are not expected to be "hardened." There is no evidence that the President has ever sought to blast- or

drone-proof his Florida property at Mar-a-Lago, where he conducts considerable public business and meets frequently with foreign dignitaries.  The President apparently feels comfortable directing major military operations from Mar-a-Lago without tearing up his personal estate to build a massive, secure command center under his ballroom there:

> "The Iran operation marks the sixth major military action Trump has directed from Mar-a-Lago during his second term, underscoring the resort's evolution from social playground to presidential command center."

 Apart from being a convenient and ill-founded afterthought, the government's argument about security concerns begs the question:  It is not whether a new ballroom should be secure, but whether the President has authority to proceed to build it at all, absent congressional approval and funding.

### B.     Federal Law Actually Prohibits the President's Actions.

President Trump's initiative lacks any support in historical practice.  More to the point, it flouts the law.

The government's brief (at p.  49) necessarily admits than there is a federal statute that, on its face, expressly bars the President from building his ballroom without congressional approval.  Specifically, 40 U.S.C. §8106 declares crisply:

> "A building or structure ***shall not be erected*** on any reservation, park, or public grounds of the Federal Government in the District of Columbia ***without express authority of Congress***."  (Emphasis added.)

So, the government is forced to search for such "express authority of Congress" for the project. But the various statutes that the government invokes provide no authority for this venture.

1. The government relies primarily on 3 U.S.C. §105(d) ("Section 105(d)"):

> "(d) There are ***authorized to be appropriated*** each fiscal year to the President such sums as may be necessary for—
>> "(1) the care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures) of the ***Executive Residence at the White House***; \*\*\*" (Emphasis added.)

It is hard to take seriously the government's reliance on this statute.

First, the statute does not "authorize" *the President* to do anything. This is an "*authorization*" statute, which is simply the first step in the constitutional process under which *Congress* may *appropriate* money from the Treasury. Under this constitutional practice, Congress treats its power to make "appropriations" as limited "to purposes previously authorized by law." That is all Section 105(d) purports to do – set the stage for *possible* appropriations.

But Congress has not proceeded with the second stage of the funding process – the actual "appropriation" of any money for the ballroom project, or anything like it.

From time to time, Congress actually has appropriated federal funds to enable each presidential family to redecorate the "Executive Residence" in the White House, where the First Family lives temporarily, to conform with the incumbents'

personal taste and to perform routine maintenance of this space.  But this periodic accommodation does not permit any President to make fundamental changes to the design and structures everywhere in this federal park complex unless Congress expressly allows such changes.

Indeed, although the President's allies in the Senate unsuccessfully attempted a parliamentary maneuver to take up a bill that would have allocated as much as $1 billion for "security improvements" for now-necessary, new East Wing reconstruction, the "text explicitly [said] the money could not be used for 'non-security elements' of the project, a reference to Trump's planned ballroom."  Then, on May 20, 2026, the Senate abandoned any effort to appropriate money for the President's project, explaining "the ballroom money is out."

Thus, even the President's congressional supporters understood that he needed congressional action to allow him to proceed with his ballroom.  But Congress declined to approve.

Second, on its face, Section 105(d) addresses only expenses for the "***Executive Residence*** at the White House" (emphasis added).  As long understood, the White House consists of three components – the "West Wing" (where senior staff offices are located), the "East Wing" (where the First Lady had offices, which the President recently bulldozed), and the "***Executive Residence***" (which includes 16 family and guest rooms and various dining rooms and meeting rooms).

Section 105(d) expressly provides authorization for funding only for this central group of rooms, the "Executive Residence."  This is the source of funding for such things as tailoring the First Family's living quarters and reception rooms *in* the central White House, especially during changes in Administration.  Any funding to change the wallpaper in the President's bedroom *in* the White House does not authorize (or finance) construction of a new $400+ million building elsewhere on White House grounds, *adjacent* to the White House complex.

Third, the government's brief (at p. 36) struggles to interpret the verbs "alter" or "improve" in Section 105(d) as somehow implying that they may include constructing a whole new building.  But no plausible canon of statutory construction would allow a court to construe these terms in this clause as having such a dramatic sweep.  The whole focus of the statutory language is on maintaining or improving the "Executive Residence" portion *inside* the White House.

2.    Next the President relies on the Organic Act creating the National Park Service.  As discussed more fully in Sections II and III of this brief, *infra*, Congress has declared the White House and its environs a national park.  Drawing on this designation, the government's brief notes (at p. 43-44) that the Park Service may construct park-related facilities in national parks.

The National Park Service Organic Act simply does not authorize construction of a daunting ballroom building on the White House lawn.  In declaring the

"purpose" of the national parks, Congress unambiguously specified (54 U.S.C,. §100101(a)):

> "The Secretary, acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures *that conform to the fundamental purpose* of the System units, which purpose is *to conserve the scenery, natural and historic objects*, and wild life in the System units and *to provide for the enjoyment of the scenery, natural and historic objects * * ** by such means as will *leave them unimpaired for the enjoyment of future generations*." (Emphasis added.)

