ORAL ARGUMENT SCHEDULED FOR JUNE 5, 2026
**Nos. 26-5123, 26-5134**

_____

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED
STATES,
*Plaintiff-Appellee/Cross-Appellant*,

v.

NATIONAL PARK SERVICE, *et al.*,
*Defendants-Appellants/Cross-Appellees*.

_____

On Appeal from the United States District Court
for the District of Columbia, No. 1:25-cv-04316
Before the Honorable Richard J. Leon

_____

**BRIEF OF *AMICI CURIAE* CAMPAIGN LEGAL CENTER AND
CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON IN
SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE**

_____

Nikhel S. Sus
Christina Wentworth
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 4596
Washington, DC 20044

Daniel S. Lenz
Robert Brent Ferguson
Renata O'Donnell
Brendan T. Nigro
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
Tel: 202-736-2200

*Attorneys for* Amicus Curiae *Citizens
for Responsibility and Ethics
in Washington*

*Attorneys for* Amicus Curiae
*Campaign Legal Center*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel certifies as follows:

### A. Parties and *Amici*

The parties are set forth in Plaintiff-Appellee's Rule 28(a)(1) Certificate, Doc. No. 2173954 (May 18, 2026) at 2, which is incorporated herein by reference. The American Conservative Union has appeared as *amicus* before this Court and filed a brief in support of Defendants-Appellants, and the American Institute of Architects, et al., have appeared as *amici* before this Court and filed a brief in support of Plaintiff-Appellee. This *amicus* brief is filed by Campaign Legal Center and Citizens for Responsibility and Ethics in Washington. The American Civil Liberties Union of the District of Columbia has indicated that they intend to file an *amicus* brief.

### B. Rulings Under Review

The rulings under review are set forth in Plaintiff-Appellee's Rule 28(a)(1) Certificate, Doc. No. 2173954 (May 18, 2026) at 3, which is incorporated herein by reference.

### C. Related Cases

This case was previously before this Court. *See National Trust for Historic Preservation in the United States v. National Park Service*, Nos. 26-5101, 26-5108.

i

Undersigned counsel is unaware of any additional related cases within the meaning

of D.C. Circuit Rule 28(a)(1)(C).

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Campaign Legal Center and Citizens for Responsibility and Ethics in Washington certify that neither organization has any parent corporation nor does any publicly held corporation own 10% or more of its stock.

## TABLE OF CONTENTS

INTERESTS OF *AMICI CURIAE* ..................................................................1

SUMMARY OF ARGUMENT.......................................................................2

ARGUMENT ................................................................................................5

    I.    Private funding of the Ballroom presents risks of *quid pro quo* corruption or the appearance of corruption. ...........................................................4

        A. Private entities with interests before the government are funding the Ballroom. ...........................................................................6

        B. Private funding of the Ballroom raises ethical concerns given the Administration's transactional approach to governing. .......................9

            i.    Private companies have responded to President Trump's transactional governing.................................................9

            ii.    Private financing of the Ballroom presents a ripe opportunity for transactional governing. ......................................11

    II.    The President's inability to unilaterally construct the Ballroom accords with separation-of-powers principles that prevent corruption. ...............13

        A. Congress's appropriations authority constrains the Executive and prevents corruption.............................................................13

        B. Appellants' actions flout separation-of-powers principles that advance democratic accountability and prevent corruption............................18

            i.    Section 105(d) does not authorize Appellants' actions.............19

            ii.    Respecting Section 105(d)'s limits preserves the separation of powers. ..................................................................22

            iii.    The NPS gift statutes and Economy Act advance separation-of-powers principles by preventing the President from using private donations for pet projects...........................................24

CONCLUSION .............................................................................................29

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Pages**

*American Federation of Government Employees. v. United States Department of Education*, No. 25-cv-3553, 2025 WL 3123707 (D.D.C. Nov. 7, 2025) ...........27

*Buckley v. Valeo*, 424 U.S. 1 (1976)................................................................28

*Consumer Financial Protection Bureau v. Community Financial Services Association*, 601 U.S. 416 (2024)...............................................................14, 21

*Cincinnati Soap Co. v. United States*, 301 U.S. 308 (1937) ....................................17

*Harrington v. Bush*, 553 F.2d 190 (D.C. Cir. 1977).....................................................17

*Emily's List v. Federal Election Commission*, 581 F.3d 1 (D.C. Cir. 2009) ............27

*Immigration and Naturalization Service v. Chadha*, 462 U.S. 919 (1983) .............23

*Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990).....................15

*Reeside v. Walker*, 52 U.S. (11 How.) 272 (1850) ....................................................17

*Trump v. United States*, 603 U.S. 593 (2024) ............................................................8

*Trump v. Vance*, 591 U.S. 786 (2020) ......................................................................8

*Wagner v. Federal Election Commission*, 793 F.3d 1 (D.C. Cir. 2015) (en banc).....9

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008).............4, 29

**Statutes**

2 U.S.C. §§ 681-688.................................................................................................18

2 U.S.C. § 1603(d) ..................................................................................................28

2 U.S.C. § 1604(d) ...................................................................................................7

3 U.S.C. § 105(d) (Section 105(d)).................................................................19, 20

13 U.S.C. § 1321(a)(17).......................................................................................25, 28

13 U.S.C. § 1321(b)(1).............................................................................................25

31 U.S.C. § 1301(a) .................................................................................................17

31 U.S.C. § 1321(a)(17)........................................................................19

31 U.S.C. § 1321(b)(1).........................................................................19

31 U.S.C. §§ 1341-1342 .......................................................................18

31 U.S.C. §§ 1349-1350 .......................................................................18

31 U.S.C. § 1531(a) ..............................................................................17

31 U.S.C. § 1532...............................................................................17, 24

31 U.S.C. § 1535...............................................................................19, 28

31 U.S.C. § 1535(a) ..............................................................................25

31 U.S.C. § 3302(b) ..........................................................................18, 24

52 U.S.C. § 30119 ..................................................................................9

54 U.S.C. § 100101(a) ...........................................................................25

54 U.S.C. § 101101(2) .....................................................................19, 25, 28

## Constitutional Provisions

U.S. Const. art. I, § 9, cl. 7..............................................................3, 14, 16

## Other Authorities

3 Joseph Story, *Commentaries on the Constitution of the United States*
    (1st ed. 1833) .............................................................................6, 15

Arden Farhi & Jennifer Jacobs, *Who's paying for the White House ballroom and
    what's in it for them*, CBS News (Sep. 19, 2025),
    https://perma.cc/LEZ9-9T7Y.....................................................4, 6, 10

Campaign Legal Center, The Donor-To-Ambassador Pipeline: Why America's Key
    Diplomats Are Often Wealthy Political Donors (May 2023),
    https://perma.cc/PW58-Y4NE ............................................................2

