## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL TRUST FOR HISTORIC PRESERVATION
IN THE UNITED STATES,

*Plaintiff-Appellee/Cross-Appellant*,

v.

NATIONAL PARK SERVICE *et al.*,

*Defendants-Appellants/Cross-Appellees*.

*On Appeal from the United States District Court
for the District of Columbia*

## BRIEF OF MEMBERS OF CONGRESS
## AS *AMICI CURIAE* IN SUPPORT OF
## APPELLEE/CROSS-APPELLANT AND AFFIRMANCE

Elizabeth B. Wydra
Brianne J. Gorod
Joshua D. Blecher-Cohen
Nina G. Henry
CONSTITUTIONAL
   ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW
Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae*

**STATEMENT REGARDING
CONSENT TO FILE AND SEPARATE BRIEFING**

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for *amici curiae* represents that counsel for all parties have consented to the filing of this brief.[1]

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *amici* certifies that a separate brief is necessary. *Amici* are Members of Congress who understand that the Constitution empowers Congress—not the President—to determine if and how construction occurs on federal property like the White House, also known as the "People's House." The White House was first built pursuant to congressional legislation, and Congress has repeatedly passed additional legislation for its expansion, maintenance, and renovation. Because the Constitution grants Congress exclusive authority to determine when federal property should be constructed or demolished, and Congress has neither authorized nor appropriated funds for the demolition and reconstruction of the East Wing, *amici* have a strong interest in this case.

As Members of Congress, *amici* also understand congressional legislative processes and regularly exercise their constitutional role to legislate and vote on federal spending. They have participated in drafting and considering countless bills

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amici curiae* or their counsel made a monetary contribution to its preparation or submission.

and congressional resolutions authorizing programs and appropriating federal funds for those programs, including considering resolutions and funding bills to acquire, construct, maintain, and renovate federal properties. *Amici* therefore have a strong interest in ensuring Congress's constitutional power over appropriations and federal buildings is respected.

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* state that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## I.  PARTIES AND *AMICI CURIAE*

Except for any *amici* who had not yet entered an appearance in this case as of the filing of Plaintiff-Appellee's brief, all parties, intervenors, and *amici* appearing in this Court are listed in Plaintiff-Appellee's brief.

## II.  RULINGS UNDER REVIEW

Reference to the rulings under review appears in Plaintiff-Appellee's brief.

## III.  RELATED CASES

Reference to any related cases pending before this Court appears in Plaintiff-Appellee's brief.

Dated: May 28, 2026

/s/ Brianne J. Gorod
Brianne J. Gorod

*Counsel for Amici Curiae*

**TABLE OF CONTENTS**

| | Page |
|---|---|
| TABLE OF AUTHORITIES | vi |
| GLOSSARY | xi |
| INTEREST OF *AMICI CURIAE* | 1 |
| INTRODUCTION AND SUMMARY OF ARGUMENT | 2 |
| ARGUMENT | 6 |
| I. The Constitution Gives Congress—Not the President—Ultimate Control over Federal Property, Including the White House | 6 |
| II. When Congress Wants to Permit Construction on Federal Property, It Legislates to Authorize and to Appropriate Funds for It | 9 |
| III. Congress Neither Authorized nor Appropriated Funds to Demolish the East Wing and Construct a Massive Ballroom | 12 |
| CONCLUSION | 20 |
| APPENDIX | 1A |

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Bowsher v. Synar*,
 478 U.S. 714 (1986) ............................................................. 5

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
 601 U.S. 416 (2024) ............................................................. 11

*Gustafson v. Alloyd Co.*,
 513 U.S. 561 (1995) ............................................................. 13

*Jarecki v. G.D. Searle & Co.*,
 367 U.S. 303 (1961) ............................................................. 13

*Rochester Pure Waters Dist. v. EPA*,
 960 F.2d 180 (D.C. Cir. 1992) .............................................. 9

*Sackett v. EPA*,
 598 U.S. 651 (2023) ............................................................. 14

*TRW Inc. v. Andrews*,
 534 U.S. 19 (2001) ............................................................... 14

*U.S. Dep't of Navy v. FLRA*,
 665 F.3d 1339 (D.C. Cir. 2012) ........................................... 8-10

*Whitman v. Am. Trucking Ass'ns*,
 531 U.S. 457 (2001) ............................................................. 14, 19

*Yates v. United States*,
 574 U.S. 528 (2015) ............................................................. 13

*Youngstown Sheet & Tube Co. v. Sawyer*,
 343 U.S. 579 (1952) ............................................................. 5

**Page(s)**

<u>Constitutional Provisions</u>

U.S. Const. art. I, § 5 ........................................................................ 10

U.S. Const. art. I, § 8 ........................................................................ 2, 6

U.S. Const. art. I, § 9 ........................................................................ 2, 6

U.S. Const. art. IV, § 3 ...................................................................... 1, 2, 6

