**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

NATIONAL TRUST FOR HISTORIC PRESERVATION
IN THE UNITED STATES,

*Plaintiff-Appellee/Cross-Appellant*,

v.

NATIONAL PARK SERVICE, et al.,

*Defendants-Appellants/Cross-Appellees.*

_____

On Appeal from the United States District Court
for the District of Columbia

_____

**BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION OF THE
DISTRICT OF COLUMBIA AS *AMICUS CURIAE* IN SUPPORT OF
PLAINTIFF-APPELLEE/CROSS-APPELLANT AND AFFIRMANCE**

_____

Aditi Shah
Scott Michelman
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, DC 20045
202-457-0800
ashah@acludc.org

May 28, 2026                                                                 *Counsel for Amicus Curiae*

# COMBINED CERTIFICATES

## Certificate as to Parties, Rulings, and Related Cases

Except for American Civil Liberties Union of the District of Columbia, Campaign Legal Center, and Citizens for Responsibility and Ethics in Washington, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Brief for Plaintiff-Appellee/Cross-Appellant. References to the rulings at issue and related cases also appear in the parties' briefs.

## Statutes and Regulations

All applicable statutes are contained in the addendum to the Brief for Defendants-Appellants/Cross-Appellees.

## Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(A), American Civil Liberties Union of the District of Columbia states that it is a 501(c)(3) non-profit organization and has no parent corporations. It does not issue any stock, and therefore no publicly owned corporation holds ten percent or more of its stock.

*/s/ Aditi Shah*
Aditi Shah
*Counsel for Amicus Curiae*

i

**TABLE OF CONTENTS**

COMBINED CERTIFICATES ........................................................................... i

TABLE OF AUTHORITIES............................................................................ iii

GLOSSARY ................................................................................................. vii

IDENTITY AND INTEREST OF *AMICUS CURIAE*...................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 1

ARGUMENT ................................................................................................. 5

I. Where a Statute Does Not Limit Judicial Review, the Ordinary *McAnnulty* Standard Applies to Ultra vires Claims. ........................................................... 5

    A. Federal Courts Have Inherent Equitable Power To Enjoin Government Officials from Acting Ultra vires. ................................. 6

    B. In Considering Challenges to Officials' Ultra vires Actions Where There Is No Statutory Limitation on Judicial Review, the Only Question Is Whether the Action Was Authorized by Law………......9

II. The Heightened *Leedom* Standard Applies Only If the Statute Limits Judicial Review of the Challenged Act. ....................................................... 13

III. Applying the Heightened *Leedom* Standard to All Ultra vires Claims Would Undermine Separation-of-Powers Principles and Courts' Ability to Enjoin Violations of Federal Law................................................................. 19

IV. This Court Should Apply the Ordinary *McAnnulty* Standard to Plaintiff's Ultra vires Claim if the FSLMRS Does Not Limit Judicial Review of the President's Exclusion Decision. ................................................................. 24

CONCLUSION ............................................................................................ 26

**Cases**                                                    **Page(s)**

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
321 F.3d 1166 (D.C. Cir. 2003) ........................................................22

*Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Kahn*,
618 F.2d 784 (D.C. Cir. 1979) ..........................................................19

*American School of Magnetic Healing v. McAnnulty*,
187 U.S. 94 (1902) ....................................................3, 9, 10, 11, 21

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ........................................................ 6, 7, 9, 19

*Bd. of Governors v. MCorp Fin., Inc.*,
502 U.S. 32 (1991) ............................................................................23

*Boire v. Greyhound Corporation*,
376 U.S. 473 (1964) ..........................................................................16

*Bowen v. Michigan Acad. of Fam. Physicians*,
476 U.S. 667 (1986) ..........................................................................20

*Carroll v. Safford*,
44 U.S. 441 (1845) ..............................................................................8

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) .....................................10, 11, 12, 18, 21

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) ..........................................................17

*D.C. Ass'n of Chartered Pub. Schs. v. District of Columbia*,
930 F.3d 487 (D.C. Cir. 2019) ............................................................7

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) ........................................................ 12, 13, 18

*Davis v. Gray*,
83 U.S. 203 (1872) ..........................................................................8, 9

*Davis v. Passman*,
442 U.S. 228 (1979) ................................................................6

*Dreamland Baby Co. v. Consumer Prod. Safety Comm'n*,
2025 WL 2758476 (D.D.C. Sept. 26, 2025)................................23

*Ex parte Young*,
209 U.S. 123 (1908) ................................................................8

*Fed. Educ. Ass'n v. Trump*,
No. 25-5303 (D.C. Cir. 2025).....................................................1

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
426 U.S. 548 (1976) ...............................................................18

*Federal Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022)........................... 2, 13, 15, 17, 22, 23, 24

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) .................................................................2

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025)................................................ 15, 17

*Griffith v. Fed. Lab. Rels. Auth.*,
842 F.2d 487 (D.C. Cir. 1988) ...................................................17

*Harmon v. Brucker*,
355 U.S. 579 (1958) ................................................ 4, 5, 17, 18, 21

*Humane Society of the U.S. v. Glickman*,
217 F.3d 882 (D.C. Cir. 2000) ...................................................18

*Immigr. & Naturalization Serv. v. Chadha*,
462 U.S. 919 (1983) ...............................................................20

*J.W. Hampton, Jr. & Co. v. United States,*
276 U.S. 394 (1928) ...............................................................20

iv

*Larson v. Domestic & Foreign Com. Corp.*,
337 U.S. 682 (1949) ..................................................................8

*Learning Resources, Inc. v. Trump*,
146 S. Ct. 628 (2026) ................................................ 5, 12, 18

