**[ORAL ARGUMENT SCHEDULED FOR JUNE 5, 2026]**

**Nos. 26-5123, 26-5134**

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL TRUST FOR HISTORIC PRESERVATION
IN THE UNITED STATES,
Plaintiff-Appellee/Cross-Appellant,

v.

NATIONAL PARK SERVICE, *et al.*,
Defendants-Appellants/Cross-Appellees.

On Appeal from the United States District Court
for the District of Columbia

## REPLY BRIEF FOR APPELLANTS/CROSS-APPELLEES

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant
Attorney General*

*Environment and Natural
Resources Division*

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant
Attorney General*

BRANTLEY T. MAYERS
*Attorney
Civil Division, Room 3632
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 890-9874*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel certifies as follows:

**A.      Parties and Amici**

Plaintiff-appellee/cross-appellant is the National Trust for Historic Preservation in the United States.

Defendants-appellants/cross-appellees are the National Park Service; Jessica Bowron, in her official capacity as Acting Director, National Park Service; John Stanwich, in his official capacity as Superintendent, the White House and President's Park; the Department of the Interior; Douglas Burgum, in his official capacity as Secretary of the Interior; the General Services Administration; Michael J. Rigas, in his official capacity as Acting Administrator, General Services Administration; Donald J. Trump, in his official capacity as President of the United States; Executive Office of the President; Susie Wiles, in her official capacity as White House Chief of Staff; Office of the Executive Residence; and Robert B. Downing, in his official capacity as White House Chief Usher.

The American Conservative Union has filed an amicus brief in support of appellants/cross-appellees.  The American Institute of Architects, the

American Society of Landscape Architects, the Association for Preservation Technology, Committee of 100 on the Federal City, Cultural Landscape Foundation, DC Preservation League, National Mall Coalition, National Preservation Partners Network, Olmsted Network, Society of Architectural Historians, Campaign Legal Center, Citizens for Responsibility and Ethics in Washington, American Civil Liberties Union of the District of Columbia, and various members of Congress have filed amicus briefs in support of appellees/cross-appellants.

### B.    Rulings Under Review

Defendants appeal from the memorandum opinion (Dkt. 72) and order (Dkt. 73) issued by the district court (Leon, J.) on April 16, 2026, granting plaintiff's motion for clarification and entering an amended preliminary injunction.    Plaintiff conditionally cross-appeals from the memorandum opinion (Dkt. 47) and order (Dkt. 48) issued on February 26, 2026, denying its first motion for a preliminary injunction.

### C.    Related Cases

This case was previously before this Court.  *See National Trust for Historic Preservation in the United States v. National Park Service*, Nos. 26-

5101, 26-5108.  Undersigned counsel is unaware of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

*/s/ Brantley T. Mayers*
BRANTLEY T. MAYERS

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION AND SUMMARY OF ARGUMENT ................................1

ARGUMENT ...........................................................................................6

I.    The Trust Lacks Article III Standing. ......................................6

    A.    Objections To The Project's "Message" Are Not Injury. ..............6

    B.    The White House Is Not Germane To The Trust's
               Purposes..................................................................................12

II.   The Trust's Claims Fail On The Merits.....................................13

    A.    The President Is Authorized To "Alter" And "Improve"
               The White House....................................................................13

    B.    The NPS Organic Act Is Independently Dispositive....................17

    C.    The Trust's Property Clause Claim Repackages Its
               Statutory Claims And Equally Fails. ..........................................23

III.  The Balance Of Equities Independently Compels Reversal.................25

CONCLUSION..........................................................................................31

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Alliance for Hippocratic Med. v. U.S. FDA,*
    78 F.4th 210 (5th Cir. 2023) ........................................................................10

*Bicycle Trails Council of Marin v. Babbitt,*
    82 F.3d 1445 (9th Cir. 1996) ........................................................................21

*Center for Biological Diversity v. U.S. EPA,*
    937 F.3d 533 (5th Cir. 2019) ..........................................................................7

*Center for Biological Diversity v. U.S. Fish & Wildlife Serv.,*
    146 F.4th 1144 (D.C. Cir. 2025)......................................................................7

*Center for Sustainable Economy v. Jewell,*
    779 F.3d 588 (D.C. Cir. 2015) ......................................................................11

*Changji Esquel Textile Co. v. Raimondo,*
    40 F.4th 716 (D.C. Cir. 2022)........................................................................15

*Cobell v. Norton,*
    391 F.3d 251 (D.C. Cir. 2004) ......................................................................26

*Consolidated Canal Co. v. Mesa Canal Co.,*
    177 U.S. 296 (1900) ......................................................................................25

*Dalton v. Specter,*
    511 U.S. 462 (1994) ..........................................................................23, 24, 25

*Davis v. Latschar,*
    202 F.3d 359 (D.C. Cir. 2000) ......................................................................21

*Department of State v. AIDS Vaccine Advocacy Coal.,*
    146 S. Ct. 19 (2025) ......................................................................................17

*\*Environmental Def. Fund v. FERC,*
    2 F.4th 953 (D.C. Cir. 2021)....................................................................10, 11

*FDA v. Alliance for Hippocratic Med.,
　　602 U.S. 367 (2024) ................................................................10

Federal Express Corp. v. U.S. Dep't of Com.,
　　39 F.4th 756 (D.C. Cir. 2022) ................................................15

Florida Health Scis. Ctr., Inc. v. Secretary of Health & Hum. Servs.,
　　830 F.3d 515 (D.C. Cir. 2016) ...............................................16

Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,
　　528 U.S. 167 (2000) ................................................................11

*Global Health Council v. Trump,
　　153 F.4th 1 (D.C. Cir. 2025)......................................16, 23, 24