In 1978, Congress considered it necessary to add a "reaffirmation" to this provision in the Organic Act, emphasizing that these precise purposes must be honored, not distorted. Congress added subsection (b):

> "Congress reaffirms, declares, and directs that the promotion and regulation of the various System units shall be *consistent with and founded in the purpose established by subsection (a)*, to the common benefit of all the people of the United States. The authorization of activities shall be construed and the protection, management, and administration of the System units shall be conducted *in light of the high public value and integrity* of the System and *shall not be exercised in derogation of the values and purposes* for which the System units have been established, *except as directly and specifically provided by Congress.*" (Emphasis added.)

Not surprisingly, the Interior Department and National Park Service have long had in place procedures specifically designed to ensure the preservation and appropriate management of "historic properties."

The general statutory command ensuring that management of national parks must "conform to the fundamental purpose of the System units, which purpose is to

- 12 -

conserve the scenery, natural and historic objects," applies equally to what Congress designated as "the White House and President's Park."

According to the "*Foundation Document*" for "The White House and President's Park," the National Park Service has declared that maintenance of the White House grounds is part of its mission to preserve –

> "***unimpaired*** the natural and cultural resources and values of the national park system for the enjoyment, education, and inspiration of this and future generations.  The National Park Service cooperates with partners to extend the benefits of natural and cultural resource conservation ***."   (Emphasis added.)

It is incongruous to view a new, hulking ballroom building on the scale of the President's plan, after the President had bulldozed the East Wing overnight, as somehow consistent with the cultural-resource preservation goals of the national park system, including the "White House and President's Park."

Viewing the White House as part of a "national park" hardly provides President Trump with *carte blanche* to tear down the East Wing summarily and to erect a sprawling ballroom.  The Park Service itself acknowledges:

> "The White House is owned by the American people and stewarded by the National Park Service."

Fulfilling Mr.  Trump's personal quest to build a "big, beautiful ballroom" hardly reflects official stewardship of a *national park* as reasonably understood.

Indeed, even the official "White House East Wing Modernization and State Ballroom Environmental Assessment," prepared by the defendant National Park

- 13 -

Service for the project in August 2025 (but withheld from the public until after this suit was brought, Joint Appendix, at 171) admits that the project "would have permanent adverse impacts on the cultural landscape, particularly the White House Grounds cultural landscape."   The relevant section of this official assessment deserves full reading:

> "Replacing the existing East Wing with a new building that is approximately 90,000 square feet and 55 feet tall *would have permanent adverse impacts on the cultural landscape, particularly the White House Grounds cultural landscape*.   Its removal would alter the architectural symmetry and historical continuity of the White House.   The increased footprint and the addition of a second story along the colonnade, compared to the existing East Wing, *would increase the massing and scale* of the eastern portion of the property, potentially deemphasizing the prominence of the West Wing and the Executive Mansion.   This change could be seen as a *departure from the traditional aesthetic values and architectural integrity that have been maintained over the years*."  (Emphasis added.)

A project that the defendant National Park Service admits would adversely affect the cultural landscape of a National Park unit is the very definition of a project that unlawfully impairs the "cultural resources and values" of the National Park System and may not be permitted under the Organic Act "except as *directly and specifically* provided by Congress." 54 USC §100101(b) (emphasis added).

3.     The Finding of No Significant Impact adopted by the National Park Service, based on its White House East Wing Modernization and State Ballroom Environmental Assessment, is procedurally and substantively in conflict with the governing land management plan adopted by the National Park Service more than

25 years ago, which is the product of an extensive public planning process resulting in the *White House and President's Park Design Guidelines* (1997) and the *White House and President's Park Comprehensive Design Plan* (2000). Those careful decisions by the defendant National Park Service were designed to ensure that future changes to the nationally significant cultural and historical values of the White House and President's Park would *not* impair the values set forth in the Organic Act. Specifically, in its 2000 Record of Decision, the Park Service adopted the Final Comprehensive Design Plan for the White House and President's Park and Environmental Impact Statement and committed:

> "Future designs and actions on the White House grounds and within President's Park ***will respect*** the significant elements of past landscape designs. Elements may be carefully redesigned to serve modern functions, but ***their original context will be preserved***. The vistas * * * and all other elements that combine to create a ceremonial landscape for state functions ***will be respected*** in the design and construction of new facilities. President's Park will continue to be an open area that is visually linked to the National Mall; the traditional vistas to and from the north and south will be maintained. ***No new surface facilities will be constructed within primary and secondary views with President's Park. Facilities and maintenance operations will reflect the dignity, significance, and history of the site and the presidency.***" (Emphasis added.)

None of the federal parties involved in this case, including the National Park Service, the National Capital Planning Commission, and the Commission of Fine Arts, made *any* effort to justify the ballroom proposal as consistent with the established, official Design Plan or Guidelines. Nor have they attempted to reconcile the project with the *Secretary of the Interior's Standards for the Treatment of*

- 15 -

*Historic Properties* or the related *Secretary of the Interior's Guidelines for the Treatment of Cultural Landscapes*, which establish the federal government's standards for measuring the appropriateness of changes to historic structures and landscapes such as the White House.