Campaign Legal Center, Trump's Corrupt Transactions (last updated May 19,
    2026), https://campaignlegal.org/document/tracking-trump-administrations-
    most-corrupt-transactions .........................................................2, 5, 9, 10, 11

Common Cause, Public Testimony on East Wing Modernization Project (Mar. 5, 2026), https://perma.cc/SC4H-HUAM ...............................................28

David Nather, *DOA budget may have life after death*, Politico (Mar. 4, 2014), https://www.politico.com/story/2014/03/barack-obama-budget-congress-104252...........................................................................................................22

Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 20, 2025), https://truthsocial.com/@realDonaldTrump/posts/115408594704490513...........5

Erin Schumaker, *Beating cancer used to be bipartisan. What happened?* Politico (Apr. 29, 2024), https://www.politico.com/news/2024/04/29/congress-is-killing-bidens-cancer-moonshot-00154718................................................................22

Forbes Breaking News, *Trump Shows Major White House Renovations to Donors to New Ballroom* (YouTube, Oct. 16, 2025), https://www.youtube.com/watch?v=VhZdBs-5R4I ...........................................12

Government Accountability Office, GAO B-330935, U.S. Government Accountability Office—Unavailability of Appropriated Funds to Subsidize Employees' Long-Distance Home-to-Work Travel (2019) ...............................22

Government Accountability Office, GAO B-330935.2, Reconsideration: Use of Appropriated Funds to Subsidize Employees' Long-Distance Home-to-Work Travel (2019)......................................................................................................22

Government Accountability Office, GAO B-331739, Matter of: U.S. Chemical Safety and Hazard Investigation Board--Independent Statutory Authority to Enter into Interagency Agreements (2021)........................................................25

Government Accountability Office, *Principles of Federal Appropriations Law* (4th ed. 2017) (GAO Redbook)..................................................18, 20, 24, 25, 26

*Interview: Miranda Devine Interviews Donald Trump for Her Pod Force One Podcast - June 9, 2025*, Roll Call (June 9, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-interview-miranda-devine-podcast-june-9-2025 .............................................................................12

Jasmine Baehr, *Trump celebrates White House demolition as new ballroom rises: 'Music to my ears'*, Fox News (Oct. 21, 2025), https://perma.cc/8CM6-WF7N ...............................................................................5

Jason Lalljee, Exclusive: Coinbase explains donation to Trump's ballroom, Axios (Nov. 18, 2025), https://www.axios.com/2025/11/18/trump-white-house-ballroom-crypto-coinbase ...................................................................10

Jasper Goodman, *Trump met with Coinbase CEO before bashing banks over crypto bill*, Politico (Mar. 3, 2026), https://www.politico.com/live-updates/2026/03/03/congress/trump-met-with-coinbase-ceo-before-bashing-banks-over-crypto-bill-00811277 ..........................................................11

Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343 (1988)................15, 29

Katherine Clark Harris, *The Statement and Account Clause: A Forgotten Constitutional Mandate for Federal Reporting*, 32 Yale L. & Pol'y Rev. 505, 516 (2014) ...............................................................................16

Kenneth P. Vogel, *Trump's Team Offers to Keep Some Ballroom Donors Incognito*, New York Times (Nov. 1, 2025), https://www.nytimes.com/2025/11/01/us/politics/trumps-team-offers-to-keep-some-ballroom-donors-incognito.html ...........................................4, 8

Lawrence Lessig, *What an Originalist Would Understand "Corruption" to Mean*, 102 Calif. L. Rev. 1 (2014) ..........................................................16

Luke Broadwater, *Inside Trump's Push to Make the White House Ballroom as Big as Possible*, New York Times (Nov. 30, 2025), https://www.nytimes.com/2025/11/29/us/politics/trump-white-house-ballroom.html?smid=nytcore-ios-share ...........................................12

Margaret Hartmann, *White House Ballroom News: Plans, Cost, and Who's Really Paying*, New York Magazine (updated May 8, 2026), https://perma.cc/UJ8T-HEL4 ...............................................................................12

Mary Clare Jalonick, Kevin Freking & Joey Cappelletti, *Republicans expected to abandon $1B security proposal for White House and Trump's Ballroom*, ABC News (May 21, 2026), https://perma.cc/G5WP-XPXW ......................................3

Matt Corley & Adam Rappaport, *White House ballroom donations should be disclosed on lobbying disclosure reports*, CREW (Feb. 4, 2026), https://www.citizensforethics.org/reports-investigations/crew-investigations/white-house-ballroom-donations-should-be-disclosed-on-lobbying-disclosure-reports/ ...............................................................7

Matthew B. Lawrence, Eloise Pasachoff & Zachary S. Price, *Appropriations Presidentialism*, 114 Geo. L.J. Online 1 (2025) ..................................................23

Nino Paoli, *Meet all 37 White House ballroom donors funding the $400 million build, including Silicon Valley tech giants, crypto bros and the Lutnicks*, Fortune (Apr. 29, 2026), https://perma.cc/PXH9-R2U2 ....................................13

Peter Nicholas & Megan Lebowitz, *How a nonprofit went from cherry trees and pickleball to handling the money for Trump's ballroom*, NBC News (Oct. 31, 2025), https://www.nbcnews.com/politics/white-house/nonprofit-trust-national-mall-trump-ballroom-white-house-rcna240543 ..................................................19

Pub. L. No. 118-47, 138 Stat. 460 (2024)..................................................................20

Pub. L. No. 119-4, 139 Stat. 9 (2025).......................................................................21

Pub. L. No. 119-75, 140 Stat. 173 (2026).................................................................21

Robert Weissman et al., *Banquet of Greed: Trump Ballroom Donors Feast on Federal Funds and Favors*, Public Citizen (Nov. 3, 2025), https://www.citizen.org/article/banquet-of-greed-trump-ballroom-donors-feast-on-federal-funds-and-favors/ ...........................................................4, 6, 7, 8, 29

Section 203 Complaint from Campaign Legal Center to Jeanine Pirro, United States Attorney for the District of Columbia (Apr. 6, 2026), https://perma.cc/M8YS-FAM7 ...........................................................................7

Tamara Keith, *Why Trump is obsessed with building a White House ballroom*, NPR (July 29, 2025), https://www.npr.org/2025/07/30/nx-s1-5425497/trump-whitehouse-ballroom ...............................................................................................11

The Federalist No. 58 (James Madison) ..................................................................14

*White House List of Donors for President Trump's $300 Million Ballroom*, New York Times (Oct. 23, 2025),

https://www.nytimes.com/2025/10/23/us/politics/trump-ballroom-donors-list.html ...................................................................................................7

Will Weissert, *These are the 37 donors helping pay for Trump's $300 million White House ballroom*, AP (Nov. 12, 2025), https://perma.cc/TDK3-DVA2 .................6