<u>Statutes and Legislative Material</u>

3 U.S.C. § 105.................................................................................... 3, 12, 13

40 U.S.C. § 8106................................................................................ 5, 7

Act of Feb. 10, 1820, ch. 10, 3 Stat. 541 ......................................... 7

Act of Feb. 13, 1815, ch. 41, 3 Stat. 205 ......................................... 7

Act of June 23, 1949, ch. 236, 63 Stat. 231 ..................................... 8

Act of June 28, 1902, ch. 1301, 32 Stat. 419 ................................... 7

Act of Mar. 3, 1823, ch. 62, 3 Stat. 784........................................... 7

Act of Mar. 3, 1829, ch. 51, 4 Stat. 362........................................... 7

*Committee on the Judiciary, Reconciliation Submission Pursuant to S. Con. Res. 33*, § 5 (May 4, 2026) (Sen. Leg. Couns. Draft MDM26A10 9PR) ....... 18

Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, 128 Stat. 2130 (2014)......................................... 16

Consolidated and Further Continuing Appropriations Act, 2013, Pub. L. No. 113-6, 127 Stat. 198 (2013)............................................. 17

Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, 114 Stat. 2763 (2000)......................................... 16

**Page(s)**

Consolidated Appropriations Act, 2004,
Pub. L. No. 108-199, 118 Stat. 3 (2004)......................................................... 16

Consolidated Appropriations Act, 2005,
Pub. L. No. 108-447, 118 Stat. 2809 (2004).................................................... 16

Consolidated Appropriations Act, 2008,
Pub. L. No. 110-161, 121 Stat. 1844 (2007).................................................... 16

Consolidated Appropriations Act, 2010,
Pub. L. No. 111-117, 123 Stat. 3034 (2009)............................................... 8, 16

Consolidated Appropriations Act, 2012,
Pub. L. No. 112-74, 125 Stat. 786 (2011)....................................................... 16

Consolidated Appropriations Act, 2014,
Pub. L. No. 113-76, 128 Stat. 5 (2014)........................................................... 16

Consolidated Appropriations Act, 2016,
Pub. L. No. 114-113, 129 Stat. 2242 (2015)............................................. 16, 17

Consolidated Appropriations Act, 2017,
Pub. L. No. 115-31, 131 Stat. 135 (2017)................................................. 16, 17

Consolidated Appropriations Act, 2018,
Pub. L. No. 115-141, 132 Stat. 348 (2018)..................................................... 16

Consolidated Appropriations Act, 2019,
Pub. L. No. 116-6, 133 Stat. 13 (2019)........................................................... 17

Consolidated Appropriations Act, 2020,
Pub. L. No. 1216-93, 133 Stat. 2317 (2020).................................................... 17

Consolidated Appropriations Act, 2022,
Pub. L. No. 117-103, 136 Stat. 49 (2022)....................................................... 17

Consolidated Appropriations Act, 2023,
Pub. L. No. 117-328, 136 Stat. 4459 (2022).................................................... 17

Consolidated Appropriations Act, 2026,
Pub. L. No. 119-75, 140 Stat. 173 (2026)....................................................... 17

Consolidated Appropriations Resolution, 2003,
Pub. L. No. 108-7, 117 Stat. 11 (2003).................................................. 16

Full-Year Continuing Appropriations and Extensions Act, 2025,
Pub. L. No. 119-4, 139 Stat. 9 (2025).................................................. 17

Further Consolidated Appropriations Act, 2024,
Pub. L. No. 118-47, 138 Stat. 460 (2024)................................ 4, 15, 17

H.R. Rep. No. 118-145 ................................................................. 17

H.R. Rule XXI, 119th Cong. (2025)............................................ 11

Omnibus Appropriations Act, 2009,
Pub. L. No. 111-8, 123 Stat. 524 (2009)................................... 8, 16

Resolution Approving PDC-0017-WA10,
S. Comm. on Env't & Pub. Works, 111th Cong. (Feb. 4, 2010) ........... 8

James V. Saturno, Cong. Rsch. Serv., R46497, *Authorizations and the
Appropriations Process* (May 2023) ....................................... 10

Sen. Rule XVI................................................................................. 11

Transportation, Treasury, Housing and Urban Development, the Judiciary,
the District of Columbia, and Independent Agencies Appropriations Act,
2006, Pub. L. No. 109-115, 119 Stat. 2396 (2005)............................... 16

Treasury and General Government Appropriations Act, 2000,
Pub. L. No. 106-58, 113 Stat. 430 (1999)................................. 16

Treasury and General Government Appropriations Act, 2002,
Pub. L. No. 107-67, 115 Stat. 514 (2001)................................. 16

White House Safety and Security Act of 2026, S. 4430, 119th Cong........ 18

**Page(s)**

<u>Books, Articles, and Other Authorities</u>

*Black's Law Dictionary* (12th ed. 2024)......................................................... 16

Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* (2017) ................................................................. 5

*The Federalist No. 51* (Clinton Rossiter ed., 1961)..................................... 9