*Leedom v. Kyne*,
358 U.S. 184 (1958) ............................... 3, 14, 15, 16, 21, 24, 25

*Marbury v. Madison*,
5 U.S. 137 (1803) ..................................................................20

*Mathis v. United States Parole Comm'n*,
749 F. Supp. 3d 8 (D.D.C. 2024) ..........................................1

*Medellin v. Texas*,
552 U.S. 491 (2008) ................................................................8

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
26 F.4th 960 (D.C. Cir. 2022) ...................................... 15, 17

*New Mexico v. Musk*,
784 F. Supp. 3d 174 (D.D.C. 2025) ....................................23

*Noble v. Union River Logging Railroad Co.*,
147 U.S. 165 (1893) ...............................................................8

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) .................... 2, 4, 5, 10, 11, 13, 14, 16, 17, 22, 25

*Nyunt v. Chairman, Broad. Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009) ...................................... 13, 17

*Osborn v. Bank of U.S.*,
22 U.S. 738 (1824) .................................................................9

*Patel v. Garland*,
596 U.S. 328 (2022) ..............................................................20

*Philadelphia Co. v. Stimson*,
    223 U.S. 605 (1912) ........................................................................10

*Stark v. Wickard*,
    321 U.S. 288 (1944) ................................................................10, 11

*Train v. City of New York*,
    420 U.S. 35 (1975) .............................................................. 18, 21

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
    967 F.2d 598 (D.C. Cir. 1992) .....................................................8

*United States v. Nourse*,
    34 U.S. 8 (1835) ...........................................................................20

*Vera Inst. of Just. v. U.S. Dep't of Just.*,
    2025 WL 1865160 (D.D.C. July 7, 2025) ...............................23

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ............................................... 2, 3, 8, 25

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017)……………………………………..…………7

**Statutes**

5 U.S.C. § 559 ...............................................................................25

**Other Authorities**

Jonathan R. Siegel, *Suing the President: Nonstatutory Review Revisited*,
    97 Colum. L. Rev. 1612 (1997).................................................25

Louis L. Jaffe, *The Right to Judicial Review I*,
    71 Harv. L. Rev. 401 (1958) .....................................................20

Ultra vires,
    *Black's Law Dictionary* (12th ed. 2024)..............................7, 8

**GLOSSARY**

| | |
|---|---|
| **ACLU-DC** | American Civil Liberties Union of the District of Columbia |
| **ACU Br.** | Amicus Brief of American Conservative Union |
| **Defs. Br.** | Brief of Defendants-Appellants/Cross-Appellees |
| **IEEPA** | International Emergency Economic Powers Act |
| **NLRA** | National Labor Relations Authority |
| **NLRB** | National Labor Relations Board |

**IDENTITY AND INTEREST OF *AMICUS CURIAE***

*Amicus curiae* American Civil Liberties Union of the District of Columbia ("ACLU-DC") is a non-profit, non-partisan organization with more than 10,000 members. It is dedicated to the principles of liberty, separation of powers, and the rule of the law enshrined in the Constitution. ACLU-DC regularly appears in the courts of this Circuit as counsel or *amicus* in cases seeking to enjoin unlawful actions by government officials, including cases involving claims that federal officials acted ultra vires (in excess of) their statutory authority. *See, e.g.*, *Fed. Educ. Ass'n v. Trump*, No. 25-5303 (D.C. Cir. 2025) (amicus); *Mathis v. U.S. Parole Comm'n*, 749 F. Supp. 3d 8 (D.D.C. 2024) (counsel).

Pursuant to Circuit Rule 29(a)(4)(E), *amicus* certifies that no counsel for a party authored this brief in whole or in part and that no one other than *amicus*, its members, or its counsel, made a monetary contribution to the preparation or submission of this brief. All parties consented to the filing of this brief on this date.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

The district court preliminarily enjoined Defendants from replacing the former East Wing of the White House with a ballroom on the ground that Plaintiff is likely to succeed on the merits of its claim that the ballroom project is ultra vires Defendants' statutory authority. Defendants argue that the district court erred in granting the preliminary injunction because (1) Plaintiff lacks Article III standing,

(2) Plaintiff is unlikely to succeed on the merits of its ultra vires claim because it "does not come close" to "show[ing] that the government has 'plainly and openly crossed a congressionally drawn line in the sand,'" Defs. Br. at 19 (quoting *Federal Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022)), and (3) the balance of the equities favors Defendants.

*Amicus* writes to address only the second argument, which rests on a mistaken premise regarding the standard applicable to ultra vires claims—an important issue that warrants clarification from this Court. Defendants assert in categorical fashion that an ultra vires claim is a "Hail Mary pass . . . [that] rarely succeeds," Defs. Br. at 5 (alteration in original) (quoting *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025)), and one that "demands that the plaintiff show the challenged act is 'entirely in excess of [an entity's] delegated powers and contrary to a *specific prohibition* in a statute,'" *id.* at 34 (alteration and emphasis in original) (quoting *Nuclear Regul. Comm'n*, 605 U.S. at 681). Although Defendants correctly describe a standard that applies to *some* claims that officials have acted ultra vires their statutory authority, their assertion that it applies to all such claims—and to Plaintiff's ultra vires claim—is wrong.[1]

---

[1] There is no dispute in this case that the "Hail Mary" standard proffered by Defendants is inapposite to claims that a federal official's action is ultra vires the official's *constitutional* authority. *See, e.g.*, *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *Youngstown Sheet & Tube Co. v.*

Defendants' blanket position is contrary to binding precedent and ignores a critical distinction that is foundational to this Court's and the Supreme Court's ultra vires jurisprudence: The heightened standard applies to ultra vires claims *only* where there is a statutory limitation on judicial review. Where there is no statutory limitation on judicial review, the ordinary, century-old standard of *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902), applies. Under that standard, courts exercise their powers in equity to determine whether the challenged conduct is authorized by law. This is the default standard courts apply to determine whether officials have acted ultra vires their statutory authority.