Hecht Co. v. Bowles,
　　321 U.S. 321 (1944) ..........................................................25, 29

Lewis v. Becerra,
　　111 F.4th 65 (D.C. Cir. 2024).................................................9

Loper Bright Enters. v. Raimondo,
　　603 U.S. 369 (2024) ......................................................... 19-20

Lujan v. Defenders of Wildlife,
　　504 U.S. 555 (1992) ........................................................... 8-9

National Parks Conservation Ass'n v. Manson,
　　414 F.3d 1 (D.C. Cir. 2005) ..................................................11

National Tr. for Historic Pres. v. National Park Serv.,
　　No. 26-5101, 2026 WL 980554 (D.C. Cir. Apr. 11, 2026) ......................4, 12, 13

National Wildlife Fed'n v. Burford,
　　835 F.2d 305 (D.C. Cir. 1987) ......................................... 25-26

Natural Res. Def. Council, Inc. v. Hodel,
　　865 F.2d 288 (D.C. Cir. 1988) ...............................................26

*Tennessee Valley Auth. v. Hill,*
  437 U.S. 153 (1978) ...................................................................14, 18, 19

*Valley Forge Christian Coll. v. Americans United for Separation of Church
  & State, Inc.,*
  454 U.S. 464 (1982) ...................................................................................6

*Washington All. of Tech. Workers v. U.S Dep't of Homeland Sec.,*
  50 F.4th 164 (D.C. Cir. 2022).................................................................19

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ...........................................................................25, 30, 31

*Wisconsin Gas Co. v. FERC,*
  758 F.2d 669 (D.C. Cir. 1985) ................................................................26

**Statutes:**

3 U.S.C. § 105(d).......................................................4, 13, 14, 15, 16, 17, 24

3 U.S.C. § 105(d)(1) ...................................................................................13

31 U.S.C. § 1321(a)(17) .............................................................................18

31 U.S.C. § 1321(b)(1) ...............................................................................18

40 U.S.C. § 8106.......................................................4, 13, 16, 19, 20, 24

54 U.S.C. § 100101(a) ................................................................................17

54 U.S.C. § 100101(b)(2) ...........................................................................20

54 U.S.C. § 101101 ....................................................................................18

54 U.S.C. § 312102(a) ................................................................................12

54 U.S.C. § 312102(b) ................................................................................12

54 U.S.C. § 312105(g)................................................................................12

**Rule:**

Fed. R. App. Proc. 27(a)(2)(B)(i) .................................................................27

**Legislative Material:**

*District of Columbia Appropriation Bill for 1927: Hearings Before the Subcomm. of the H. Comm. on Appropriations*, 69th Cong. (1926) ............20

**Other Authorities:**

Robert J. Donovan,
    *Conflict and Crisis: The Presidency of Harry S. Truman, 1945-1948* (1996) ....................................................................................................16

*Principles of Federal Appropriations Law*,
    published by Gov't Accountability Office, *available at* https://www.gao.gov/legal/appropriations-law/red-book ...................18, 19, 22

Remarks by President Trump on the Construction of the White House Ballroom (May 19, 2026),
    https://www.c-span.org/program/white-house-event/president-trump-speaks-at-white-house-ballroom-construction-site/679525 ............................2

Campbell Robertson *et al.*,
    *One Killed in Exchange of Gunfire With Secret Service Near White House*, N.Y. Times (May 23, 2026) .................................................................1

*The White House—The Vice President—Gifts*,
    2 Op. O.L.C. 349 (1977) ...............................................................................15

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| EXR | Office of the Executive Residence |
| JA | Joint Appendix |
| NPS | National Park Service |
| Project | East Wing Modernization Project |
| Red Book | *Principles of Federal Appropriations Law*, published by Gov't Accountability Office, *available at* https://www.gao.gov/legal/appropriations-law/red-book |
| Trust | National Trust for Historic Preservation in the United States |

## INTRODUCTION AND SUMMARY OF ARGUMENT

It has been less than a month since defendants filed their opening brief, just after a gunman attempted to assassinate the President, the First Lady, the Vice President, and many members of the Cabinet at the White House Correspondents' Association dinner. In that short time there has been another attempt on the President's life. On May 23, a man approached a White House security checkpoint, professionally pulled out a high caliber gun, and opened fire toward the White House. Brave Secret Service officers responded with fire. The gunman was killed, and an innocent bystander was seriously wounded.[1] This latest attempted assassination underscores that the White House is in dire need of a state of the art National Security facility to protect the President, future Presidents, their families, staff, Foreign Dignitaries, and guests.

The East Wing Project answers that critical security need, and ensures that the President can fulfill his constitutional duties in a safe and heavily secured facility. From the deeply ensconced bunker, and its attendant bomb shelters, hospitals, medical facilities, and other National Security functions, to

---

[1] Campbell Robertson *et al.*, *One Killed in Exchange of Gunfire With Secret Service Near White House*, N.Y. Times (May 23, 2026).

the highly sophisticated Drone Port and Sniper Nests atop the Ballroom, the complex is a highly knitted, unified whole.  The Project will finally allow Presidents to safely host events like Inaugurations and state dinners with world leaders, including the King and Queen of the United Kingdom, or President Xi of China, which are currently held in plastic tents that cannot even protect highly esteemed guests from inclement weather, let alone high caliber bullets or kamikaze drones.  The heavy steel drone proof roof, missile resistant columns, bullet, ballistic, and blast proof glass windows, military grade and hermetically sealed venting for air conditioning and heating, and far more, will safeguard the entire White House, and the occupants thereof. Further, as the President recently felt compelled by this litigation to share publicly, the Ballroom's rooftop will serve a crucial strategic function as a state of the art Drone Port to protect Washington, D.C. from enemy attack, and will likewise house Government Sniper Nests to give Secret Service, and the Military, visibility across the entire White House Grounds.[2]  The Ballroom is on time, under budget, and free to the American taxpayer, while benefiting

---

[2] *See* Remarks by President Trump on the Construction of the White House Ballroom (May 19, 2026), https://www.c-span.org/program/white-house-event/president-trump-speaks-at-white-house-ballroom-construction-site/679525.