While the park is named the "White House and President's Park," Congress did not make this 82-acre tract, which includes the White House, the President's private preserve. Much of the park, including all of Lafayette Square, is always open to the public, and virtually all is visible. No American President should view this portion of the Nation's property like his own personal property. The Park Service's complicity in allowing the ballroom to proceed is undeniably arbitrary, capricious, and "contrary to law." 5 U.S.C, §706(2)(A).

### C. Solicitation of Private Donors Does Not Allow Construction of an Otherwise-Unauthorized Ballroom Building.

The government's brief (at p.45) offers one final statutory justification for proceeding with the ballroom – the Park Service may accept "donations" "for the purposes of the System." S*ee* 54 U.S.C. §101101(2). That argument begs the question: Is the project itself consistent with the "purposes" of the System as Congress has defined them?

The visual and spatial relationships of the White House grounds, designed mainly by renowned landscape architect Frederick Law Olmsted, Jr., would be significantly altered by this project. No reasonable, neutral observer could think that

a massive ballroom out of proportion to any surrounding structures and displacing much of the open space serves the statutory purposes of the national parks system to "conserve the scenery, natural and historic objects" and "provide for the enjoyment of the scenery, natural and historic objects."

As noted *supra*, Congress has not "directly and specifically" (54 USC §100101(b)) made an exception for this ballroom or been willing to fund it. Soliciting friends and supporters to put up the money does not justify presidential usurpation of congressional authority. Congress's unwillingness to fund this massive project underscores that it is more a personal quest than authorized public action.

The original assurance that the project would be funded by the President and "other patriot donors" – including companies or individuals with other business relationships with the Trump family or with the federal government, or both – does not legitimize the venture. The potential ability to draw upon *outside* funds for the project does not supersede statutory policies established when the White House grounds were established as a national park. The President, for example, would not be able to order one of Washington, D.C.'s famous monuments to be replaced with a monument to himself simply because private donors would be willing to fund it. Nor could he replace the Executive Mansion entirely with a residence of his own design, so long as the project is funded by private donations. Simply put, access to

private funds does not nullify or waive statutory restrictions on erecting new federal buildings nor does it create independent authority to do so.

> **D.     Historic Practice Shows That All Major Projects on White House Grounds Were Approved and Funded by Congress**.

As the White House Historical Association notes: "This iconic building has undergone numerous transformations since its construction began in 1792."  Some were controversial.  But for *all* major structural changes, Congress had authorized and appropriated public funds for it, including most significantly the Truman-era renovations, the only construction remotely comparable to what President Trump wants to do on his own.

The controversial construction of the "Truman portico/balcony" in 1948 cost only $15,000 and was covered by appropriated funds.  For the more extensive renovations, President Truman in 1949 carefully asked Congress to create a commission to oversee the *potential* restoration and renovation of the White House. The Commission decided that the best way to save its historical integrity was to gut the interior while preserving the outside walls, and to rebuild it from the inside. Congress then appropriated the funds ($5.7 million) for the project, which was completed in 1952.

Contrary to the government's contention that Congress's engagement with the renovation of the Executive Mansion during the Truman Administration is the "exception that proves the rule," the rule is exactly the opposite, even though several

minor projects inside the White House occurred without express authorization. The record is replete with documentation that alterations and improvements to the White House over the years have been consistently made with funds authorized and appropriated by Congress. Joint Appendix 198-212 (Document #2172336).

Apparently, only twice in American history has a President solicited contributions to make alterations to the White House that Congress had not authorized and funded. In both cases – neither of which had been challenged – they involved minor changes *within* the living quarters and at a cost of only a few thousand dollars. In 1933, FDR, a paraplegic, arranged to add an indoor swimming pool for exercise, and in 1973 Nixon decked over the swimming pool, without damaging it, to create a bowling alley for *his* exercise. Neither is remotely comparable to demolishing an entire wing of the White House and planning to use private money to construct an entirely new and gigantic, colonnaded ballroom building elsewhere on the White House grounds.

In sum, the President has no lawful authority to proceed with the construction of the massive, above-ground ballroom that fits his personal vision.

## II. THE HISTORY OF CAREFUL PLANNING FOR WHITE HOUSE FACILITIES AS PART OF THE LARGER PLAN FOR THE NATION'S CAPITAL DEMONSTRATES A PUBLIC INTEREST IN UPHOLDING THE INJUNCTION AGAINST CONSTRUCTING THE BALLROOM.

Since construction of the proposed ballroom building would be unlawful, the district court properly enjoined further construction of any above-ground structure

for this purpose.  That injunction implements the criterion for weighing the public interest in formulating injunctive relief.