Zachary S. Price, *Funding Restrictions and Separation of Powers*,
71 Vand. L. Rev. 357 (2018) .............................................................................21

Zephyr Teachout, *The Anti-Corruption Principle*,
94 Cornell L. Rev. 341 (2009) ..........................................................................16

Zolan Kanno-Youngs, *Trump Hosts Dinner for Wealthy Donors to White House Ballroom*, New York Times (Oct. 15, 2025),
https://www.nytimes.com/2025/10/15/us/politics/trump-white-house-dinner-ballroom-donors.html .......................................................................................10

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CLC | Campaign Legal Center |
| CREW | Center for Responsibility and Ethics in Washington |
| EXR | Office of the Executive Residence |
| FY | Fiscal Year |
| LDA | Lobbying Disclosure Act |
| NPS | National Park Service |
| SEC | Securities and Exchange Commission |

## INTERESTS OF *AMICI CURIAE*[1]

Campaign Legal Center (CLC) is a nonpartisan, nonprofit organization dedicated to solving the wide range of challenges facing American democracy. CLC works to enforce and reform ethical guidelines and laws to ensure public trust and accountability. CLC engages with the public and with civic leaders to ensure that potential conflicts of interest and their appearance are avoided, clear ethical guidelines are established and followed, and that public confidence in government is well-earned.

Citizens for Responsibility and Ethics in Washington (CREW) is a nonprofit, nonpartisan organization dedicated to promoting integrity, transparency, and accountability in government. CREW seeks to protect the rights of citizens to be informed about the activities of government officials and to ensure the integrity of those officials.

*Amici* submit this brief based on their expertise in ethics and corruption in government institutions. *Amici* explain the harm to public trust and the separation of powers if Presidents can collect and use private funds for legacy projects while circumventing the strictures of congressional appropriations.

---

[1] All parties have consented to *amici*'s filing. No counsel for a party authored this brief in whole or in part, and no person other than CLC, CREW, or its counsel contributed money that was intended to fund preparing or submitting this brief.

**SUMMARY OF ARGUMENT**

Private companies and individuals with business interests before the federal government are donating millions to fund a massive ballroom project at the White House. Private donations to the President's prized project create inescapable conflicts of interest and raise the risk of *quid pro quo* corruption, or, at a minimum, the appearance of corruption. The Trump Administration has displayed a willingness to trade official benefits—including high-ranking appointments, pardons, government contracts, and more—in exchange for donations to the President's campaign and inauguration funds.[2] Although Presidents of both major parties have offered ambassadorships and other key positions to their biggest fundraisers,[3] no other President has established such an explicit nexus between major donations and favorable official actions. Enabling a $400 million public construction project to be funded by private actors that Appellants call "great patriots," *see* Opening Br. at 5, would provide yet another avenue for special interests to seek favor with the President and erode citizens' trust in our government institutions.

---

[2] Campaign Legal Ctr., Trump's Corrupt Transactions (last updated May 19, 2026), https://campaignlegal.org/document/tracking-trump-administrations-most-corrupt-transactions.

[3] Campaign Legal Ctr., The Donor-To-Ambassador Pipeline: Why America's Key Diplomats Are Often Wealthy Political Donors (May 2023), https://perma.cc/PW58-Y4NE.

The Constitution vests the authority to fund government projects solely in Congress, *see* U.S. Const. art. I, § 9, cl. 7, to maintain a separation of powers between Congress and the Executive and to check against precisely this type of bargain. The funding statutes at issue reflect a basic separation-of-powers principle: Congress, not the Executive, controls the country's purse strings. This is a check against both Executive extravagance and the risk of corrupting influence.

Although *ultra vires* claims must meet a "rigorous" standard, the departure from congressional mandates in this case sharply contravenes Congress's appropriations power such that the American people's most direct representatives have no voice in the transformation of one of the nation's iconic landmarks. Though it holds the exclusive power of the purse, Congress has neither appropriated funds for the Ballroom nor approved use of private donations toward that end.[4] Therefore, this Court must ensure that Appellants' "Rube Goldberg contraption" of a funding scheme, *see* JA478, does not establish a model for end-runs on other congressional appropriations. The separation-of-powers harm, erosion of public trust, and risk of corruption or its appearance, bears on this Court's consideration of the "public

---

[4] The Senate recently considered and rejected funding aspects of the Ballroom because "the votes are not there." *See* Mary Clare Jalonick, Kevin Freking & Joey Cappelletti, *Republicans expected to abandon $1B security proposal for White House and Trump's Ballroom*, ABC News (May 21, 2026), https://perma.cc/G5WP-XPXW.

interest" and "balance of equities" factors of the *Winter* standard. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008). These structural concerns are proper considerations in this Court's equitable discretion to affirm the district court's tailored injunction.

## ARGUMENT

### I.    Private funding of the Ballroom presents risks of *quid pro quo* corruption or the appearance of corruption.

The Administration has consistently made clear that private individuals and companies, not Congress through public appropriations, would finance the construction of what is now the proposed $400 million, 90,000 square foot Ballroom.[5] The White House has released a list of dozens of Ballroom donors, but the Administration has offered to withhold the identities of others.[6] Both the disclosed and undisclosed donors have interests before the federal government in the form of contracts, pending enforcement actions, and proposals for beneficial industry regulations.[7] Given the President's public statements about how important

---

[5] Arden Farhi & Jennifer Jacobs, *Who's paying for the White House ballroom and what's in it for them*, CBS News (Sep. 19, 2025), https://perma.cc/LEZ9-9T7Y.

[6] *See* Kenneth P. Vogel, *Trump's Team Offers to Keep Some Ballroom Donors Incognito*, N.Y. Times (Nov. 1, 2025), https://www.nytimes.com/2025/11/01/us/politics/trumps-team-offers-to-keep-some-ballroom-donors-incognito.html.

[7] *See id.*; *see also* Robert Weissman, Michael Tanglis, Eileen O'Grady, Jon Golinger, Rick Claypool, and Alan Zibel, *Banquet of Greed: Trump Ballroom Donors Feast on Federal Funds and Favors*, Pub. Citizen (Nov. 3, 2025),

4

the Ballroom is to him personally,[8] this private funding scheme presents obvious conflicts of interest and raises the specter of *quid pro quo* corruption and its appearance. President Trump has routinely taken a transactional approach to governing, and wealthy individuals, companies, and special interest groups have lined up to pay to gain favor with the Administration.[9]

This transactional approach conflicts with a fundamental separation-of-powers principle: Congress decides the amount and purpose of public expenditures. *See infra* Section II. Requiring that appropriations be made pursuant to law, rather than the Executive's whims, allows Congress to hold the President accountable. If the President could unilaterally accept donations from private interests or dictate the nation's finances, these constitutional guardrails would crumble, creating

---

https://www.citizen.org/article/banquet-of-greed-trump-ballroom-donors-feast-on-federal-funds-and-favors/.