Matthew B. Lawrence et al., *Appropriations Presidentialism*, 114 Geo. L.J. Online 1 (2025) ................................................................. 9

*Merriam-Webster Dictionary*, https://www.merriam-webster.com ........... 16

Brett Samuels, *Trump: Cost of New Ballroom May Reach $400M*, The Hill (Dec. 17, 2025), https://thehill.com/blogs/in-the-know/5652531-trump -cost-new-ballroom-400m......................................................................... 18

U.S. Government Accountability Office, *Principles of Federal Appropriations Law* (4th ed. 2016)........................................................... 11

# GLOSSARY

CFPB      Consumer Financial Protection Bureau

EPA      Environmental Protection Agency

FLRA      Federal Labor Relations Authority

**INTEREST OF *AMICI CURIAE***

*Amici curiae* are Members of Congress who understand that the Constitution empowers Congress—not the President—to "dispose of and make all needful Rules and Regulations respecting" federal property.  U.S. Const. art. IV, § 3.  Because the White House is federal property, Congress is responsible for determining whether (and, if so, how) its various parts should be demolished or reconstructed.  Congress passed the initial legislation to build the White House and, since then, has repeatedly passed legislation to provide for its expansion, maintenance, and renovation as needed.  *Amici* have a strong interest in ensuring that Congress's constitutional responsibility for federal property is protected from executive-branch encroachment.

As Members of Congress, *amici* also understand the authorization and appropriations processes of the House and Senate, and they regularly exercise their constitutional role under Article I to legislate and vote on federal spending.  *Amici* have participated in the drafting and consideration of countless bills and resolutions that authorize federal spending and appropriate funds for that spending pursuant to longstanding congressional procedures, including funds designated to maintain and renovate federal properties.  Because Congress has the sole authority to authorize construction on federal property and to appropriate funds for such projects, *amici* have a strong interest in this case.

A full list of *amici* appears in the Appendix.

1

**INTRODUCTION
AND SUMMARY OF ARGUMENT**

The Constitution grants Congress ultimate and exclusive control over all "Property belonging to the United States," including the power to "dispose of and make all needful Rules and Regulations respecting" federal property. U.S. Const. art. IV, § 3. The White House is, indisputably, federal property. Indeed, the White House was built only after Congress passed legislation authorizing its construction and appropriating funds to cover that expense. And for over two hundred years since, the White House has been renovated and maintained pursuant to congressional authorizations and appropriations. Appellants/Cross-Appellees ("Appellants") have no authority to demolish the White House's East Wing and to build a massive ballroom in its stead, and the district court rightly issued a preliminary injunction.

In addition to its control over federal property, Congress also "exercise[s] exclusive Legislation in all Cases whatsoever" over the District of Columbia as "the Seat of Government of the United States." *Id.* art. I, § 8. The Constitution further provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." *Id.* art. I, § 9. Together, the Property Clause, District Clause, and Appropriations Clause "establish Congress's primacy over federal property, spending, and the District of Columbia" and thus over any decision to demolish existing federal buildings or to construct new ones. JA470. The White House falls squarely within this authority. Whereas the President lives in the White

House for only a finite period while in office, the Constitution entrusts Congress, acting for the people, with making long-term decisions about the "People's House."

Operating against this constitutional backdrop, Congress authorizes and funds construction on federal property when it deems such work necessary. The House of Representatives and the Senate both allocate discretionary federal spending according to a two-step procedure. First, an authorizing statute or resolution permits the government to take an action, such as relocating an agency's headquarters or constructing a new federal building. Second, an appropriations statute provides budgetary approval for a specific amount to carry out that previously authorized action. The federal government has followed this longstanding procedure with respect to White House modifications for more than two centuries.

Here, Congress neither authorized nor appropriated funds for the President to demolish the East Wing. Nor did it authorize or appropriate funds for the ballroom he is planning to build in its place. The authorization statute Appellants cite covers the White House's existing physical plant, permitting the appropriation of funds for the "care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence." 3 U.S.C. § 105(d)(1). As that list indicates, Congress authorized the maintenance and upkeep of only extant White House property. Though Appellants seek support for their position in the words "alteration" and

"improvement," *see* Appellants Br. 35-43, the limited scope of those words is made clear by their surrounding terms, which plainly authorize only *adjustments* to the current White House structure. They cannot be divorced from that context to encompass the *demolition* of an entire wing.

Separately, Congress never appropriated funds for that unauthorized project. The 2024 appropriations act was narrower than § 105(d), providing funds only for "required maintenance, resolution of safety and health issues, and continued preventative maintenance" at the White House's Executive Residence. Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 532 (2024). Maintaining a building is flatly incompatible with demolishing it. And "safety," read alongside "health" and "maintenance," refers to mitigating building-related issues like crumbling facades or asbestos rather than, as Appellants urge, to addressing external security threats. The appropriation itself confirms that Congress did not fund largescale construction: the entire amount Congress appropriated, even if devoted solely to that project, would cover *less than 1%* of the ballroom's estimated $400,000,000 cost.