In contrast, the heightened standard for ultra vires claims that Defendants proffer here stems from *Leedom v. Kyne*, 358 U.S. 184 (1958). In *Leedom*, the plaintiff sought to vacate an action by the National Labor Relations Board ("NLRB") that was contrary to the express requirements of § 9(b)(1) of the National Labor Relations Act ("NLRA"), *see id.* at 185-86, but was not a type of action within the scope of judicial review authorized under that statute, *id.* at 187. The Court authorized plaintiff to proceed, but its explanation of the suit—"one to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act," *id.* at 188—has come to stand for a key limitation

---

*Sawyer*, 343 U.S. 579, 587-88 (1952). Although the government in other cases has argued that the President's constitutional authority vitiates statutory limits on his conduct, it does not make that claim here.

3

on ultra vires review in circumstances like those in *Leedom*. Specifically, where a challenger to executive action proceeds outside the confines of a reticulated judicial review scheme set by Congress, the plaintiff is required to demonstrate not only that the action was contrary to the law, but that it was "'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (cleaned up). This requirement exists to prevent "an easy end-run around the limitations of . . . judicial-review statutes." *Id.*

Because none of the statutes in this case evince any congressional intent to limit judicial review of Plaintiff's challenge—a point Defendants do not dispute— the ordinary *McAnnulty* standard, rather than the heightened *Leedom* standard, applies to Plaintiff's ultra vires claim.

The *Leedom* standard of review for ultra vires claims is an exception to the default *McAnnulty* standard. Where plaintiffs are not trying to proceed in the face of a statutory limitation on judicial review, courts exercise their inherent equitable power to consider a claim that an official acted ultra vires and apply the default *McAnnulty* standard to assess the merits of that claim: If the plaintiff demonstrates that the action was unauthorized by the statute, it will prevail. Indeed, the same year as *Leedom*, the Court decided the ultra vires claim in *Harmon v. Brucker*, 355 U.S. 579 (1958), where there was no statutory cause of action and no statutory limitation on judicial review, by assessing simply "whether the [official] did exceed his

powers" under the statutes at issue. *Id.* at 582. Subsequent decisions from the Court and this Court have toed the line between *McAnnulty*'s ordinary rule and *Leedom*'s special one, including as recently as this year. *See Learning Resources, Inc. v. Trump*, 146 S. Ct. 628, 646 (2026). This distinction makes practical sense: When Congress has not limited judicial review, there is no risk that ultra vires review will "become an easy end-run around the limitations of . . . judicial-review statutes," obviating the need for a heightened standard. *Nuclear Regul. Comm'n*, 605 U.S. at 681.

Subjecting all statutory authority ultra vires claims to the heightened *Leedom* standard, as Defendants urge, would contravene a century of binding precedents and undermine courts' authority to remedy harms caused by executive action in violation of limits set by Congress. This Court should reject Defendants' argument that the heightened *Leedom* standard applies to all statutory authority ultra vires claims and apply the ordinary *McAnnulty* standard to Plaintiff's claim. It should also hold that Plaintiff satisfies the *McAnnulty* standard because the proposed ballroom project is unauthorized by law for the reasons identified by the district court and Plaintiff.

## ARGUMENT

**I.     Where a Statute Does Not Limit Judicial Review, the Ordinary *McAnnulty* Standard Applies to Ultra Vires Claims.**

Federal courts have long exercised inherent equitable power to enjoin government officials who act ultra vires (exceed) their statutory authority. This

equitable power, tracing back to the English common law, requires no cause of action and enables courts to enforce limits Congress places on Executive Branch authority without the heightened showing that *Leedom* requires. Instead, courts apply the century-old standard under *McAnnulty*, which asks simply whether the challenged action was authorized by law, not whether it violated a specific statutory prohibition.

**A.     Federal Courts Have Inherent Equitable Power To Enjoin Government Officials from Acting Ultra Vires.**

To see why both Defendants' position and the even-more-radical position of its *amicus* American Conservative Union ("ACU"), which seeks to erase actions in equity entirely, are wrong, begin with two fundamental principles about federal courts' powers in equity and the Executive's powers vis-à-vis Congress.

***First***, as the Supreme Court has "long held," federal courts have inherent equitable power to enjoin government officials from violating federal law. *E.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Such equitable authority "reflects a long history of judicial review of illegal executive action, tracing back to England" and "is a judge-made remedy." *Id.* at 327.

*Amicus* ACU's argument that "every plaintiff in federal court must have a 'cause of action,'" ACU Br. at 9, mistakenly conflates claims for *equitable* relief with claims for *money damages*, which are not at issue here. The case ACU cites, *Davis v. Passman*, 442 U.S. 228 (1979), applied the now-"disfavored" *Bivens*