2

future Presidents by serving as a "safe haven" from attackers such as the two recent would-be assassins.

In spite of these obvious National Security risks, and the "Top Secret" nature of this Development, which the "Trust" was strongly informed about, they continue to insist that this vital Project must be halted to protect the feelings of a strolling woman passerby, who is a serial plaintiff throughout the Washington, D.C. area.  In actuality, the Project will greatly enhance the White House and reinforce the statement that the United States respects, dignifies, and protects its institutions and officials.  Most importantly, neither the Trust nor its member, Alison Hoagland, has Article III standing to object to a "statement" or a "symbol."  JA76-77.  The Project will not deprive this casual pedestrian of any rights—she is not injured in any way, shape, or form.  Conferring standing based on her personal preferences, would open the courthouse door to anyone who merely dislikes any government action, and would confer standing on anyone who dislikes any construction project, governmental or civilian, within Washington, D.C.  This is an unacceptably broad conception of Article III that the Supreme Court and this Court have repeatedly rejected.  This case should never have proceeded past the very powerful and impactful standing threshold.

The Trust's objections are also legally meritless, especially under the "Hail Mary" standard that applies to its *ultra vires* claims.  Under 3 U.S.C. § 105(d), the President is fully and legally empowered to alter and improve the White House.  This was never questioned before, and it should never be questioned again.  Highly respected Judge Neomi Rao stated that the project "qualifies as an improvement permitted under section 105(d)(1)."  *National Tr. for Historic Preservation v. National Park Serv.*, No. 26-5101, 2026 WL 980554, at *7 (Rao, J., dissenting).  The longstanding power of the National Park Service (NPS) under its Organic Act to promote National Parks, which gives it the authority to build, is, in and of itself, independently sufficient to allow construction of the Project.  The Trust only half heartedly defends the district court's incorrect reading of the Law because they don't believe it themselves, and returns to a weak attack on NPS's exercise of discretion that the district court correctly ignored.  The Trust also presses an interpretation of Section 8106 that, if they were correct, would invalidate a century's worth of structures built all over Washington, D.C., some of the greatest anywhere in the world.  Additionally, the Trust tries to revive an equally baseless "constitutional" claim against the Project.  Even the district court rejected both of these latter theories now advanced again by the Trust.  Additionally,

4

the Project received overwhelming approval by the National Capital Planning Commission, and unanimous consent from the United States Commission of Fine Arts. The Trust's initial argument was that defendants lacked these two approvals, so defendants secured them, and then the Trust pivoted to yet another reason to sue.

Finally, this is a quintessential case where the equitable factors preclude relief regardless of likelihood of success. The Project's features will ensure the safety of all future Presidents (President Trump will only have the privilege of using it for a few months prior to the end of his term), and the Continuity of Government against adversaries and modern day, very dangerous weapons. Defendants raised those concerns from the outset, and the President and senior government officials have repeatedly detailed them, many of a Top Secret nature, to defend against this meritless and destructive lawsuit. Against these weighty considerations, the Trust asserts the personal feelings of a single, litigious, passerby who has not been harmed, and has no standing. An injunction would greatly extend the time during which the Project is unavailable, thereby jeopardizing the National Security of the United States of America.

This Court should reverse this egregious injunction.

5

## ARGUMENT

## I.    The Trust Lacks Article III Standing.

Under established law, this case should never have crossed the Article III threshold.  The Trust says little to defend its standing, and this Court can reverse the injunction on this basis alone.

### A.    Objections To The Project's "Message" Are Not Injury.

The Trust's basic theory is that Hoagland has standing because she visits the White House area approximately once a month and disagrees with the "architectural message" she thinks the ballroom will send.  Opp.23.  That theory defies the Supreme Court's instruction that mere "observation of conduct with which one disagrees" is "not an injury sufficient to confer standing." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982).  The Trust's contrary arguments misunderstand first principles and precedent.

1.    The Trust asserts that the "desire to use or observe something" can be a cognizable injury.  Opp.22.  Indeed it *can* be, such as when government action impedes a plaintiff's particular use or observation and thereby affects her conduct.  But that is not license to press generalized visual grievances.  For instance, a plaintiff had standing when government action would preclude him

6

from researching and photographing a species he has long researched and photographed. *See Center for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1157 (D.C. Cir. 2025). Here, however, the East Wing has already been demolished, and completing the ballroom will not stop Hoagland from engaging in any activities in which she previously engaged. She travels to the "White House neighborhood" to "attend meetings, view exhibits, and have medical appointments." JA75; *see* JA77. She can keep doing so after the ballroom is constructed, and once it is completed nothing will require her to gaze en route to the doctor's office. *See Center for Biological Diversity v. U.S. EPA*, 937 F.3d 533, 541 (5th Cir. 2019).