1.      For decades, any alterations to the White House complex, including the greenspaces that are part of the national park, have been subject to careful and detailed planning.  *See*, *e.g.*, *Report of the Commission on the Renovation of the Executive Mansion* (1952); *The White House & President's Park, Comprehensive Design Plan* (2000); *The White House & President's Park: Cultural Landscape Report, Site History and Evaluation, 1791-1994* (2001); *Foundation Document The White House and President's Park* (2014).

This practice is consistent with the longstanding national policy of protecting the White House complex, including the surrounding park, from ill-considered and impulsive disruption.  This policy is based not only on the character of the White House complex itself, but also its relationship to the rest of the Federal City, as developed historically.  Congress has codified this policy.

Title 40 of the U.S. Code generally covers "public buildings, property and works."  In asserting its plenary constitutional power over federal lands and property, including its special authority over the District of Columbia, Congress has imposed a variety of restrictions designed to ensure that any federal projects in the District conform with a coherent design plan.  *See* 40 USC Chapter. 87.  Congress found that "there is needed a central planning agency for the National Capital region to

- 20 -

coordinate certain developmental activities of the many different agencies of the Federal and District of Columbia Governments so that those activities may conform with general objectives."  40 USC §8701(a)(4).

Congress delegated this coordination function to the National Capital Planning Commission, a multi-dimensional entity that includes officials from the Executive Branch, the Congress, the District of Columbia government, and "five citizens with experience in city or regional planning."  *Id.* § 8711(b).  The statue directs (*id.* §8722(b)(1)):

> "To ensure the comprehensive planning and orderly development of the National Capital, a federal or District of Columbia agency, ***before preparing construction plans*** the agency originates for proposed developments and projects *** ***shall advise and consult*** with the Commission as the agency prepares plans and programs in preliminary and successive stages that affect the plan and development of the National Capital."  (Emphasis added.)

Although Congress exempted projects on the Capitol grounds and certain projects on military bases from these restrictions (*id*. §8722(b)(2)), there is no comparable exception for the White House complex, including the national park in which the White House sits.  Most relevant here, Congress specified (*id.* §8722(d)):

> "In order to ensure the orderly development of the National Capital, the location, ***height, bulk, number of stories, and size of federal public buildings in the District of Columbia*** and the provision for open space in and around federal public buildings in the District of Columbia ***are subject to the approval of the Commission.***"  (Emphasis added.)

Under this statutory policy, any plans for construction on White House grounds ordinarily go through a careful planning process, with opportunity for public

comments to the Commission, long *before* any construction actually proceeds. See, *e.g*, White House security fence.

But President Trump decided to knock down the East Wing on his own initiative and to launch his longstanding goal of erecting a massive ballroom on the White House grounds without attempting to coordinate his plans with the Commission. The construction is being overseen by the National Park Service and other federal entities that are unquestionably governed by the statutory planning process set forth in 40 U.S.C. §8722, including the obligation to consult with the Commission *before* preparing construction plans.

2.    The President eventually submitted his plan to the Commission, which approved it in April 2026, despite overwhelming public opposition (97%) manifested in over 32,000 adverse comments. The result, giving *retrospective* approval to the President's goal, was not surprising. Just as with the approval in only twelve minutes by the advisory Commission of Fine Arts, all of whose prior members President Trump had fired and replaced with loyalists, key appointments to the National Capital Planning Commission similarly were stacked with the President's own subordinates inserted before that Commission summarily greenlighted his project.

Those key appointees, which under the statute were to be "citizen members," are actually subordinate White House officials, including the President's staff

- 22 -

secretary as chair of the Commission and two other White House officials; all appear to lack the statutory requirement to have "experience in city planning."

The current proceeding is not the forum in which to consider whether those nominal "approvals" would survive a direct challenge under the Administrative Procedure Act as arbitrary and capricious. *Department of Homeland Security* v. *Regents of University of California*, 519 U.S. 1 (2020); *Federal Communications Commission* v. *Prometheus Radio Project*, 592 U.S. 414 (2021); *City of Port Isabel* v. *FERC*, 111 F.4th 1198, 1214 (D.C. Cir. 2024); *Fontem US, LLC* v. *FDA*, 82 F.4th 1207, 1217 (D.C. Cir. 2023). What is relevant here is that the process followed in "approving" the President's plan avoided the rigorous and thoughtful planning process that ordinarily would govern a project of this magnitude and impact in the Nation's Capital. At the least, the President's manipulation of the statutory review process severely undermines the government's ability to rely on those perfunctory approvals. The dubious process further supports the district court's decision to grant a preliminary injunction to restrain the unlawful construction.

3.      The comprehensive congressional plan for careful, objective evaluation of coherent construction planning in the Capital *before* construction begins should weigh heavily in addressing the propriety of the preliminary injunction. As against President Trump's long-held personal desire to build a huge ballroom, the statutory policy requiring careful planning for any federal construction in the Capital,

including in White House national park, demonstrates that "the balance of equities

tips" in favor of blocking the unauthorized ballroom and "that an injunction is in the

public interest." *Starbucks Corp. v. McKinney*, 602 U.S.339, 340 (2024); *see, also*

*Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022).