[8] *See* ECF No. 14 at 6, *Nat'l Tr. for Historic Preservation v. Nat'l Park Serv.*, No. 1:25-cv-04316-RJL (D.D.C. Dec. 15, 2025) (discussing the President's "intimate" and personal involvement in the project); Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 20, 2025), https://truthsocial.com/@realDonaldTrump/posts/115408594704490513 ("For more than 150 years, every President has dreamt about having a Ballroom . . . . I am honored to be the first President to finally get this much-needed project underway . . . ."); Jasmine Baehr, *Trump celebrates White House demolition as new ballroom rises: 'Music to my ears'*, Fox News (Oct. 21, 2025), https://perma.cc/8CM6-WF7N ("We're building a world-class ballroom . . . . You probably hear the beautiful sound of construction to the back here. That's music to my ears. People don't like it. I love it. When I hear that sound, it reminds me of money . . . .").

[9] Campaign Legal Ctr., Trump's Corrupt Transactions, *supra* note 2.

5

opportunities for corruption. *See* 3 Joseph Story, *Commentaries on the Constitution of the United States*, § 1342 (1st ed. 1833) (the Constitution prohibits the Executive holding "an unbounded power over the public purse [of] the nation" to assure "regularity, punctuality, and fidelity, in the disbursements of the public money") (hereinafter *Commentaries*). The Ballroom project is the type of unbounded spending that the Constitution prevents.

### A. Private entities with interests before the government are funding the Ballroom.

Private entities have made massive donations to the President's Ballroom. Donors include technology companies like Google, Palantir, Meta, Apple, and Alphabet; cryptocurrency companies like Coinbase and Ripple; and defense contractors like Lockheed Martin, which has alone pledged more than $10 million.[10] The known donors to the project maintain major lobbying operations, having spent nearly $800 million on lobbying in the past five years, and have made campaign contributions "totaling more than $960 million during the last election cycle and $1.6 billion over the last five years."[11] These numbers reflect only those donors the White

---

[10] Farhi & Jacobs, *supra* note 5; Will Weissert, *These are the 37 donors helping pay for Trump's $300 million White House ballroom*, AP (Nov. 12, 2025), https://perma.cc/TDK3-DVA2.

[11] Weissman et al., *supra* note 7.

House disclosed—21 corporations and 16 individuals and family foundations[12]—plus three more corporations identified through public reporting.[13]

Indeed, despite the requirements of the Lobbying Disclosure Act (LDA),[14] *see* 2 U.S.C. § 1604(d), only one of the 26 known lobbyist employers that donated to the Ballroom has reported the donation under the LDA.[15] While CLC has sought enforcement of the LDA's requirements,[16] the lack of transparency in Appellants' funding scheme creates additional risk of corruption or the appearance thereof.

The Ballroom's donors have reason to court the Administration's favor. Some have a direct monetary incentive. Two-thirds of the Ballroom's known corporate donors have government contracts.[17] "Altogether, the corporate donors benefited from nearly $43 billion in contracts last year and $279 billion over the last five years."[18] Lockheed Martin is the largest, with $191 billion in contracts accrued over

---

[12] *White House List of Donors for President Trump's $300 Million Ballroom*, N.Y. Times (Oct. 23, 2025), https://www.nytimes.com/2025/10/23/us/politics/trump-ballroom-donors-list.html.

[13] Weissman et al., *supra* note 7.

[14] *See* Matt Corley & Adam Rappaport, *White House ballroom donations should be disclosed on lobbying disclosure reports*, CREW (Feb. 4, 2026), https://www.citizensforethics.org/reports-investigations/crew-investigations/white-house-ballroom-donations-should-be-disclosed-on-lobbying-disclosure-reports/.

[15] *See id.*

[16] *See* Section 203 Complaint from Campaign Legal Ctr. to Jeanine Pirro, U.S. Att'y for D.C. (Apr. 6, 2026), https://perma.cc/M8YS-FAM7.

[17] Weissman et al., *supra* note 7.

[18] *Id.*

the last five years.[19] Others have a legal incentive. The majority of known corporate Ballroom donors are facing federal enforcement actions or have recently had such federal enforcement actions suspended by the Administration.[20] These "include major antitrust actions involving Amazon, Apple, Meta, Microsoft, Nvidia and T-Mobile; labor rights cases involving Amazon, Apple, Caterpillar, Google, Lockheed and Meta; and SEC matters involving Coinbase and Ripple."[21] Other donors have an interest in administrative decisions, including "a pair of health care companies seeking to protect or expand Medicare reimbursement for their products, as well as the Wall Street powerhouse BlackRock, whose bid to acquire a stake in Panama Canal ports has been supported by Mr. Trump."[22]

The President has immense leverage to wield the authority of his office to punish opponents and privilege allies. *See Trump v. Vance*, 591 U.S. 786, 800 (2020) (President's duties "are of unrivaled gravity and breadth").[23] In turn, there is considerable risk that private interests will seek to curry favor with the President

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *See* Vogel, *supra* note 6.

[23] They are not, however, unlimited, and "[n]o matter the context, the President's authority to act necessarily 'stems either from an act of Congress or from the Constitution itself.'" *Trump v. United States*, 603 U.S. 593, 607 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)).

through donations to the Ballroom or demand a *quid pro quo* favor for their participation.[24]

### B. Private funding of the Ballroom raises ethical concerns given the Administration's transactional approach to governing.

President Trump has previously established that his Administration will respond to those who court his favor,[25] and he has made clear that the Ballroom is of great importance to him. Private donors have responded by funding this effort.

i.    <u>Private companies have responded to President Trump's transactional governing.</u>

Wealthy individuals, companies, and special interest groups have sought to curry favor with the Administration through donations to the President's inaugural fund, campaign accounts, and "legacy projects" such as the Presidential Library, planned Memorial Circle Arch, and the Ballroom.[26] Ballroom donors have already

---

[24] In other contexts, such as political campaigns, federal laws bar active and prospective government contractors from contributing to candidates, parties, and political committees to prevent such *quid pro quo* corruption. *See* 52 U.S.C. § 30119; *Wagner v. Fed. Election Comm'n*, 793 F.3d 1, 32 (D.C. Cir. 2015) (en banc) (upholding federal ban on contractor contributions).

[25] *See generally* Campaign Legal Ctr., Trump's Corrupt Transactions, *supra* note 2 (collecting examples of donations to entities associated with the President and subsequent receipt of an official government benefit by the donor or related parties).