Appellants acknowledge that "the political process" serves as a "check[]" on "the President's authority," but they suggest that Congress can step in only when it "has become concerned that [an ongoing] White House improvement may go too far." Appellants Br. 42. That approach is precisely backward: the constitutional

default is not untrammeled executive-branch authority. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) ("The President's power, if any . . . must stem either from an act of Congress or from the Constitution itself."). Instead, any White House construction is contingent on authorization and an annual appropriation from Congress, which "resets to zero in the absence of congressional action and thereby forces the president to negotiate with Congress each year." Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* 62 (2017). And if there were any doubt, Congress has barred the erection of any "building . . . on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." 40 U.S.C. § 8106. The process of congressional authorization and appropriation must occur *before* any construction begins—and the President is powerless to act without it.

In short, Congress neither authorized nor funded the demolition of the East Wing and the construction of a ballroom in its place. Appellants' actions infringe on Congress's authority, seizing for the President legislative power the Constitution reserves to Congress and violating the constitutional separation of powers, the "structural protections against abuse of power [that are] critical to preserving liberty." *Bowsher v. Synar*, 478 U.S. 714, 730 (1986).

This Court should affirm the preliminary injunction.

**ARGUMENT**

## I. The Constitution Gives Congress—Not the President—Ultimate Control over Federal Property, Including the White House.

The Constitution grants Congress exclusive control over all federal property. As a result, the executive branch has only such power to demolish or construct federal buildings as is expressly delegated by Congress. *Cf.* JA470 (noting that Appellants "declined to argue that they have any inherent constitutional authority to build the [East Wing] ballroom").

Three constitutional provisions undergird that exclusive congressional authority. First, the Property Clause gives Congress the power "to dispose of and make all needful Rules and Regulations respecting . . . Property belonging to the United States." U.S. Const. art. IV, § 3. Second, the Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." *Id.* art. I, § 9. Third, as relevant here, the District Clause gives Congress the power to "exercise exclusive Legislation in all Cases whatsoever, over such District . . . as may . . . become the Seat of Government of the United States." *Id.* art. I, § 8.

As the district court correctly recognized, "[t]ogether, the Property Clause, the Appropriations Clause, and the District Clause establish Congress's primacy over federal property, spending, and the District of Columbia." JA470. These overlapping provisions provide Congress, acting for the people, with the sole

authority to permit and fund construction on federal property in Washington, D.C. Congress has buttressed its exclusive control over construction on Washington, D.C.-based federal property via statute, providing that a "building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress."  40 U.S.C. § 8106.  The White House—also known as the "People's House"—falls squarely within Congress's constitutional and statutory authority.

Congress has funded construction work on the White House since it was first built shortly after the Founding.  *See* JA462-63 (cataloging examples).  After the War of 1812, Congress passed legislation providing for "the President's House" to be "repaired or rebuilt forthwith" and funding that construction.  Act of Feb. 13, 1815, ch. 41, 3 Stat. 205, 205 (authorizing construction at the White House's "present site[]"); *see* Act of Feb. 10, 1820, ch. 10, 3 Stat. 541, 541 (appropriating $13,174.66 to supplement "appropriations heretofore made for . . . finishing the President's house").  Later, Congress funded a series of White House expansions. *See* Act of Mar. 3, 1823, ch. 62, 3 Stat. 784, 784 (appropriating $19,000 to "finish[] the south portico to the President's house"); Act of Mar. 3, 1829, ch. 51, 4 Stat. 362, 362-63 (appropriating $24,769.25 to "complete the north front of the President's house . . . by erecting a portico"); Act of June 28, 1902, ch. 1301, 32 Stat. 419, 460 (appropriating $65,196 for "a building to accommodate the offices of the President,

7

to be located in the grounds of the Executive Mansion," which became the East and West Wings). And in the 1940s, Congress appropriated millions of dollars to modernize the White House. *See* Act of June 23, 1949, ch. 236, 63 Stat. 231, 235 (appropriating $2,000,000 and authorizing an additional $3,400,000 in contracts for "the renovation, repair, and modernization . . . of the Executive Mansion, or for such other provision for remodeling or rebuilding the Executive Mansion or for construction of a separate residence for the President"). More recently, Congress authorized and funded significant updates to the White House's physical systems infrastructure. *See, e.g.*, Resolution Approving PDC-0017-WA10, S. Comm. on Env't & Pub. Works, 111th Cong. (Feb. 4, 2010) (authorizing $203,595,000 for "West and East Wing infrastructure systems replacement"); Consolidated Appropriations Act, 2010, Pub. L. No. 111–117, 123 Stat. 3034, 3188 (2009) (appropriating $84,500,000 for the "East Wing Infrastructure Systems Replacement"); Omnibus Appropriations Act, 2009, Pub. L. No. 111-8, 123 Stat. 524, 661 (2009) (appropriating $76,487,000 for the "West Wing Infrastructure Systems Replacement").