6

doctrine to recognize the latter, not the former. *See Ziglar v. Abbasi*, 582 U.S. 120, 131 (2017) (discussing *Davis*). *Davis* therefore is inapposite here. Underscoring the distinction between implied causes of action and actions in equity, just two years before the Court in *Abbasi* cut sharply back the implied *Bivens* cause of action, it reaffirmed in *Armstrong*—with no dissent on this point—federal courts' equitable power to enjoin violations of federal law. 575 U.S. at 327. *Armstrong* further reflects the distinction between a statutory cause of action and equitable enforcement by analyzing the two points separately and under different tests. *Compare id.* at 327-29 (considering whether plaintiffs can "proceed . . . in equity" by assessing whether Congress manifested an "'intent to foreclose' equitable relief"), *with id.* at 331 (plurality opinion) (considering "the Medicaid Act itself" as a separate "possible source of a cause of action" and holding that it "lacks the sort of rights-creating language needed to imply a private right of action"). Finally, if ACU's point is merely a semantic requirement to invoke something called a "cause of action," then Circuit precedent provides the answer, characterizing the type of suit that "exists as 'the creation of courts of equity'" "to enjoin unlawful executive action" as itself a "cause of action." *D.C. Ass'n of Chartered Pub. Schs. v. District of Columbia*, 930 F.3d 487, 493-94 (D.C. Cir. 2019) (quoting *Armstrong*, 575 U.S. at 327).

***Second***, when Executive Branch officials violate federal law, they act ultra vires—literally, "beyond the powers (of)," Ultra vires, *Black's Law Dictionary* (12th

ed. 2024). It is well settled that "the exercise of any governmental power[] 'must stem either from an act of Congress or from the Constitution itself.'" *Medellin v. Texas*, 552 U.S. 491, 524 (2008) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). Where "[a]gency actions [are] beyond delegated authority," as they are here, they "are '*ultra vires*,' and courts must invalidate them." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992); *see also Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949) ("[W]here [an] officer's powers are limited by statute, his actions beyond those limitations . . . are ultra vires his authority and therefore may be made the object of specific relief.").

Since at least the mid-nineteenth century, the Supreme Court has recognized that even in the absence of a cause of action, federal courts can, pursuant to their inherent equitable power, enjoin government officials from acting ultra vires. *See, e.g.*, *Ex parte Young*, 209 U.S. 123, 150-51 (1908) (federal court sitting in equity may enjoin state officer from enforcing a state law that violates the Constitution); *Noble v. Union River Logging Railroad Co.*, 147 U.S. 165, 171-72 (1893) (injunctive relief is available even in the absence of a cause of action if the federal official "has no power at all to do the act complained of"); *Carroll v. Safford*, 44 U.S. 441, 463 (1845) (holding that "in a proper case, relief may be given in a court of equity" to, *inter alia*, "prevent an injurious act by a public officer"); *Davis v. Gray*, 83 U.S. 203,

220 (1872) (same); *Osborn v. Bank of U.S.*, 22 U.S. 738, 838-39 (1824) (same).

These cases are part of the "long history . . . tracing back to England," *Armstrong*, 575 U.S. at 327, demonstrating that no statutory cause of action is needed for courts to enjoin public officials from acting ultra vires.

**B.**   **In Considering Challenges to Officials' Ultra Vires Actions Where There Is No Statutory Limitation on Judicial Review, the Only Question Is Whether the Action Was Authorized by Law.**

Where there is no statutory limitation on judicial review, this Court and the Supreme Court have exercised their powers in equity and applied the ordinary, default standard to adjudicate claims that a government official acted ultra vires: whether the official's action was authorized by law.

More than a century ago, the Supreme Court set out this ordinary standard in *McAnnulty*. There, the Postmaster General invoked statutory authority to stop mail service and prohibit payment of postal money orders to a business that he deemed to be fraudulent. 187 U.S. at 100 & n.†. The Court disagreed with the Postmaster General's conclusion that the plaintiffs' business activities violated mail-fraud statutes and held that the Postmaster General did not have statutory authority to withhold the plaintiffs' mail. *Id.* at 107. The Court noted that "[t]he acts of all [government] officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *Id.* at 108. Because the Postmaster General's order was "based on a mistaken

9

view of the law," the Court instructed the lower courts to grant plaintiffs' motion for a temporary injunction prohibiting further withholding of the mail from the plaintiffs. *Id.* at 110. The Court did not require the plaintiffs to show that the official's action was "contrary to a *specific prohibition* in a statute," *Nuclear Regul. Comm'n*, 605 U.S. at 681 (cleaned up), before enjoining his action.

Nor, contrary to ACU's argument, did *McAnnulty*'s reference to a "violation of the rights of the individual," 187 U.S. at 110, impose a requirement that "the [statutory] prohibition at issue must confer rights upon the individual seeking ultra vires review." ACU Br. 8 (citation omitted). *McAnnulty* did not concern any statutory prohibition, let alone a rights-conferring one. The statute at issue authorized the Postmaster General to "instruct postmasters . . . to return" to post offices mail he deemed to be in furtherance of a fraudulent scheme. 187 U.S. at 100 n.†. The reference to "rights of the individual" was to generalized "property rights of the person whose letters are withheld," *id.* at 110, not to rights conferred *by statutes*.

As this Court recognized, "[t]he reasoning of *McAnnulty* has been employed repeatedly." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996). In *Philadelphia Co. v. Stimson*, 223 U.S. 605 (1912), the standard the Supreme Court applied to determine whether the Secretary of War acted within the scope of his authority was whether he "exceed[ed] the power which had been conferred" to him by Congress, *id.* at 638—the *McAnnulty* standard. In *Stark v. Wickard*, 321 U.S. 288

(1944), the Court held that "[t]he responsibility of determining the limits of statutory grants of authority . . . is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction," and on remand, "[t]he trial court is free to consider whether the statutory authority given the Secretary [of Agriculture] is a valid answer to the petitioners' contention." *Id.* at 310-11.