The Trust's real argument is not that Hoagland will be impeded from doing or seeing anything she wishes, or even that she will be forced to look at something she does not want to see. It is instead that she disagrees with the "architectural message" she thinks the ballroom will send. Opp.23; *see* JA77 (alleging that ballroom would detract from the "architectural statement"). That injury, which exists entirely in Hoagland's own mind, is not cognizable. If the theory is that viewing the ballroom will make her unhappy, that "injury" is self-inflicted: Nothing requires that she look at the ballroom when passing by the White House. Disagreement with the "message" sent by government

7

action is a classic generalized grievance.  Hoagland has admitted that she is "just the symbol" of an injury that she believes is "to everybody."  Govt.Br.25-26.  A plaintiff cannot transform a mere personal disagreement with government action into an actionable injury-in-fact sufficient to convey standing simply by declaring that the disagreement reduces her general happiness or enjoyment of an activity.

The Trust belatedly suggests that Hoagland has a more significant relationship with the White House by highlighting her role as an "architectural historian."  Opp.23.  Yet Hoagland has never explained how her work would be impeded by completion of the Project.  She suggested that the White House is relevant to her research because "[a]s one of the first prominent government buildings in the new capital city, it drove development around it."  JA76.  But whether the Project is completed will have no effect on how the White House looked in the early 1800s.  Hoagland has never explained why leaving a hole next to the Executive Mansion would facilitate her research, or why research about the White House's architecture requires the historian's design approval.  To be sure, Hoagland's status as a historian may well give her especially strong feelings about the White House, but the law is crystal clear that a "special interest" in a subject is not a substitute for a cognizable injury.  *See Lujan v.*

8

*Defenders of Wildlife*, 504 U.S. 555, 563 (1992). The Supreme Court "routinely denies Article III standing to parties who have suffered no concrete, particularized, and actual or imminent injury in fact—no matter how strongly they feel, how vigorously they advocate, or how well they develop the facts." *Lewis v. Becerra*, 111 F.4th 65, 74 (D.C. Cir. 2024).

Worse, the notion that disagreeing with a government "message" or "statement" is a cognizable injury would open the floodgates to infinite challenges by anyone anywhere. Someone could sue the National Gallery for an exhibit she disliked or the Postal Service for a stamp honoring a figure she opposed. The Trust admits its theory would allow suits over billboards. Opp.25. Presumably the same goes for someone who objected to the message sent by the D.C. mayor's decision to paint "Black Lives Matter" on 16th Street, or someone who disapproves of a Pride flag in a government building or park. None of this is hypothetical. Hoagland filed a declaration objecting to the paint color of a federal building, Govt.Br.31, and a suit over the color of the Reflecting Pool is already pending. Neither this Court nor the Supreme Court recognizes this "see something, sue something" theory of standing.

9

2.    Indeed, precedent unambiguously forecloses it.  Just a few years ago, the Fifth Circuit found standing for doctors who alleged that they were "distressed by others' use of mifepristone," *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 390 n.3 (2024), with one judge expressly reasoning that they suffered an "aesthetic injury from the destruction of unborn life," *Alliance for Hippocratic Med. v. U.S. FDA*, 78 F.4th 210, 259 (5th Cir. 2023) (Ho, J., concurring in part and dissenting in part).  The Supreme Court found this argument sufficiently outlandish to warrant its unanimous rejection *in a footnote*: "distress at or disagreement with the activities of others is not a basis under Article III for a plaintiff to bring a federal lawsuit."  602 U.S. at 390 n.3.  The Trust never acknowledges *Alliance*.

Nor can the Trust distinguish *Environmental Defense Fund v. FERC*, 2 F.4th 953 (D.C. Cir. 2021) (*EDF*), which held that injuries like Hoagland's "reflect nothing more than generalized grievances." *Id.* at 969-70.  The Trust suggests the White House is an "attraction" rather than a "nuisance," Opp.25, but with the exception of the old East Wing (the demolition of which is not redressable), the White House remains where it has always stood.  Hoagland's actual concern is that she will dislike what is being newly constructed, which is precisely the theory *EDF* forecloses.

10

None of the Trust's cases suggest otherwise. In *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, individuals were forced to abandon their recreational activities to avoid toxic pollutants. *See* 528 U.S. 167, 181-82 (2000) (one member "would like to fish, camp, swim, and picnic in and near the river" but "would not do so because he was concerned that the water was polluted"; another previously "picnicked, walked, birdwatched, and waded" in area but was "no longer engaged in these activities in or near the river because she was concerned about harmful effects from discharged pollutants"). Again, here Hoagland has not identified any change to her plans or activities. As for *Center for Sustainable Economy v. Jewell*, 779 F.3d 588 (D.C. Cir. 2015), defendants already explained that it involved injury to both recreational and economic interests, which are absent here. Govt.Br.28-29. Finally, in *National Parks Conservation Association v. Manson*, the members objected to "air pollution" in land they "regularly use," and the existence of a cognizable injury was not even disputed. 414 F.3d 1, 4 (D.C. Cir. 2005).

In sum, there is "nothing in the existing case law to suggest that a person who incidentally views something unpleasant has suffered an injury-in-fact." *EDF*, 2 F.4th at 969-70. That holding controls here and requires reversal.

11

### B.    The White House Is Not Germane To The Trust's Purposes.

Even if Hoagland could sue in her own right, this suit is not germane to the Trust's purposes, which are to "preserve and administer" sites that have been donated to it.  54 U.S.C. § 312102(b).  The White House has obviously not been donated, and indeed falls within an express carve-out for sites the Trust cannot acquire.  *Id.* § 312105(g).  The Trust therefore "has no authority over or interest in the White House," making this litigation non-germane.  *National Tr.*, 2026 WL 980554, at *5 (Rao, J., dissenting).  This is fatal to the Trust's case.