The Court is also entitled to weigh the "balance of equities" in the context of

other astonishing examples of President Trump's peremptory efforts to remake the

Nation's Capital in his preferred image, regardless of congressional directives or

objective, professional planning:

- Renaming the Kennedy Center to include his name (putting it first).

- Directing construction of a 250-feet high "triumphal arch" at Memorial
  Bridge.

- Ordering the Reflecting Pool on the National Mall painted in
  swimming-pool blue.

- Commandeering and redesigning the public golf course in the District
  of Columbia.

- Planning to deface the historic granite façade of the Eisenhower Old
  Executive Office Building ("Old EOB") by painting it white.

The National Capital is not the private preserve of any incumbent President,

nor particularly is the "White House and President's Park." A President's ability to

ensure that his subordinates indulge his personal taste does not tilt the balance of

equities in his favor. That balance warrants upholding the historic traditions and

values embedded in Congress's statutory plans.  The preliminary injunction does that.

### III.  CONGRESSIONAL ENACTMENTS RELATING TO THE WHITE HOUSE AND SURROUNDING NATIONAL PARK CREATE INTERESTS THAT PLAINTIFF HAS STANDING TO PROTECT IN COURT.

Despite the government's argument that the plaintiff lacks "standing" to pursue claims that this ballroom project and any federal approvals are *ultra vires*, the plaintiff's claims are well within the courts' power to entertain and remedy.

1.    Federal courts may review claims that federal action is *ultra vires*, including actions taken pursuant to presidential direction.  As this Court has explained, statutory "limitations on the President's authority" "create a 'clear and specific statutory mandate' that is 'susceptible to *ultra vires review*.'" *Federal Educ. Ass'n* v. *Trump*, 2025 U.S. App. LEXIS 25013 (D.C. Cir. Sept. 25, 2025) (quoting *National Association of Postal Supervisors* v. *USPS*, 26 F.4th 960, 971 (D.C. Cir. 2022)).

In Section I of this brief, *supra*, we explained why a variety of federal statutes explicitly prohibit the kind of construction that the President initiated, unless Congress expressly removes the ban.  The actions by the President and the agencies that he enlisted are *ultra vires* as that concept is commonly understood.

2.    The district court correctly concluded that the  plaintiff has standing to challenge this *ultra vires* action.

Even apart from the general equity power to enjoin *ultra vires* action that damages or threatens to damage identifiable persons, the Administrative Procedure Act ("APA") expressly makes the challenged actions subject to judicial review. *See* 5 U.S.C. §706(A)(2) (authorizing federal court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . .arbitrary, capricious, . . . or otherwise not in accordance with law"). The Supreme Court recently reiterated that, in the APA, Congress "created a general cause of action" for "any person aggrieved" by unlawful agency actions to obtain judicial review. *Nuclear Regulatory Comm'n v. Texas*, 605 U.S. 665, 680 (2025). The various government entities involved in "approving" and implementing this project are "agencies" (5 U.S.C. §701(b)(1)) whose actions are subject to APA review.

As we have discussed above, Congress established the White House as a unit of the National Park System in 1961; it is managed by the National Park Service through "Presidents Park." See Pub. L. No. 87-286, 75 Stat. 586 (1961). The official "*Foundation Document*" for the White House national park affirms that its mission is to preserve "unimpaired the natural and cultural resources and values of the national park system for the enjoyment, education, and inspiration of this and future generations."

The interplay of the congressional policies to regulate the design and construction of federal buildings in the Nation's Capital and to declare the White

House and its grounds part of a national park demonstrate why the plaintiff has standing to seek judicial protection for these policies (as would similarly-focused preservation and planning organizations).  Such organizations are within the zone of interests protected by these laws requiring careful design and planning for federal buildings in the Capital and requiring maintenance of the significant cultural spaces in the national park area surrounding the White House.

As the Supreme Court and this Court have recognized, organizations and individuals have standing to defend their recreational or aesthetic interests in the national parks, when there is a live, imminent threat to those interests.  *E.g.*, *Summers* v. *Earth Island Inst.*, 555 U.S.  488, 494 (2009); *Sierra Club* v.  *Morton*, 405 U. S. 727, 734–736 (1972).  An organization may sue to protect against harm "germane to its purpose." *Sierra Club* v.  *FERC,* 827 F.3d 59, 65 (D.C.  Cir.  2016) Both organizations and individuals have standing to sue when government projects threaten their members' "concrete aesthetic and recreational interests." ′ *WildEarth Guardians v. Jewell,* 738 F.3d 298, 305 (D.C. Cir. 2013).  "This requirement of germaneness is 'undemanding'; 'mere pertinence between litigation subject and organizational purpose' is sufficient." *National Lime Ass 'n v.  EPA,* 233 F.3d 625, 637 (D.C.  Cir.  2000) (citations omitted).