[26] *Id.*

enjoyed personal access to the President as he hosted a dinner with donors last October,[27] and the President has directly solicited Ballroom contributions.[28]

Beyond gaining access to the President, Ballroom donors are building on past success from the Administration's transactional approach to governing. For example, cryptocurrency companies involved in funding the Ballroom have previously sought favor through directed gifts. Coinbase—a Ballroom donor—gave $1 million to President Trump's inaugural fund, and a combination of Coinbase's most important investors gave $6 million to MAGA Inc., a Trump-aligned super PAC, in early 2025.[29] Just one month later, the Administration dropped a civil enforcement action against Coinbase.[30] After donating an undisclosed amount to the Ballroom last year, Coinbase President and COO Emilie Choi was asked whether the donation was intended to "keep good relations with the White House," to which Choi candidly responded, "sure."[31] And in March 2026, President Trump met with Coinbase's CEO and hours later publicly backed the company's position on a banking bill, stating that

---

[27] Zolan Kanno-Youngs, *Trump Hosts Dinner for Wealthy Donors to White House Ballroom*, N.Y. Times (Oct. 15, 2025), https://www.nytimes.com/2025/10/15/us/politics/trump-white-house-dinner-ballroom-donors.html.

[28] Farhi & Jacobs, *supra* note 5.

[29] Campaign Legal Ctr., Trump's Corrupt Transactions, *supra* note 2.

[30] *Id.*

[31] Jason Lalljee, *Exclusive: Coinbase explains donation to Trump's ballroom*, Axios (Nov. 18, 2025), https://www.axios.com/2025/11/18/trump-white-house-ballroom-crypto-coinbase.

a recent stablecoin law was "being threatened and undermined by the Banks, and that is unacceptable."[32] Ripple—also a Ballroom donor and crypto company—donated $5 million to President Trump's inaugural fund.[33] Just a few months later, the Administration returned $75 million of a $125 million fine to Ripple that a federal court had levied against the company in a lawsuit by the SEC.[34] A few months after that, the Administration dropped all pending litigation against Ripple.[35]

      ii. <u>Private financing of the Ballroom presents a ripe opportunity for transactional governing.</u>

Given the personal importance the President has placed on the Ballroom's construction, private entities (and the public) may believe donations to the project will facilitate better government outcomes for themselves. President Trump has expressed interest in constructing the Ballroom for over a decade.[36] Viewing the project as a symbolic legacy, the President has said, "I'm going to [] gift the White

---

[32] *See* Jasper Goodman, *Trump met with Coinbase CEO before bashing banks over crypto bill*, Politico (Mar. 3, 2026), https://www.politico.com/live-updates/2026/03/03/congress/trump-met-with-coinbase-ceo-before-bashing-banks-over-crypto-bill-00811277.

[33] *See* Campaign Legal Ctr., Trump's Corrupt Transactions, at 23, *supra* note 2.

[34] *Id.*

[35] *Id.*

[36] Tamara Keith, *Why Trump is obsessed with building a White House ballroom*, NPR (July 29, 2025), https://www.npr.org/2025/07/30/nx-s1-5425497/trump-whitehouse-ballroom.

House the most beautiful ballroom you've ever seen"[37] and has even personally selected contractors, eschewing competitive government bidding processes.[38] President Trump has explained that the Ballroom "never happened because they never had a real estate person," but he "love[s]" the prospect of building "a great ballroom."[39] Given the significant personal attention devoted by the President to the project, private donors likely perceive it as an ideal means to curry favor with the Administration.

The White House has already demonstrated its admiration for the companies and individuals who have supported the Ballroom, calling them "patriot donors" who have "generously committed to donating the funds necessary to build" the $400 million structure.[40] Appellants' opening brief emphasizes the President's admiration for Ballroom donors, characterizing them as "great patriots and people who truly

---

[37] *Interview: Miranda Devine Interviews Donald Trump for Her Pod Force One Podcast - June 9, 2025*, Roll Call, at 17:10-17:18 (June 9, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-interview-miranda-devine-podcast-june-9-2025.

[38] Luke Broadwater, *Inside Trump's Push to Make the White House Ballroom as Big as Possible*, N.Y. Times (Nov. 30, 2025), https://www.nytimes.com/2025/11/29/us/politics/trump-white-house-ballroom.html?smid=nytcore-ios-share.

[39] Forbes Breaking News, *Trump Shows Major White House Renovations to Donors to New Ballroom*, at 0:09-24 (YouTube, Oct. 16, 2025), https://www.youtube.com/watch?v=VhZdBs-5R4I.

[40] Margaret Hartmann, *White House Ballroom News: Plans, Cost, and Who's Really Paying*, N.Y. Magazine (updated May 8, 2026), https://perma.cc/UJ8T-HEL4.

love our Country." *See* Opening Br. at 5. Donors, like Lockheed Martin, have announced that they are "grateful for the opportunity to help bring the President's vision to reality and make this addition to the People's House, a powerful symbol of the American ideals we work to defend every day[.]"[41] But these private entities are part of a project that would subvert, rather than uphold, core ideals of constitutional governance.

## II.   The President's inability to unilaterally construct the Ballroom accords with separation-of-powers principles that prevent corruption.

Congress, not the Executive, holds the nation's purse strings. Congressional control over the public fisc is a check on the Executive, promotes democratic input, and ensures that public projects are funded in a transparent and responsible manner. The purpose and tradition of Congress's power of the purse demonstrates why Appellants' plan to fund the Ballroom with private donations cannot stand.

### A. Congress's appropriations authority constrains the Executive and prevents corruption.

Consistent with these principles, the district court recognized that Appellants must identify a congressionally enacted law that permits the use of private funds for the Ballroom. JA470. Appellants cite various laws that purportedly permit them, through a complicated set of transactions, to shuffle money from one entity to the

---

[41] Nino Paoli, *Meet all 37 White House ballroom donors funding the $400 million build, including Silicon Valley tech giants, crypto bros and the Lutnicks*, Fortune (Apr. 29, 2026), https://perma.cc/PXH9-R2U2.

next. *See* ECF No. 30 at 34-35, *Nat'l Tr. for Historic Preservation v. Nat'l Park Serv.*, No. 1:25-cv-04316-RJL (D.D.C. Jan. 15, 2026). But Appellants do not have authority to execute this complex scheme, which seeks to avoid the Constitution's vesting of the spending power in Congress. History, precedent, and practice confirm as much.

The Appropriations Clause of the Constitution commands, "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Congress's "power over the purse may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people." The Federalist No. 58 (James Madison). The Framers' decision to commit the spending power to Congress was built on the history of the British Parliament wresting control of the public fisc from the monarchy. *See Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n*, 601 U.S. 416, 427-31 (2024) (recounting this history). This included the gradual shift from a system in which the monarchy exercised "financial independence" with "little parliamentary interference"—raising and spending revenues at will—to one where Parliament controlled revenue and appropriations and successfully limited the monarchy's ability to defy that power. *Id.* at 453-57 (Alito, J., dissenting). Similar struggles over appropriations between royal governors and the colonies occurred before the Revolution. *Id.* at 460.