Congress's "absolute" federal-spending authority, including over federal property, thus forms "a bulwark of the Constitution's separation of powers," serving as a "particularly important . . . restraint on Executive Branch officers." *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1347-48 (D.C. Circ. 2012) (Kavanaugh, J.)

(quoting in part *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)). Indeed, control over appropriations "was one of the most important authorities" the Constitution granted Congress, *id.* at 1346 (citing *The Federalist No. 51*, at 320 (James Madison) (Clinton Rossiter ed., 1961)), as this Court has noted, and it has a long pedigree as a tool for accountability and a check on executive-branch overreach, *see* Matthew B. Lawrence et al., *Appropriations Presidentialism*, 114 Geo. L.J. Online 1, 7 (2025) ("Historically, Congress adopted the practice of time-limited appropriations from the British Parliament, which employed it to provide an ongoing check on royal authority.").

The Constitution vests Congress with exclusive authority to expand, maintain, and renovate the White House, even as individual presidencies come and go. When construction is necessary, Congress—not the President—has acted. Allowing the President to demolish an entire wing of the White House and rebuild it to his liking, while entirely bypassing Congress's constitutional role and ignoring clear statutory constraints, disrupts the balance of powers put in place by the nation's Framers.

II. **When Congress Wants to Permit Construction on Federal Property, It Legislates to Authorize and to Appropriate Funds for It.**

Congress knows how to authorize federal action, including the demolition and reconstruction of federal property, when it wishes to do so. Both the House and Senate, drawing on their constitutional power to "determine the Rules of [their]

Proceedings," have developed rules that govern their disbursement of government funds. U.S. Const. art. I, § 5.

Discretionary federal spending is generally distributed via a two-step procedure, in which "legislation is enacted that establishes or continues federal agencies, programs, policies, projects, or activities, and legislation that provides funding for these purposes is presumed to follow." James V. Saturno, Cong. Rsch. Serv., R46497, *Authorizations and the Appropriations Process* 1 (May 2023). This policy of restricting congressional appropriations to expenditures previously authorized by law was formalized in House rules in 1837 and Senate rules in 1850, although its observation in practice dates back even earlier. *Id.* at 2-3.

First, legislative *authorization* "defines the authority of the government to act," such as by relocating an agency's headquarters or constructing a new federal building. *Id.* at 1. An authorizing statute or resolution does not itself provide any funding but serves instead to permit a particular government action (or type of action). Congressional authorization cabins how federal funds can be used. Indeed, "all uses of appropriated funds must be affirmatively approved by Congress." *U.S. Dep't of Navy*, 665 F.3d at 1348.

Second, legislative *appropriation* pursuant to an earlier authorization "provides budget authority," enabling government actors "to incur obligations and make payments from the Treasury for specified purposes." Saturno, *supra*, at 1. An

appropriating statute allocates federal funding by "identify[ing] a source of public funds and authoriz[ing] the expenditure of those funds for designated purposes." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 426 (2024). In certain cases, a single statute can provide both authorization and appropriation for a particular expenditure, such that "the enacted appropriation, in effect, carries its own authorization." U.S. Government Accountability Office, *Principles of Federal Appropriations Law*, at 2-79 to 2-80 (4th ed. 2016).

The procedure of authorization and appropriation is codified in both the House and Senate rules. *See* H.R. Rule XXI, cl. 2(a)(1), 119th Cong. (2025) ("An appropriation may not be reported in a general appropriation bill, and may not be in order as an amendment thereto, for an expenditure not previously authorized by law, except to continue appropriations for public works and objects that are already in progress."); Sen. Rule XVI, ¶ 1 ("On a point of order made by any Senator, no amendments shall be received to any general appropriation bill the effect of which will be to increase an appropriation already contained in the bill, or to add a new item of appropriation, unless it be made to carry out the provisions of some existing law, or treaty stipulation, or act or resolution previously passed by the Senate during that session . . . .").

Past practice confirms that, when it wants to permit White House construction, Congress authorizes and appropriates funding to support specific projects. *See supra*

11

Section I.  Congress has legislated to allow such construction expressly rather than, as Appellants would have it, hiding funding for largescale building projects in routine language regarding standard maintenance.

**III.  Congress Neither Authorized nor Appropriated Funds to Demolish the East Wing and Construct a Massive Ballroom.**

As the district court correctly found, Congress has neither authorized nor appropriated funds for the East Wing's demolition and the construction of a ballroom in its stead.  *See* JA473-79.[2]

*First*, Congress has not authorized such construction.  Appellants claim to find authority in 3 U.S.C. § 105(d)(1).  *See* Appellants Br. 35-43.  But the text of that statute does not authorize the demolition of an entire wing of the White House. Section 105(d) provides that "[t]here are authorized to be appropriated each fiscal year to the President such sums as may be necessary for" certain categories of expense.  3 U.S.C. § 105(d).  The relevant category authorizes funds to be appropriated for the "care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence at the White House."  *Id.* § 105(d)(1).  Although "[s]ums appropriated under this subsection for expenses . . . may be expended as the

---

[2] Separately, the district court correctly determined that the National Park Service Organic Act "cannot supply the requisite authorization for construction of the ballroom" because the Act does not grant the National Park Service "blanket authority to engage in construction in national parks."  JA487-88.