In each of these cases challenging a federal official's action as beyond their statutory powers, the Court conducted a straightforward inquiry to determine whether the action was ultra vires: It asked whether the official's action was authorized by Congress, not (per Defendants' proposed standard) whether the official acted "'in excess of [the official's] delegated powers and contrary to a *specific prohibition*' in a statute." Defs. Br. at 34 (quoting *Nuclear Regul. Comm'n*, 605 U.S. at 681). Nor did the Court describe the standard applied in those cases as requiring the plaintiff to show "extreme error" or to complete a "Hail Mary pass." *Id.* at 34, 36 (citation omitted). Instead, the simple inquiry is whether the act was "justified by some law." *McAnnulty*, 187 U.S. at 108. In cases where the act was not, courts exercise their equitable power to enjoin the unlawful act.

Challenges to presidential ultra vires actions are no exception to this general rule. This Court held as much in *Chamber of Commerce of U.S. v. Reich*, which concerned whether the President's Executive Order "barring the federal government from contracting with employers who hire permanent replacements during a lawful

11

strike . . . conflict[ed] with the [NLRA]." 74 F.3d at 1324. This Court first held that it had jurisdiction under *McAnnulty* and its progeny to review the plaintiffs' claim notwithstanding the lack of a statutory cause of action. *Id.* at 1328. On the merits of the plaintiffs' claim that the Executive Order conflicted with the NLRA, this Court "look[ed] to the extensive body of Supreme Court cases that mark out the boundaries of the field occupied by the NLRA" to determine whether the "tension between the President's Executive Order and the NLRA" was an "unacceptable conflict." *Id.* at 1333-34. It did not ask whether the Executive Order was contrary to a specific prohibition in the NLRA. Indeed, the Court made clear that it could not "possibly matter for purposes of reviewability" whether the mandate the plaintiffs sought to enforce was "found in the statute in so many words." *Id.* at 1330.

Most recently, in *Learning Resources, Inc. v. Trump*, 146 S. Ct. 628 (2026), the Supreme Court applied the ordinary *McAnnulty* standard to assess the plaintiffs' claim that the President's tariffs were ultra vires his authority under the International Emergency Economic Powers Act ("IEEPA") and invalidated the tariffs because they were not authorized under IEEPA. *Id.* at 646. It similarly applied the *McAnnulty* standard in an earlier IEEPA case, *Dames & Moore v. Regan*, 453 U.S. 654 (1981), where it held that the President did not act ultra vires in nullifying attachments and liens on Iranian assets in the United States and directing the transfer of those assets to Iran, concluding based on the text and history of the statute that those actions were

12

authorized. *Id.* at 671-74. In all three cases, where Congress did not provide a private right of action nor limit judicial review, this Court and the Supreme Court assessed the Executive's statutory authority using the default *McAnnulty* standard: asking simply whether the acts—in those cases, the President's—were authorized by law.

## II. The Heightened *Leedom* Standard Applies Only If the Statute Limits Judicial Review of the Challenged Act.

Defendants' proposed standard of review for ultra vires claims, which stems from *Leedom*, applies only when Congress has limited judicial review. This Court has characterized *Leedom* as an "exception" that "permits, in certain limited circumstances, judicial review of agency action for alleged statutory violations *even when a statute precludes review*." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (emphasis added). When Congress has limited judicial review of the challenged action, this Court has held that Plaintiff can obtain review under *Leedom* only where "(i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express. Corp.*, 39 F.4th at 763 (cleaned up). As the Supreme Court noted in *Nuclear Regulatory Commission*, this approach prevents end-runs around Congress's exclusive review procedures. 605 U.S. at 681. But where, as here, Congress has not

13

confined judicial review, *Leedom*'s heightened standard is inapposite.

In *Leedom*, a labor union challenged the NLRB's decision to include both professional and nonprofessional employees in a bargaining unit without holding a vote by the professional employees. 358 U.S. at 185. It filed suit, claiming that the NLRB's action directly conflicted with a requirement in the NLRA. *Id.* at 186. The government did not dispute that the NLRB's action violated the NLRA, but argued that the NLRA's judicial review provisions foreclosed the lawsuit. *Id.* at 187-88.

*Leedom* decided two related but separate issues: First, it held that even though the plaintiff was proceeding outside the judicial review structure of the NLRA, the district court could still exercise its equitable powers to review the plaintiff's claim that the NLRB exceeded its authority. *Id.* at 188. It concluded that the NLRA did not preclude judicial review of plaintiff's claim because the Court "cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers." *Id.* at 190.

Second, *Leedom* established a heightened standard for Plaintiff to prevail on such claims: To avoid "an easy end-run" around those statutory judicial-review limitations, *Nuclear Regul. Comm'n*, 605 U.S. at 681, a plaintiff proceeding under *Leedom* can prevail on the merits of its equitable claim only if the official acted "*in excess* of [his] delegated powers and contrary to a *specific prohibition* in the Act" that was "*clear and mandatory*." *Leedom*, 358 U.S. at 188 (emphasis added). That

14

standard was directly tied to the circumstances of that case, in which the plaintiff sought judicial review "apart from the review provisions of the [statute]." *Id.*

Contrary to *amicus* ACU's argument, the heightened *Leedom* standard does not require "the [statutory] prohibition at issue [to] confer rights upon the individual seeking ultra vires review." ACU Br. at 8 (first alteration in original) (emphasis omitted) (quoting *Glob. Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025)). The dicta in *Global Health Council* on which ACU relies cited *Leedom*, which discussed rights created by Congress in the context of holding that the Court "cannot lightly infer" Congress intended to foreclose judicial review of plaintiff's claim. *Leedom*, 358 U.S. at 190. Nor is there any support in *Nuclear Regulatory Commission*, which merely cites the phrase from *McAnnulty*—where, as discussed above, the statutory language at issue did not discuss "the rights of the individual" at all. Although some of this Court's ultra vires cases have involved statutes that granted rights, *see, e.g.*, *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960 (D.C. Cir. 2022), others have not. *See, e.g.*, *Fed. Express Corp.*, 39 F.4th at 767 (applying heightened *Leedom* standard to ultra vires claim even though it did not concern rights conferred by statute).