The Trust cites prefatory language in 54 U.S.C. § 312102(a) explaining why Congress chose to create the Trust, Opp.27, but it ignores the structure of the statute, which delineates between the general reasons why Congress created the Trust (subsection (a)) and the much narrower list of the Trust's actual responsibilities (subsection (b)).  The Trust never argues that this suit is germane to the specific purposes enumerated in subsection (b).  It observes that Congress also authorized it to perform certain other functions, like administering grants and participating in an advisory council.  Opp.29.  None of those functions concern the White House.

12

At bottom, the Trust's argument collapses to its assertion that it has an "obvious interest" in the appearance of the White House because it cares about historic preservation as a general matter. But just as Hoagland's feelings are not enough, the Trust's feelings cannot change the fact that Congress "carved the White House out" of the Trust's responsibilities. *National Tr.*, 2026 WL 980554, at *5 (Rao, J., dissenting).

## II. The Trust's Claims Fail On The Merits.

As defendants explained, the Project is authorized twice over, by both 3 U.S.C. § 105(d) and the NPS Organic Act, and therefore also complies with 40 U.S.C. § 8106. The Trust reads Section 105(d) to authorize nothing at all; tries to skirt the NPS Organic Act with arguments even the district court ignored; interprets Section 8106 to forbid decades of construction that nobody thought was unlawful; and throws in a specious "constitutional" claim. None of this supports the injunction.

### A. The President Is Authorized To "Alter" And "Improve" The White House.

3 U.S.C. § 105(d)(1) confirms the President's operational control over his office and residence by authorizing appropriations for, among other things, "repair, alteration," and "improvement" of the White House. That embraces the Project and defeats the Trust's *ultra vires* claim.

1.    The Trust's lead response is that Section 105(d) itself authorizes the President to do nothing; that it merely authorizes Congress to appropriate funds that the President may then expend consistent with the appropriations legislation.  Opp.30-32.  That is wrong.  By authorizing future appropriations to the President for "alteration" and "improvement" of the White House, Section 105(d) confirms that the President has authority to engage in those activities.  Appropriations "have the limited and specific purpose of providing funds for *authorized programs*." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978) (emphasis added) (*TVA*).  Section 105(d)'s framework of appropriations for White House improvements means the President is authorized to undertake them.  That forecloses Trust's *ultra vires* challenge.

Of course, if the specific appropriations that Section 105(d) contemplates are not sufficient to pay for an improvement, the Executive must rely on other authorized sources.  As the Trust itself says, President Roosevelt used a public works appropriation and "a national-defense appropriation" to fund his East and West Wing projects.  Opp.35.  Enacted against that history, Section 105(d) recognizes the President's authority over the White House while enabling one source of funding for him.  It does not preclude other sources of funding, and indeed the Trust admits that President Ford's swimming pool and President

14

Trump's tennis pavilion were funded using NPS donations, Opp.34, consistent with longstanding legal guidance, *The White House—The Vice President— Gifts*, 2 Op. O.L.C. 349, 350 (1977).  If the Trust has to explain away four separate White House projects, it can hardly maintain that defendants have "plainly and openly crossed a congressionally drawn line in the sand." *Federal Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022).

**2.**     The Trust next argues that, even if Section 105(d) does authorize the President to "alter" and "improve" the White House, those terms do not reach the Project.  Opp.33-35.  The Trust does not dispute that the dictionary definitions do so, but argues that context and canons favor a narrower read— apparently the President is free to gut-renovate the White House and even add a "patio" or "balcony," but a new wing is not allowed.  Opp.34-35.

Defendants have explained why reading "minor" into the statute, Opp.35, is wrong as a matter of statutory interpretation, Govt.Br.36-40, and Judge Rao agreed.  More fundamentally, "[t]he canons invoked by the [Trust] can resolve statutory ambiguity in close cases, but they do not allow us to discern any clear and mandatory prohibition" for an *ultra vires* claim. *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 725 (D.C. Cir. 2022).  Section 105(d) never distinguishes a "new *balcony*" from a "new *building*," Opp.35, let

15

alone make the latter "obviously beyond the terms of the statute," *Florida Health Scis. Ctr., Inc. v. Secretary of Health & Hum. Servs.*, 830 F.3d 515, 522 (D.C. Cir. 2016). Indeed, President Truman's balcony caused a great political "outcry." Robert J. Donovan, *Conflict and Crisis: The Presidency of Harry S. Truman, 1945-1948*, at 349-50 (1996).

**3.** Section 8106 adds nothing, because the Trust does not dispute that if Section 105(d) authorizes the Project, that "authority" satisfies Section 8106. Opp.36. Nor does this statute help the Trust complete its "Hail Mary" pass. Even assuming its prohibition is clear, mandatory, and applicable (*but see* Govt.Br.50-52), that is not enough. Rather, "the prohibition at issue must confer rights upon the individual seeking ultra vires review." *Global Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025). The Trust makes no attempt to satisfy that test, and does not even cite *Global Health Council*. It instead says it "arguably" falls within Section 8106's "zone of interests" for APA purposes. Opp.38. This is not an APA claim. The higher bar of *Global Health Council* applies and the Trust cannot clear it.

Had Congress wanted private citizens to enforce Section 8106 against the White House, it could have provided a private cause of action. Congress did not. This inter-branch dispute must accordingly be resolved through the

16

political process, like prior disputes between Congress and the President over White House renovations, Govt.Br.42-43. This Court should not allow the Trust to inject the judiciary into that process for the first time through a non-statutory, equitable cause of action. *Cf. Department of State v. AIDS Vaccine Advocacy Coal.*, 146 S. Ct. 19 (2025).