As the district court found, the plaintiff National Trust for Historic Preservation was established by Congress "to facilitate public participation in the

- 27 -

preservation of sites, buildings, and objects of national significance or interest." 54 U.S.C. §312102(a). The National Trust has done so by maintaining some historic properties and by suing to protect others. *E.g.*, *National Trust for Historic Preservation v. Department of State,* 834 F. Supp. 453 (D.D.C. 1993); *National Trust for Historic Preservation v. U.S. Army Corps of Engineers*, 552 F. Supp. 784 (S.D. Ohio 1982). Congress has expressly designated the National Trust to assist in administering federal preservation programs. *See, e.g.,* 2 U.S.C. §4110 (administration of grants to Congressional Cemetery); 54 U.S.C. §304101(a)(9) (National Trust Chair as statutory member of Advisory Council on Historic Preservation); 54 U.S.C. §308602(b) (consultation on African-American Burial Grounds preservation); 54 U.S.C. §308702 (grants for maritime heritage programs).

Both the National Trust and one of its members have explained why they have a direct and tangible interest in obtaining judicial relief against the unlawful construction of the ballroom on national park land. The various statutes discussed in the preceding sections of our brief show that Congress has imposed a rigorous regime designed to ensure that the Nation's Capital in general and the White House complex and national park in particular are preserved as coherent, aesthetic, and historic sites subject to careful, thoughtful, and professional planning and preservation. Plaintiff, like *amici*, have a specific and focused purpose to promote and protect the historic, architectural, and environmental integrity of federal

- 28 -

facilities in the Nation's Capital, including the White House itself, which Congress has exercised its constitutional power to protect.

Allowing the ballroom to proceed would directly impair those interests. By contrast, upholding an injunction prohibiting this unlawful action would provide tangible benefit to the plaintiff (and *amici*). No more is required to demonstrate that this is a real, concrete, live controversy between adverse parties satisfying the Article III requirement for a "case or controversy."

\* \* \*

At a time when most Americans do not trust government officials to "do the right thing," this is hardly the time for the federal courts to shirk their responsibility "to say what the law is." *Marbury* v. *Madison*, 5 U.S. 137, 177 (1803). The President's ballroom project violates the law.

## CONCLUSION

The Order granting a preliminary injunction should be *affirmed*.

Dated: May 27, 2026.                    Respectfully submitted.

ANDREA C. FERSTER
(Counsel of Record)
Law Offices of Andrea C Ferster
DC Bar #384648
68 Beebe Pond Road
Canaan, NY 12029
Phone: 202-669-6311
Email: andreaferster@gmail.com

*Of counsel*

PHILIP ALLEN LACOVARA
DC Bar #194472
9101 Southmont Cove
Fort Myers, FL 33908
Phone: 917-412-9766
Email: placovara@gmail.com

PAUL W. EDMONDSON
DC Bar #358440
6129 33rd St. NW
Washington, DC 20015
Phone: 202-270-3276
Email: paul@preservationlaw.com

- 30 -

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(C) or 32(a)(7)(B) because:

[ X ] this brief contains 6494 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *and*

[ ] this brief uses a monospaced typeface and contains [____] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a monospaced typeface using [Microsoft Word 2010]] with [14pt times roman].

 Dated: May 27, 2026

*   /s/ Andrea Ferster*
*Counsel of record for Amici*

## CERTIFICATE OF SERVICE

I, Andrea C. Ferster, hereby certify that on May 27, 2026, I electronically filed the above document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all registered participants as identified in the CM/ECF electronic filing system for this matter.

/s/_Andrea C. Ferster_____
Andrea C. Ferster

- 31 -

## APPENDIX

## DESCRIPTION OF *AMICI CURIAE*

The **American Institute of Architects** ("AIA"), a New York not-for-profit organization founded in 1857, unites architects in fellowship; promotes the aesthetic, scientific, and practical efficiency of the profession; advances the science and art of planning and building; and makes the profession of ever-increasing service to society. In pursuit of its mission, AIA and its members serve as a unified voice in preserving the historic integrity and symbolic significance of national landmarks. Members of The AIA—who include over 100,000 architects and design professionals—have a deep appreciation of the aesthetic, cultural, professional, and educational benefits from the preservation of the Nation's historic and architectural resources. The AIA takes legal action to protect threatened sites of cultural and architectural value when necessary. *See, e.g., D.C. Preservation League, et al. v. Board of Trustees of the John F. Kennedy Center for the Performing Arts et al.*, No. 26-cv-00981 (D.D.C. 2026). The AIA also has participated as *amicus curiae* in the federal courts. *See, e.g., United States v. Ellerbe Becket, Inc.*, 976 F. Supp. 1262 (D. Minn. 1997). The AIA and its members derive aesthetic, cultural, professional, and educational benefits from the preservation of the historic and architectural values of the White House and President's Park. The AIA and its members regularly participate in consultation and review processes to advance its mission and the

interests of its members, including matters involving federal agencies such as the National Park Service, and specifically including landmarks and cultural landscapes in the Nation's Capital.