The Appropriations Clause reflects the Framers' judgment "that congress should possess the power to decide, how and when any money should be applied for [public] purposes." 3 Story, *Commentaries*, § 1342. Under the Appropriations Clause, Congress has "'the right to specify how appropriated moneys shall be spent,' which takes on added significance in a separation-of-powers regime." Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343, 1353-54 (1988). As Alexander Hamilton explained, "no money can be expended, but for an *object*, to an *extent*, and *out of a fund*, which the laws have prescribed." *Id.* (internal citation omitted) (emphasis in original).

This structure ensures that "there will be a legislative authorization for all activity undertaken in the name of the United States." *Id.* Housing the appropriations power within the democratically elected 535-person Congress, rather than the singular Executive, mitigates against "[t]he dangers of corruption, conflict-of-interest, favoritism, and undue discrimination in government administration[.]" *See id.* at 1376. The Appropriations Clause thus functions as "a most useful and salutary check upon profusion and extravagance, as well as upon corrupt influence and public speculation." 3 Story, *Commentaries*, § 1342. The "obvious practical consideration" underlying the Appropriations Clause "of preventing fraud and corruption" is as salient now as it was at the Constitution's ratification. *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427 (1990).

Budget transparency requirements also protect against corruption. The Statement and Account Clause, which immediately follows the Appropriations Clause, reflects a constitutional commitment to transparency and provides that "a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time." U.S. Const. art. I, § 9, cl. 7. President Jefferson understood that clear reporting of government spending was essential to ensure "every member of Congress, and every man of any mind in the Union, should be able to comprehend [the federal budget] to investigate abuses, and consequently to control them." *See* Katherine Clark Harris, *The Statement and Account Clause: A Forgotten Constitutional Mandate for Federal Reporting*, 32 Yale L. & Pol'y Rev. 505, 516 (2014) (internal citation omitted).

Both clauses fit within the Constitution's structural commitment to preventing corruption and "improper dependence." *See generally* Zephyr Teachout, *The Anti-Corruption Principle*, 94 Cornell L. Rev. 341 (2009). The Framers intended for the political branches to depend on the people alone, viewing there to be "corruption" whenever politicians depended on interests other than those of the voters. *See* Lawrence Lessig, *What an Originalist Would Understand "Corruption" to Mean*, 102 Calif. L. Rev. 1, 7-8 (2014). Such interests include monied actors aiming to contort government action to private benefit (rather than the public interest), a risk

inherent to private funding schemes operating free from congressional supervision and approval.

The Supreme Court has likewise recognized that the Appropriations Clause "was intended as a restriction upon the disbursing authority of the Executive." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937); *Reeside v. Walker*, 52 U.S. (11 How.) 272, 291 (1850) ("However much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned. Any other course would give to the fiscal officers a most dangerous discretion."). The Appropriations Clause therefore represents "the principle of legislative supremacy over fiscal matters" that "engendered little debate" at the Constitutional Convention. *Cmty. Fin. Servs. Ass'n*, 601 U.S. at 431.

Congress's historical exercise of this power confirms its primacy over spending. *See Harrington v. Bush*, 553 F.2d 190, 194 (D.C. Cir. 1977). Congress has enacted legislation to safeguard its appropriations authority:

- The Purpose Statute requires that appropriations "shall be applied only to the objects for which the appropriations were made." 31 U.S.C. § 1301(a).

- The transfer statutes prevent transferring funds between agencies unless authorized by law, and limit the use of transferred funds to the "purpose for which the appropriation was originally made." 31 U.S.C. §§ 1531(a), 1532.

- The Miscellaneous Receipts Act requires any official receiving "money for the Government from any source" to immediately deposit it within the U.S. Treasury to ensure accountability, including when gifts are made to the United States, absent specific statutory authority. 31 U.S.C. § 3302(b).

- The Impoundment Control Act requires the President to follow certain procedures before temporarily withholding funds. 2 U.S.C. §§ 681-688.

- The Antideficiency Act prohibits spending more than Congress appropriates. 31 U.S.C. §§ 1341-1342, 1349-1350.

In addition to framework legislation, Congress passes annual appropriations acts to establish additional purpose, time, and amount limitations on the use of funds. *See* Gov't Accountability Off., *Principles of Federal Appropriations Law* 3-9 (4th ed. 2017) (hereinafter GAO Redbook). As the Government Accountability Office explains in its treatise on appropriations law, "it is for Congress to determine the purposes for which an appropriation may be used," and disregarding the purpose of an appropriation "would render congressional control largely meaningless." *See* GAO Redbook, at 3-10.

### B. Appellants' actions flout separation-of-powers principles that advance democratic accountability and prevent corruption.

Appellants argue that a complicated set of transactions under multiple statutes authorizes the use of private donations to construct a massive Ballroom. Their

18

reading disregards Congress's statutory instructions, flouts separation-of-powers principles, and opens the door to *quid pro quo* corruption.

Under Appellants' proffered scheme, the Trust for the National Mall, a tax-exempt nonprofit, accepts private donations from individuals and corporations,[42] and then donates the collected funds to the Secretary of the Interior, who may accept donations to the National Park Service (NPS) "for the purposes of the [Park] System." *See* 54 U.S.C. § 101101(2); Opening Br. at 13. The funds are held in the NPS Trust Fund, *see* 31 U.S.C. § 1321(a)(17); JA265, and "appropriated to be disbursed in compliance with the terms of the trust," *see* 31 U.S.C. § 1321(b)(1). Finally, under the Economy Act, NPS contracts with the Office of the Executive Residence (EXR) (shielding the project, in their view, from APA review), *see* 31 U.S.C. § 1535; Opening Br. at 13, which spends the collected funds on the Ballroom project, *see* Opening Br. at 19-20.

Appellants' expansive reading of these statutes does not pass muster.

i.    Section 105(d) does not authorize Appellants' actions.

Appellants' principal argument rests on the erroneous premise that 3 U.S.C. § 105(d) (Section 105(d)) gives EXR authority to construct the Ballroom. But Section

---

[42] *See* Peter Nicholas & Megan Lebowitz, *How a nonprofit went from cherry trees and pickleball to handling the money for Trump's ballroom*, NBC News (Oct. 31, 2025), https://www.nbcnews.com/politics/white-house/nonprofit-trust-national-mall-trump-ballroom-white-house-rcna240543.

105(d) merely authorizes Congress to appropriate funds for "the care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence at the White House." It provides no funding to EXR; rather, this authorization is "basically a directive to Congress itself, which Congress is free to follow or alter (up or down) in the subsequent appropriation act." *See* GAO Redbook, at 2-56.

Even if Congress agreed to appropriate funds for all purposes covered by Section 105(d), this authorizing language, replete with terms connoting minor repairs, cannot bear Appellant's preferred meaning. *See* JA474. Neither razing an entire Wing of the White House, nor reconstructing it with a $400 million, 90,000 square-foot Ballroom (and related annex), qualifies as a mere "alteration" or "improvement" envisioned by the statute. *See* 3 U.S.C. § 105(d).