President may determine, notwithstanding the provisions of any other law," *id.* § 105(d)(5), those appropriated sums can only be used to fund actions Congress expressly authorized in § 105(d).

Demolishing the East Wing does not fall within the meaning of "alteration" or "improvement," the only terms Appellants invoke in support of their actions, *see* Appellants Br. 35-43, and so is not authorized by Congress. To start, the specific expenses listed in the statute—"air-conditioning, heating, and lighting (including electric power and fixtures)"—deal with discrete aspects of upkeep for an existing building. Their presence makes clear that the terms "alteration" and "improvement" do not clandestinely authorize the President to demolish an entire wing of a building. Instead, the words "immediately surrounding" the references to alteration and improvement "cabin the[ir] contextual meaning." *Yates v. United States*, 574 U.S. 528, 543 (2015). This principle of statutory construction "avoid[s] ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress.'" *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)). Here, that principle counsels against a broad reading of "alteration" and "improvement," which would not merely warp Congress's statutory text but do so at Congress's expense, giving the President *carte blanche* authority to demolish the entire White House if he so chose.

Appellants' view of "alteration" and "improvement" would also swallow the rest of § 105(d) whole. If those two words could authorize the President to demolish an entire wing of the White House, they must surely also permit him to refurnish the Executive Residence, change its cooling or heating systems, or update its lighting. Such a capacious construction of "alter[]" and "improve[]" would render most of § 105(d)'s text superfluous, despite it being "a cardinal principle of statutory construction" that statutes must be "construed [so] that . . . no . . . word shall be superfluous, void, or insignificant," *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks omitted). Understanding "alteration" and "improvement" to authorize changes within the White House's existing structure short of demolition preserves the textual significance of each entry in § 105(d). At the same time, it avoids hiding "elephants" in statutory "mouseholes"—something Congress does not do when legislating, as the Supreme Court has "often remarked." *Sackett v. EPA*, 598 U.S. 651, 677 (2023) (quoting in part *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). Congress did not authorize the President to tear down the White House by giving him permission to conduct routine maintenance and upkeep.[3]

---

[3] Given Congress's constitutional control over all federal property, the President cannot demolish federal property without Congress's authorization even if private funding were available. The President could not, say, unilaterally tear down the Washington Monument absent express congressional authorization—even if he raised private funds to cover the cost.

*Second*, and independently, Congress never appropriated funds for these unauthorized East Wing renovations. The text of the 2024 Appropriations Act is even narrower than that of § 105(d) and plainly does not cover the East Wing's demolition and reconstruction as a giant ballroom. *See* Further Consolidated Appropriations Act, 2024, 138 Stat. at 532. Strikingly, Appellants do not even suggest it could: they argue that § 105(d) *authorizes* their renovations, *see* Appellants Br. 35-43, but nowhere identify any statute under which Congress has *appropriated* funds to support that project.

Under the heading "White House Repair and Restoration," the 2024 Act appropriated "[f]or the repair, alteration, and improvement of the Executive Residence at the White House pursuant to 3 U.S.C. 105(d), $2,475,000, to remain available until expended, *for required maintenance, resolution of safety and health issues, and continued preventative maintenance*." 138 Stat. at 532 (emphasis added). That is, Congress appropriated funds for "repair, alteration, and improvement" that fulfill three specific objectives: required maintenance, resolution of safety and health issues, and preventative maintenance. The challenged construction accomplishes none of those objectives.

To begin, the East Wing demolition and ballroom-construction project is neither "required maintenance" nor "preventative maintenance," both of which contemplate action taken to preserve existing property (rather than to tear down

15

extant structures and build new ones).  *See, e.g.*, *Maintenance*, *Black's Law Dictionary* (12th ed. 2024) ("The care and work put into property to keep it operating and productive; general repair and upkeep."); *Maintenance*, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/maintenance (referring to "the upkeep of property") (last accessed May 28, 2026).