The Supreme Court's post-*Leedom* cases make clear that the Court continued to require plaintiffs bringing equitable ultra vires claims to show that the challenged action was "contrary to a specific," "clear and mandatory" statutory prohibition, 358

U.S. at 188, *only* where there was a statutory limitation on judicial review. For example, in *Boire v. Greyhound Corp.*, 376 U.S. 473 (1964), a union challenged an NLRB decision defining a bargaining unit and ordering an election among its employees, and the parties agreed that the type of decision at issue was, "in the normal course of events . . . not directly reviewable in the courts." *Id.* at 475-76. The Court accordingly assessed whether the case fell within "the painstakingly delineated procedural boundaries of [*Leedom*]," *id.* at 481, and, because it did not, reversed the lower court's decision in the union's favor, *see id.* at 481-82.

The most recent example is *Nuclear Regulatory Commission*. There, the petitioners challenged the Commission's decision to grant a license to an entity to store spent nuclear fuel in a Texas facility. 605 U.S. at 668-69. But the Hobbs Act limited judicial review of such decisions only to applicants for licenses or those who intervened in the licensing proceeding; because petitioners were neither, they could not obtain review under the Act. *Id.* at 680. Petitioners asserted in the alternative "claims of ultra vires agency action." *Id.* The Supreme Court applied the *Leedom* standard to petitioners' ultra vires claim because the Hobbs Act specifically circumscribed review of the decisions at issue and petitioners were trying to proceed outside of the statutorily defined process. *See id.* at 681. Otherwise, "ultra vires review could become an easy end-run around the limitations of the Hobbs Act and other judicial-review statutes.'" *Id.* That reasoning would have no purchase where

16

there is no "judicial-review statute[]" and therefore no possible end-run. *Id.*

Likewise, the common denominator across this Court's decisions applying the *Leedom* standard to ultra vires claims is the presence of a statutory limitation on judicial review. *See, e.g.*, *Glob. Health Council*, 153 F.4th at 18-20 & n.17 (statutory scheme barred claim under the Administrative Procedure Act ("APA") to enforce the statute); *Fed. Express Corp.*, 39 F.4th at 763 (statute exempted challenged agency action from review under the APA); *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 970-71 (same); *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721 (D.C. Cir. 2022) (same); *Nyunt*, 589 F.3d at 448-49 (channeling scheme under the Civil Service Reform Act precluded plaintiff's APA claim); *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 492 (D.C. Cir. 1988) ("Congress intended to cut off judicial review of FLRA decisions regarding arbitral awards of the sort involved in this case"). Indeed, this Court has repeatedly defined the *Leedom* exception by the presence of a statutory limitation on judicial review. *See, e.g.*, *Nyunt*, 589 F.3d at 449.

*Leedom* did not displace the default *McAnnulty* standard in the ordinary case (*i.e.*, where Congress has not limited review). In *Harmon v. Brucker*, 355 U.S. 579 (1958), decided the same year as *Leedom*, the plaintiff claimed that the Secretary of the Army acted ultra vires by issuing other-than-honorable discharge certificates to service members based on their conduct prior to induction. *Id.* at 580. The Supreme Court applied the longstanding *McAnnulty* standard and simply asked whether the

17

statute authorized the Secretary's action, concluding it did not. *See id.* at 582-83. *See also, e.g.*, *Learning Res., Inc.*, 146 S. Ct. at 646 (concluding, without applying the heightened *Leedom* standard, that "the terms of IEEPA do not authorize [the President's] tariffs"); *Dames & Moore v. Regan*, 453 U.S. 654, 671-74 (1981) (holding that the President's actions were authorized by IEEPA); *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 551-52 (1976) ("What we must decide is whether [the statute] also authorizes the President to control [petroleum and petroleum product] imports by imposing on them a system of monetary exactions in the form of license fees."); *Train v. City of New York*, 420 U.S. 35, 47 (1975) (holding that President's order to impound funds was unauthorized by the statute).

This Court's precedents likewise reflect the distinction between *McAnnulty* and *Leedom* standards for ultra vires review. As noted above, in *Chamber of Commerce*, this Court applied the ordinary *McAnnulty* standard rather than the heightened *Leedom* standard in considering whether the President's Executive Order conflicted with the NLRA. 74 F.3d at 1333-34. In *Humane Society of the U.S. v. Glickman*, 217 F.3d 882 (D.C. Cir. 2000), this Court, without relying on review under the APA or any "specific review provision," applied ordinary tools of statutory interpretation to assess the plaintiffs' claim that the agency's decision that a permit was not required to kill migratory birds violated the Migratory Bird Treaty Act. *Id.* at 884, 886-88. In neither *Chamber of Commerce* nor *Humane Society* did the Court

ask whether the act was contrary to a specific, clear, and mandatory statutory prohibition. *See also Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Kahn*, 618 F.2d 784, 796 (D.C. Cir. 1979) (en banc) (applying the ordinary *McAnnulty* standard in rejecting claim that Presidential order denying government contracts to companies not complying with voluntary wage and price standards was outside the President's statutory authority).