**B.    The NPS Organic Act Is Independently Dispositive.**

The Project is independently authorized by the NPS Organic Act, which permits construction in national parks. *See* Gov't.Br.43-49.[3]

1.    The district court ruled that the Organic Act does not confer *any* construction authority on NPS—the agency can "promote and regulate the use of the National Park System," 54 U.S.C. § 100101(a), but apparently *not* by building visitor centers, comfort stations, shade structures, administrative offices, or recreational facilities. That contradicts the plain text, because those structures obviously help "promote" use of the national parks. It also conflicts with a century of agency practice. JA93, 245, 401-07.

---

[3] The Trust argues that defendants must prevail on this issue even if they also prevail on Section 105(d), because the Project's donated funding is tied to NPS's statutory authority. Opp.39. But, as the district court noted, the "legality" of the "funding mechanism" is "not squarely at issue." JA478. In all events, the NPS Organic Act authorizes the Project *and* its funding, and the Court could therefore vacate the injunction on this basis alone.

The Trust only half-heartedly defends the district court's rationale. It responds to the history by suggesting Congress "approved funds" for certain NPS projects. Opp.40-41. That cuts the other way. Appropriations "must be distinguished" from "[e]nabling or organic legislation"; the latter "provide[s] the necessary authority to conduct the program or activity," while the former "provide[s] budget authority." Red Book 2-54. Again, appropriations simply "provid[e] funds for authorized programs." *TVA*, 437 U.S. at 190. So the fact that Congress appropriated funds for NPS construction projects only confirms that NPS has authority under its organic legislation to do construction. Plus, the Trust has no answer to the fact that Congress approved nearly $100 million for NPS construction this year. Govt.Br.47.

Moreover, the Trust simply ignores that, in addition to appropriating for NPS construction, Congress specifically authorized NPS to accept donations, 54 U.S.C. § 101101, which are "appropriated to be disbursed" accordingly, 31 U.S.C. § 1321(a)(17), (b)(1). Under that authority, NPS has used donations "to carry out projects on parkland, including the construction of facilities." JA403. If it was permissible to construct the National Capital Region Headquarters using appropriated funds, as the Trust concedes, Opp.40-41, it is lawful to construct the East Wing Project using appropriated donations.

18

**2.**     Recognizing the broad authority conferred by the Organic Act, the Trust weaves Section 8106 back into its analysis, apparently to contend that even if NPS *generally* may build in national parks, it cannot do so *in the District* absent specific congressional approval.  Opp.40.  Even the district court did not adopt that theory as it is contrary to the statute and historical practice.  JA481.  In making this argument, the Trust conveniently ignores that NPS has constructed in D.C. for decades, without project-by-project approval.  Govt.Br.44-45.  The Trust claims Congress approved two such projects, but cites only legislative history.  Opp.40-41 & nn.8-9.  "Expressions of committees dealing with requests for appropriations cannot be equated with statutes enacted by Congress."  *TVA*, 437 U.S. at 191; *see* Red Book 2-59.  Anyway, the Trust admits it can find no record of Congress ever speaking to any of the other examples that NPS identified.  Opp.41.

The Trust is thus left to protest that even consistent practice and history cannot override plain text.  Opp.40.  But, if "Congress has continually declined to disturb a longstanding interpretation of a statute, that 'may provide some indication that Congress at least acquiesces in, and apparently affirms, that interpretation.'"  *Washington All. of Tech. Workers v. U.S Dep't of Homeland Sec.*, 50 F.4th 164, 182 (D.C. Cir. 2022); *accord Loper Bright Enters. v.*

19

*Raimondo*, 603 U.S. 369, 386 (2024).  Neither the law nor history support the Trust's argument.

The Executive's "longstanding interpretation" of Section 8106, has been clear and uncontroverted for over a century.  In 1926, then-parks director Ulysses S. Grant III explained to Congress that the statute "has never been construed to prevent such construction by the park authorities within the limits of the appropriations."  *District of Columbia Appropriation Bill for 1927: Hearings Before the Subcomm. of the H. Comm. on Appropriations*, 69th Cong. 533 (1926).  The referenced field house in Anacostia was funded by a lump-sum, not an earmark, *see id.*, yet nobody saw a Section 8106 problem. So too here, there is no Section 8106 problem with use of NPS's general donation authority to fund a project within the scope of its Organic Act powers.

3.     Pivoting to another argument the district court did not buy, the Trust claims that the Project exceeds NPS's authority because it violates the so-called Redwood Amendment.  That provision "reaffirms" that NPS cannot exercise its Organic Act powers "in derogation of the values and purposes for which the System units have been established, except as directly and specifically provided by Congress."  54 U.S.C. § 100101(b)(2).  The Trust argues that the Project offends the "values and purposes" of President's Park

20

because it disrupts "historical continuity," "architectural integrity," and the "feeling of the White House." Opp.42.

This argument is so unserious that the district court did not bother to address it. NPS demonstrated compliance with both the Organic Act and the Redwood Amendment in a non-impairment determination that thoroughly explained the purposes of this park unit and why the Project would advance those purposes. JA108-44. The Trust makes no attempt to engage with NPS's determination or to explain why it was wrong. Regardless, there is no basis to second-guess NPS's thorough and reasoned judgment as to whether the Project is sufficiently aligned with the "values and purposes" of President's Park. As this Court has recognized, "the Organic Act is silent as to the specifics of park management," and so "the Secretary has especially broad discretion on how to implement his statutory mandate." *Davis v. Latschar*, 202 F.3d 359, 365 (D.C. Cir. 2000); *see Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1454 (9th Cir. 1996). At most, this is a policy dispute over how NPS has exercised that "broad discretion."[4]