The **American Society of Landscape Architects** ("ASLA") is a 501(c)(6) professional society representing landscape architecture professionals in the United States. ASLA—representing more than 16,000 landscape architects and design professionals—is profoundly committed to the preservation of our nation's historic landscapes, recognizing that these sites offer invaluable aesthetic, cultural, and educational enrichment for both the profession and the public. Licensed in all 50 states and the District of Columbia, landscape architects are the leading design professionals of our nation's civic spaces. Since its founding in 1899, ASLA and its members have played a critical role in planning, designing, protecting, and preserving our nation's historic and cultural treasures, including the U.S. Capitol Grounds, the National Mall, and more. ASLA has a particular interest in preserving the historical integrity of the White House and President's Park, given the national significance of those landscapes. Members of ASLA regularly participate in consultation and review processes to ensure protection of significant landmarks and cultural landscapes across the country, including those involving federal agencies such as the National Park Service, and specifically including landmarks and cultural landscapes in the Nation's Capital.

The **Association for Preservation Technology International** ("APT") is a cross-disciplinary, U.S. based, international membership organization dedicated to promoting appropriate traditional and new technology for conserving historic structures of all kinds. Founded in 1968, it connects preservationists, architects, engineers, conservators, educators, and skilled trades and craft workers to advance the technology and science of preserving the built environment. APT focuses on protecting historic buildings, landscapes, and structures by cultivating the exchange of knowledge and sharing cutting-edge preservation techniques. APT's United States based members regularly participate in consultation and review processes to ensure protection of significant landmarks and cultural landscapes across the country, including those involving federal agencies such as the National Park Service, and specifically including landmarks and cultural landscapes in the Nation's Capital.

The **Coalition to Protect America's National Parks** is a 501(c)(3) nonprofit organization made up of more than 5,000 members, all of whom are current, former, and retired employees and volunteers of the National Park Service. Together, the Coalition's members have accumulated over 50,000 years of experience among them caring for America's most valuable natural and cultural resources. The Coalition's goal is to support the preservation and protection of the National Park System and the mission-related programs of the National Park Service to ensure the survival of

the park system for generations to come.  The Coalition's members are regular and avid users of the National Park System and Park Service programs, as well as the national forests and other public lands, for recreation and conservation activities. The Coalition and its members regularly participate in consultation and review processes to ensure protection of significant landmarks and cultural landscapes of the National Park System, and the Coalition takes legal action to protect America's National Parks both as party and as *amicus curiae*.  See, e.g., *National Parks Conservation Association v.  U.S.  Department of the Interior*, No.  1:26-cv-10877 (D.  Mass.  filed Feb.  17, 2026); *National Parks Conservation Assoc.  v.  Semonite*, No.  0:2018cvus05179 (D.C.  Cir.  2019).

The **Committee of 100 on the Federal City** (the "Committee of 100") is a District of Columbia nonprofit civic organization founded in 1923 to advance thoughtful planning and preservation in the Nation's Capital.  The Committee of 100 takes legal action to protect threatened cultural sites in the District of Columbia.  *See, e.g.*, *Comm.  of 100 on the Fed.  City v.  Foxx*, 87 F.  Supp.  3d 191 (D.D.C.  2015). The Committee of 100 also has participated as *amicus curiae* in the federal courts. *See, e.g.*, *Third Church of Christ, Scientist, Washington, D.C.  v.  District of Columbia Historic Preservation Review Board et al.*, No.  08-cv-01371 (D.D.C.)(2008).  The Committee of 100 and its members regularly participate in consultation and review processes to ensure protection of significant landmarks and

cultural landscapes in Washington, D.C., including those involving federal agencies such as the National Park Service, and specifically including the White House and President's Park.

The **Cultural Landscape Foundation** is a 501(c)(3) nonprofit organization founded in 1998 to "connect people to places." TCLF educates and engages the public to make our shared landscape heritage more visible, identify its value, and empower its stewards.  Through its publications, events, and prestigious Cornelia Hahn Oberlander International Landscape Architecture Prize, The Cultural Landscape Foundation broadens support and understanding for cultural landscapes. TCLF also takes legal action to protect threatened cultural landscapes when necessary.  *See, e.g., Cultural Landscape Foundation v.  U.S.  Department of the Interior,* No.  26-cv-01593 (D.D.C.  2026)*; Pres.  All.  of Minn.  v.  City of Minneapolis*, No.  27-CV-12-14220 (Minn.  Dist.  Ct.  2013).  The Cultural Landscape Foundation's founding President & CEO,  Charles Birnbaum, is a recognized authority on the nation's cultural landscape legacy as has published extensively on the history and stewardship of Modernist landscape architecture.  As Coordinator of the *Historic Landscape Initiative* at the National Park Service (1992-2007), he authored the *Secretary of the Interior's Guidelines for the Treatment of Cultural Landscapes*, which set the national standard for determining appropriate treatments for these important properties.  The Cultural Landscape Foundation and

Mr. Birnbaum regularly participate in consultation and review processes to ensure protection of significant landmarks and cultural landscapes in Washington, D.C., including those involving federal agencies such as the National Park Service, and specifically including the White House and President's Park.