And here, in Fiscal Year (FY) 2024 Congress appropriated $2.475 million under Section 105(d) for an even narrower purpose, namely, "required maintenance, resolution of safety and health issues, and continued preventive maintenance." *See* Pub. L. No. 118-47, 138 Stat. 460, 532 (2024) ("White House Repair and Restoration" account); *see also* GAO Redbook, at 2-65 ("[A]n appropriation made for specific purposes is not available for related but more extended purposes contained in the authorization act but not included in the appropriation."). Since President Trump took office, Congress has twice reinstated the same funding level

20

and purpose limits for the Section 105(d) appropriation. *See* Pub. L. No. 119-4, 139 Stat. 9, 11 (2025); Pub. L. No. 119-75, 140 Stat. 173, 451 (2026).

These decisions demonstrate how Congress exercises its core power of the purse: By specifying the *purpose* and *amount* of provided funds. The original public meaning of the term "appropriation" is "a law authorizing the expenditure of *particular funds* for *specified ends*." *See Cmty. Fin. Servs. Ass'n*, 601 U.S. at 427 (emphases added) (citing Founding-era dictionaries describing the "purpose" or "particular use" restrictions inhering in the term "appropriation"). While the district court described the many ways Appellants' funding scheme is *ultra vires*, *see* JA473-88, adhering to congressional judgments in the language of appropriations statutes also advances essential constitutional values.

Private funding schemes that operate without congressional authorization, oversight, or control are contrary to constitutional tradition. "Congress's power of the purse is the single feature of our system that most effectively guarantees an ongoing political constraint on the president's authority to set policy unilaterally." *See* Zachary S. Price, *Funding Restrictions and Separation of Powers*, 71 Vand. L. Rev. 357, 369 (2018). Congress may enforce constraints by denying the President's budgetary requests, limiting funds to a specified purpose different than the

President's policy aims, or significantly reducing an agency's appropriation.[43] Enabling the President to evade these controls by using private funds for a transformative $400 million Ballroom at the White House would undercut both finely wrought legislative compromises and Congress's power under the Constitution.

### ii. Respecting Section 105(d)'s limits preserves the separation of powers.

Congress's process of authorizing and appropriating funds promotes democratic accountability and consensus-building, as the Framers intended. Both the authorizing language in Section 105(d) and the narrower funding for White House repair and maintenance in the FY24 – FY26 appropriations bills reflect compromises, which emerged from negotiations between members representing diverse constituencies in both Houses of Congress, and with the President. Increasingly, appropriations are passed in "omnibus" form, in which the enactment

---

[43] *See, e.g.*, Erin Schumaker, *Beating cancer used to be bipartisan. What happened?* Politico (Apr. 29, 2024), https://www.politico.com/news/2024/04/29/congress-is-killing-bidens-cancer-moonshot-00154718 (describing Congress's decision not to fund President Biden's request under the Cures Act); David Nather, *DOA budget may have life after death*, Politico (Mar. 4, 2014), https://www.politico.com/story/2014/03/barack-obama-budget-congress-104252 (describing the unlikelihood of many of President Obama's signature budget priorities becoming law); *see* Gov't Accountability Off., GAO B-330935, U.S. Government Accountability Office—Unavailability of Appropriated Funds to Subsidize Employees' Long-Distance Home-to-Work Travel 3 (2019), *reconsidered on other grounds by* GAO B-330935.2, Reconsideration: Use of Appropriated Funds to Subsidize Employees' Long-Distance Home-to-Work Travel (2019).

22

depends on combining the priorities of many members of Congress into a single package. *See* Matthew B. Lawrence, Eloise Pasachoff & Zachary S. Price, *Appropriations Presidentialism*, 114 Geo. L.J. Online 1, 17 (2025). The bicameralism and presentment requirements of Article I, Section 7 ensure that funding legislation reflects the judgment of each of the relevant constitutional actors. The Framers designed this process, with its many veto gates, to "divide and disperse power in order to protect liberty." *See Immigr. and Naturalization Serv. v. Chadha*, 462 U.S. 919, 950 (1983).

If the President may distort a specific appropriation's purpose (here, "required maintenance, resolution of safety and health issues, and continued preventive maintenance") or ignore the specific amount provided (for FY24, $2.475 million) through a private funding scheme, then these delicate, intra- and interbranch negotiations, and Congress's corresponding ability to constrain presidential expenditures, breaks down. The President could simply ignore congressional intent and, as here, corral private interests to fund whatever projects he pleases. Such an arrangement would damage the constitutional separation of powers.[44] The appropriations process, cumbersome as it can be, avoids precisely the type of

---

[44] Nor is this how the relevant constitutional actors have understood the division of power with respect to maintaining the White House itself. As Plaintiff's historical annex shows, there is a long history of Congress approving each major modification to the White House. *See* JA198- JA212.

23

unilateral spending and aura of public corruption that has characterized funding of the Ballroom. *See supra* Section I.

> iii. <u>The NPS gift statutes and Economy Act advance separation-of-powers principles by preventing the President from using private donations for pet projects.</u>

Congress also effectuates its power of the purse by prescribing whether, when, and for what purpose an agency can accept funds outside the annual appropriations process. As relevant here, the gift statutes provide NPS circumscribed authority to accept and use private funds, while the Economy Act operates as an exception to the prohibition on transfers by permitting agencies to pay each other for goods or services. Appellants' use and interpretation of their authority under these provisions, however, contravenes separation-of-powers principles by permitting the President to create an unrestricted slush fund to use as he sees fit.

In general, a federal agency "may not accept for its own use . . . gifts of money or other property in the absence of specific statutory authority." *See* GAO Redbook, at 6-222-23 (citing 16 Comp. Gen. 911 (1937)). This principle against augmentation prevents agencies from "undercutting the congressional power of the purse by circuitously exceeding the amount Congress has appropriated for [an] activity." *Id.* at 6-163. Agencies accordingly may not use gifts or receive a transfer of funds without congressional authorization. *Id.*; *see also* 31 U.S.C. §§ 1532, 3302(b).

24

Congress has created specific mechanisms through gift statutes, however, for private parties to donate to federal agencies, including to the NPS trust fund, and for agencies to use those amounts without further appropriation from Congress. *See* 13 U.S.C. §§ 1321(a)(17), (b)(1); 54 U.S.C. § 101101(2). Here, Congress authorized NPS to accept donations only "for the purposes of the [National Park] System." 54 U.S.C. § 101101(2). And Congress delineated such purposes: The NPS's "purpose is to conserve the scenery, natural and historic objects, and wild life in the System units" and to provide for the enjoyment of the National Park units "by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). As Appellee persuasively argues, razing the East Wing and erecting a 90,000 square-foot building in its place cannot be described as "conserv[ing] . . . historic objects" or "leav[ing] them unimpaired." *See* JA396.