Nor does "resolution of safety and health issues" encompass the East Wing's demolition and reconstruction.  That standardized language has appeared in appropriations for White House repair and restoration since 1999.[4]  Paired together

---

[4] From 1999 to 2009, the appropriation under 3 U.S.C. § 105(d) covered "required maintenance, safety and health issues, and continued preventative maintenance."  *See* Treasury and General Government Appropriations Act, 2000, Pub. L. No. 106-58, 113 Stat. 430, 446 (1999); Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, 114 Stat. 2763, 2763A-137 (2000); Treasury and General Government Appropriations Act, 2002, Pub. L. No. 107-67, 115 Stat. 514, 527 (2001); Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, 117 Stat. 11, 444 (2003); Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, 118 Stat. 3, 322 (2004); Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, 118 Stat. 2809, 3247 (2004); Transportation, Treasury, Housing and Urban Development, the Judiciary, the District of Columbia, and Independent Agencies Appropriations Act, 2006, Pub. L. No. 109-115, 119 Stat. 2396, 2473 (2005); Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, 121 Stat. 1844, 1981 (2007); Omnibus Appropriations Act, 2009, 123 Stat. at 639.  From 2009 onward, the appropriation has covered "required maintenance, resolution of safety and health issues, and continued preventative maintenance."  *See* Consolidated Appropriations Act, 2010, 123 Stat. at 3168; Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, 125 Stat. 786, 893 (2011); Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, 128 Stat. 5, 194 (2014); Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, 128 Stat. 2130, 2342 (2014); Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242, 2435 (2015); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135, 338 (2017); Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat.

in the context of a building, "safety" and "health" refer to issues related to the building's existing physical plant. *See, e.g.*, H.R. Rep. No. 118-145, at 55 (referring, in the Act's accompanying House Report, to a program funding space rentals for "relocations from Federal buildings due to forced moves and relocations as a result of health and safety conditions"). And sandwiching "safety and health" between "required maintenance" and "continued preventative maintenance" underscores that the Act covers standard issues related to building conditions (*e.g.*, crumbling facades or asbestos remediation) rather than external security threats, as Appellants suggest, *see* Appellants Br. 38, 53-54. Indeed, when Congress funds White House security efforts, it makes an appropriation to the Secret Service, not, as here, to the Executive Residence. *See, e.g.*, Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242, 2503 (2015) (appropriating funds "for security improvements at the White House complex"); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135, 435 (2017) (appropriating to the Secret Service "an additional

---

348, 547 (2018); Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13, 151 (2019); Consolidated Appropriations Act, 2020, Pub. L. No. 1216-93, 133 Stat. 2317, 2446 (2020); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182, 1392 (2020); Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, 251 (2022); Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4662 (2022); Further Consolidated Appropriations Act, 2024, 138 Stat. at 532; Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173, 451 (2026); *see also* Consolidated and Further Continuing Appropriations Act, 2013, Pub. L. No. 113-6, 127 Stat. 198, 412 (2013) (importing 2012 levels); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9, 26 (2025) (importing 2024 levels).

amount for 'Procurement, Construction, and Improvements' for necessary expenses for Presidential security").

*Third*, the miniscule amount of appropriated funds as compared to the cost of the East Wing demolition and reconstruction confirms that the appropriation was intended to fund only modest maintenance needs. Appropriating a fixed sum of $2,475,000 falls well short of the estimated $400,000,000 needed for East Wing demolition and ballroom construction. *See, e.g.*, Brett Samuels, *Trump: Cost of New Ballroom May Reach $400M*, The Hill (Dec. 17, 2025), https://thehill.com/blogs/in -the-know/5652531-trump-cost-new-ballroom-400m. The dramatic gap between funds appropriated and funds needed for the East Wing building project belies any congressional plan to permit such a project. Even if *all* the funds Congress appropriated for "White House Repair and Restoration" were allocated toward that single project, they would cover less than 1% of estimated costs.

That disparity is telling. By way of contrast, recent proposals to fund East Wing renovations via congressional action contemplate the allocation of far larger sums, up to $1,000,000,000. *See* White House Safety and Security Act of 2026, S. 4430, 119th Cong. ($400,000,000); *Committee on the Judiciary, Reconciliation Submission Pursuant to S. Con. Res. 33*, § 5 (May 4, 2026) (Sen. Leg. Couns. Draft MDM26A10 9PR) ($1,000,000,000). Just as Congress does not "hide elephants in

18

mouseholes," *Whitman*, 531 U.S. at 468, it does not fund largescale construction projects with drop-in-the-bucket funding.

* * *

The Constitution gives Congress control over all federal property, including the White House. The President cannot undertake any construction at the White House—much less demolish one of its wings—without clear authorization from Congress, as well as an appropriation of funds to do so. Here, Congress neither authorized the demolition and reconstruction of the East Wing nor appropriated funds necessary for that project. The President's unilateral construction absent congressional permission is unconstitutional.

# CONCLUSION

For the foregoing reasons, this Court should affirm the preliminary injunction.

Respectfully submitted,

/s/ Brianne J. Gorod
Elizabeth B. Wydra
Brianne J. Gorod
Joshua D. Blecher-Cohen
Nina G. Henry
CONSTITUTIONAL ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae*

Dated: May 28, 2026

# APPENDIX

List of *Amici Curiae*


## Members of Congress

Sen. Sheldon Whitehouse

Sen. Cory Booker

Sen. Martin Heinrich

Sen. John Hickenlooper

Sen. Mazie K. Hirono

Sen. Amy Klobuchar

Sen. Ben Ray Luján

Sen. Gary Peters

Sen. Jack Reed

Sen. Jeanne Shaheen

Sen. Chris Van Hollen

Sen. Ron Wyden

Rep. Robert Garcia

Rep. Jared Huffman

Rep. Pete Aguilar

Rep. Gabe Amo

Rep. Yassamin Ansari

Rep. Jake Auchincloss

Rep. Becca Balint

Rep. Nanette Diaz Barragán

Rep. Joyce Beatty

Rep. Wesley Bell

Rep. Brendan F. Boyle

Rep. Shontel M. Brown

Rep. Julia Brownley

Rep. Nikki Budzinski

Rep. Janelle S. Bynum

Rep. Salud O. Carbajal

Rep. Troy A. Carter Sr.