The throughline of these precedents is clear: A plaintiff challenging a government official's action as ultra vires the official's statutory authority is not automatically required to show that the action was contrary to a clear and mandatory statutory prohibition. The default rule is the opposite: The *Leedom* standard of review applies *if and only if* there is a statutory limitation on judicial review.

III. **Applying the Heightened *Leedom* Standard to All Ultra Vires Claims Would Undermine Separation-of-Powers Principles and Courts' Ability to Enjoin Violations of Federal Law.**

Defendants' position that *all* claims challenging statutory violations as ultra vires must meet the high *Leedom* bar would frustrate courts' long-recognized power to enjoin statutory violations by federal officials, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), at an unacceptable cost to the separation of powers. Contrary to Defendants' unsupported assertion that "[e]quity does not supply [Plaintiff] with a cause of action to inject itself (and this Court) into that back-and-forth reserved exclusively for the political branches," Defs. Br. at 52, core to the

constitutional design is the judiciary's ability to check the executive when it violates the legislature's will.

Since the time of *Marbury v. Madison*, 5 U.S. 137 (1803), Article III courts have reviewed challenges to violations of federal law to ensure "the boundaries between each branch" are "fixed 'according to common sense and the inherent necessities of the governmental co-ordination.'" *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 962 (1983) (Powell, J., concurring) (quoting *J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 406 (1928)). In recognition of the judiciary's role in enforcing statutory constraints on Executive Branch authority, Congress drafts legislation against the "strong" background presumption that judicial review will be available. *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986). Because "executive determinations generally are subject to judicial review," courts "presume that review is available," even "when a statute is silent." *Patel v. Garland*, 596 U.S. 328, 346 (2022) (internal quotation marks and citation omitted). Indeed, "[t]he very essence of civil liberty . . . consists in the right of every individual to claim the protection of the laws, whenever he receives an injury," *Marbury*, 5 U.S. at 163, and the judiciary's "duty . . . to decide questions of right" applies "not only between individuals, but between the government and individuals," *United States v. Nourse*, 34 U.S. 8, 28 (1835); *see also* Louis L. Jaffe, *The Right to Judicial Review I*, 71 HARV. L. REV. 401, 432 (1958) ("[J]udicial review is the rule. It rests on the

20

congressional grant of general jurisdiction to the article III courts. . . . [T]he intention to exclude it must be made specifically manifest.").

Applying the *Leedom* standard to all claims that an official has acted ultra vires their statutory authority would unduly limit courts' ability to enjoin illegal executive action. In *Train*, for example, the Supreme Court held that President Nixon's order to impound funds was unauthorized by the Federal Water Pollution Control Act because Congress had directed the expenditure of the funds, *not* because Congress had specifically prohibited impoundment. 420 U.S. at 45-47. Likewise, in *Harmon*, there was no "specific prohibition" that was "clear and mandatory," *Leedom*, 358 U.S. at 188, barring the Secretary of the Army from issuing other-than-honorable discharge certificates based on pre-induction conduct. *See Harmon*, 355 U.S. at 582-83. In *Chamber of Commerce*, too, there was no specific statutory prohibition barring the President's Executive Order. 74 F.3d at 1333-34. Had these cases assessed whether the actions were ultra vires under the *Leedom* standard instead of the *McAnnulty* standard, they likely would have come out the other way.

Indeed, *McAnnulty* itself likely would have come out differently had the Supreme Court required the Postmaster General's action to be contrary to a specific statutory prohibition. The statute in that case expressly authorized the Postmaster General to withhold mail "upon evidence satisfactory to him." *McAnnulty*, 187 U.S. at 100 n.†. If the Court had applied the "painstakingly delineated procedural

21

boundaries of [*Leedom v.*] *Kyne*," it likely would have upheld the Postmaster General's decision on the ground that it did not violate a "specific prohibition" in the statute. *Nuclear Regul. Comm'n*, 605 U.S. at 681 (citations omitted).

This Court's clarification of when each standard—*McAnnulty* or *Leedom*—applies will assist lower courts in assessing ultra vires claims in two ways. First, it will help deter any blurring of the standard based on potentially ambiguous dicta in this Court's cases. For instance, *Federal Express* characterized the decision in *Aid Association for Lutherans v. U.S. Postal Service*, 321 F.3d 1166 (D.C. Cir. 2003), as "point[ing] to a demanding standard of review by drawing heavily on *McAnnulty*, [*Leedom v.*] *Kyne*, and their progeny when determining the availability of ultra vires relief." 39 F.4th at 765. As illustrated above and demonstrated by the cases *Federal Express* cites, the genesis for the "demanding standard of review" for ultra vires claims is *Leedom* alone. Moreover, *Aid Ass'n* in fact did not credit *McAnnulty* for a demanding standard—it merely cited *McAnnulty* for the proposition that "judicial review is available when an agency acts ultra vires." 321 F.3d at 1173. Nor would reading *McAnnulty* as establishing a demanding standard like *Leedom*'s be plausible. *See supra* pp. 9-10. The discussion in *Federal Express* appears to have been shaped by the plaintiff's curious argument that the Court's analysis should be guided not by *McAnnulty* or *Leedom* but instead by *Chevron*. *See* 39 F.4th at 764.

Another example of dicta that could confound parties and the district court is

the statement that "ultra vires review imposes the same demanding standard in all cases, including those where only APA review is foreclosed." *Fed. Express Corp.*, 39 F.4th at 766 (citation omitted). This statement also appears to have been prompted by an incorrect argument that a plaintiff advanced—specifically, that *Leedom* "applies only when Congress is understood generally to have precluded *all* statutory judicial review," *id.* at 764 (emphasis added), as opposed to just one form of review. Of course, where Congress is "clear and convincing" in precluding all review, the result is not *Leedom* review, but no review at all. *Bd. of Governors v. MCorp Fin., Inc.*, 502 U.S. 32, 44 (1991).