---

[4] The Trust frames its argument about the NPS Organic Act as an APA claim, Opp.39, but the Trust sought this injunction on an *ultra vires* theory because EXR (which is running the Project) is not an APA agency. Dkt.51. EXR is acting under NPS's statutory authority by virtue of an Economy Act

*Continued on next page.*

**4.** Lastly, the Trust objects that even if the Organic Act authorizes the Project, NPS cannot use the Economy Act to contract with EXR to manage the work. Opp.43. That goes nowhere. *First*, the Trust did not press such a claim below, so it is forfeited. JA478 (recognizing that "legality" of "funding mechanism" is "not squarely at issue"). *Second*, the Trust is wrong on the merits. This transaction is not trying to "avoid legislative restrictions" on NPS. Opp.43. Rather, NPS "is authorized to do" the Project and has funds "available" under its donation authority; meanwhile, EXR has "experience or expertise" working closely with the President to manage the Executive Mansion, and faces no "statutory prohibitions or restrictions which would obstruct performance." Red Book 12-26, 12-27, 12-28. Such transactions are routine for both NPS and the White House, as the Trust does not contest. *See* JA413-22. *Finally*, even if the Economy Act transaction were deficient, that would not support the injunction, which prohibits *all* defendants (including NPS) from constructing the ballroom.

---

transaction. The Trust could perhaps have challenged NPS's entry into that transaction as final agency action, but never did. Regardless, the Trust's claim fails whether characterized as an APA or *ultra vires* claim.

C.    **The Trust's Property Clause Claim Repackages Its Statutory Claims And Equally Fails.**

As an alternative basis to affirm, the Trust revives a "constitutional" claim that even the district court correctly rejected. JA333-39. As it explained, the "Trust's principal constitutional argument is that Defendants' construction of the ballroom usurps Congress's authority under the Property Clause." JA333. That is simply another way of arguing that the statutes invoked as authority for the Project do not actually authorize it—a statutory claim, not a constitutional one.

In *Dalton v. Specter*, the Supreme Court rejected the proposition "that every action by the President … in excess of his statutory authority is *ipso facto* in violation of the Constitution." 511 U.S. 462, 472 (1994); *see* JA335. The Court instead "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Dalton*, 511 U.S. at 472. A claim is constitutional if the government relies on the Constitution as an independent source of authority or on a statute that itself violates the Constitution. *See id.* at 473 & n.5. But if a claim "simply alleg[es] that the President has exceeded his statutory authority," it is not a genuine "constitutional" claim, and a plaintiff needs a statutory right of action. *Id.* at 473; *accord, e.g.*, *Global Health Council*, 153 F.4th at 13-17.

23

*Dalton* and *Global Health Council* control here. As the district court recognized, the government has "argued that the President's authority to construct the ballroom comes from a series of statutes." JA336 (emphasis omitted). The Trust has not suggested those statutes are unconstitutional, so the only merits question is whether defendants are right that 3 U.S.C. § 105(d) or the NPS Organic Act authorize the Project, or whether the Trust is right that Section 8106 blocks it. As in *Global Health Council*, "the constitutional claim is predicated on underlying statutory violations." 153 F.4th at 17.

The Trust suggests that this understanding of *Dalton* would permit the government to avoid constitutional claims whenever it concocted any patently baseless statutory predicate for its action. *See* Opp.45-46. That concern is ill-founded; if the government invokes obviously inapplicable statutes, the mechanism for judicial challenge is an *ultra vires* claim. Nor would the government have any incentive to abandon reliance on colorable constitutional authority if it could win the case on that basis.

On the other hand, the rule proposed by the Trust is boundless. In some metaphysical sense, any claim that the Executive Branch has acted without statutory authority implicates the Constitution. *See Dalton*, 511 U.S. at 471. Yet "if every claim alleging that the President exceeded his statutory authority

24

were considered a constitutional claim," the exception permitting review of presidential actions for constitutionality "would be broadened beyond recognition." *Id.* at 474. That holding controls here.

## III.    The Balance Of Equities Independently Compels Reversal.

The Trust concedes that likely success on the merits does not guarantee an injunction. Opp.55. Rather, in "do[ing] equity," a court must balance the harms and consider the public interest. *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944); *see Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). The district court seriously abused its discretion in finding that these factors justified stopping a national-security project in its tracks to protect a mere "trifling" psychological injury. *Consolidated Canal Co. v. Mesa Canal Co.*, 177 U.S. 296, 302 (1900).

1.    The Trust claims it "will be irreparably harmed" absent relief. Opp.47. But it offers only *ipse dixit* and a case largely about standing, *National Wildlife Fed'n v. Burford*, 835 F.2d 305 (D.C. Cir. 1987). As explained, Hoagland's injuries are not cognizable under Article III, but even if they were, they are *de minimis*. Unlike, for example, the plaintiff members in *Burford*, who were threatened with loss of land they used for "fishing, hunting, bird and wildlife watching, canoeing and boating, hiking, camping,

and other similar activities," *id.*, Hoagland worries about offense from an "architectural statement," JA327.  Irreparable harm must be "certain *and great.*"  *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (emphasis added).

Nor can the Trust pivot to harm "to the White House and President's Park."  Opp.48.  It is the "moving party" that "must demonstrate" that "*it* would suffer irreparable harm."  *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (emphasis added).  For similar reasons, the Trust cannot rest on harm to Congress of being "excluded" from "decisionmaking."  Opp.48.  That Congress has chosen not to intervene does not mean the courts should do so— just the opposite.  *Cf. Natural Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 318 (D.C. Cir. 1988).

**2.**     The gross imbalance between these makeweight harms and the grave government and public interests on the other side further underscores the district court's self-evident abuse of discretion.