The **DC Preservation League** ("DCPL") is a District of Columbia nonprofit 501(c)(3) membership organization dedicated to the preservation, protection, and enhancement of the historic buildings, structures, and landscapes in Washington, D.C., through advocacy and education. DCPL carries out its mission through research and documentation, review of major development projects in D.C.'s historic districts or affecting individual landmarks, and by monitoring legislation that impacts historic preservation laws. DCPL also takes legal action to protect threatened cultural sites in the District of Columbia when necessary. *See, e.g.*, *Cultural Heritage Partners, et al., v. Donald J. Trump, et al.*, No. 25-cv-03969 (D.D.C.) (2025). Members of DCPL include residents, architects, historians, landscape architects, architectural historians, and others who derive aesthetic, cultural, professional, and educational benefits from the preservation of the historic and architectural values of the White House and President's Park. DCPL regularly participates in consultation and review processes to ensure protection of significant landmarks and cultural landscapes in Washington, D.C., including those involving

federal agencies such as the National Park Service, and specifically including the White House and President's Park.

The **National Mall Coalition** is an independent 501(c)(3) nonprofit citizens' organization founded in 2000. It is dedicated to advocating for comprehensive, visionary planning for the National Mall to ensure it remains a protected, symbolic landscape and a functioning stage for American democracy. Key aspects of the organization's mission include advocating for a comprehensive master plan for the National Mall's future, encouraging the expansion of its boundaries to accommodate new museums, monuments, and amenities, championing carefully designed infrastructure to alleviate severe flooding, manage stormwater runoff, and provide visitor center amenities. The National Mall Coalition and its members derive aesthetic, cultural, professional, and educational benefits from the preservation of the historic and architectural values of the National Mall and its component buildings and landscapes, including the White House and President's Park. The leaders of the Coalition are recognized by local, national, and international media for their in-depth knowledge and appreciation of National Mall history and current issues. Members of the Coalition regularly participate in consultation and review processes to ensure protection of significant landmarks and cultural landscapes in Washington, D.C., including those involving federal agencies such as the National Park Service, and specifically including the White House and President's Park.

A-7

The **National Preservation Partners Network** is a membership-based, independent 501(c)(3) nonprofit dedicated to advancing the organized historic preservation movement. It strengthens the capacity of local, state, and regional preservation organizations through communication, education, training, shared advocacy, and networking. Its principal mission is to empower preservation professionals and organizations so they can effectively protect America's historic places, stories, and building culture. Its membership represents a nationwide community of more than 150 nonprofit organizations, ranging from small local historical societies to large statewide preservation groups. It provides access to affinity groups, mentorships, webinars, and semi-annual in-person retreats to share best practices and resources. The National Preservation Partners Network and its members derive aesthetic, cultural, professional, and educational benefits from the preservation of the historic and architectural values of the White House and President's Park. The National Preservation Partners Network and its members regularly advocate for the protection of significant landmarks and cultural landscapes across the country, including those involving federal agencies such as the National Park Service, and specifically including landmarks and cultural landscapes in the Nation's Capital.

The **Olmsted Network** is a Washington, D.C.-based nonprofit dedicated to preserving and championing the legacy of Frederick Law Olmsted and his firm.

Founded in 1980, the organization advocates for the stewardship, education, and protection of historic parks, landscapes, and urban planning principles across North America. The Network is an approved provider for landscape architecture continuing education and hosts annual conferences and webinars focused on historic preservation and community identity. The organization also partners with local municipalities, citizen activists, and park stewards to defend and restore Olmsted-designed landscapes from threats like commercial development. The Olmsted Network and its members regularly advocate for the protection of significant Olmsted-designed cultural landscapes across the country, including those involving federal agencies such as the National Park Service, and specifically including the White House and President's Park.

The **Society of Architectural Historians** ("SAH"), a nonprofit membership organization founded at Harvard University in 1940 and currently located in Chicago, promotes the study, interpretation, and conservation of architecture, design, landscapes, and urbanism worldwide. SAH serves an international network of approximately 600 institutions and 2,400 individuals who focus on the history of the built environment and its role in shaping contemporary life. Members include historians, architects, preservationists, urban planners, teachers, students, museum professionals, and individuals from other professions who share a passion for historic buildings, structures, and landscapes. SAH produces programs, meetings,

and publications that reach scholarly and public communities across the globe. As part of its mission, and as the leading scholarly organization for architectural historians in North America, SAH advocates for the preservation of nationally and internationally significant buildings, districts, sites, and landscapes. SAH and its members derive aesthetic, cultural, professional, and educational benefits from the preservation of the historic and architectural values of the White House and President's Park. SAH and its members regularly participate in consultation and review processes to advance its mission and the interests of its members, including matters involving federal agencies such as the National Park Service, and specifically including landmarks and cultural landscapes in the Nation's Capital.