Congress also may permit agencies to transfer funds between accounts, and provided one such exception with the Economy Act. *See* Gov't Accountability Off., GAO B-331739, Matter of: U.S. Chemical Safety and Hazard Investigation Board-- Independent Statutory Authority to Enter into Interagency Agreements 1, 2 (2021). The Act serves a discrete purpose: allow an ordering agency that has authority and funding to obtain goods or services to rely on the expertise of another agency to provide them. 31 U.S.C. § 1535(a). The Act does *not*, however, allow an ordering agency "to use another agency to do anything it could not lawfully do itself," GAO

25

Redbook, at 12-26, authorize a performing agency to receive payments for services it is required by law to provide, *id.* at 12-68, enable an agency to circumvent congressional restrictions on the use of funds, *id.* at 12-46, or permit an agency that is short on funds to "dip into the pocket[s]" of another, *id.*

Yet that is precisely what Appellants have tried, contending that they can "supplement the Section 105(d) appropriated funds with funds donated to NPS." Opening Br. at 41. But an agency may not augment its appropriation without authorization from Congress, including under the Economy Act, which merely permits payment for goods or services provided. *See* GAO Redbook, at 12-46; *id.* at 6-162 (explaining that allowing otherwise "would amount to a usurpation of the congressional prerogative"). Appellants cannot use this limited interagency contracting authority to supplement and expand the purpose of the limited funding Congress decided to provide for White House repairs under Section 105(d).

Congress's decision to limit the purposes for which NPS can spend private donations and on the circumstances in which agencies can transfer funds reflects its plenary spending authority. And although Congress elected to use its power of the purse to enable NPS to retain private donations, thereby ceding some authority over the *amount* of public expenditures, it nonetheless retained tight control over the *purpose* for which those donations may be used. These restrictions serve critical purposes: mitigating improper influence from private donors, ensuring that the use

26

of funds comports with the agency's mission and Congress's intent, and preventing the President from spending at will. Appellants seek to disregard these constraints. Without enforcement of these congressionally imposed limitations, the President could use the vast levers of government power to urge private actors to donate to priorities Congress has declined to fund. Congress has wisely constrained the purpose for which gifts to NPS can be spent, and restricted when agencies can transfer funds. The Court should reject Appellants' attempt to exceed those constraints here.

Moreover, the risks of *quid pro quo* corruption and its appearance in Appellants' unrestrained collection and use of funds from private entities further counsel against their reading of the statutes. Seeking to curry favor through donations to legacy projects creates a "broad[] threat" that "politicians [will be] too compliant with the wishes of large contributors." *See Emily's List v. Fed. Election Comm'n*, 581 F.3d 1, 36 (D.C. Cir. 2009). Government officials must avoid even the appearance of *quid pro quo* corruption. "[I]t is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent." *Am. Fed. of Gov't Emps. v. U.S. Dep't of Educ.*, No. 25-cv-3553, 2025 WL 3123707, at *17 (D.D.C. Nov. 7, 2025).

Further, the Economy Act and NPS gift statutes relied upon by Appellants do not contain any explicit requirements for public disclosure and reporting of donations. *See* 13 U.S.C. § 1321(a)(17); 54 U.S.C. § 101101(2); 31 U.S.C. § 1535. *But see* 2 U.S.C. § 1603(d) (LDA may require disclosure by covered lobbyists). Unlike amounts provided in annual appropriations acts, for which the source is evident and the public can scrutinize the allowable purpose and amount, private donations made under the gift statutes or transfers made under the Economy Act do not preserve a similar opportunity for public accountability.[45]

Under Appellants' theory, the President could collect, transfer, and use unlimited donations to accomplish anything that, in his view, vaguely fits under an existing authorization. *See* Opening Br. at 34-43. This expansive assertion alone creates a risk of corruption.

That risk is enhanced by the lack of public disclosure for Ballroom donations, *cf. Buckley v. Valeo*, 424 U.S. 1, 67 (1976) ("disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity"), and the close connection between the

---

[45] Many Americans are concerned with the lack of transparency in who is funding the Ballroom. In recent testimony before the National Capital Planning Commission, Abigail Bellows of Common Cause reported that "[m]ore than 134,000 Americans have already signed [Common Cause's] petition calling for an investigation into the financing of Trump's ballroom." *See* Common Cause, Public Testimony on East Wing Modernization Project 93 (Mar. 5, 2026), https://perma.cc/SC4H-HUAM.

President's express wishes for a Ballroom and corresponding donations for that purpose. "The dangers of corruption . . . are exacerbated where people may do 'favors' for the government, or for particular agencies; indeed, these dangers may be especially great where the circumstances of the 'favor' preclude open and explicit repayment." Stith, *Congress' Power of the Purse*, 97 Yale L.J. at 1376-77. Such concern is paramount for the private donors funding the Ballroom, many of which contract with the government or have faced federal enforcement actions.[46]

In reviewing the district court's preliminary injunction, this Court must evaluate the "public interest" and "balance of the equities" factors of the *Winter* standard. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008). Here, that analysis clearly favors Appellee. Private donations for President Trump's long-time goal of building a Ballroom create substantial risks of *quid pro quo* corruption, or at least its appearance. Donations to make President Trump's personal vision for the White House a reality are the *quid*, and deploying the power of public office for the donor's advantage is the *quo*. These are the precise harms the Constitution sought to mitigate by vesting the spending authority in Congress.

## CONCLUSION

*Amici* respectfully request that the Court affirm.

---

[46] *See* Weissman et al., *supra* note 7.

29

Dated: May 27, 2026

Respectfully submitted,

*/s/ Daniel S. Lenz*

Nikhel S. Sus (DC Bar No. 1017937)
Christina Wentworth (DC Bar No. 1741468)
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 4596
Washington, DC 20044
nsus@citizensforethics.org
cwentworth@citizensforethics.org

Daniel S. Lenz (Wis. Bar No. 1082058)
R. Brent Ferguson (DC Bar No. 1782289)
Renata O'Donnell (DC Bar No. 1723929)
Brendan T. Nigro (DC Bar No. 90039380)
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200
dlenz@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
rodonnell@campaignlegalcenter.org
bnigro@campaignlegalcenter.org

*Counsel for* Amicus Curiae *Citizens for Responsibility and Ethics in Washington*

*Counsel for* Amicus Curiae *Campaign Legal Center*

30

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(ii) because it contains 6,475 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

This filing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this response has been prepared using Microsoft Office Word in Times New Roman 14-point font.

*/s/ Daniel S. Lenz*
Daniel S. Lenz

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2026, I electronically filed this *Amici Curiae* Brief with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system, thereby serving all persons required to be served.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Daniel S. Lenz*
Daniel S. Lenz