Rep. Greg Casar

Rep. Ed Case

Rep. Sean Casten

Rep. Joaquin Castro

Rep. Judy Chu

Rep. Yvette D. Clarke

Rep. Emanuel Cleaver II

Rep. Steve Cohen

Rep. Herbert C. Conaway Jr.

Rep. Jim Costa

Rep. Joe Courtney

Rep. Angie Craig

Rep. Jasmine Crockett

Rep. Jason Crow

Rep. Danny K. Davis

Rep. Madeleine Dean

Rep. Diana DeGette

2A

Rep. Rosa L. DeLauro

Rep. Chris Deluzio

Rep. Mark DeSaulnier

Rep. Maxine Dexter

Rep. Lloyd Doggett

Rep. Veronica Escobar

Rep. Adriano Espaillat

Rep. Lizzie Fletcher

Rep. Bill Foster

Rep. Lois Frankel

Rep. Laura Friedman

Rep. Maxwell Alejandro Frost

Rep. John Garamendi

Rep. Jesús G. "Chuy" García

Rep. Sylvia R. Garcia

Rep. Jimmy Gomez

Rep. Maggie Goodlander

Rep. Adelita Grijalva

Rep. Jahana Hayes

Rep. Pablo José Hernández

Rep. Jim Himes

Rep. Steven Horsford

Rep. Val Hoyle

Rep. Glenn Ivey

Rep. Jonathan L. Jackson

3A

Rep. Pramila Jayapal

Rep. Julie Johnson

Rep. Sydney Kamlager-Dove

Rep. William Keating

Rep. Timothy M. Kennedy

Rep. Ro Khanna

Rep. Raja Krishnamoorthi

Rep. John B. Larson

Rep. George Latimer

Rep. Summer L. Lee

Rep. Susie Lee

Rep. Teresa Leger Fernández

Rep. Mike Levin

Rep. Sam T. Liccardo

Rep. Ted W. Lieu

Rep. Stephen F. Lynch

Rep. Seth Magaziner

Rep. Doris Matsui

Rep. April McClain Delaney

Rep. Betty McCollum

Rep. James P. McGovern

Rep. LaMonica McIver

Rep. Analilia Mejia

Rep. Robert J. Menendez

Rep. Grace Meng

4A

Rep. Kweisi Mfume

Rep. Dave Min

Rep. Gwen S. Moore

Rep. Kelly Morrison

Rep. Seth Moulton

Rep. Jerrold Nadler

Rep. Richard E. Neal

Rep. Eleanor Holmes Norton

Rep. Alexandria Ocasio-Cortez

Rep. Frank Pallone Jr.

Rep. Jimmy Panetta

Rep. Nancy Pelosi

Rep. Scott H. Peters

Rep. Brittany Pettersen

Rep. Chellie Pingree

Rep. Nellie Pou

Rep. Ayanna Pressley

Rep. Mike Quigley

Rep. Emily Randall

Rep. Jamie Raskin

Rep. Luz M. Rivas

Rep. Andrea Salinas

Rep. Mary Gay Scanlon

Rep. Jan Schakowsky

Rep. Robert C. "Bobby" Scott

Rep. Brad Sherman

Rep. Lateefah Simon

Rep. Adam Smith

Rep. Darren Soto

Rep. Melanie A. Stansbury

Rep. Haley M. Stevens

Rep. Suhas Subramanyam

Rep. Mark Takano

Rep. Shri Thanedar

Rep. Mike Thompson

Rep. Dina Titus

Rep. Rashida Tlaib

Rep. Jill N. Tokuda

Rep. Paul D. Tonko

Rep. Norma J. Torres

Rep. Ritchie Torres

Rep. Lori Trahan

Rep. Derek T. Tran

Rep. Lauren Underwood

Rep. Juan Vargas

Rep. Nydia M. Velázquez

Rep. Eugene Vindman

Rep. James Walkinshaw

Rep. Maxine Waters

Rep. Bonnie Watson Coleman

Rep. George Whitesides

Rep. Nikema Williams

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 4,416 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 28th day of May, 2026.


/s/ Brianne J. Gorod
Brianne J. Gorod

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of May, 2026, I electronically filed the

foregoing document using the Court's CM/ECF system, causing a notice of filing to

be served upon all counsel of record.

Dated: May 28, 2026

/s/ Brianne J. Gorod
Brianne J. Gorod