Second, clarifying that the *Leedom* standard applies *only* where there is a statutory limitation on judicial review will encourage the district court to first determine whether there is such a limitation before applying the heightened standard, which the district court does not always do, *see, e.g.*, *Dreamland Baby Co. v. Consumer Prod. Safety Comm'n*, 2025 WL 2758476, at *9 (D.D.C. Sept. 26, 2025) (court applied *Leedom* standard to ultra vires claim without first finding there was a statutory limitation on judicial review); *Vera Inst. of Just. v. U.S. Dep't of Just.*, 2025 WL 1865160, at *17 (D.D.C. July 7, 2025) (same), and to dispel confusion resulting in the blurring of the standards, *see New Mexico v. Musk*, 784 F. Supp. 3d 174, 205-06 (D.D.C. 2025) (court "agree[d] that [the *Leedom*] test applies" to the plaintiffs' ultra vires claim but held that there was no statutory preclusion of judicial review

and that plaintiffs stated an ultra vires claim because they adequately alleged defendants acted without statutory authority—*i.e.*, the *McAnnulty* standard).

Clear delineation of the boundary that this Court and the Supreme Court have applied between the *McAnnulty* and *Leedom* standards will provide guidance to the district court and help ensure that federal courts' ability to enforce statutory limits on Executive Branch authority is not unduly diluted.

## IV. The Ordinary *McAnnulty* Standard Applies to Plaintiff's Ultra Vires Claim.

This Court should apply the ordinary *McAnnulty* standard to Plaintiff's ultra vires claim because there is no evidence that Congress intended to limit judicial review of their challenge to the construction of the proposed ballroom.

Statutory limitations on judicial review that trigger the heightened *Leedom* standard typically come in the form of a reticulated judicial review scheme set by Congress, *e.g.*, *Leedom*, 358 U.S. at 187, or express judicial review carve outs in statutes, *e.g.*, *Fed. Express Corp.*, 39 F.4th at 763. As to the former, the archetypal example is a statute that demonstrates Congress's intent to confine judicial review to a specific scheme and requirements, such as the NLRA in *Leedom* or the Hobbs Act in *Nuclear Regulatory Commission*. In both statutes, Congress created judicial review schemes that made clear it intended actions to be reviewed only in specified ways. In *Leedom*, for instance, the NLRA limited review of plaintiff's claim because

24

the action plaintiff challenged was "not a final order and therefore is not subject to judicial review except as it may be drawn in question by a petition for enforcement or review of an order, made under [§] 10(c) of the Act, restraining an unfair labor practice." 358 U.S. at 187 (cleaned up). Likewise, in *Nuclear Regulatory Commission*, the Hobbs Act specified that judicial review of the Commission's decision was available *only* to applicants for licenses or those who intervened in the licensing proceeding, and the petitioners were neither. 605 U.S. at 680.

The statutes the parties and district court relied on here—3 U.S.C. § 105(d), 54 U.S.C. § 100101(a), and 40 U.S.C. § 8106—resemble neither of these. None of them contains anything in their text, context, or structure to suggest that Congress intended to limit judicial review of Plaintiff's claim to a specific scheme.

Nor does the potential availability or unavailability of an APA claim make a difference. The APA "do[es] not limit or repeal additional requirements imposed by statute or otherwise recognized by law." 5 U.S.C. § 559. Indeed, the Supreme Court has relied on its inherent equitable power to enjoin ultra vires action even where the APA was available as an alternative. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952); *see also* Jonathan R. Siegel, *Suing the President: Nonstatutory Review Revisited*, 97 COLUM. L. REV. 1612, 1666 (1997) ("Nothing in the APA purports to be exclusive or suggests that the creation of APA review was intended to preclude any other applicable form of review."). Where this Court has

deemed the APA's unavailability to trigger the heightened *Leedom* standard, it is only because Congress prohibited APA review of that particular claim, reflecting congressional intent, specific to the question at hand, that judicial review should be limited. There is no such language or intent in the statutes here.

Because there is no limitation on judicial review of Plaintiff's claim, this Court should apply the ordinary, default *McAnnulty* standard to Plaintiff's claim rather than the heightened *Leedom* standard.

## CONCLUSION

This Court should reject Defendants' argument that the heightened *Leedom* standard applies to ultra vires claims that a federal official exceeded their statutory authority even in the absence of any statutory limitation on judicial review and apply the *McAnnulty* standard to Plaintiff's ultra vires claim.

Respectfully submitted,
/s/ Aditi Shah
Aditi Shah
Scott Michelman
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, D.C. 20045
202-457-0800
ashah@acludc.org

May 28, 2026                                    *Counsel for Amicus Curiae*[2]

---

[2] Counsel wish to acknowledge the assistance of paralegal Ameerah Adetoro in the preparation of this brief.

**CERTIFICATE OF COMPLIANCE**

I hereby certify that my word processing program, Microsoft Word, counted 6,488 words of the foregoing brief, excluding the items exempted by Federal Rule of Appellate Procedure 32(f) and that this complies with the word limit set forth in Federal Rule of Appellate Procedure 29(a)(5).

*/s/ Aditi Shah*
Aditi Shah

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2026, I electronically filed the foregoing brief in support of Plaintiff-Appellee/Cross-Appellant with the Clerk of the Court of the U.S. Court of Appeals for the D.C. Circuit by using the Appellate CM/ECF system, which will send notice to all counsel who are registered CM/ECF users.

*/s/ Aditi Shah*
Aditi Shah