Most obvious is the profound national-security interest in completing the Project.  As our declarants have said without rebuttal, the entire Project is essential to protecting the President, his family and staff, and the White

House itself.  *See* Gov't.Br.53, JA499-501, Stay.Add.17-24.[5]  The President has publicly explained the same.  The Project—from its underground hospital and bomb shelter to its drone port on the roof—is knit together and will provide the military with critical resources.  The ballroom "technically and structurally complement[s]" the below-ground structures, with features such as "missile-resistant steel columns and beams, drone-proof roofing, and bullet- and blast-proof glass windows," that are vital to security.  JA500, 506.

The Trust argues that the Project is not essential because Presidents have safely resided at the White House for "two centuries."  Opp.50.  But President Jefferson's adversaries were not armed with drones and other modern weaponry.  The Trust similarly points out that the ballroom's absence "has not prevented … this President from residing [in the White House] in the seven months since the East Wing was demolished."  *Id.*  Given the *multiple* assassination attempts during that time, this casual assertion is shocking.

---

[5] The Trust contends that this Court cannot consider the Driscoll Declaration, Opp.52, but defendants attached it to their stay motion in accord with the Rules, *see* Fed. R. App. Proc. 27(a)(2)(B)(i), and argued consistently below that the Project's underground features "cannot serve their functions without an appropriate structure to shield and protect them," Dkt.69 at 1.  At minimum, the declaration is properly before the Court on the stay motion.

Instead of seriously grappling with the national-security implications of the injunction, the Trust claims defendants have contradicted themselves on the topic. Opp.50-51. Not so. Defendants *never* suggested the below-ground facilities were independent of the overall structure or could exist in a vacuum. Rather, when the Trust fretted that the below-ground work being done in late 2025 and early 2026 would immediately "lock in" the design and render futile any feedback from regulatory bodies, defendants reassured it that "potential modifications" to the design, Dkt.30-2, ¶ 12, such as relocating doors and stairs, Dkt.30-4, ¶¶ 9-11, could still be accommodated. The point was that the minor design decisions on which the Trust was focused were not driving the below-ground construction then in progress, which was instead driven by national-security needs "independent" of those design choices. Dkt.30 at 39.

To be sure, as this litigation has proceeded through three complaints, three motions for preliminary relief, and over a dozen claims, defendants have responded to the moving target with greater detail about national security. At the outset, classified declarations made the point in general terms. When it became clear that the district court had concerns, defendants provided more substantiation. When the court's amended order bifurcated underground work from the ballroom, defendants explained why that was impossible.

28

Because of this litigation, the President has more recently felt the need to speak to the American people publicly about these issues. National security, however, has been the government's consistent justification throughout.

Even the district court ultimately recognized that the equities required altering its injunction to permit certain construction for national-security reasons. JA509. In trying to slice and dice the Project, however, the court failed to appreciate its cohesive nature; features like venting, partitioning, and communications infrastructure cannot be properly integrated into half a building. In addition to being unworkable, the district court's amended order is also inequitable: By allowing certain structures to be built so long as they are *not* "the proposed ballroom," JA513, the district court has obstructed the Project and set back national security without even providing Hoagland with any guarantee she will prefer the resulting architectural "statement."

For its part, the Trust claims the equities can *never* preclude injunctive relief if a plaintiff is likely to succeed on a constitutional claim. Opp.53-55. The Trust's real claims here are statutory, though, like in *Winter*. *Supra*, Part II.C. Regardless, no authority suggests that invoking the Constitution exempts a plaintiff from "the requirements of equity practice with a background of several hundred years of history." *Hecht Co.*, 321 U.S. at 329. Whether a claim

29

rests on the Constitution or a statute, "the balance of equities and consideration of the public interest … are pertinent in assessing the propriety of any injunctive relief." *Winter*, 555 U.S. at 32.

Indeed, the Trust does not believe its own argument, because it concedes elsewhere that, at some point, construction will have progressed so far that judicial intervention would be inappropriate. Opp.47-48. We are already past that point. Once the old East Wing was demolished—several months after the Project was announced, but before the Trust filed suit[6]—a new structure was imperative; it is untenable to leave a hole next to the Executive Mansion. Even the district court so recognized when it allowed "above-ground construction" so long as it is not "the proposed ballroom." JA509-10. More fundamentally, the Trust is haggling over price. If the mere "cost" of taking down a structure would foreclose an injunction in a few months, Opp.48, certainly the serious risk to the President and continuity of government forecloses one now.

In the end, "the proper determination of where the public interest lies does not strike us as a close question." *Winter*, 555 U.S. at 26. Indeed, the scales here are even more lopsided. Nothing more than an obvious equitable

---

[6] Contrary to the Trust's claim of a lack of "advance public notice," Opp.6, the press release plainly stated that "the new ballroom will be where the small, heavily changed, and reconstructed East Wing currently sits," JA82.

intuition—that a critical national-security project should not be indefinitely postponed because one pedestrian might meet it with literal glancing disapproval once a month—is needed to reverse. *Id.* Equity should protect the Nation, its leaders, and its institutions, not a passerby's architectural sensitivities.

## CONCLUSION

This Court should continue the stay and reverse the injunction.

ADAM R.F. GUSTAFSON
  *Principal Deputy Assistant*
*Attorney General*

  *Environment and Natural*
  *Resources Division*

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant*
    *Attorney General*

/s/ Brantley T. Mayers
BRANTLEY T. MAYERS
  *Attorney*
  *Civil Division, Room 3632*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 890-9874*

May 2026

31

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because it contains 6,481 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Expanded BT 14-point font, a proportionally spaced typeface.

*/s/ Brantley T. Mayers*
BRANTLEY T. MAYERS