# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued June 5, 2026                    Decided August 7, 2026

No. 26-5123

NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE
UNITED STATES,
APPELLEE

v.

NATIONAL PARK SERVICE, ET AL.,
APPELLANTS

———

Consolidated with 26-5134

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:25-cv-04316)

———

*Yaakov M. Roth*, Principal Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for appellants/cross-appellees. With him on the briefs were *Brett A. Shumate*, Assistant Attorney General, *Brantley T. Mayers*, Attorney, and *Adam R.F. Gustafson*, Principal Deputy Assistant Attorney General, Environment and Natural

2

Resources Division.  *Steven A. Myers* and *Michael S. Raab*, Attorneys, entered appearances.

*Richard Jaffe* was on the brief for *amicus curiae* American Conservative Union in support of appellants/cross-appellees.

*Thaddeus A. Heuer* argued the cause for appellee/cross-appellant.  With him on the brief were *Matthew F. Casassa*, *Kevin Y. Chen*, *Jack C. Smith*, and *Gregory B. Craig*.

*Philip Allen Lacovara*, *Andrea C. Ferster*, and *Paul W. Edmondson* were on the brief for *amici curiae* Various Organizations Advancing Protection of National Parks, Historic Preservation, and National Capital Planning in support of appellee/cross-appellant.

*Nikhel S. Sus*, *Christina Wentworth*, and *Daniel S. Lenz* were on the brief for *amici curiae* Campaign Legal Center and Citizens for Responsibility and Ethics in Washington in support of appellee/cross-appellant.

*Elizabeth Wydra* and *Brianne J. Gorod* were on the brief for *amici curiae* Members of Congress in support of appellee/cross-appellant.

*Aditi Shah* and *Scott Michelman* were on the brief for *amicus curiae* American Civil Liberties Union of the District of Columbia in support of appellee/cross-appellant.

Before: MILLETT, RAO, and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judges* MILLETT and GARCIA.

Dissenting opinion filed by *Circuit Judge* RAO.

3

MILLETT and GARCIA, *Circuit Judges*:  The White House is the People's House, and under the Constitution's Property Clause, Congress exercises plenary control over the building and its surrounding land.  The White House is also the centerpiece of President's Park, a National Park stewarded by the National Park Service.  According to the government, as the oldest public building in the District of Columbia, the White House is the crown jewel not just of President's Park, but also of the Lafayette Square National Historic Landmark District, a site listed for preservation in the National Register of Historic Places.  *See* Finding of No Significant Impact, White House East Wing Modernization & State Ballroom Environmental Assessment ("FONSI"), ECF No. 14-2, at 5. The founding architect of the Nation's capital, Pierre L'Enfant, designed the capital city's layout to focus on the towering Capitol building—the gleaming palace of the people in the new democracy—and to contrast it with the simple humility of the White House.  *See* SCOTT W. BERG, GRAND AVENUES: THE STORY OF PIERRE CHARLES L'ENFANT 112 (2008) ("Where the king's bedroom was placed on the central axis of Versailles, enshrining the rule of divine right transferred via primogeniture, here in L'Enfant's plan the home of Congress took center stage."); FONSI at 5 ("Situated on a high point within the city, the White House is a focal point on the principal north-south axis of L'Enfant's plan.").[1]

Each President is a temporary tenant, not the owner, of the White House and its Executive Residence.  The President has no—and claims no—constitutionally assigned authority over that property, which is designed and maintained for the use of

---

[1] Unless otherwise indicated, all citations to ECF numbers are to the district court docket in this case, 25-CV-4316 (D.D.C., filed Dec. 12, 2025).  Citations to page numbers are to the electronically generated numbers at the top of the page.

4

all Presidents, current and future, and for the American people. As the defendant National Park Service has explained, "[t]he White House is owned by the American people and stewarded by the National Park Service. It is more than the President's residence; it is a site for protests and national discourse about what it means to be American." *The White House and President's Park*, NAT'L PARK SERV., https://perma.cc/MJ7A-2JSG.

Throughout history, Congress has appropriated funds both for the White House's maintenance and for necessary physical improvements and additions. Congress, for example, authorized the repair and reconstruction of the White House after the British attempted to burn it down during the War of 1812. Act of Feb. 13, 1815, ch. 41, 3 Stat. 205, 205. Congress also specifically appropriated the funds that were used to build the original East and West Wings of the White House. Act of June 28, 1902, ch. 1301, § 1, 32 Stat. 419, 460.

We are aware of no instance in American history in which a President unilaterally and using privately collected funds demolished substantial portions of the White House that Congress authorized to be built and American taxpayers paid for. Until now.

Over just three days in October 2025, without undertaking promised consultations or obtaining Congress's permission, President Trump bulldozed the entire East Wing in order to construct a massive, 90,000 square-foot ballroom paid for by private funds with no congressional oversight. There is no factual dispute at this juncture—in fact, the Defendants admit—that the erection of this enormous ballroom will "have permanent adverse impacts on the cultural landscape" of President's Park. White House East Wing Modernization & State Ballroom Environmental Assessment ("Env't

5

Assessment"), ECF No. 14-3, at 11.  The ballroom construction also will "disrupt the historical continuity of the White House grounds[,]" and will "adversely alter the design, setting, and feeling of the White House and the grounds over the long-term."  FONSI at 6–7.

The National Trust for Historic Preservation brought suit challenging the planned construction.  The district court preliminarily enjoined the above-ground construction of the ballroom.  At the same time, the injunction expressly excepts from its scope all below-ground construction, including construction of bunkers, bomb-shelters, and military and medical infrastructure, as well as above-ground construction "strictly necessary to cover, secure, and protect" such facilities, "to provide for the personal safety of the President and his staff[,]" and "to ensure the safety, security, and structural integrity of the White House, the White House grounds, and the below-ground construction site[.]"  Am. P.I. Order, ECF No. 73, at 2–3.

The Defendants have appealed that preliminary injunction and requested a stay pending appeal.  We affirm the grant of the preliminary injunction, with its safety-and-security exception, and deny the motion for a stay as moot.  The Defendants disclaim any explicit or implicit constitutional authority for their actions.  And they very likely lack statutory authority to construct the ballroom given (i) Congress's full constitutional control over federal property and the funding of its maintenance and development, (ii) the absence of any express or implied authorization for the ballroom construction, and (iii) express statutory limitations that the ballroom construction violates.  Absent the injunction, construction of the ballroom will inflict permanent and irreversible harm to the historic, architectural, and aesthetic interests of the National Trust's members, as well as the design of President's Park, the

6

White House, and the surrounding area. The Defendants themselves agree those irreversible harms will occur. As for the Defendants' safety and security concerns, the district court's modified preliminary injunction will protect them during the pendency of litigation. In addition, the Constitution assigns Congress—not the Executive—the responsibility to decide whether proposed changes to the physical design of the White House may proceed, even where those changes are said to serve security interests. The Defendants have not shown that Congress delegated that authority to either the President or the National Park Service. Whether or not a massive ballroom should be constructed is for Congress to decide and is not a matter for Executive self-help.

This holding has nothing at all to do with whether the proposed ballroom is desirable, or not, as a matter of policy. This ruling does not even necessarily mean that the Defendants may not ultimately construct the ballroom. What it does mean is that the Defendants may not do so during the district court's expeditious litigation without securing Congress's authorization, as the Constitution and laws require. At this preliminary stage, the National Trust has shown, compellingly, that Congress has not ceded unfettered authority to the Executive Branch to dramatically redesign, reshape, and reconstruct the White House—the People's House—to fit a particular President's desires.

Accordingly, we affirm the district court's judgment issuing the modified preliminary injunction and vacate this court's administrative stay entered on April 17, 2026. We will stay this decision for fourteen days to allow the Defendants, if they choose, to seek Supreme Court review.

7

**I**

**A**

**1**

Congress has exclusive authority to regulate the construction and demolition of White House structures.  The Constitution's Property Clause vests Congress with plenary control over all real property that belongs to the United States.  U.S. CONST. Art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States[.]"); *see Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 331 (1936) (The Clause's "broad terms" encompass "the due regulation of all \* \* \* personal and real property rightfully belonging to the United States.") (quotation marks omitted).  In addition, the Constitution's District Clause confers on Congress comprehensive legislative authority over the District of Columbia as "the Seat of Government of the United States[.]" U.S. CONST. Art. I, § 8, cl. 17.

In 1912, Congress placed a statutory exclamation point on its exclusive powers by providing that "there shall not be erected on any reservation, park, or public grounds[] of the United States within the District of Columbia, any building or structure without express authority of Congress."  Act of Aug. 24, 1912, ch. 355, 37 Stat. 417, 444.  More than a hundred years later, that prohibition remains in effect:  "A building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress."  40 U.S.C. § 8106.

8

As long as the White House has existed, Congress has authorized and funded its upkeep, maintenance, updates, and renovations large and small. *See, e.g.*, Residence Act, ch. 28, § 3, 1 Stat. 130, 130 (1790) (creating a commission to "provide suitable buildings for the accommodation * * * of the President"); Act of Feb. 13, 1815, ch. 41, 3 Stat. 205, 205 (authorizing the President to borrow up to $500,000 to "cause to be repaired or rebuilt forthwith, the President's House" following its destruction in the War of 1812); An Act making appropriations for the public buildings, ch. 62, § 1, 3 Stat. 784, 784 (1823) (appropriating $19,000 to "finish[] the south portico to the President's house"); An Act making appropriations for the public buildings, and for other purposes, ch. 51, § 1, 4 Stat. 362, 362 (1829) (appropriating $24,769.25 to "complete the north front of the President's house, according to the original plan, by erecting a portico"); Act of March 3, 1853, ch. 97, § 1, 10 Stat. 189, 207 (providing $6,250 for "cleaning, painting, and whitewashing inside of the house; extending east wing of offices for carriage-house, blinds for the west front of the house, flooring large room in basement, purchasing trees and plants for garden, and for making hot-beds therein"); Act of June 28, 1902, ch. 1301, § 1, 32 Stat. 419, 460 (providing $65,196 for the building of the West Wing, "constructed with sufficient foundation and walls suitable for a durable, permanent building," and $475,445 "[f]or extraordinary repairs and refurnishing of the Executive Mansion * * * including all necessary alterations and additions"); Act of March 4, 1909, ch. 299, § 1, 35 Stat. 945, 995 (providing $40,000 for construction of the Oval Office as "additional accommodations to the building erected for the offices of the President"); Act of July 3, 1926, ch. 771, § 1, 44 Stat. 841, 844 ("For reconstructing the roof, attic, and ceilings of the second story of the Executive Mansion, including all necessary work in connection therewith, to be prosecuted, by contract or otherwise as the President may determine, under the

9

supervision of the Director of Public Buildings and Public Parks of the National Capital, fiscal years 1927 and 1928, $375,000[.]"); Act of April 28, 1942, ch. 247, 56 Stat. 226, 236 ("For an additional amount for salaries and expenses, public buildings and grounds in the District of Columbia and adjacent area, fiscal year 1942, including the objects specified under this head in the Independent Offices Appropriation Act, 1942, $3,413,394[.]"); Act of Dec. 28, 1945, ch. 589, 59 Stat. 632, 634 (providing $1.65 million "[f]or an addition to the Executive Mansion" and "for alterations, improvements, and furnishings"); An Act To provide for a Commission on Renovation of the Executive Mansion, ch. 51, §§ 1–5, 63 Stat. 45, 45–47 (1949) (creating a Commission on Renovation of the Executive Mansion to oversee President Truman's renovations); Act of June 23, 1949, ch. 236, 63 Stat. 231, 235 (providing $2 million "[f]or all expenses necessary for and incident to the renovation, repair, and modernization * * * of the Executive Mansion").

Congress also has separately authorized the President to make discretionary expenditures to pay for needed staff within the White House. In 1948, Congress passed a modest provision setting the annual compensation for the President's personal secretary at $10,000. Act of June 25, 1948, ch. 644, § 105, 62 Stat. 672, 678. Over the next thirty years, Congress occasionally tweaked that provision, codified at 3 U.S.C. § 105, to create new salaried positions for a growing cadre of administrative aides.[2]

---

[2] *See* Act of Oct. 15, 1949, ch. 695, § 2(a), 63 Stat. 880, 880 (adding positions for "six administrative assistants[,]" an "Executive Secretary of the National Security Council," and "five other secretaries or other immediate staff assistants"); Act of July 31, 1956, ch. 804, § 109, 70 Stat. 736, 740 (adjusting salaries and adding three more secretaries and staff assistants); Act of Oct. 4, 1961, Pub. L.

10

In 1978, Congress reorganized Section 105 into its current form. *See* Act of Nov. 2, 1978, Pub. L. No. 95-570, 92 Stat. 2445, 2445–2446. As amended, Section 105 provides for "Assistance and [S]ervices for the President" in five subsections. 3 U.S.C. § 105. Sections 105(a) and (b) provide that "the President is authorized" to hire and pay employees "in the White House Office" and "in the Executive Residence at the White House" under the General Schedule pay-grade system. *Id.* § 105(a)–(b). Section 105(c) provides that the "President is authorized" to procure, "as provided in appropriation Acts, temporary or intermittent services of experts and consultants" for the White House Office and the Executive Residence. *Id.* § 105(c). And Section 105(e) allows the President's spouse to enjoy the assistance and services of the employees and consultants authorized above. *Id.* § 105(e).

This case concerns Section 105(d), which amid those staff funding authorizations provides:

> (d) There are authorized to be appropriated each fiscal year to the President such sums as may be necessary for—
>
> > (1) the care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power fixtures) of the Executive Residence at the White House;

---

No. 87-367, § 303(h), 75 Stat. 785, 794 (adjusting salaries); Act of Aug. 14, 1964, Pub. L. No. 88-426, § 304(b), 78 Stat. 400, 422 (adding position for an "Executive Secretary of the National Aeronautics and Space Council"); Act of Dec. 23, 1967, Pub. L. No. 90-222, § 111(c), 81 Stat. 672, 726 (adding position for an "Executive Secretary of the Economic Opportunity Council").

11

(2) the official expenses of the White House Office;

(3) the official entertainment expenses of the President;

(4) the official entertainment expenses for allocation within the Executive Office of the President; and

(5) the subsistence expenses of persons in the Government service while traveling on official business in connection with the travel of the President.

3 U.S.C. § 105(d).

The phrase "[t]here are authorized to be appropriated" in Section 105(d) sharply distinguishes that provision from the rest of Section 105, which speaks in terms of what "*the President* is authorized" to do.    3 U.S.C. § 105(a)–(c) (emphasis added).    Section 105(d), in contrast, is an appropriation "authorization act" that Congress can choose to fund or not going forward. OFFICE OF THE GEN. COUNSEL, GOV'T ACCOUNTABILITY OFF., PRINCIPLES OF FEDERAL APPROPRIATIONS LAW 2-56 ("GAO REDBOOK") (4th ed. 2016); *see also id.* at 2-54.    "The expression 'authorized to be appropriated' * * * clearly indicates that no appropriation is made or intended to be made, but the bill when enacted becomes the authority of law for an expected appropriation in the future[.]"  *Id.* at 2-54–2-55 (quoting 27 Comp. Dec. 923 (1921)).

12

Said more simply, an "authorization act is basically a directive to Congress itself, which Congress is free to follow or alter * * * in the subsequent appropriation act." GAO REDBOOK 2-56; *cf. CFPB v. Community Fin. Servs. Ass'n of America, Ltd.*, 144 S. Ct. 1474, 1481 (2024) ("[T]o satisfy the Appropriations Clause," an appropriation "need only identify a source of public funds and authorize the expenditure of those funds for designated purposes[.]").

Congress has regularly exercised its appropriation authority under Section 105(d), often continuing its historical pattern of regulating the President's use of the funds. *See*, *e.g.*, Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, 118 Stat. 2809, 3246 (2004) (appropriating $12.76 million "[f]or the care, maintenance, repair and alteration, refurnishing, improvement, heating, and lighting, including electric power and fixtures, of the Executive Residence at the White House and official entertainment expenses of the President * * * to be expended and accounted for as provided by 3 U.S.C. 105, 109, 110, and 112–114"); *id.* at 3247 (appropriating $1.9 million "[f]or the repair, alteration, and improvement of the Executive Residence at the White House * * * to remain available until expended, for required maintenance, safety and health issues, and continued preventative maintenance"); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182, 1392 (2020) (appropriating $2.5 million "[f]or the repair, alteration, and improvement of the Executive Residence at the White House pursuant to 3 U.S.C. 105(d) * * * to remain available until expended, for required maintenance, resolution of safety and health issues, and continued preventative maintenance").

In 2024, 2025, and 2026, Congress appropriated $2.475 million under Section 105(d) to be used for "required maintenance, resolution of safety and health issues, and

13

continued preventative maintenance."  Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 532 (under the heading "White House Repair and Restoration"); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101(a)(5), 1102, 139 Stat. 9, 11–12 (continuing 2024 funding levels); Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173, 451 (same as 2024).

When Congress appropriates funds for the purposes described in Subsections 105(d)(1), (3), or (5), such sums "may be expended as the President may determine, notwithstanding the provisions of any other law," as long as the expenditures remain within the confines of the appropriation act's denominated purposes.  3 U.S.C. § 105(d).  At the same time, those expenditures are expressly subject to oversight by the Comptroller General, who "may inspect all necessary * * * records" to verify that the President's spending was confined to "expenses in paragraph (1), (3), or (5)." *Id.*  The Comptroller General must "certify to Congress the fact of such verification, and shall report any such expenses not expended for such purpose." *Id.*

Section 105's statutory neighbors similarly reflect Congress's close control over and provision for maintenance of the White House on legislatively specified terms.  For example, Congress closely regulates the acquisition of furniture for the Executive Residence, 3 U.S.C. §§ 109–110, requiring that purchased furniture be, "as far as practicable, of domestic manufacture" and that any donated furniture "maintain[] the interior of the Executive Residence at the White House in keeping with its original design," *id.* § 110.  Congress further required the Director of the National Park Service to establish a committee that includes representatives of the American Federation of Arts, the National Commission of Fine Arts, the

14

National Academy of Design, and the American Institute of Architects to "select" and "recommend" the acceptance or not of any donated furniture pieces. *Id*.; *see id.* § 109 (requiring annually a "complete inventory, in proper books" of "all the public property in and belonging to the Executive Residence at the White House").

**2**

The 1916 National Park Service Organic Act established the Park Service and charged it with

> promot[ing] and regulat[ing] the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

54 U.S.C. § 100101(a); Act of Aug. 25, 1916, ch. 408, § 1, 39 Stat. 535, 535.

Later, in the 1978 Redwood Amendment, Congress doubled down on its requirement that the "protection, management, and administration" of the National Park System "shall not be exercised in derogation of the values and purposes for which the System units have been established" and requiring that any authority to depart from those purposes be "*directly and specifically* provided by Congress." 54 U.S.C. § 100101(b)(2) (emphasis added); Act of March 27, 1978, Pub. L. No. 95-250, § 101(b), 92 Stat. 163, 166.

15

The Organic Act separately authorizes the Park Service to accept "money that may be donated for the purposes of the System." 54 U.S.C. § 101101(2). The congressionally chartered National Park Foundation "accept[s] and administer[s] those gifts" to "further the conservation of natural, scenic, historic, scientific, educational, inspirational, or recreational resources for future generations of Americans[.]" *Id.* § 101111. All donations to the Park Service must be placed in a federal trust. *See* 31 U.S.C. § 1321(a)(17), (b)(1). Congress has appropriated those funds to be used only "for the benefit of, or in connection with," the Park Service, "its activities, or its services." 54 U.S.C. § 101113; *see* 31 U.S.C. § 1321(a)(17), (b)(1).

**3**

Under the Economy Act, the "head of an agency or major organizational unit within an agency may place an order with a major organizational unit within the same agency or another agency for goods or services if":

(1) amounts are available;

(2) the head of the ordering agency or unit [that is, the agency making the request] decides the order is in the best interest of the United States Government;

(3) the agency or unit to fill the order is able to provide or get by contract the ordered goods or services; and

(4) the head of the agency decides ordered goods or services cannot be provided by contract as conveniently or cheaply by a commercial enterprise.

16

31 U.S.C. § 1535(a).[3]

Importantly, "the Economy Act does not authorize an agency to use another agency to do anything it could not lawfully do itself." GAO REDBOOK 12-26 (3d ed. 2008); *see also* 31 U.S.C. § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."); *cf. Department of Navy v. Federal Lab. Rels. Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) ("[A]n agency cannot use the device of a contract, grant, or agreement to accomplish a purpose it could not do by direct expenditure[.]") (quoting GAO REDBOOK 4-9 (3d ed. 2004)). The Defendants agree. Oral Arg. Tr. 32:18–19 (The ordering agency "has to be able to do the project."); *id.* at 35:6–9 (agreeing that the ordering agency must "have the legal authority so that they could * * * do th[e] job themselves").

**B**

**1**

The White House sits at the heart of President's Park. President's Park began as "Federal Reservation 1" in Pierre L'Enfant's 1791 plan for the nascent capital city. *See* Nat'l Park Serv., *Comprehensive Design Plan:  The White House & President's Park* 143 (2000) ("2000 Design Plan").  The National Park Service assumed responsibility for the property in 1933. *Id.* at 40; *see also* Exec. Order No. 6166 § 2 (1933). Congress later formally directed that the White House building

---

[3] Title 31 broadly defines "agency" as "a department, agency, or instrumentality of the United States Government." 31 U.S.C. § 101.

17

complex itself be administered as a national park.  *See* Act of Sept. 22, 1961, Pub. L. No. 87-286, § 1, 75 Stat. 586, 586.

Today, President's Park extends north from Constitution Avenue, across Pennsylvania Avenue, to H Street Northwest.  *The White House and President's Park:  Explore President's Park*, Nat'l Park Serv., https://perma.cc/3CB3-VSDD.  It comprises about 82 acres, including the Ellipse, the White House complex and its grounds, and Lafayette Square.  *Id.*; 2000 Design Plan at 6; FONSI at 5.  The Park's northern edge is embraced by the Lafayette Square Historic District, which itself boasts paradigms of 19th century American architecture like St. John's Church, the Blair House, the Dolley Madison House, and the Stephen Decatur House.  *See The White House and President's Park:  Explore President's Park*.  The White House is the centerpiece of President's Park.  FONSI at 5.

**2**

On July 31, 2025, the White House announced plans to build a 90,000 square-foot ballroom in President's Park using privately donated funds.  Press Release, The White House, The White House Announces White House Ballroom Construction to Begin (July 31, 2025), https://perma.cc/6N2H-RLE9.  The announcement explained that the ballroom would be "substantially separated from the main building of the White House" and constructed where the "East Wing currently sits."  *Id.*  The press release represented that the President was "fully committed to working with the appropriate organizations to preserv[e] the special history of the White House[.]"  *Id.*

In August 2025, the National Park Service conducted an environmental assessment of the proposed construction.  The Park Service determined that the project "would have permanent adverse impacts on the cultural landscape" of

18

President's Park because the proposed ballroom would "depart[] from the traditional aesthetic values and architectural integrity" of the White House complex. Env't Assessment at 11.

The government's Environmental Assessment also found that the ballroom "would disrupt the historical continuity of the White House grounds" because the "new building's larger footprint and height would dominate the eastern portion of the site, creating a visual imbalance with the more modestly scaled West Wing and Executive Mansion." Env't Assessment at 14. The planned second-story addition to the East Colonnade would exacerbate the asymmetry. *Id.* According to the assessment, this discrepancy would "chang[e] the traditional spatial organization and sightlines of the grounds[.]" *Id.* In combination, the proposed construction would "adversely alter the design, setting, and feeling of the White House and the grounds over the long-term." FONSI at 7.

The Environmental Assessment further concluded that the proposed ballroom's size would permanently alter the views of President's Park for visitors in "certain locations, particularly Lafayette Square and portions of the Ellipse[.]" Env't Assessment at 19. The Park Service added that "[t]he removal of the current East Wing" to build the ballroom "will result in a permanent adverse impact for those who value the experience of this specific space." FONSI at 8.

Nevertheless, the Park Service found that the ballroom project would have no "significant" impact on the White House complex because the White House would retain "photograph[s]" of what the East Wing previously looked like and would "salvage and stor[e] * * * select historic building materials[.]" FONSI at 6, 16. In the Park Service's view, those two steps sufficed to "preserve important elements of the

19

historic fabric" of the East Wing and the formerly cohesive White House complex.  *Id.* at 16.  In so finding, the Park Service briefly considered "a no action alternative[,]" but the ballroom project "was selected for implementation[] because the Executive Office of the President identified the selected action as the only alternative that meets its functional goals and operational needs."  *Id.* at 13.

The Park Service chose, without any explanation, not to publish either its Environmental Assessment or its Finding of No Significant Impact.  *Contrast* 42 U.S.C. § 4336(b)(2) ("[An] environmental assessment shall be a concise *public document* prepared by a Federal agency[.]") (emphasis added); NAT'L PARK SERV., NPS NEPA HANDBOOK 69 (2015) ("The NPS must notify the public of the availability of a FONSI once it is signed.  The standard NPS practice to meet this requirement is to announce its availability on [the NPS's online platform for public comment] and through a press release, direct or electronic mailings, or other effective means of communication.") (citations omitted).

Two months later, "without advance notice" and without first undertaking the promised consultations, President Trump posted on social media that "ground ha[d] been broken on the White House grounds to build the new, big, beautiful White House Ballroom."  *National Trust for Historic Pres. in the U.S. v. National Park Serv.*, 827 F. Supp. 3d 93, 100 (D.D.C. 2026) ("*National Trust III*").  Within three days, "the East Wing had been demolished in its entirety."  *Id.*

20

**C**

**1**

The National Trust for Historic Preservation in the United States is a congressionally chartered membership organization that seeks to preserve and promote the United States' architectural and cultural heritage. *See* Decl. of Elizabeth S. Merritt, ECF No. 2-2, at ¶¶ 2–4. The National Trust was created in 1949 to, among other things, "facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest[.]" 54 U.S.C. § 312102(a). The National Trust has a long history of involvement in President's Park. Since 1956, the National Trust has owned the historic home of Commodore Stephen Decatur, the first private residence built in the Lafayette Square Historic District. *See* Merritt Decl. ¶ 9. The Decatur House, which the famed Naval Commodore enjoyed only briefly before his death in an honor duel, sits on the northwest corner of Lafayette Square and looks out onto President's Park. *Id.*; Decl. of Alison K. Hoagland, ECF No. 2-3, at ¶ 12. The National Trust "frequently" holds board meetings at the Decatur House, Merritt Decl. ¶ 9, since the District of Columbia is the National Trust's "principal" location, 54 U.S.C. § 312103.

When the National Trust learned about the sudden demolition of the East Wing, it warned the Park Service that the "massing and height of the proposed new construction" would "permanently disrupt the carefully balanced classical design of the White House[.]" Compl., ECF No. 1, at ¶ 51. The National Trust urged the National Park Service to "pause" demolition and construction until the proposal for the ballroom could be publicly reviewed. *Id.* ¶ 52. The Park Service did not respond. *Id.* ¶ 53.

21

In December 2025, the National Trust filed this suit and moved for a temporary restraining order halting further construction. *See* Compl.; TRO Mot., ECF No. 2-1. As relevant here, the National Trust argued that the Park Service and its officers had acted contrary to law by starting the ballroom project without Congress's express authorization and without statutorily required consultations, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2). *See* Compl. ¶¶ 105–134, 154–160; TRO Mot. at 25–32. The National Trust contended that if the Park Service continued with the ballroom project, the National Trust and its members would suffer "aesthetic, cultural, and historic harms" because "the historical significance of [the White House's] design will be physically overcome" by the proposed ballroom. TRO Mot. at 45.

On the merits, the Defendants responded that the National Trust's claims were misdirected "[b]ecause [the Executive Office of the President (EOP)] is managing this project" and the relevant consultation statutes have "no application to the President." TRO Opp'n, ECF No. 14, at 22–26. At a hearing on the National Trust's motion, the Defendants doubled down: Because the project "is being planned, directed, and executed by the Executive Office of the President" and the Office of the Executive Residence (EXR), and because neither of those entities is an agency within the meaning of the APA, "there is no agency action for [the] Court to enjoin[,]" so the Trust's APA claims necessarily fail. TRO Hr'g Tr., ECF No. 18, 22:2–6, 24:17–20. In addition, the Defendants argued that EOP and EXR have independent statutory authority to construct the ballroom under Section 105(d)(1). TRO Opp'n at 23.

The Defendants further argued that the National Trust's claims were "unripe" because EOP and EXR would "commence the statutory consultation process" shortly, "architectural design for the above-grade elements is still in

22

progress[,]" and "above-grade structural work will not occur until April 2026, at the earliest." TRO Opp'n at 18–19. When pressed by the district court on whether the below-ground work, which had already begun, would "dictate the height and the width" of the ballroom itself, the Defendants assured the district court that "[t]here's nothing here to suggest" that changes to the ballroom "would be impossible" or that "anything irreversible" would occur during underground construction. TRO Hr'g Tr. 21:9–20; *see also id.* 20:22–24 ("[T]he below-ground work that's occurring now has nothing to do with Plaintiff's asserted aesthetic injury" from above-ground construction of the ballroom.); Decl. of Professional Engineer, ECF No. 30-4, at ¶ 9 (Defendants' submission of a declaration from a professional engineer stating that the "primary foundation system for the structure can accommodate potential design changes to the configuration of the above-grade structure").

The district court denied the National Trust's request for a temporary restraining order on the ground that there was "no sufficiently imminent risk of irreparable aesthetic harm" tied to above-ground construction that required immediate relief. *National Trust for Historic Pres. in the U.S. v. National Park Serv.*, 813 F. Supp. 3d 42, 44 (D.D.C. 2025) ("*National Trust I*"). The court expressly rested its ruling on "the Government's representations" that the above-ground designs were not yet finalized, and added that "[i]f there *is* any below-grade construction that dictates the size or scale of the proposed ballroom * * *, then the Government should be prepared to take it down" if required by a future ruling. *Id.*; *see also id.* ("The Court will hold the Government to its word.").

Two weeks later, the National Trust amended its complaint and sought a preliminary injunction. *See* Am. Compl., ECF No. 19; P.I. Mot., ECF No. 20. As relevant here, the National

23

Trust added EOP and EXR as defendants based on the Defendants' representation that those entities were in charge of the project. *See* P.I. Mot. at 10. The National Trust argued that EXR was an agency for purposes of its APA claims and that both EOP and EXR could be enjoined from constructing the ballroom under the APA. *Id.* at 26–30. Alternatively, the National Trust argued that EOP's and EXR's unilateral direction of the project would violate the constitutional separation of powers by usurping Congress's authority under the Property Clause. *Id.* at 32–35.

In January 2026, the Defendants opposed the National Trust's preliminary injunction motion. P.I. Opp'n, ECF No. 30. The Defendants argued the National Trust was not likely to succeed on the merits of its APA claim because "the entity directing the project"—EXR—"is not subject to the APA." *Id.* at 22 (capitalization altered). The Defendants added that an APA claim could not lie against the Park Service because the Park Service "is indisputably not directing" the project and that there was "no [Park Service] action that the Court could set aside under the APA[.]" *Id.* at 26 n.7.

In February, the district court denied the National Trust's request for a preliminary injunction. *National Trust for Historic Pres. in the U.S. v. National Park Serv.*, 821 F. Supp. 3d 62, 65 (D.D.C. 2026) ("*National Trust II*"). The district court concluded that the National Trust had shown a substantial likelihood of associational standing to vindicate cognizable harms to its members' aesthetic, historic, and cultural interests in the White House and President's Park. *Id.* at 68–71. But, in reliance on the Defendants' representation that EXR was "the entity managing the East Wing project[,]" the district court concluded that the Trust's APA claims were unlikely to succeed because "EXR is likely not an 'agency' under the APA." *Id.* at 71. The court further ruled that the National

24

Trust's claims were "properly characterized as statutory," so it lacked "a freestanding constitutional claim for injunctive relief." *Id.* at 73–74 (first quoting *Global Health Council v. Trump*, 153 F.4th 1, 14 (D.C. Cir. 2025)). The district court noted that the National Trust had not pleaded a statutory *ultra vires* claim. *Id.* at 76.

A week later, the National Trust amended its complaint to add the claims that the Park Service, EOP, and EXR had acted *ultra vires* and without statutory (or other) authority to erect a ballroom on the White House grounds. 2d Am. Compl., ECF No. 50, ¶¶ 197–224. The National Trust also repeated its allegation that the Park Service had acted contrary to law in violation of the APA and 40 U.S.C. § 8106 by beginning construction of a whole new building on the White House grounds without Congress's express authorization. 2d Am. Compl. ¶¶ 172–178. The National Trust then renewed its request for a preliminary injunction. *See generally* 2d P.I. Mot., ECF No. 51-1.

In response, the Defendants added a new defense that the project was lawful because the Park Service had independent authority to construct the ballroom on White House grounds under its organic statute. 2d P.I. Opp'n, ECF No. 52, at 21–27 (citing 54 U.S.C. § 100101). That argument "came as a surprise" to the district court, *National Trust III*, 827 F. Supp. 3d at 113, because the Defendants had previously argued—and won the denial of a preliminary injunction by arguing—that the Park Service had "no role" in the project and had taken no action reviewable under the APA, P.I. Opp'n at 26 n.7, 32.

On March 31st, the district court preliminarily enjoined the above-ground construction of the ballroom. *See National Trust III*, 827 F. Supp. 3d at 99. The district court concluded that, to the extent EXR or EOP had ordered the construction, that

25

action was likely *ultra vires* because (i) Congress has exclusive constitutional authority over federal property like the White House, (ii) 3 U.S.C. § 105(d)(1) does not authorize the President to demolish an entire publicly funded Wing of the White House and replace it with a privately funded ballroom, and (iii) 40 U.S.C. § 8106 separately requires Congress's express approval for such an endeavor. *See National Trust III*, 827 F. Supp. 3d at 104–112. In addition, to the extent the Park Service had a role in directing and funding the construction, the district court concluded that such action was likely contrary to law in violation of the APA because nothing in the Park Service's organic statute overrode the requirement of congressional approval in 40 U.S.C. § 8106. *See National Trust III*, 827 F. Supp. 3d at 112–114.

The district court enjoined the Park Service, EXR, EOP, and related entities, officers, and agents "from taking any action in furtherance of the physical development of the proposed ballroom * * *, including but not limited to any further demolition, site preparation work, landscape alteration, excavation, foundation work, or other construction or related work[.]" P.I. Order, ECF No. 61, at 1–2. The injunction did not extend to the President himself. *See generally id.* At the same time, the court exempted from the preliminary injunction those "actions strictly necessary to ensure the safety and security of the White House and its grounds, including the ballroom construction site, and provide for the personal safety of the President and his staff[.]" *Id*. at 2.

At the Defendants' request, the district court stayed the effect of its order for fourteen days to allow them time to seek a stay pending appeal from this court. *See* P.I. Order at 2. The Defendants noticed their appeal and moved this court for a stay pending appeal.

26

**2**

On April 11th, we extended the stay for an additional week, remanded the case to the district court, and dismissed the Defendants' motion as moot. Per Curiam Order, No. 26-5101, Dkt. 2168165 (April 11, 2026) ("Remand Order"). We did so because the Defendants' claimed irreparable harms—a prerequisite for the issuance of a stay pending appeal—were difficult to square with the limited record. *See id.* at 3 (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

The Defendants argued that the district court's preliminary injunction interfered with the construction of security fixtures *beneath* the proposed ballroom. *See* Remand Order at 3. But the injunction's language prohibited only "physical development *of the proposed ballroom*[.]" P.I. Order at 2 (emphasis added). It expressly exempted those "actions strictly necessary to ensure the safety and security of the White House and its grounds[.]" *Id.*

The Defendants also argued that the injunction would jeopardize national security by delaying the realization of security upgrades and the closure of the open construction site on White House grounds. *See* Remand Order at 3–4. But the Defendants had not explained how, if at all, the injunction interfered with their plans to secure the grounds during a project their own planning documents showed would not be completed for more than two years at the earliest. *See id.* (citing FONSI at 8).

We remanded the case to give the Defendants an opportunity to develop a record of their claimed irreparable harms and to allow the district court to resolve a then-pending motion to clarify the injunction given the parties' sharp

27

disagreement over the scope of the injunction's safety-and-security exception.  Remand Order at 4.

**3**

On remand, the Defendants told the district court that their plans for below-ground security upgrades were "inseparable" from the original ballroom design itself and that the two "cannot exist in isolation."  *See* Resp. to Mot. to Clarify, ECF No. 69, at 2–3.  On that basis, the Defendants reasoned that the court's preliminary injunction had no effect and all construction could proceed under the "'safety-and-security' exception" because "the entire project advances critical national-security objectives as an integrated whole."  *Id.* at 1.

The district court strongly disagreed.  *See National Trust for Historic Pres. in the U.S. v. National Park Serv.*, No. 25-CV-4316, 2026 WL 1027744, at *1 (D.D.C. April 16, 2026) ("*National Trust IV*").

The court first pointed out that, through all previous stages of the litigation, the Defendants had repeatedly represented that the project's "*underground* elements"—not anything above ground—impacted national security, *National Trust IV*, 2026 WL 1027744, at *2, and that construction of the security bunker below ground and the ballroom above were "independent" of each other, *id.* at *3 (quoting P.I. Opp'n at 48).  Further, the Defendants had assured the district court in January that "the project's below-ground elements do not 'lock in' the design of the above-ground ballroom."  *Id.* at *2 (quoting P.I. Opp'n at 13).  The district court found that the Defendants' current claim that the ballroom and below-ground bunker construction have been an inseparable and integral whole all along is "in direct conflict with Defendants' prior representations" to the court.  *Id.* at *3.

28

With that procedural background in mind, the district court explained that its order enjoined "the above-ground, visible construction of the ballroom," but not below-ground construction. *National Trust IV*, 2026 WL 1027744, at *2. In the court's judgment, that division both prevented the National Trust's threatened irreparable harms and respected the "discrete national security concerns about construction of *underground* elements" that the Defendants had raised "throughout this case[.]" *Id.* The court further clarified that its order did not affect the Secret Service's plans to implement "measures to ensure the security and safety of the President, the First Family, and the White House complex[,]" *id.* at *3 (quotation marks omitted), or the Defendants' plans "to preserve and protect the structural integrity of the White House and to protect the construction site itself from deterioration due to the elements[,]" *id.* at *4. "Both categories of construction activities may proceed." *Id.*

The district court then modified its earlier preliminary injunction to clarify that the order prohibits the Park Service, EOP, EXR, and related officers, entities, and agents "from taking any action in furtherance of the above-ground physical construction of the proposed ballroom[.]" Am. P.I. Order, ECF No. 73, at 1–2. At the same time—as long as the actions "will not lock in the above-ground size and scale of the ballroom"— the preliminary injunction "does not prohibit":

- "[B]elow-ground construction, including below-ground construction of national security facilities";

- "[A]bove-ground construction * * * that is strictly necessary to cover, secure, and protect such national security facilities";

29

- "[M]easures strictly necessary to provide for the personal safety of the President and his staff short of constructing the proposed above-ground ballroom"; or

- "[C]onstruction strictly necessary to ensure the safety, security, and structural integrity of the White House, the White House grounds, and the below-ground construction site—including waterproofing, water management, structural reinforcement, and sealing off exposed construction areas—short of constructing the proposed above-ground ballroom[.]"

*Id.* at 2–3.

The district court crafted each of those exceptions in response to the specific national-security concerns the Defendants had raised. *National Trust IV*, 2026 WL 1027744, at *4. The court added that, having demarcated the lines between prohibited and permissible construction, it would not require the Defendants "to request and receive written approval before proceeding" under those exceptions. *Id.* at *5 (quotation marks omitted); *see also id.* ("I have no desire or intention to be dragooned into the role of construction manager.").

The district court stayed the effect of its amended preliminary injunction until April 23, 2026, to allow the Defendants to seek appellate relief. *See* Am. P.I. Order at 3; *National Trust IV*, 2026 WL 1027744, at *5.

On the Defendants' renewed motion for a stay pending appeal, this court issued an administrative stay, consolidated the stay motion and merits appeal from the preliminary

30

injunction, and ordered highly expedited briefing and oral argument.

## II

Before reaching the merits, we must, as always, assure ourselves of our jurisdiction, including Article III standing. At the preliminary injunction stage, the National Trust needs to "clear[ly]" show that it is "likely to establish each element of standing." *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) (quotation marks omitted).

An association like the National Trust has standing to sue on behalf of its membership when (A) at least one of its members would have standing independently, (B) the interests the association is suing to protect "are germane to the organization's purpose[,]" and (C) the claim the association asserts and the relief it requests do not require "the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 143 S. Ct. 2141, 2157 (2023) (quotation marks omitted).

At this preliminary stage, the National Trust clears those hurdles.

## A

## 1

With respect to the first prong of the associational standing test, the National Trust has clearly shown that one of its members likely has standing to sue in her own right. Specifically, the Trust has shown that (i) its long-term member, Professor Alison Hoagland, has suffered a concrete and particularized "injury in fact" that is "actual or imminent"; (ii)

31

her injury "is fairly traceable to the challenged action"; and (iii) her injury will likely be redressed by a ruling in the National Trust's favor. *Healthy Gulf v. Department of the Interior*, 152 F.4th 180, 189 (D.C. Cir. 2025) (quoting *Center for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015)); *see Students for Fair Admissions*, 143 S. Ct. at 2157. The National Trust identified Professor Hoagland as a representative "example" of its "thousands of members" who would be injured by the ballroom project. 2d Am. Compl. ¶ 22.

Professor Hoagland is an architectural historian, author, consultant, and professor emerita in historic preservation. Hoagland Decl. ¶¶ 4–5, 16. She has been a member of the National Trust for over 40 years. *Id.* ¶¶ 2–3. She is currently a Trustee of the National Trust and serves on its Executive Committee. *Id.* ¶¶ 2–3. She previously worked for fifteen years as the senior historian at the National Park Service's Historic American Buildings Survey, which documents historic aspects of national sites, including the White House. *Id.* ¶ 5.

Professor Hoagland routinely recreates by walking in front of the White House and in Lafayette Square directly across from the White House, and she "intend[s] to continue" doing so. Hoagland Decl. ¶ 12. She "regularly walk[s] through portions of President's Park, including Lafayette Square, in order to enjoy the historic buildings" in the area, the carefully preserved historic architecture, and "the beauty of the L'Enfant Plan[.]" *Id.* ¶ 9. She routinely "use[s], enjoy[s]," and "derive[s] benefit from" President's Park, "including the White House[.]" *Id.* ¶ 3. A particular focus of Professor Hoagland's

32

tours is the "iconic" White House complex, which "continue[d] to * * * impress[]" her after years of visits.  *Id.* ¶ 12.[4]

In addition, as a Trustee and Executive Committee member of the National Trust, Professor Hoagland attends Board meetings that are "frequently" held at the Decatur House, Merritt Decl. ¶ 9, a historic property "on the northwest corner of Lafayette Square," across the quadrangle from the White House.  Hoagland Decl. ¶ 12.  She plans to attend those meetings, which happen "at least annually," at the Decatur House in 2026.  Hoagland Decl. ¶ 12.  To get to the meetings, Professor Hoagland, who lives just two miles away on Capitol Hill, commonly walks along Lafayette Square in front of the White House to enjoy its architectural simplicity and historical significance.  *See id.* ¶¶ 9, 12.

Professor Hoagland also is a professional academic who continues to study and relies on the architectural design of the White House and President's Park in her work.  *See* Hoagland Decl. ¶¶ 11, 14.  Specifically, she is a historian who publishes works on historical architecture in Washington, D.C.  *Id.* ¶ 4. She has a special interest in vernacular architecture and the District's unique architectural history, and she has authored several books and scholarly articles on those topics.  *See id.* ¶¶ 4, 8.  The structural appearance of the White House "affects [Professor Hoagland's] research" on "locally focused architecture" because, throughout the Nation's history, the

---

[4]  The dissenting opinion's standing argument rests on a misconstruction of Professor Hoagland's declaration.  It claims that Professor Hoagland intends to travel to the area about once a month only to "attend functions in neighboring buildings."  Dissenting Op. 14.  The declaration actually states that she "intend[s] to continue to travel to the area around the White House, to walk through Lafayette Square, to attend functions in neighboring buildings, and to continue to be impressed by this iconic building."  Hoagland Decl. ¶ 12.

33

White House has "help[ed] to define" development in the surrounding area, "while also serving as a landmark defining L'Enfant's plan for the city[.]" *Id*. ¶ 11. Indeed, as Professor Hoagland notes, the White House sits at an important central axis on the L'Enfant Plan, thus influencing the urban design of the rest of the city. *Id.* ¶¶ 9, 11. Because of that, Professor Hoagland uses "the White House as a reference point" for her studies of D.C.'s architecture, given its role as "one of the first prominent government buildings" in the early days of our new Nation, and presently "as the most important house in the city[.]" Hoagland Decl. ¶ 11; *see also id.* at ¶ 16. For Professor Hoagland, the White House—designed to reflect "republican simplicity"—"is one of the clearest examples of a building constructed with the explicit intention of imparting meaning with its style, size, and scale[,]" the message being that the home of the elected United States President is designedly a "modest building[.]" *Id*. ¶ 10.

Professor Hoagland further attests that building the 90,000 square-foot ballroom "would cause permanent and irreparable harm to the White House and President's Park" because it would "overshadow[] the White House, exceeding it in height and massing, [and] would diminish the primacy of the White House[.]" Hoagland Decl. ¶ 13. She explains that "[n]o longer would the eye be drawn to the jewel of the building in the center," which was designed to "declar[e] to viewers that our president lives in a *house*[,]" and "not a palace." *Id*. ¶¶ 10, 13. Those changes, Professor Hoagland explains, will cause her to "suffer both professional and personal injuries" to her "aesthetic, cultural, and historic interests[.]" *Id.* ¶ 14. Her "use" and "enjoy[ment]" of the White House, which have already "been impaired by the destruction of the East Wing of the White House[,] * * * will be impaired further by the construction on the East Wing's former site of a ballroom

34

substantially similar" in size and design "to that which the defendants propose to build." *Id.* ¶ 3.

In addition, Professor Hoagland's work as a Trustee and member of the National Trust "will be impaired" by the construction of the ballroom as the Trust focuses on "preserving and protecting historic and cultural resources in Washington, D.C.," Hoagland Decl. ¶ 3, including the Trust-owned Decatur House, *id.* ¶ 12, a historic residence hugging the corner of Lafayette Square, Merritt Decl. ¶ 9, and its environs and neighboring historic structures that make up the historic district.

Further, like many National Trust members, Professor Hoagland "use[s], enjoy[s], derive[s] benefit from, and ha[s] a substantial interest in preserving and protecting historic and cultural resources in Washington, D.C., including the White House and President's Park[.]" Hoagland Decl. ¶ 3. She "intend[s] to continue to travel to the area around the White House, to walk through Lafayette Square, [and] to attend functions in neighboring buildings * * * about once a month[.]" *Id.* ¶ 12. With the construction of the ballroom, her walks through President's Park would no longer permit her to "enjoy" the "innovative preservation project concerning the buildings surrounding Lafayette Square[,]" if that historical coherence is destroyed by such an ahistoric and asymmetrical change to the most important building in the Square. *Id.* ¶¶ 9, 10, 14. Construction of the ballroom, in short, will cause Professor Hoagland personal and professional "injuries, including to [her] aesthetic, cultural, and historical interests[.]" *Id.* ¶ 14.

In those ways, Professor Hoagland has adequately alleged, at this stage of the litigation, concrete and imminent "professional and personal[,]" historical-preservation, and

35

aesthetic injuries that "[she] would suffer[.]" Hoagland Decl. ¶ 14. For her, the historical and architectural coherence of President's Park and the White House that she routinely enjoys studying, viewing, and spending time with would be permanently lost by the construction of a structure that "overshadow[s] the White House," "exceeding it in height and massing[.]" *Id.* ¶¶ 10, 13.

Professor Hoagland's specific, here-and-now, and frequently recurring injuries qualify as an Article III injury. A plaintiff like Professor Hoagland who "aver[s] that [she] use[s] the affected area" and is an individual "'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity" has "adequately allege[d]" an injury in fact. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("[I]f [the alleged] harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice.").

Numerous cases from the Supreme Court and this court have recognized Article III injuries in similar circumstances. *See, e.g.*, *Friends of the Earth*, 528 U.S. at 181–183 (holding that individuals who lived within driving distance of a river and who fished in it and picnicked along its banks had standing to challenge water pollution); *Center for Biological Diversity v. Fish & Wildlife Serv.*, 146 F.4th 1144, 1157–1158 (D.C. Cir. 2025) (holding that an amateur photographer and entomophile who went on annual vacations to view the American Burying Beetle had standing to challenge a change in its protected status); *International Dark-Sky Ass'n v. FCC*, 106 F.4th 1206, 1217 (D.C. Cir. 2024) (holding that amateur stargazers and astronomers who look at the sky for recreation had standing to challenge an environmental assessment of a license permitting

36

satellites that caused light pollution); *Sierra Club v. Jewell*, 764 F.3d 1, 5 (D.C. Cir. 2014) (holding that the National Trust's members who "view and enjoy" the historic battlefield site of Blair Mountain "for purposes of studying and appreciating its history" had standing to challenge governmental action affecting the historical status of the Mountain); *see also Summers*, 555 U.S. at 494 (recognizing government admission that a plaintiff who had repeatedly visited a national forest to view flora and fauna, and who had imminent plans to do so again, suffered a cognizable aesthetic injury for purposes of standing from a planned sale of felled logs).[5]

---

[5] The dissenting opinion attempts to distinguish these cases by pointing out that "stargazers" "use the sky" when looking at constellations and history buffs "view and enjoy" a battlefield when they visit it to study and appreciate its historical significance. Dissenting Op. 13 (first quoting *International Dark-Sky Ass'n*, 106 F.4th at 1217, and second quoting *Sierra Club*, 764 F.3d at 5). Professor Hoagland alleges the same. She has attested that she "use[s] * * * the White House and President's Park" when she "regularly walk[s]" there "in order to enjoy the historic buildings, the beauty of the L'Enfant Plan * * *, and the innovative preservation project concerning the buildings surrounding Lafayette Square[.]" Hoagland Decl. ¶¶ 3, 9. The dissenting opinion offers no principled distinction between the injury in fact of disrupted star gazing, battlefield gazing, animal viewing, and Professor Hoagland's disrupted historic architecture viewing (and studying).

The dissenting opinion also claims that Professor Hoagland's injuries are not sufficiently "imminent." Dissenting Op. 13–14. That is wrong. Her concrete plans to "travel to the area around the White House" to see the "iconic [White House] building * * * about once a month" plainly are imminent under established precedent. Hoagland Decl. ¶ 12. The Supreme Court, moreover, has found an imminent injury when the defendant was likely to award a relevant contract "at least once per year," and the plaintiff was "very likely to bid on each such contract[.]" *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200,

37

Before both the district court and this court, the Defendants insisted that Professor Hoagland and members of the public will not be able to see the massive ballroom from various angles around Lafayette Square.  *See* 2d P.I. Opp'n at 37 ("Dr. Hoagland could scarcely see the old East Wing from public view, and the new East Wing will be equally obscured."); Oral Arg. Tr. 7:3–8 ("[A]t least in the classic locations where people come to view the White House from the south, you will not be able to see the east wing. * * *  If you come to the front from the north view, the classic view, the trees are designed to shield the view."); *id.* at 9:3–5 ("I think [Professor Hoagland] would have to intentionally put herself in the very narrow locations where you can actually view [the ballroom].").

"[P]ure fiction" was the district court's response to that factual argument.  *National Trust III*, 827 F. Supp. 3d at 114 n.18.  The district court found as fact that "Defendants' own renderings show that the proposed ballroom will be clearly visible from Lafayette Park, and even from the steps of the U.S. Capitol[.]"  *Id.* (citing Executive Director's Recommendation, National Cap. Planning Comm'n 17–18 (March 5, 2026), https://perma.cc/4LFC-YDEJ).    The Defendants have not argued those findings were clear error.  *See Doe v. Blanche*, 172 F.4th 901, 911 (D.C. Cir. 2026).  Nor could they given that the National Park Service itself found that the ballroom will "permanently alter[]" "views of the White House from Lafayette Park[,]" and will cause "visual imbalance" in the White House's historic appearance.  FONSI at 6, 7; Env't

_____

212 (1995).  This court likewise has found aesthetic standing where a plaintiff "plan[ned] to" observe beetles in the habitat at issue "[i]n the coming years * * * during his annual summer vacation." *Center for Biological Diversity*, 146 F.4th at 1158 (quotation marks omitted).

38

Assessment at 19 ("[V]iews from certain locations, particularly Lafayette Square and portions of the Ellipse, would be altered [by ballroom construction].").

Nor can the Defendants claim that Professor Hoagland is misguided in asserting those injuries. The Defendants themselves have admitted that constructing the ballroom will cause the same substantial, adverse, and irreparable visual, aesthetic, historical-preservation, and architectural consequences to which Professor Hoagland gives voice and which "thousands" of National Trust members share, 2d Am. Compl. ¶ 22. In its August 2025 Environmental Assessment and Finding of No Significant Impact, the National Park Service concluded that "views of the White House from Lafayette Park and the Ellipse will be *permanently altered* due to the modifications to the East Wing." FONSI at 6 (emphasis added); *see also id.* at 5 (Park Service explaining that "[s]ituated on a high point within the city, the White House is a focal point on the principal north-south axis of L'Enfant's plan[,]" in which "[v]iews and vistas were among the most essential features").

The report also found that the ballroom "will disrupt the historical continuity of the White House grounds and alter the architectural integrity of the east side[.]" FONSI at 7. That is because the addition of the ballroom "will dominate the eastern portion of the site, creating a visual imbalance with the more modestly scaled West Wing and Executive Mansion." *Id.*

The Defendants' own admission of the extensive and permanent architectural, historical-preservation, and other aesthetic harms that the ballroom construction will cause underscores the concreteness, imminence, and substantiality of Professor Hoagland's individualized injuries, which arise from her routine recreational, volunteer, and professional activities

39

in President's Park. At the same time, such official concurrence, after in-depth and formal review by the Executive Branch, certainly belies the Defendants' effort to paint Professor Hoagland's injuries as the idiosyncratic grousing of "a single pedestrian[]" who "occasionally walks near President's Park[.]" Defs.' Opening Br. 4.

Nor is it accurate for the Defendants to categorize Professor Hoagland's injury as a mere "psychological consequence" that similarly impacts everyone across the country. Defs.' Opening Br. 24 (quoting *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982)). Professor Hoagland has identified concrete ways she is personally and routinely impacted by the ballroom construction in her professional commitments that require her to meet in Lafayette Square, her recreational time walking through President's Park to enjoy its historic architecture, and her professional research and writing that focus on D.C. architecture and its connection to the L'Enfant Plan, of which the White House serves as a critical focal point. *See* Hoagland Decl. ¶¶ 9, 11–14; *see also* BERG, GRAND AVENUES at 102 (In the L'Enfant Plan, "[t]he Congress House and President's House were set on the two highest points in the territory, providing a pair of geometrical and geographical anchors for the city's road map."); Alison K. Hoagland, *Nineteenth-Century Building Regulations in Washington, D.C.*, 52 RECS. COLUMBIA HIST. SOC'Y 57, 58 (1989) ("[President] Washington's regulations, primarily concerned with aesthetics, were intended to produce buildings which complemented L'Enfant's plan[.]").

In those ways, Professor Hoagland is a far cry from the doctors alleging harm when thinking about or witnessing others use abortion drugs. Defs.' Opening Br. 10 (quoting *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 144 S. Ct. 1540,

40

1561 n.3 (2024)). She has alleged direct harm to her personal "aesthetic, cultural, and historic" interests that she fulfills through her regular visits to President's Park, Hoagland Decl. ¶¶ 11–14, not mere "distress at or disagreement with the activities of others[,]" divorced from the governmental action's direct effect on her, *Alliance for Hippocratic Med.*, 144 S. Ct. at 1561 n.3.

The Defendants maintain that Professor Hoagland can easily avert her gaze to avoid viewing the new ballroom and so she is "[u]nlike" the plaintiffs in cases in which we have found standing when plaintiffs are "deprived of [the] opportunity" to view something they wish to observe. Defs.' Opening Br. 27. That is wrong. Professor Hoagland will no longer be able to "use[ and] derive benefit from" seeing and studying a White House with historic and intentionally designed "republican simplicity," and that permanent loss will injure her "aesthetic, cultural, and historical interests[.]" Hoagland Decl. ¶¶ 3, 10, 14. She will also lose forever the opportunity to view Lafayette Square with the intentional architectural symmetry of the 235-year-old L'Enfant Plan—an experience she greatly values—if the ballroom is constructed as planned. *See id.* at ¶¶ 9, 13. The proposed ballroom would so alter the symmetry of the White House complex that it would no longer remain in harmony with the symmetry of Major L'Enfant's axial plan of the capital city, in which the President's House and the Capitol building sit symmetrically on perpendicular axes. *See* FONSI at 6–7 ("This change will disrupt the historical continuity of the White House grounds and alter the architectural integrity of the east side of the property."); Env't Assessment at 10 (noting that the symmetrically designed "axial relationship" that had previously existed between the Capitol and the White House had been "one of the defining attributes for the entirety of Washington, DC's monumental core").

41

The Defendants nonetheless insist that aesthetic harm from the permanent visual destruction of part of the Nation's history is insufficient unless it also changes the plaintiff's conduct. Defs.' Opening Br. 28–29. That makes no sense. The whole point of preserving historic buildings and sites, monuments, and memorials is for members of the public to be able to visit them, view them, and appreciate them, even though they cannot use them in the tangible ways the Defendants would require. Some people visit particular national sites—like the Mormon Pioneer Trail, the First Baptist Meeting House in America, Ebenezer Baptist Church, and Zion and Bryce Canyon National Parks—because of their religious significance and inspiration, and the loss of the ability to have that religious experience has long been acknowledged to be an Article III injury. *See, e.g.*, *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 442 (1988) (adjudicating the merits of a case when the alleged injury was that the construction of a road would damage "the sacred areas which are an integral and necessary part of the belief systems and lifeway of Northwest California Indian peoples"); *Narragansett Indian Tribal Historic Pres. Off. v. FERC*, 949 F.3d 8, 12 (D.C. Cir. 2020) (noting that "the destruction of the ceremonial landscapes" used by the Narragansett Tribe for cultural and religious purposes "certainly qualifies as an injury in fact"); *Arizona Mining Reform Coal. v. Forest Serv.*, 172 F.4th 641, 655 (9th Cir. 2026) (finding standing for Apache Tribe members challenging a copper mine's construction when the Forest Service's assessment identified "physical and visual impacts on traditional cultural places" that the Apache used for religious ceremonies) (formatting modified); *South Texas Env't Just. Network v. Texas Comm'n on Env't Quality*, 165 F.4th 356, 366 (5th Cir. 2026) (holding that the Carrizo Comecrudo Tribe had standing to challenge the construction of a natural gas pipeline when the Tribe alleged that its members' "recreational,

42

aesthetic, and religious experiences in the area surrounding the site will be harmed").

In that same way, others seek aesthetic, familial, cultural, historical, or educational connection and enrichment from visiting national sites and parks and culturally significant places. *See Lemon v. Geren*, 514 F.3d 1312, 1314–1315 (D.C. Cir. 2008) (finding standing for plaintiffs alleging harm due to "the closure and redevelopment of Fort Ritchie[,]" "an historic site they visit and enjoy"); *Sierra Club v. Department of Transportation*, 125 F.4th 1170, 1181–1182 (D.C. Cir. 2025) (finding standing for a native Tribe challenging the shipping of natural gas through tribal land, which affects "the Tribe's heritage, its land, its people, and its resources") (quotation marks omitted).

The Defendants' cramped standing theory would deem no one injured by a decision to raze the Statue of Liberty, to obscure the names on the Vietnam War Memorial, or to install a political billboard atop Mount Rushmore. People wounded by the lost historical view could just "shift [their] gaze[.]" Defs.' Opening Br. 25. Yet the harm would remain from being unable to look upon, learn from, or commune in a location where, for example, a personal hero was born, an ancestor first arrived in the United States, a relative died on September 11th, or the battle for the individual's equal rights and dignity first started. The Defendants' argument, in other words, simply brushes off the signification, emotion, meaning, and particularized value to individuals of witnessing certain places where their history happened, looking upon architectural marvels, reveling in sweeping landscapes, and viewing buildings, memorials, and monuments that tell the American story.

43

The Defendants' and the dissenting opinion's resort to *Environmental Defense Fund v. FERC*, 2 F.4th 953 (D.C. Cir. 2021), is of no help. In that case, the plaintiff complained that a metering station she would drive by and incidentally view was an "eyesore," but "she never indicate[d] how she derived aesthetic value from the land as it had existed before the construction[,]" "that she intended to use the land in the future[,]" or "that her planned future uses of the land have been foreclosed by the construction[.]" *Id.* at 969; *see also Gardner v. Mutz*, 962 F.3d 1329, 1342–1343 (11th Cir. 2020) (finding no aesthetic injury for individuals opposing the move of a Confederate statue because the plaintiffs failed to allege that they "routinely visited the monument [in the prior location] or, alternatively, that they won't be able to visit the monument at its new location"). Professor Hoagland, by contrast, has detailed (i) her aesthetic and professional interests in appreciating and studying the historic design of the White House, the architectural significance it embodies, and the political statement it makes about her value as a citizen, Hoagland Decl. ¶¶ 10–14; (ii) her regular visits to enjoy and take in the views, *id.* ¶¶ 9–10, and intent to continue to do so on a routine basis, *id.* ¶ 12; and (iii) how the proposed ballroom would materially injure her personal and professional enjoyment of the historic site, *id.* ¶¶ 13–14.

Further, Professor Hoagland has alleged a "particularized connection" to the Lafayette Square historic district. As a Trustee of the National Trust, Professor Hoagland has a professional interest in the historic nature of Lafayette Square, which houses the Trust's meetings. *See* Section II.B., *infra*. Moreover, unlike the plaintiff in *Environmental Defense Fund*, Professor Hoagland's individualized harm goes beyond just passing distaste. She chooses routes through President's Park that provide her with views of the White House for personal recreation, enjoyment, and aesthetic pleasure, both as an

44

individual and as someone with a keen appreciation for the architecture.  Further, her academic work using the unique architecture of "the most important house in the city" as a central "landmark defining L'Enfant's plan for the city" will be hampered by the construction of the looming ballroom as part of the White House.  Hoagland Decl. ¶¶ 9, 11.

**2**

The National Trust has also clearly shown a likelihood of establishing that the Defendants have caused Professor Hoagland's injuries and that court-ordered relief can redress them.  Indeed, the Defendants have not challenged the National Trust's standing on these grounds.  For good reason.  The National Trust, as voiced by its member Professor Hoagland, has explained—and the district court found as fact—that constructing a ballroom of the looming size the Defendants intend on the East Wing's former site will cause the very harms identified by Professor Hoagland.  Hoagland Decl. ¶¶ 13–14; *National Trust II*, 821 F. Supp. 3d at 70–71; *see Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2135 (2025); *Duke Power Co. v. Carolina Env't Study Group, Inc.*, 438 U.S. 59, 77–78 (1978); *see also* P.I. Hr'g, ECF No. 57, 11:12–14 ("Once above-grade construction proceeds, those adverse aesthetic impacts and the adverse cultural impacts will be locked in."); *Collins v. Yellen*, 141 S. Ct. 1761, 1799 (2021) (noting that the traceability inquiry asks "whether the plaintiffs' injury can be traced to allegedly unlawful conduct of the defendant, not to the provision of law that is challenged") (quotation marks omitted).

In addition, the Defendants do not dispute that an injunction from the district court preventing ballroom construction will remediate that injury.  *See Friends of the Earth*, 528 U.S. at 185–186 ("It can scarcely be doubted that,

45

for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct * * * provides a form of redress.").

**B**

Having clearly shown that an individual member of the Trust likely has standing, the National Trust also is likely to establish the second prong of associational standing—germaneness—because the historical and architectural injuries asserted fall squarely within its area of expertise and concern.

Germaneness requires "pertinence" between the object of the litigation and the plaintiff's "organizational purpose." *Center for Sustainable Econ.*, 779 F.3d at 597 (quotation marks omitted); *see International Dark-Sky Ass'n*, 106 F.4th at 1218. The point of the inquiry is to prevent organizations from litigating "issues as to which the organizations themselves enjoy little expertise and about which few of their members demonstrably care." *Center for Sustainable Econ.*, 779 F.3d at 597 (quotation marks omitted). In that way, the germaneness requirement guards against an association "alleging injury from governmental action wholly unrelated" to its own interests; otherwise, an association could become akin to a law firm "seeking to sue in its own name on behalf of a client * * * alleging injury from governmental action wholly unrelated to the firm." *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 57–58 (D.C. Cir. 1988) (emphasis omitted).

That concern has no purchase here. The National Trust was chartered by Congress in 1949 as a nonprofit corporation, "to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest[.]" 54 U.S.C. § 312102(a); Merritt Decl. ¶ 2. Its "self-described

46

mission[,]" *International Dark-Sky Ass'n*, 106 F.4th at 1218, is to "protect[] America's historic sites through stewardship, advocacy, and direct assistance[,]" 2d Am. Compl. ¶ 21.

The National Trust also has unquestioned "expertise" in historic sites and the preservation of historic buildings and land, and its members are "demonstrably" invested in that cause. *See Center for Sustainable Econ.*, 779 F.3d at 597 (quoting *Humane Soc'y of the U.S.*, 840 F.2d at 57); *see also* 2d Am. Compl. ¶ 22 ("Members of the National Trust use, enjoy, derive personal and professional benefit from, and have a substantial interest in preserving and protecting historic and cultural resources in Washington, D.C., including the White House and President's Park."); Letter from Nat'l Trust to Defs., ECF No. 2-16, at 2 ("[The National Trust's] mission is to protect America's significant historic sites and to advocate for historic preservation as a core public value."); *International Dark-Sky Ass'n*, 106 F.4th at 1218 (holding that the mission of an association of "stargazers" that "exists primarily to provide information and education to the public" was germane to a lawsuit challenging the environmental assessment of a license for satellites emitting light pollution).

The Defendants contend that the National Trust's purpose is limited to just two of its enumerated statutory authorities—that is, to "receive donations of sites, buildings, and objects significant in American history and culture" and to "preserve and administer" those sites "for public benefit." Defs.' Opening Br. 32 (quoting 54 U.S.C. § 312102(b)(1), (2)). Because the Trust cannot acquire property within a National Park, 54 U.S.C. § 312105(g), the Defendants assert that the National Trust lacks any "role to play" in regard to the White House. Defs.' Opening Br. 33; *see also* Dissenting Op. 7–8.

47

At the outset, we are skeptical that the germaneness inquiry is limited to the National Trust's statutorily delineated functions. We have specifically rejected the idea that an association fails to satisfy the germaneness requirement because there is "no specific reference in its certificate of incorporation" to the "litigation subject[.]" *Humane Soc'y of the U.S.*, 840 F.2d at 58–59; *see also id.* at 59 ("[T]he [Supreme] Court nowhere has suggested that mention of a given purpose in an organization's organic papers is talismanic[.]"). True, the National Trust is differently situated from some other associational plaintiffs because its purposes are statutorily defined. But neither the Defendants nor the dissenting opinion offer a good reason that difference should matter.

The dissenting opinion argues that a congressionally chartered nonprofit corporation may sue "only to vindicate its statutory authority." Dissenting Op. 7. None of the cases cited for that proposition are relevant to the National Trust's challenge. *See Bankers Trust Co. v. Texas & Pacific Railway Company*, 241 U.S. 295, 302–303 (1916) (Railroad foreclosure case interpreting a 1915 law that stripped federal courts of jurisdiction over cases against railroads where the federal question jurisdiction was based only on the railroad being incorporated by federal statute); *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) (Telecommunications case holding that agency action does not preempt state law when the agency has acted outside its statutory scope of authority); *Department of Transportation v. Association of American Railroads*, 575 U.S. 43, 54–55 (2015) (holding that separation of powers claims could be brought against Amtrak because "[t]he political branches created Amtrak, control its Board, define its mission, specify many of its day-to-day operations, have imposed substantial transparency and accountability mechanisms, and, for all practical purposes, set and supervise

48

its annual budget"). These cases have nothing to say about congressionally chartered nonprofits or the germaneness requirement of associational standing.

Anyhow, even if the National Trust's associational interests to which litigation could be pertinent were tied tightly to the mast of its charter, the Defendants' argument would still fail in multiple respects.

To start, the Defendants and dissenting opinion ignore that the National Trust's charter also charges it with "carrying out [a] preservation program" that goes beyond just receiving pieces of property. 54 U.S.C. § 312102(b)(3). Specifically, the National Trust is directed to work with agencies at all levels of government, "corporations, associations, [and] individuals" to promote the "protection, preservation, maintenance, or operation of any historic site, building, object, or property used in connection with the site, * * * *regardless of whether the National Trust has acquired title to the property, or any interest in the property*." *Id.* § 312105(h) (emphasis added). The National Trust's interest in preserving the architectural history of the White House and President's Park accordingly falls squarely within its congressionally chartered role and concern.

Indeed, the National Trust's ability to preserve the architectural and historic environment of property it owns—including the Decatur House in President's Park—is directly affected by the ballroom construction. *See* Nat'l Trust Br. 27–28; Env't Assessment at 11 (The new ballroom "would have permanent adverse impacts on the cultural landscape [of President's Park], particularly the White House Grounds cultural landscape."). The Decatur House was the first private home built in the area near the White House and sits on the northwest corner of President's Park, looking out onto the

49

future ballroom site. *See* Merritt Decl. ¶ 9; FONSI at 15 ("[V]iews of the White House from Lafayette Park and the Ellipse will be permanently altered due to the modifications to the East Wing."). Lafayette Square is home not only to the Decatur House, but also to other historic buildings that have played a key role in American history, like the Dolley Madison House and the President's Guest House. Matthew R. Costello, *Lafayette Square: The People's Park*, 32 WASH. HIST. Fall 2020, at 10; *see also* Merritt Decl. ¶ 9.

Protecting the nature of its own historic neighborhood is certainly pertinent to the National Trust's mission. Congress has charged the National Trust to "preserve * * * for public benefit" the Decatur House, 54 U.S.C. § 312102(b)(2), and to "facilitate public participation in the preservation of sites, buildings, and objects of national significance" more broadly, *id.* § 312102(a). After all, the significance of the Decatur House is dependent, in part, on its location in one of the most architecturally historic areas in the District of Columbia. Tearing a hole in the architectural cohesion of President's Park and the Lafayette Square historic district diminishes the historic significance of the Decatur House itself and threatens the legacy of the oldest residence in the area. *See* Merritt Decl. ¶ 9. By bringing this lawsuit on behalf of its thousands of members who share "a substantial interest in preserving and protecting historic and cultural resources in Washington, D.C.," the National Trust is facilitating just such participation and fulfilling its "advocacy" mission. *See* Hoagland Decl. ¶ 3; 2d Am. Compl. ¶¶ 21–22; *see also International Union, United Auto., Aerospace & Agric. Implement Workers of America v. Brock*, 477 U.S. 274, 286 (1986) (reasoning that "there is little question that the interests" of a union advocating for its members' unemployment benefits were "germane to the organization's purpose" when one of the goals enumerated in

50

the union's constitution was to advocate "on a national scale" for benefits).

Further, the National Trust was established "to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest[,]" 54 U.S.C. § 312102(a), as well as to "further" the "national policy" of preserving such sites, buildings, and objects "for the inspiration and benefit of the people of the United States[,]" *id.*; *id.* § 320101. Such a mission is certainly pertinent to the National Trust's aim of ensuring a historically integrated and cohesive design for whatever is built where the East Wing used to stand. *See id.* § 312105(k) ("The National Trust may generally do any and all lawful acts necessary or appropriate to carry out the purposes for which the National Trust is created.").

In that regard, we note that this court has previously held that the National Trust has associational standing to challenge the spoliation of historic sites over which it has no ownership or legal interests. In *Sierra Club v. Jewell*, 764 F.3d 1 (D.C. Cir. 2014), we held that a group of "environmental and historic preservation organizations," including the National Trust, had associational standing to challenge the delisting of Blair Mountain battlefield from the National Register of Historic Places. *Id*. at 3. This court so held even though "the Battlefield area [was] privately owned" and there was no evidence that any member "possess[ed] any legal entitlement to set foot" on it. *Id.* at 6. We explained that "there is no reason that the cognizability of aesthetic and associated interests in a particular site could turn on owning a legal right to enter or view the property." *Id.*

The dissenting opinion insists that *Sierra Club* amounts to nothing more than a "drive-by jurisdictional ruling[.]" Dissenting Op. 10. Hardly. *Sierra Club* did not "silently

51

assume[] jurisdiction or merely state[] without analysis that it existed[.]" *United States v. Jones*, 846 F.3d 366, 369 (D.C. Cir. 2017) (citation omitted).  Quite the opposite, *Sierra Club*'s only holding was that the plaintiffs there—the National Trust included—had standing.  *See* 764 F.3d at 3.  And *Sierra Club* did so in express reliance on declarations from the National Trust's members.  *See id.* at 5; Decl. of Barbara Rasmussen, *Sierra Club v. Salazar*, 894 F. Supp. 2d 97 (D.D.C. 2012) (No. 10-1513), ECF No. 23-6, at ¶ 1; Decl. of Nell Ziehl, *Sierra Club*, 894 F. Supp. 2d 97, ECF No. 23-8, at ¶ 1.  *See also National Parks Conservation Ass'n v. Semonite*, 925 F.3d 500, 501 (D.C. Cir. 2019) (per curiam) (National Trust participation in suit challenging a utility's erection of electrical transmission towers across the James River); *National Trust for Historic Pres. in the U.S. v. Dole*, 828 F.2d 776, 777 (D.C. Cir. 1987) (per curiam) (challenging construction barriers on the Duke Ellington Bridge).

## C

Finally, there is no serious question that the injunctive and declaratory relief sought by the National Trust does not require the participation of an individual plaintiff.  *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977) (holding that a "request for declaratory and injunctive relief" does not mandate "individualized proof[,]" and so it is "properly resolved in a group context"); *Animal Legal Def. Fund, Inc. v. Vilsack*, 111 F.4th 1219, 1225 (D.C. Cir. 2024) (holding that animal rights group seeking declaratory and injunctive relief against an agency did not require "personal participation" by individual members).

52

* * * * *

For all of those reasons, we affirm the district court's conclusion that the National Trust has clearly shown a likelihood of associational standing.

**III**

We now turn to the merits of the Defendants' appeal. For a preliminary injunction to issue, the district court must find that (1) the moving party is likely to "succeed on the merits"; (2) the moving party is likely to "suffer irreparable harm in the absence of preliminary relief"; (3) the equities favor the issuance of an injunction; and (4) "an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). We review the district court's issuance of a preliminary injunction for abuse of discretion. *Media Matters for America v. Paxton*, 138 F.4th 563, 573 (D.C. Cir. 2025).

On this record, the Defendants have not shown that the district court abused its discretion in enjoining above-ground construction of the planned ballroom itself while still allowing the below-ground construction of security features and the above-ground construction of measures necessary to ensure safety and security.

**A**

The National Trust has shown that it is likely to succeed on the merits.

The Defendants concede that the Executive lacks any inherent constitutional authority to construct the ballroom. Instead, as all agree, the Constitution gives Congress exclusive authority to regulate federal property and the District of

53

Columbia.  *See* U.S. CONST. Art. IV, § 3, cl. 2; *id.* Art. I, § 8, cl. 17.  The only question is therefore whether Congress has authorized the Defendants' ballroom construction by statute.

The Defendants point to two potential sources of authority.  The first is 54 U.S.C. § 100101(a), a provision of the statute creating the National Park Service.  The second is 3 U.S.C. § 105(d), which addresses the President, and under which the Office of the Executive Residence (EXR) is purportedly acting to lead the construction.

Importantly, however, the Defendants have authority to carry out the ballroom construction only if *both* statutes apply.  Section 100101(a) alone cannot support the project because, as we detail below, the only statute that could supply EXR authority to lead the project is Section 105(d).  And the Defendants conceded at oral argument that Section 105(d) alone cannot support the project.  Oral Arg. Tr. 55:4–56:19.  That is so because the project is funded by private donations given to the National Park Service and—even on the Defendants' view of the case—those funds can be used to support the ballroom construction only if the National Park Service could use the funds under Section 100101(a) for the identified purposes of conservation and preservation.[6]

---

[6] The dissenting opinion asserts that we "need not address the Trust's APA challenge to NPS's construction authority[.]"  Dissenting Op. 24–25 n.8.  That assertion rests on the premise that the Park Service's sole involvement is "collecting donations and transferring them to EXR[.]"  *Id.*  But the Defendants themselves claim that the Park Service can fulfill that role only "because the [ballroom construction] is authorized by the [Park Service's] Organic Act."  Defs.' Opening Br. 45.  Indeed, that is why the Defendants concede that the Organic Act must apply for them to be able to undertake the ballroom project using donations to the Park Service.

54

Regardless, the Defendants are unlikely to succeed on the merits under either provision.  If the Park Service is acting under 54 U.S.C. § 100101(a), then the Defendants violated the Administrative Procedure Act because Section 100101(a) does not authorize the ballroom construction.  And to the extent the project instead rests on the President's authority under 3 U.S.C. § 105(d), then the Defendants acted *ultra vires* by relying on a patent misconstruction of that statute.  Indeed, the statutory landscape reveals that over the decades, Congress has jealously guarded its authority over the White House and President's Park in multiple ways.  Contrary to the Defendants' telling, Congress has not relinquished to the Executive Branch full authority to reshape these iconic, historic sites.

**1**

The National Trust is likely to succeed on its claim, brought under the APA, that the National Park Service Organic Act does not authorize the ballroom project.

The starting point for the National Trust's claim is 40 U.S.C. § 8106.  That statute, first enacted in 1912, provides that "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress."  The Defendants do not dispute that, by constructing the ballroom, they would "erect[]" a "building or structure" on a "park [or] public grounds of the Federal Government in the District of Columbia[.]"

The plain text of Section 8106 unambiguously bars the ballroom construction, absent another statute providing the National Park Service with "express authority" to construct buildings in federal parks in the District of Columbia.  The Defendants nevertheless argue that Section 8106 does not bind

55

the Executive Branch at all, because "it was concerned with stopping construction by unauthorized third parties[.]" Defs.' Opening Br. 50–51.  The statute's text makes no such suggestion.  The Defendants' only support for this theory is a statement by an Executive Branch official in 1926 suggesting that the statute was enacted to "prevent[] encroachments upon park property by other Government offices or by the public, and has never been construed to prevent such construction by the park authorities within the limits of the appropriations." *Id.* at 51 (quoting *District of Columbia Appropriation Bill, 1927: Hearings Before the Subcomm. of the H. Comm. on Appropriations*, 69th Cong. 533 (1926)).  It suffices to say that this solitary statement, made over a decade after Section 8106's enactment, cannot change the clear statutory text.

Because Section 8106 applies by its plain terms, the Defendants must identify "express authority" for the Park Service to erect structures in federal parks in the District of Columbia, and thus to engage in the ballroom construction.  As noted, they rely upon 54 U.S.C. § 100101(a), which was enacted after Section 8106 in 1916 and today states:

> The Secretary, acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

54 U.S.C. § 100101(a).  Because the White House is within a National Park Service "System unit[]"—President's Park, *see*

56

Act of Sept. 22, 1961, § 1, 75 Stat. at 586—the Defendants contend that this general language confers the requisite express authority for construction on federal property in the District of Columbia, and so the National Trust is unlikely to succeed on its contrary-to-law claim under the Administrative Procedure Act, *see* Defs.' Opening Br. 43–45.[7]

There are two flaws with that position.  First, Section 100101(a) says nothing about construction, much less construction in the District of Columbia.  The operative language is instead strikingly general, providing that the Park Service "shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units[.]"  54 U.S.C. § 100101(a).  Perhaps Section 100101(a)—by permitting "means" and "measures" that conform to the fundamental purpose of the Park System—authorizes certain construction in national parks generally.  But Section 8106 bars construction on parks and other public grounds of the federal government *specifically in the District of Columbia*, unless Congress provides "express authority" to do so.  Read in context, we do not think a statute that arguably authorizes an agency to engage in construction and other acts throughout the country—without addressing the District of Columbia in particular—constitutes the type of "express authority" Section 8106 demands.

Second, and independently, the Defendants' claim that the ballroom construction is authorized by Section 100101(a) also contravenes the express condition the statute places on the Park Service's authority.  The statute authorizes the Director to take

---

[7] System units are defined as "any area of land and water administered by the Secretary [of the Interior], acting through the Director [of the Park Service], for park, monument, historic, parkway, recreational, or other purposes."  54 U.S.C. § 100501; *see id.* § 100102(6).

57

actions that "conform to the fundamental purpose of the System units," and specifies that purpose as "to *conserve* the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as *will leave them unimpaired* for the enjoyment of future generations." 54 U.S.C. § 100101(a) (emphases added). To drive the point home, Congress in the 1978 Redwood Amendment expressly "reaffirm[ed], declare[d], and direct[ed]" that the Park Service's authority "shall not be exercised in derogation of the values and purposes for which the System units have been established, except as directly and specifically provided by Congress." *Id.* § 100101(b)(2).

Reading those provisions together, Congress has prohibited any action that does not "conserve the scenery * * * and historic objects" in national parks. "Conserve" means "to keep from being damaged, lost, or wasted; save." *Conserve*, WEBSTER'S NEW WORLD DICTIONARY 297 (3d college ed. 1988); *see also Conserve*, THE AMERICAN HERITAGE DICTIONARY 313 (2d college ed. 1991) (defining "conserve" as "[t]o protect from loss or depletion"). The East Wing is a "historic object[]" within President's Park. 54 U.S.C. § 100101(a). The Defendants do not explain how their construction project—which will significantly and permanently alter the historic appearance and architecture of the entire White House campus by demolishing and replacing the East Wing—can possibly "conserve" the East Wing, much less the "scenery" of President's Park, so as to "leave them unimpaired for the enjoyment of future generations." *Id.* To the contrary, the Defendants tout the many ways in which the project, in their view, will "demoli[sh]" and "replac[e]" that historic object. Defs.' Opening Br. 12, 38; *see also* Env't Assessment at 11, 14 (observing that "[d]econstruction and replacement of the East Wing would result in the permanent

58

alteration of a component that has been integral to White House operations since its construction in 1942[,]" and that the ballroom "would have permanent adverse impacts on the cultural landscape"). Section 100101(a) certainly does not "directly and specifically" authorize that impairing construction as the Redwood Amendment requires. 54 U.S.C. § 100101(b)(2).

The Defendants assert that this express statutory obstacle amounts only to a "policy dispute" with the Park Service's determination that the ballroom construction generally promotes the purposes of President's Park. Defs.' Reply Br. 21. The Defendants miss the point. There is no finding—and we do not see how there could be—that the ballroom construction "conserves" the "historic objects" in President's Park as the statute requires. *See generally* Env't Assessment; FONSI. In fact, the Park Service found that the ballroom's construction would do the opposite. Env't Assessment at 15 ("These changes would affect elements that have shaped the property's character since the early 20th century."); FONSI at 6 ("These changes will result in long-term adverse effects on the cultural landscape."); *id.* at 7 ("Adding a second story to the East Colonnade will further modify the setting, contrasting with the single-story design of the West Colonnade and changing the traditional spatial organization[.]").[8]

_____

[8] President's Park's enabling legislation provides that "nothing done under this Act shall conflict with the administration of the Executive offices of the President or with the use and occupancy of the buildings and grounds as the home of the President and his family and for his official purposes." Act of Sept. 22, 1961, § 3, 75 Stat. at 586. The plain text of this provision *limits* the Park Service's authority. And the massive destruction and construction involved in building the ballroom does not plausibly qualify as the "administration," "use," or "occupancy" of the residence or grounds.

59

In urging that Section 100101(a) expressly authorizes the ballroom construction, the Defendants' brief is notably devoid of any argument based on the statute's text. Instead, the Defendants' position rests on three previous Park Service projects in the District of Columbia: the construction of the National Capital Region headquarters campus in East Potomac Park; the construction of a tennis stadium in Rock Creek Park; and the renovation of the U.S. Park Police Horse Stables on the National Mall. *See* Defs.' Opening Br. 44–45; *see also* Supp. Decl. of Tammy Stidham, ECF No. 52-1, at ¶¶ 14–22. They assert that none of those projects was specifically authorized by Congress, and that the Park Service instead relied on Section 100101(a)'s general authority. Perhaps that is true. But no one challenged those projects in court, and "the existence of a prior administrative practice" does not "relieve us of our responsibility to determine whether that practice is consistent with the agency's statutory authority." *SEC v. Sloan*, 436 U.S. 103, 118 (1978); *cf. NLRB v. Noel Canning*, 573 U.S. 513, 573 (2014) (Scalia, J., concurring in the judgment) ("[P]ast practice does not, by itself, create power.") (quoting *Medellín v. Texas*, 552 U.S. 491, 532 (2008)). Even on the Defendants' own terms, moreover, those prior projects appear far more consistent with Section 100101(a) than the ballroom project. It is easy to see how construction of the Park Service's regional headquarters and renovation of Park Police stables might enable "conserv[ation]" and safe "enjoyment" of Park sites without meaningfully impairing any "natural and historic objects" within the Park. 54 U.S.C. § 100101(a). But it strains credulity to think that the demolition and replacement of the

So nothing in that language empowers the Park Service to bypass its express statutory confines just to accommodate the President's "longstanding need[s]." Env't Assessment 31.

60

East Wing constitute an effort "to conserve" that "historic object[.]" *Id.*

At bottom, we may assume that Section 100101(a)'s general language authorizes the Park Service to engage in some construction projects in national parks generally—at least as long as those projects are designed to promote conservation and leave historic objects unimpaired for the enjoyment of future generations. But it cannot constitute the "express authority" for "erect[ion]" of "building[s] or structure[s]" on public grounds *in the District of Columbia* that 40 U.S.C. § 8106 demands—especially when there is no argument that the construction at issue will "conserve" historic sites in keeping with Section 100101(a) and Congress's express reaffirmation of that requirement in the Redwood Amendment.

Indeed, Congress has time and again expressly authorized construction projects on public grounds in the District of Columbia. *See, e.g.*, Act of June 28, 1902, ch. 1301, § 1, 32 Stat. at 460 (East and West Wings); An Act To provide for the construction of certain public buildings, and for other purposes, ch. 380, § 1, 44 Stat. 630, 630–631 (1926) (buildings of Federal Triangle); An Act To provide for the construction of a building for the Supreme Court of the United States, ch. 9, §§ 1–3, 46 Stat. 51, 51 (1929); An Act To authorize the Board of Regents of Gunston Hall to establish a memorial to George Mason in the District of Columbia, Pub. L. No. 101-358, § 1, 104 Stat. 419, 419 (1990); National Museum of African American History and Culture Act, Pub. L. No. 108-184, § 8, 117 Stat. 2676, 2680–2682 (2003) (codified at 20 U.S.C. § 80r-6). Section 100101(a) bears no resemblance to those express authorizations.

61

**2**

We now turn to the Defendants' assertion that 3 U.S.C. § 105(d)(1) grants the President himself authority to build a towering ballroom on the former East Wing site. Before proceeding, we note again the secondary role that Section 105(d) plays in the Defendants' theory: The Defendants expressly conceded that if Section 100101(a) does not authorize the construction, then Section 105(d) cannot independently support it because the Defendants are relying on National Park Service funds. Oral Arg. Tr. 55:4–56:19. Our analysis of Section 100101(a) thus resolves the likelihood of success on the merits factor on the Defendants' own terms. For completeness, we nevertheless address Section 105(d).

The National Trust's challenge to the President's reliance on Section 105(d) cannot proceed under the APA because the President is not an "agency" subject to APA review. *See Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). Instead, the National Trust brings an equitable *ultra vires* claim. *Ultra vires* review provides a critical backstop when "there is no other means * * * to protect and enforce [a statutory] right." *Leedom v. Kyne*, 358 U.S. 184, 190 (1958). It is available when the President "has taken action entirely 'in excess of [his] delegated powers and contrary to a *specific prohibition*' in a statute." *Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1776 (2025) (quoting *Brotherhood of Ry. & S.S. Clerks v. Association for the Benefit of Non-Cont. Emps.*, 380 U.S. 650, 660 (1965)). We will thus grant *ultra vires* relief when the President acts based on an "utterly unreasonable" statutory interpretation or a "patent[] * * * misconstruction" of the law. *Federal Express Corp. v. Department of Com.*, 39 F.4th 756, 764–765 (D.C. Cir. 2022) (quotation marks omitted).

62

The baseline for this analysis is again Section 8106, the statute providing that "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." 40 U.S.C. § 8106. This is a "clear and mandatory" provision that leaves no discretion and thus can support *ultra vires* review. *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (quotation marks omitted).

The Defendants counter that Section 8106 should play no role in the *ultra vires* analysis because it does not apply to the President. They argue that, per *Franklin v. Massachusetts*, 505 U.S. 788 (1992), "generally applicable statute[s]" like Section 8106 "should not be construed as restricting the President without a clear statement to that effect." Defs.' Opening Br. 51.

The Defendants overread *Franklin*. That case concerned whether the President was an "agency" within the meaning of the APA, as the APA's definition of "agency" neither "explicitly excluded" nor "explicitly included" the President. *Franklin*, 505 U.S. at 800 (citing 5 U.S.C. §§ 701(b)(1), 551(1)). Had the Court held that Congress's "textual silence" was sufficient to bring the President within the APA's purview, then "the President's performance of his statutory duties [could] be reviewed for abuse of discretion[,]" which would implicate "separation of powers and the unique constitutional position of the President[.]" *Id.* at 800–801. The wide-ranging implications of applying the APA—which could conceivably apply to any presidential action under any of his statutory and constitutional authorities—warranted caution without an "express statement" that Congress intended that result. *Id.* at 801.

63

Here, by contrast, Section 8106 concerns a limited and defined subject over which Congress, all agree, has twofold constitutional primacy: construction on federal property within the District of Columbia. *See Palmore v. United States*, 411 U.S. 389, 397 (1973) ("Congress may * * * exercise all the police and regulatory powers [in the District of Columbia] which a state legislature or municipal government would have in legislating for state or local purposes."). Applying Section 8106 as a limit to any presidential statutory authority concerning construction in the District of Columbia would not "significantly alter the balance between Congress and the President[,]" and so there is no compelling reason to apply a clear statement rule. *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991). Indeed, we have previously found that the President violated a generally applicable statute that does not expressly state that it applies to the President. *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1339 (D.C. Cir. 1996) (National Labor Relations Act).

We therefore conclude that Section 8106 applies and requires the Defendants to identify, in Section 105(d) or elsewhere, "express authority" for the President to erect a building or structure. We note, however, that even if Section 8106 did *not* apply to the President, little of what we say below about Section 105(d) would change. Section 8106 aside, the Defendants would still need to identify affirmative authority for their transformative ballroom construction in Section 105(d). And as we now explain, the Defendants' view that Section 105(d) provides that authority violates numerous aspects of the statute and amounts to a "patent[] misconstruction" of the law. *Federal Express Corp.*, 39 F.4th at 764.

64

Section 105(d)(1) states:

> There are authorized to be appropriated each fiscal year to the President such sums as may be necessary for * * * the care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence at the White House[.]

3 U.S.C. § 105(d)(1).

According to the Defendants, this provision "expressly authorizes the President" to make "major renovations of the White House" through its references to "alterations and improvements." Defs.' Opening Br. 35 (capitalization altered). On the Defendants' telling, the ballroom project constitutes such an alteration or improvement. *Id.* at 36–38. Indeed, as explained below, the Defendants' position suggests that Section 105(d)(1) grants the President unilateral authority to carry out *any* construction project—up to and including demolishing and replacing the entire White House—with any source of funding he can identify. There are multiple independent obstacles to that expansive view.

**a**

First, Section 105(d)(1) does not confer independent authority upon the President absent an accompanying appropriation under that Section on which the President can rely. Yet the Defendants are relying on privately donated funds, not congressional appropriations.

The plain text of Section 105(d)(1) does not expressly grant the President any independent authority. It instead addresses *Congress*: "There are authorized to be appropriated

65

each fiscal year to the President" certain sums. This "authorized to be appropriated" formulation is prototypical of what is referred to in appropriations law as an "appropriation authorization." GAO REDBOOK 2-54 (4th ed. 2016). Such a law confers no affirmative authority to act on the Executive Branch. Instead, as the text indicates, it serves only as "a directive to Congress itself, which Congress is free to follow or alter * * * in the subsequent appropriation act." *Id.* at 2-56; *see Steward Mach. Co. v. Davis*, 301 U.S. 548, 577 (1937) ("All [an appropriation authorization] does is to authorize future appropriations."). An appropriation authorization is distinct from "[e]nabling" or "organic" legislation that might "establish[] a program" or "prescribe[] a function[.]" GAO REDBOOK 2-54 (4th ed. 2016). Standalone appropriation authorizations are not strictly necessary—a single law might both authorize appropriations and serve as enabling legislation providing affirmative authority to act. *See* Gillian E. Metzger, *Taking Appropriations Seriously*, 121 Colum. L. Rev. 1075, 1089–1091 (2021); *see also* Railroad Rehab. & Improvement Fund, 65 Comp. Gen. 524, 527 (1986) (explaining that freestanding authorization laws are "traditional" but "not required"). But where freestanding authorization laws exist, they do not, on their own, grant powers to the Executive. And the language of Section 105(d), which has remained unchanged since its enactment in 1978, indicates that it is just such a standalone appropriation authorization. Indeed, the session law clearly marked Section 105(d) (but not the immediately preceding provisions) as an "[a]ppropriation authorization." *See* Act of Nov. 2, 1978, 92 Stat. at 2446.

Comparing Section 105(d) with the immediately surrounding and concurrently enacted provisions confirms the point. Section 105(a)(1), for example, states that "the President is authorized to appoint and fix the pay of employees in the White House Office without regard to any other provision of

66

law[.]"  That language explicitly provides the President authority to act.  So too for Section 105(b)(1):  "[T]he President is authorized to appoint and fix the pay of employees in the Executive Residence at the White House[.]"  And for Section 105(c):  "The President is authorized to procure for the White House Office and the Executive Residence at the White House" certain services.  It is precisely this type of language—authorizing the President to act, as opposed to speaking to future Congresses—that is noticeably absent from Section 105(d).

The Defendants' argument ignores how Congress legislates.  *See West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 100 (1991) (explaining that courts ought to interpret statutes in a way that "fits most logically and comfortably into the body of both previously and subsequently enacted law").  When Congress wishes to pair an appropriation authorization with a conferral of substantive authority, it generally does so in two distinct steps.  Section 5 of the Indian Reorganization Act, 25 U.S.C. § 5108, is illustrative.  That law first provides that "[t]he Secretary of the Interior is authorized, in his discretion, to acquire" property "for the purpose of providing land for Indians."  *Id.*  It then separately provides that "there is authorized to be appropriated" funds "[f]or the acquisition of such lands[.]"  *Id.*  Numerous other statutes follow a similar pattern.[9]  But glaringly absent from Section 105(d) is any affirmative grant of authority to the Executive.

---

[9]     *See, e.g.*, 16 U.S.C. §§ 410ggg-1(a)(2), 410ggg-3(a)(1) (giving the Secretary of the Interior "[s]pecific authorities" to "conduct and maintain oral histories" of World War II, and then authorizing appropriations of "such sums as may be necessary to conduct" those oral histories); 8 U.S.C. § 1711(d) (instructing the Secretary of State to "implement enhanced security measures for the review of visa applicants[,]" and then authorizing appropriations "to

67

The only language in Section 105(d) that could be construed as a grant of substantive authority to the President explicitly limits that authority to funds that Congress directly appropriates for Section 105(d)'s purposes. After describing the purposes for which "appropriat[ions]" are "authorized[,]" the provision states that "[s]ums appropriated under this subsection for expenses described in paragraph[] (1) * * * may be expended as the President may determine[.]" 3 U.S.C. § 105(d). Thus, when Congress appropriates funds "under" Section 105(d), the President has authority to expend those funds—but only those funds—to act under Section 105(d). *Id.* Put another way, the President is authorized to act under Section 105(d) *only* with funds "appropriated under [that] subsection[.]" *Id.* And those appropriations can themselves come with additional strings attached. *See, e.g.*, Further Consolidated Appropriations Act, 2024, 138 Stat. at 532 (appropriating funds "pursuant to 3 U.S.C. 105(d) * * * for required maintenance, resolution of safety and health issues, and continued preventative maintenance"). So, even when funds are appropriated under Section 105(d), the President's actions are limited by both the amount appropriated and any terms and conditions accompanying the appropriation.

---

carry out" that directive); 20 U.S.C. §§ 1078(f)(1), 1071(b)(5) (authorizing the Secretary of Education to pay certain loan processing fees, and then authorizing appropriations of "sums as may be necessary" for those payments); 42 U.S.C. § 18363(a), (c) (authorizing the NASA Administrator to "decommission" "Space Shuttle orbiter vehicles[,]" and then authorizing appropriations of "such sums as may be necessary" to do so); 52 U.S.C. §§ 21121(a), 21123 (authorizing the Election Assistance Commission to develop the "Help America Vote College Program[,]" and then authorizing appropriations "to carry out" that program).

68

Comparing Section 105(d) with other common statutory formulations again underscores the point:  Section 105(d) does not authorize the President to draw on, for example, "any available funds," 23 U.S.C. § 132(b), or "amounts otherwise available," 42 U.S.C. § 7433(a)(1), or any privately donated "gift of money," 22 U.S.C. § 2697(b).  Instead, the statute authorizes the President to expend those funds—and only those funds—that Congress "appropriate[s] under" Section 105(d).[10]

That limited authority offers no basis for the demolition and replacement of the East Wing.  The only relevant Section 105(d) appropriation that the Defendants have identified appears in the Further Consolidated Appropriations Act, 2024, which states:  "For the repair, alteration, and improvement of the Executive Residence at the White House pursuant to 3 U.S.C. 105(d), $2,475,000, to remain available until expended, for required maintenance, resolution of safety and health issues, and continued preventative maintenance."  138 Stat. at 532.  Reading Section 105(d) and the Appropriations Act together, the President is surely authorized to direct the expenditure of $2.475 million "for required maintenance * * * and continued preventative maintenance."  *Id.*  But to assert that Congress has authorized the construction of a $400 million ballroom using private donations is patently unreasonable.

The Defendants have no response to this dispositive flaw in their position, even though both the district court and the National Trust identified it.  *See National Trust III*, 827 F.

---

[10] For that reason, the dissenting opinion's contention that Park Service "gift funds are an appropriation" under 31 U.S.C. § 1321(b)(1) is beside the point.  Dissenting Op. 23 & n.7.  Regardless of whether those sums could be considered appropriations through a daisy-chain of *other* statutes, they are not "sums appropriated under" Section 105(d)(1) to be expended on the Executive Residence.  3 U.S.C. § 105(d).

69

Supp. 3d at 107; Stay Opp'n, No. 26-5101, Dkt. 2167556, at 15–17 (April 8, 2026). That is, they do not even attempt to explain why, notwithstanding Section 105(d)'s text and the appropriations principles discussed above, the President has statutory authority to perform Section 105(d) projects with funds that were not "appropriated under" Section 105(d).

The Defendants instead proceed as if it is self-evident that the President can carry out construction under Section 105(d) by drawing on any available source of funds. And the Defendants purport to find such available funds in the form of monies donated by third parties—some known, some not—to the National Park Service under 54 U.S.C. § 101101. That statute authorizes the Secretary of the Interior "in the administration of the Service" to accept "money that may be donated for the purposes of the System." 54 U.S.C. § 101101(2). The Defendants insist that the Park Service can contract with EXR to construct the ballroom under the Economy Act, 31 U.S.C. § 1535, and fund that contract using those donations because EXR has authority to engage in the construction.

That theory does not withstand scrutiny. Put simply, funds donated to the Park Service by third parties under 54 U.S.C. § 101101 are not funds "appropriated under" Section 105(d) by Congress. There is no plausible argument to the contrary—again, the Defendants simply ignore the problem.

Relatedly, the Park Service's ability to accept donations does not mean it can use those funds however it wishes, much less that it may then transfer those funds to other agencies (or the President) to fund projects the Park Service has no authority to carry out. Government funds may be spent only as Congress directs. *See Reeside v. Walker*, 52 U.S. (11 How.) 272, 291 (1851) ("However much money may be in the Treasury at any

70

one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned."); *see also* 31 U.S.C. § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."). Section 101101(2) itself provides the Park Service only the ability to "accept" donations, not to "accept and use" them. *Compare* 54 U.S.C. § 101101(2), *with id.* § 101102(a)(1). Congress has elsewhere provided that money donated to the Park Service's trust fund is "appropriated to be disbursed in compliance with the terms of the trust." *See* 31 U.S.C. § 1321(b)(1); *see also id.* § 1321(a)(17). Those terms allow expenditures only "for the benefit of, or in connection with, the [Park] Service, its activities, or its services." 54 U.S.C. § 101113(a)(1). The donated funds could thus likely be used by the Park Service if the agency had statutory authority to undertake the ballroom project (which it does not, as explained in Section III.A.1, *supra*). But donations to the Park Service cannot be redirected by the agency to fund a project that is being carried out under statutory authority granted only to the President or another agency, especially when that statutory authority requires targeted appropriations.

Nor does the Defendants' invocation of the Economy Act, 31 U.S.C. § 1535, undermine the National Trust's likelihood of success. The Defendants insist that the Economy Act permits the Park Service to transfer both its statutory authority and its private donations to EXR through an inter-agency contract. That theory fails for three independent reasons.[11]

---

[11] The dissenting opinion contends that we should not address the Economy Act because "the Trust never directly challenged the government's reliance on" that statute. Dissenting Op. 24. But our colleague fundamentally misunderstands how the Economy Act fits into the analysis. At the threshold, as we have explained, our analysis of Section 105(d) is only an alternative holding given the

71

First, the Economy Act could allow the use of the Park Service's donated funds for the construction only if the Park Service *also* had authority to construct the ballroom. As the Defendants concede, "the purpose of [an Economy Act] transaction must be something the *ordering agency*"—here, the Park Service—"is authorized to do." GAO REDBOOK 12-26 (3d ed. 2008) (emphasis added); *see* Defs.' Opening Br. 48 ("[F]unds transferred under the Economy Act are 'available for the purposes for which the *appropriation from which [the funds are] transferred* [is] available[.]'") (quoting Acting Comptroller Gen. Elliott to the Sec'y of War, 18 Comp. Gen. 489, 490–491 (1938)) (emphasis added); Oral Arg. Tr. 35:2–9 (Question: "[I]n your view, it always has to be something [the Park Service] o[r] Interior has the authority to do?" Answer: "Yes." Question: "They have to have the legal authority so that they could sort of just do this job themselves?" Answer: "Yes."). The Park Service, however, likely has no authority to construct

---

Defendants' express concession that they cannot construct the ballroom unless the NPS Organic Act authorizes them to do so. *See* pp. 52–53 & n.6, 61, *supra*. The dissenting opinion glosses over that concession and offers no analysis at all of the National Trust's APA claim against the Park Service. *See* Dissenting Op. 24–25 n.8. That failure alone defeats the dissenting opinion's merits analysis. Our alternative analysis of Section 105(d) starts by agreeing with the district court's holding that EXR cannot draw on funds Congress did not appropriate under that provision. *See National Trust II*, 827 F. Supp. 3d at 107. In response to that argument, advanced by the National Trust and accepted by the district court, the Defendants suggested that the Economy Act offers them an escape hatch from Section 105(d)'s limiting language, and the Trust responded. *See* Defs.' Opening Br. 46, 48; *see also* Nat'l Trust Br. 43–44 (responding to the Defendants' argument). The dissenting opinion's charge that rejecting the Defendants' attempted response to one of several independent flaws in their position somehow violates party presentation principles is false.

72

the ballroom.  *See* Section III.A.1, *supra*.  The Park Service cannot contract its way out of the statutory constraints Congress imposed on it by simply paying another agency to do for it what Congress has said it cannot do.  *Cf. Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1867) ("[W]hat cannot be done directly cannot be done indirectly.").

Second, "[t]he Economy Act does not give a *performing* agency"—here, EXR—"any authority which it would not otherwise have."   GAO REDBOOK 12-28 (3d ed. 2008) (emphasis added).  That is, EXR can act in this case only with the authority conferred by Congress under Section 105(d).  And as we have just explained, Congress has carefully calibrated Section 105(d)'s appropriation authorization so that Congress retains control over construction at the White House through the recurring appropriations process.  Indeed, as we detail in the sections below, there are two additional substantive limitations on EXR's authority under Section 105(d) that bar the ballroom construction.  EXR cannot sidestep those limits and authorize itself to take action at the Executive Residence at the White House via the Economy Act just because some agency—any agency—could take that action somewhere else.  Nor, as just discussed, have the Defendants identified such an agency in the Park Service.

Third, the Economy Act authorizes one "agency" to contract with another "agency" for "goods or services" under certain conditions.  31 U.S.C. § 1535(a).  Yet the Defendants have nowhere bothered to explain why EXR is an "agency" within the meaning of the Economy Act, even though they argued strenuously and successfully below that EXR is not an "agency" under the Administrative Procedure Act.  P.I. Opp'n at 22; *National Trust II*, 821 F. Supp. 3d at 71; *cf. Sweetland v. Walters*, 60 F.3d 852, 855 (D.C. Cir. 1995) (per curiam) (holding that the Executive Residence is not an "agency" under

73

the Freedom of Information Act).  Indeed, the statutory definitions of "agency" under the Economy Act and the Administrative Procedure Act are both phrased generally and do not expressly include or exclude the President or EXR.  *See* 31 U.S.C. § 101; 5 U.S.C. § 551(1).  The Defendants' failure even to acknowledge, let alone address, an indispensable statutory predicate to the success of their argument reinforces the National Trust's likelihood of success.

Stepping back, it is easy to see why Congress has not authorized the use of private gifts (or "any available funds") for major renovations at the White House.  When Congress permits an agency or the President to pursue programs with donated or general funds, it necessarily gives up some of its own power to check the Executive Branch.  The "power of the purse," after all, is one of Congress's crucial means of leverage over the Executive.  *See Public Citizen, Inc. v. National Highway Traffic Safety Admin.*, 489 F.3d 1279, 1295 (D.C. Cir. 2007).  Donation-based financing of government can thus "circumvent or skew the normal processes of democratic decision-making." Margaret H. Lemos & Guy-Uriel Charles, *Patriotic Philanthropy? Financing the State with Gifts to Government*, 106 Calif. L. Rev. 1129, 1178 (2018).  The Framers viewed congressional control over appropriations as a means of "preventing fraud and corruption" or the appearance thereof. *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427 (1990); *see also id.* ("[Congress's] power to control and direct the appropriations, constitutes a most useful and salutary check upon * * * corrupt influence and public peculation[.]") (quoting 2 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1348 (3d ed. 1858)).  Congress accordingly does not cede its appropriations power lightly.  It stands to reason that Congress would be reluctant to relinquish its oversight and control over the Executive by allowing the

74

President to use private donations to remake the White House, one of our Nation's most historic and well-known sites.

Indeed, where Congress has allowed the use of donations at the White House, it has done so for modest purposes, accompanied by myriad procedural requirements. Most notably, Congress has authorized the Park Service "to accept donations of furniture and furnishings for use in the Executive Residence[.]" 3 U.S.C. § 110. But Congress then instructed the Director of the Park Service to "appoint a temporary committee" with nine members to "have full power to select and pass on the articles in question and to recommend the same for acceptance." *Id.* It is difficult to believe that Congress would be so focused on structuring review of donated furniture yet entirely outsource to the President authority to reshape the White House complex itself with any funds he can obtain, regardless of the source.

Finally, the Defendants point to four examples of "President-directed construction at the White House[.]" Defs.' Opening Br. 8–9. Those instances have no bearing on the meaning of Section 105(d)(1). First, the historical record suggests that Congress appropriated funds for two of those projects: President Franklin D. Roosevelt's wartime renovation of the East Wing, as both parties agree, and his Depression-era renovation of the West Wing. *See* Defs.' Opening Br. 8–9 (citing Act of April 28, 1942, 56 Stat. at 236); Nat'l Trust Br. 35; *see also National Trust III*, 827 F. Supp. 3d at 112 & n.12. Second, "there is nothing to indicate" that a third project—President Gerald Ford's construction of a swimming pool—was "ever called to the attention of Congress" when Congress enacted Section 105(d). *See United States v. Calamaro*, 354 U.S. 351, 359 (1957). Finally, even spotting the Defendants those four exceptions, their rarity proves the rule. The historic practice from the Founding and

75

codified in Section 105(d)(1)'s text is that Congress routinely and vigorously exercises its authorization and appropriation control over major construction on White House grounds. *See* Section I.A.1, *supra*; *see also Noel Canning*, 573 U.S. at 538 ("[W]hen considered against 200 years of settled practice, we regard these few scattered examples as anomalies.").

**b**

The Defendants' Section 105(d)(1) argument runs into a second textual wall. Even after Congress has appropriated funds under Section 105(d), the plain text confines their usage to the care, maintenance, and so forth, "of the Executive Residence at the White House[.]" 3 U.S.C. § 105(d)(1). Just as the Defendants have ignored the statutory limitations in the National Park Service Organic Act, the Defendants likewise breeze past the "Executive Residence at the White House" qualifier and make no argument at all—not one word—that the East Wing is part of the Executive Residence at the White House. *See* Amicus Br. of American Inst. of Architects et al. 10.

President's Park consists of the White House and its surrounding grounds. *See* Act of Sept. 22, 1961, § 1, 75 Stat. at 586. The White House, in turn, consists of a collection of structures—including, most notably: (1) the West Wing, "the part of the White House in which the Oval Office, the Cabinet Room and the Situation Room are located"; (2) the former East Wing, which "serve[d] as office space for the First Lady and her staff, the Department of Defense, and the United States Secret Service"; and (3) the main building in between, where the President and his family live. 155 CONG. REC. H10028 (daily ed. Sept. 29, 2009). With that context, the phrase "Executive Residence at the White House" would be a very strange way to refer to the *entire* White House. Instead, it is

76

most naturally read to refer only to the last structure. "Residence," after all, means "[t]he place in which one lives; a dwelling[.]" *Residence*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1106 (New College ed. 1976). And that understanding comports with the duties of "Executive Residence staff[,]" which include "general housekeeping, prepar[ing] and serv[ing] meals, greet[ing] visitors, and provid[ing] services as required in support of official and ceremonial functions." *Sweetland*, 60 F.3d at 854 (quoting Report of Senate Appropriations Committee, S. REP. No. 286, 103d Cong., 2d Sess. 51 (1994)).

That understanding of "Executive Residence" also fits common usage. Bills introduced in Congress have repeatedly referred to the "Executive Residence" as separate and distinct from the East and West Wings. *See, e.g.*, Our Lawn Act, H.R. 6116, 117th Cong. § 2 (2021) (defining "Federal property" to include "the White House grounds and the White House (including the Old Executive Office Building, *the West Wing, the East Wing, the Rose Garden, and the Executive Residence*, but not including the second floor of the Executive Residence)") (emphasis added); Our Lawn Act, H.R. 8228, 116th Cong. § 2 (2020) (same). *Compare* Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3187–3188 (2009) (appropriating $84.5 million for "East Wing Infrastructure Systems Replacement" to the General Services Administration), *with id.* at 3167 (appropriating $13.8 million "[f]or the care, maintenance, repair and alteration, refurnishing, improvement, heating, and lighting, including electric power and fixtures, of the Executive Residence at the White House" directly to the Executive Office of the President); *compare also* Omnibus Appropriations Act, 2009, Pub. L. No. 111-8, 123 Stat. 524, 659, 661 (appropriating $76 million for "West Wing Infrastructure Systems Replacement" to the GSA), *with id.* at 638 (appropriating $13 million for "the

77

Executive Residence at the White House" to the Executive Office of the President). *See generally* The White House—The Vice President—Gifts, 2 Op. O.L.C. 349, 350 (1977) (expressing "understanding that, by arrangement with the National Park Service, maintenance and furnishing of the East and West Wings of the White House are the responsibility of the General Services Administration"). Similarly, the Park Service's Comprehensive Design Plan for the White House, which "provide[s] a framework for future management" of the "White House and President's Park," expressly distinguishes the "Executive Residence" from the "East and West Wings" of the White House. 2000 Design Plan at 5, 13, 32.

The President, in promoting the ballroom, also describes the "Residence" as distinct from the White House Wings. *See About the White House*, The White House, https://perma.cc/8F8U-YHNB ("President Theodore Roosevelt began a major renovation of the White House, including the relocation of the President's offices *from the Second Floor of the Residence to the newly constructed temporary Executive Office Building* (now known as the West Wing).") (emphasis added); *id.* ("The $250 million project includes modernized offices and bulletproof glass, upgrading the historic 1902 structure *while preserving the main residence*.") (emphasis added); *see also Blassingame v. Trump*, 87 F.4th 1, 33 (D.C. Cir. 2023) (Katsas, J., concurring) ("Unless speaking at some specific campaign or political event, [the President] will thus likely be 'clothed in the trappings' of his Office—whether *in the West Wing* [*or*] *in the Executive Residence*[.]") (emphasis added).

**c**

Finally, express statutory limits on the presidential use of Section 105(d)(1) funds strike a third textual blow to the

78

Defendants' argument. Recall that the statute refers to "the care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence at the White House[.]" 3 U.S.C. § 105(d)(1). The Defendants focus on the words "alteration" and "improvement," and argue that their remaking of the White House qualifies as either. That argument does nothing to undercut the National Trust's likelihood of success on the merits.

Start with "alteration." That verb "alter" means "to change some of the elements or ingredients or details *without substituting an entirely new thing or destroying the identity of the thing affected.*" *Alter*, BLACK'S LAW DICTIONARY 71 (5th ed. 1979) (emphasis added); *see also Alter*, 1 OXFORD ENGLISH DICTIONARY 365 (2d ed. 1989) (defining "alter" as "to make some change in character, shape, condition, position, quantity, value, etc. *without changing the thing itself for another*") (emphasis added). The Defendants wholly ignore the definition's limiting language, characterizing Section 105(d) as "capacious." Defs.' Opening Br. 36. In the same vein, they have previously equated "alter" with "modify," Defs.' Stay Mot. 17, failing to appreciate that the term "modify" also "carries a connotation of increment or limitation" and "must be read to mean to change moderately or in minor fashion[,]" *Biden v. Nebraska*, 143 S. Ct. 2355, 2368 (2023) (quotation marks omitted); *see also Modify*, BLACK'S LAW DICTIONARY 1155 (rev. 4th ed. 1968) (defining "modify" as "to change in incidental or subordinate features"). The Defendants do not dispute that the ballroom is a change far from minor.

Section 105(d)(1)'s inclusion of "improvement" also does not strengthen the Defendants' hand. The Defendants draw primarily on the proposition that "in the real property context,

79

to 'improve' means to build structures on land." Defs.' Opening Br. 36–37 (quotation marks omitted) (citing, e.g., *Land*, BLACK'S LAW DICTIONARY (12th ed. 2024); *Improved Land*, BLACK'S LAW DICTIONARY (5th ed. 1979); Brian Sawers, *The Right to Exclude from Unimproved Land*, 83 Temple L. Rev. 665, 666 (2011); Act of Sept. 4, 1841, ch. 16, § 10, 5 Stat. 453, 455 (granting "public lands" to persons "who shall inhabit and improve the same")). But all of the Defendants' citations indicate at most that "improvement" carries that connotation in the context of improvements *to land*. *See id.* The term "improvement," however, can encompass "valuable addition[s]" to either land or buildings. *See Improvement*, BLACK'S LAW DICTIONARY (4th revised ed. 1968) (defining "improvement" more broadly as a "valuable addition made to property" that is "usually" but not always "real estate"). And as we will next explain, the term carries a different meaning depending on the context. To understand the nature of the "improvement[s]" discussed in Section 105(d)(1), we must consult the text of that provision.

Section 105(d)(1) plainly does not implicate improvements to land. It instead concerns "improvement * * * of *the Executive Residence at the White House*[.]" 3 U.S.C. § 105(d)(1) (emphasis added). The phrase "Executive Residence at the White House," in turn, clearly refers to a *building*. *Cf.* Section III.A.2.b, *supra*. First, the word "residence" frequently refers to a "type of structure." *Bruno v. Hanna*, 164 A.2d 647, 649 (N.J. Super. Ct. App. Div. 1960); *see also Residence*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1106 (New College ed. 1976) (defining "residence" as "[t]he place *in which* one lives; a dwelling") (emphasis added). Second, it would be passing strange to say that one can "ke[ep] [furniture] *in*[,]" "refurnish[,]" "air-condition[,]" or "heat[]" a parcel of land. 3 U.S.C. §§ 102, 105(d)(1) (emphasis added). Third, when

80

Congress refers to the land appurtenant to the White House, it does so explicitly. *See, e.g.*, 3 U.S.C. § 421(a) (ADA applies to "White House and its appurtenant grounds"); 18 U.S.C. § 1752(c)(1)(A) (illegal to enter "White House or its grounds" without lawful authority).

Although the word "improvement" can carry a broader meaning in the context of "changes to land," "its meaning is otherwise" when used in the "context of" "[b]uilding[s]" or "[s]tructure[s]." *Vogel v. Reed Supply Co.*, 177 S.E.2d 273, 281 (N.C. 1970). In the latter context, courts have long "distinguish[ed] * * * improvement of an existing structure from construction of a new structure[.]" *Hanson Assocs., P.C. v. Gallery Plaza P'ship*, 32 Va. Cir. 356, 356 (Va. Cir. Ct. 1994). That distinction is sometimes drawn by assessing whether changes are made to the interior or exterior of a building: "[A] mere change in a building's purpose by virtue of extensive interior alterations * * * constitutes improvements to an existing building[.]" *Id.* But "concomitant alterations in the building's exterior" transform that improvement into "new" construction. *Id.* (collecting cases); *see also Cinelli Builders, Inc. v. Ferris*, 911 N.Y.S.2d 446, 447 (N.Y. App. Div. 2010) (Plaintiff "was not required to possess a home improvement contractor's license" when "the construction was for a 'new home'" and "not a 'home improvement'"). Other times, the distinction is drawn by considering the extent of changes to the building: An "addition to [an] existing structure" that is "about one-seventh of size of [the] existing building" has been treated as an improvement to the existing building, *id.*, whereas "a substantial addition to a structure" was "treated as a new erection or construction," *Anastasi v. Brunet*, 90 A.2d 636, 637 (Pa. Super. Ct. 1952); *see also id.* (holding that the "erection of a building adjoining" a "22 by 35 feet" "dwelling house"

81

constituted "new construction" because the complex became "a large rambling structure covering 2354 square feet").[12]

However that distinction is drawn, the proposed ballroom—which would replace the East Wing with a new structure dwarfing other parts of the White House—constitutes new construction, not an improvement. Indeed, in the construction context, courts "uniform[ly] conclu[de]" that the verb "erect" means "[t]he creation of something new, *as distinguished from the * * * improvement of something already existing*." *State ex rel. Celebrezze v. National Lime & Stone*

_____

[12] The dissenting opinion cites a pair of statutes that supposedly "confirm[]" that the term "improvement" in Section 105(d)(1) must "include the construction of buildings" and suggests that "improvement" carries the same meaning whether the thing "improved" is land or an existing structure. Dissenting Op. 19–20. That is incorrect. One of those laws uses the statutory term of art "construction or facility improvement project." *See* 10 U.S.C. § 2687a(a)(3)(B)(i) ("improvement to real property"). The other addresses improvements to land. *See* 16 U.S.C. § 666 ("improvements * * * of areas made available to the Secretary of Interior under" the Fish and Wildlife Coordination Act). Meanwhile, other statutes focused on buildings distinguish new construction from improvements to existing structures. *See, e.g.*, 10 U.S.C. § 2825(a)(2), (b)(2) (defining "improvement" to include "rehabilitation of a housing unit and major maintenance or repair work" and presenting improvement as an alternative to "a newly constructed unit"); 15 U.S.C. § 278d(a) (separately authorizing "construction of buildings" and "improvements to existing buildings"); 16 U.S.C. § 215 (separately authorizing the Park Service to provide for "the improvement of * * * buildings" and "the construction of * * * additional * * * buildings" in a national park); 42 U.S.C. § 8628 (prohibiting use of grant funds for "the purchase, construction, or permanent improvement * * * of any building"); 50 U.S.C. § 3303(a) (distinguishing a "project for the construction of any facility" from "improvement to any facility").

82

*Co.*, 627 N.E.2d 538, 542 (Ohio 1994) (formatting modified) (collecting cases); *see also Travelers Indem. Co. v. Wilkes County*, 116 S.E.2d 314, 317 (Ga. Ct. App. 1960) (similar). Accordingly, the verb "improv[e]" in Section 105(d)(1) affords the Defendants no "express authority of Congress" to "erect[]" an entirely new "building or structure" in the District of Columbia, 40 U.S.C. § 8106.

Reading "alteration" and "improvement" in context—as we must—only further refutes the Defendants' position. *See, e.g.*, *Deal v. United States*, 508 U.S. 129, 132 (1993); *Learning Res., Inc. v. Trump,* 146 S. Ct. 628, 643 (2026). The terms surrounding "improvement" and "alteration"—"care," "maintenance," "repair," "refurnishing," "air-conditioning," "heating," and "lighting"—all presuppose an already-existing structure and indicate minor changes. *See* 3 U.S.C. § 105(d)(1). The interpretive instruction that a word in such a list is "known by the company it keeps," *Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality opinion), applies with straightforward logical force here: Congress is extremely unlikely to have written a statute that says, in the same breath, that the President may maintain the Executive Residence at the White House, replace its light fixtures, fix the air-conditioning, *and demolish and replace the entire structure with whatever new structure he prefers*. One of those things is not like the others.

The Defendants (and the dissenting opinion) emphasize that the words "alteration" and "improvement" should have some meaning independent of the other terms in the list. *See* Defs.' Opening Br. 38–39; Dissenting Op. 20 n.6. But "[t]he anti-surplusage canon is not an iron rule." *Mullin v. Al Otro Lado*, --- S. Ct. ----, 2026 WL 1825741, at *8 (U.S. June 25, 2026). Indeed, "redundancies are common in statutory drafting—sometimes in a congressional effort to be doubly

83

sure, sometimes because of congressional inadvertence or lack of foresight, or sometimes simply because of the shortcomings of human communication." *Barton v. Barr*, 140 S. Ct. 1442, 1453 (2020) (collecting cases). Recall, for instance, that Congress authorized appropriations for "care, maintenance, [and] repair" in the same breath. 3 U.S.C. § 105(d)(1). Regardless, the words "alteration" and "improvement" can easily have independent meaning without coming anywhere close to the Defendants' expansive whatever-the-President-wants view. For example, as just discussed, an "improvement" to an existing structure often refers to renovations that update a structure without crossing the line to construction of an entirely new one. We need not precisely demarcate the bounds of that authority to recognize that demolishing and replacing an entire, major structure falls well outside of it.[13]

The Defendants' contrary view that Congress has outsourced to any President full and unchecked authority to remake the White House is impossible to reconcile with the statutory context. As the district court explained, under the Defendants' view of Section 105(d)(1)—as a complete conferral of authority to the President to engage in any construction he sees fit—the President could bulldoze the entire White House and replace it with a new building of his

---

[13] It is also important to remember that the statute, properly viewed, is structured in another way that minimizes the type of line-drawing concerns that the Defendants conjure: Section 105(d)(1) requires *Congress* to appropriate funds specifically for the purpose of Section 105(d)(1) before the President can take *any* action at all under it. *See* Section III.A.2.a, *supra*. Congress can convey or clarify the permissible scope of work in a Section 105(d)(1) appropriation, as it did in 2024 when it limited the use of funds appropriated under Section 105(d)(1) to maintenance and resolution of health and safety issues. *See* Consolidated Appropriations Act, 2024, 138 Stat. at 532.

84

own design, including a "skyscraper." *National Trust III*, 827 F. Supp. 3d at 107.

Congress does not "hide elephants in mouseholes." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001). If Congress, acting against the backdrop of other statutes that strictly limit construction within Park System units in the District of Columbia, and which require the government to jump through significant procedural hoops to accept even donations of furniture at the White House, wanted to convey to the President unchecked construction authority over the White House, we would expect it to do so with language saying just that. We would not expect Congress to do so by turning to a provision titled "Assistance and services for the President," adding a fourth subsection framed as a mere appropriation authorization, and inserting the words "alteration" and "improvement" alongside other statutory terms speaking to such anodyne matters as the President's ability to use congressional appropriations to maintain power outlets and keep the building warm. 3 U.S.C. § 105(d)(1).

Even through the demanding lens of *ultra vires* review, the Defendants have identified no remotely plausible basis for their sweeping claim of authority to reshape one of our Nation's most historic sites without express authorization by Congress.

**B**

The National Trust and its members have shown that they will suffer irreparable harm absent a preliminary injunction.

Concrete and extensive architectural, historic-preservation, professional, and visual injuries of the types claimed by Professor Hoagland—and factually found by the National Park Service itself to be material and permanent

85

results of the ballroom's planned size and scale—demonstrate irreparable harm.  In *National Wildlife Federation v. Burford*, 835 F.2d 305 (D.C. Cir. 1987), for example, this court affirmed a finding of irreparable harm where a conservation organization showed that "its members' interests in conserving natural resources for their aesthetic * * * use and enjoyment [would] be irreparably injured" absent preliminary relief, because those resources would be imminently sold or opened to mining operations, and thus "permanently lost[,]" *id.* at 324. Other appellate courts have upheld findings of irreparable harm in similar contexts.  *See, e.g.*, *National Wildlife Fed'n v. National Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018) ("[P]laintiffs have shown irreparable harm to their own interests stemming from the irreparable harm to the listed species[,]" upon which Plaintiffs depended for "recreational and aesthetic pursuits[.]"); *Sierra Club v. Army Corps of Eng'rs*, 645 F.3d 978, 995 (8th Cir. 2011) ("[I]rreparable harm to the environment necessarily means harm to the plaintiffs' specific aesthetic, educational and ecological interests."); *Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1086 (10th Cir. 2004) (finding irreparable harm where plaintiffs' "enjoyment of their land" would suffer due to the "greater proximity of a major highway" being constructed nearby).

Like the plaintiffs in those cases, Professor Hoagland has "delineated specific ways[,]" *Burford*, 835 F.2d at 324, in which the construction of a ballroom of the planned size and scale would irreparably and harmfully alter her use, experience, and enjoyment of the archaeological, historical, visual, and aesthetic appearance of the White House and President's Park. The ballroom would "overshadow[] the White House, exceeding it in height and massing, [and] would diminish the primacy of the White House, which makes [an] architectural statement through its singularity on the landscape." Hoagland Decl. ¶ 13; *see National Trust III*, 827 F. Supp. 3d at 115–116.

86

This would permanently impair the White House's ability to "serv[e] as a landmark defining L'Enfant's plan for the city" and to embody George Washington's intent for a "modest" residence that reflects "republican simplicity[.]" Hoagland Decl. ¶¶ 10–11, 13.

Professor Hoagland also has identified specific reasons why this dramatic change to the architecture of the White House, Lafayette Square, and President's Park would irreparably harm her. Professor Hoagland crosses through Lafayette Square monthly "to attend functions in neighboring buildings" to the White House, on walks to enjoy the architecture, and on other occasions. Hoagland Decl. ¶¶ 9, 12. Further, as a current Trustee of the National Trust, Professor Hoagland attends the National Trust's Board meetings in the District of Columbia and intends to do so in 2026. *Id.* ¶¶ 2, 12. Those meetings are "usually" held at the Decatur House. *Id.* ¶ 12. Because the Decatur House is located on the corner of Lafayette Square and kitty-corner to the eastern side of the White House, that means Professor Hoagland will have to face whatever is erected in place of the old East Wing every time she attends these Decatur House Board meetings.

Professor Hoagland's professional injuries are also irreparable. She is an architectural historian and the author of six books "on various aspects of American vernacular architecture[,]" including her most recent book about D.C.'s historic Row Houses. Hoagland Decl. ¶ 4. Professor Hoagland has attested that the changes to the White House and the careful layout of the L'Enfant Plan adversely "affect[] [her] own research" on Washington's architecture. *Id.* ¶ 11.

Defendant National Park Service agrees that the ballroom construction will cause irreversible historical-preservation, architectural, and visual damage. After careful review, the

87

Park Service concluded that constructing a ballroom "that is approximately 90,000 square feet and 55 feet tall would have permanent adverse impacts" on "the White House Grounds cultural landscape." Env't Assessment at 11.  The Park Service found that the project will "disrupt the historical continuity of the White House grounds" and "alter the architectural integrity of the east side of the property[,]" because the ballroom's "larger footprint and height will dominate" and "creat[e] a visual imbalance with the more modestly scaled West Wing and Executive Mansion."  FONSI at 7; *see also National Trust III*, 827 F. Supp. 3d at 115–116 (crediting that finding).  Additionally, building a second story to the ballroom will contrast with the single story of the West Colonnade "and chang[e] the traditional spatial organization and sightlines of the grounds."  FONSI at 7.  In the words of the Park Service: "These changes will adversely alter the design, setting, and feeling of the White House and the grounds over the long-term."  *Id.*

The National Trust has also shown that this harm is sufficiently "imminen[t]" to support the issuance of a preliminary injunction.  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (emphasis omitted).  The Defendants insist that construction needs to start right away.  *See* Defs.' Opening Br. 56; *see also* Decl. of John Stanwich, ECF No. 14-6, at ¶ 20; *National Trust III*, 827 F. Supp. 3d at 115.  And, as the National Trust points out and Defendants do not dispute, the above-ground construction of the ground floor of the ballroom has begun, including portions of the pillars that will support additional floors.  *See* Nat'l Trust Br. 47 & n.12.

The Defendants have made no argument that the harms that will be imposed by a towering ballroom could be redressed at the end of this litigation, absent preliminary injunctive relief.

88

They have not said anywhere that they will still be able to make material changes to the ballroom's planned size and scale (rather than its minor design features) further down the road. The Defendants' nascent construction of the supporting structure and their continued insistence that the ballroom is one "unified[] and cohesive" whole say quite the opposite. Defs.' Opening Br. 54.

Nor have the Defendants represented that, if they were to lose on the merits of the case, they would remove any unlawfully built structures to remedy the injuries. To the contrary, the Defendants insist that, once built, the ballroom must remain intact permanently for national security and safety reasons, making it harder for the district court to fashion any relevant remedy. *See, e.g.*, *National Parks Conservation Ass'n*, 925 F.3d at 502 (remanding case for determination of a proper remedy where petitioners had defeated conservation groups' preliminary-injunction motion by arguing that petitioners' electrical transmission towers, if unlawfully built, could be removed, and then opposed the towers' removal as wasteful and disruptive *after* construction was completed); *id.* ("Had the [petitioners] said all along what they say now, either the district court or this court might have enjoined tower construction[.]").

## C

The relevant equitable considerations also favor the National Trust.

### 1

The Defendants argue that the district court's preliminary injunction inequitably injures their safety and security interests. In considering those arguments, the bottom-line question is whether the district court abused its discretion in

89

concluding that the harms to the National Trust outweigh the Defendants' asserted harms and that an injunction is in the public interest. *Winter*, 555 U.S. at 25–26.

We note, at the outset, that the Defendants, including the President, have disclaimed *any* constitutional authority, whether explicit or implicit, to build the ballroom. P.I. Opp'n at 39 ("The President is not claiming inherent constitutional authority to undertake the East Wing project[.]"). They assert only statutory authority. *Id.* ("[H]e rests on statutory authority[.]"). But, as discussed, the only statute they rely on that arguably assigns some authority over White House alterations or repairs to the President is Section 105(d), which does not apply on these facts and which the Defendants admit does not by itself authorize the ballroom project. Oral Arg. Tr. 55:6–11; Section III.A.2, *supra*. And the statutory assignment of authority over national parks and historic sites to the National Park Service is to "conserve" and maintain such sites and to "leave them unimpaired[.]"  54 U.S.C. § 100101(a). Congress has not given the Park Service authority, specifically and expressly, or otherwise, to raze protected historic sites in the name of presidential functions or national security. As the Defendants are very likely without statutory authority to act, those interests cannot carry the weight that the Defendants claim in the balancing of interests. *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022) (court's determination that the movant is likely to succeed on the merits and will suffer irreparable harm during the litigation absent an injunction—the two most critical factors in the preliminary injunction analysis—"lightens the Executive's stated interests").[14]

---

[14]  The dissenting opinion objects to "collapsing * * * the merits and the equities[.]"  Dissenting Op. 32.  Of course those two factors

90

Said another way, the district court's exercise of equitable judgment falls more firmly within the scope of its discretion when the Defendants claim no Article II power for their action and likely lack any statutory basis for it too. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952) (affirming preliminary injunction over a wartime President's objection that "his action was necessary to avert a national catastrophe"); *NFIB v. OSHA*, 142 S. Ct. 661, 666–667 (2022) (per curiam) (staying a regulation over the government's objection that it would "save over 6,500 lives and prevent hundreds of thousands of hospitalizations" in the midst of a global pandemic).

Turning specifically to the Defendants' three claims of harm, none of them hold up. Each is either fully addressed by the injunction's safety-and-security exception or unsustainable on this record. Likewise, none shows that the balance of equities tilts decisively in the Defendants' favor.

---

do separate work. But as the dissenting opinion recognizes, *id.*, the Supreme Court and this court have repeatedly held that a likelihood of success on the merits or lack thereof can bear on the balancing of the equities. *See, e.g.*, *Huisha-Huisha*, 27 F.4th at 734; *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020); *Alabama Ass'n of Realtors v. Department of Health & Human Servs.*, 141 S. Ct. 2485, 2490 (2021) (per curiam) ("But our system does not permit agencies to act unlawfully even in pursuit of desirable ends" such as "combating the spread of * * * COVID-19[.]"). The dissenting opinion's authorities agree. *See, e.g.*, *Hanson v. District of Columbia*, 120 F.4th 223, 247 (D.C. Cir. 2024) (stating in case involving allegedly unconstitutional law that "the public interest * * * rises and falls with the strength of the moving party's showing on the merits") (formatting modified), *cert. denied*, 145 S. Ct. 2778 (2025); *id.* ("[The] equities might balance differently if the plaintiffs had established a likelihood of success on the merits of their constitutional claim[.]").

91

*First*, as the district court found, much of the Defendants' equitable argument concerns security features that would be installed beneath the planned ballroom.  *See National Trust IV*, 2026 WL 1027744, at *2.  The district court's preliminary injunction allows construction of those underground features to go forward.  Am. P.I. Order at 2.  It halts only the above-ground "physical construction *of the proposed ballroom*" itself.  *Id.* (emphasis added).  So no harm shown there.

The Defendants object that the subterranean security features, as well as the exposed side of the Executive Mansion, need to be covered to protect them.  Defs.' Opening Br. 55–56.  The preliminary injunction allows that too.  The district court's order modifying the injunction is explicit that the Defendants can put a fully protective covering over the underground construction and other exposed portions of the construction site.  Am. P.I. Order at 2–3.

The Defendants next contend that only the *completed* ballroom, with its large size and mass, can sufficiently protect the White House complex—that is, the entire project is a "unified whole" that is essential to security and safety.  Defs.' Opening Br. 18; *see also id.* at 54.

As an initial matter, the district court found that this argument contradicts what the Defendants told the district court throughout months of litigation—that is, that the above-ground and below-ground portions of the project were "independent of" one another.  *National Trust IV*, 2026 WL 1027744, at *3 (formatting modified); *see* Section I.C.3, *supra*.  Nowhere do the Defendants explain how this newly asserted national security requirement that either did not exist or was withheld from the district court in February materialized in April with such force that it should have tilted the district court's balance

92

of equities in the Defendants' favor.  Such shifting and contradictory positions are a frail reed on which to rest equitable arguments.[15]

In any event, the Defendants' argument essentially boils down to the position that the ballroom, once completed two or more years from now, will be more secure than the now-demolished East Wing and an active construction site.  Defs.' Opening Br. 54–55.

Of course a completed, fortified building fitted with modern security features will be more secure than an active

---

[15] Undeterred by the district court's finding, the Defendants have taken to asserting more brand-new security justifications for the first time on appeal.  For example, in a declaration submitted only to this court, the Secretary of the Army relays that the ballroom is an advanced "sacrificial" structure designed to protect the bunkers underneath.  *See* Decl. of Daniel P. Driscoll, No. 26-5123, Dkt. 2169274, at Add. 21–22 ¶¶ 8–9 (April 17, 2026).  The Defendants' reply brief (with no citation or declaration) also advances the new factual assertion that the ballroom's rooftop will feature a "highly sophisticated Drone Port[.]"  Defs.' Reply Br. 2.  Of course, "declarations that were not part of the record before the district court at the time of a judgment or order are not part of the record on appeal of that judgment or order." *Public Emps. for Env't Resp. v. Zeldin*, 174 F.4th 183, 191 (D.C. Cir. 2026) (quoting *Swanson Group Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015)).  Especially when, as here, no reason at all is given as to why that same information could not have been provided to the district court over a month earlier, either *in camera* or on the public record.  In addition, the district court could not have abused its discretion by failing to consider factual arguments the Defendants never put before it.  *See Ellipso, Inc. v. Mann*, 480 F.3d 1153, 1160 (D.C. Cir. 2007).  But because of the singular importance of safety and security, we have considered the information and it does not alter our analysis for the reasons explained.

93

construction site.  But the existence of both a construction site and an unfinished project on top of the underground security features are the fully expected and necessarily planned-for side effects of this multi-year building project.  The Defendants' own construction schedule means that no completed ballroom would be in place as the top structure for roughly two years at the earliest.  *See* FONSI at 8 (estimating that construction is "anticipated" to be complete in "summer 2028"); Defs.' Opening Br. 3 (stating that the ballroom will be completed "a few months prior to the expiration of [President Trump's] term").  So whether or not the injunction remains in place, the Defendants' need for interim security measures will continue for the near future while the litigation proceeds.

*Second*, the Defendants argue that any delay to the multi-year construction timeline inflicts intolerable harm because "they will have no way to recoup that lost time, the added costs associated with delay, or the benefits" from a completed ballroom.  Defs.' Opening Br. 58.  On the record the Defendants have created, that argument carries little weight.

To start, the Defendants—quite unusually in a case involving national-security arguments—did not seek to expedite either the district court's proceedings or this appeal.  This court acted on its own to do so.

In addition, any risk caused by the construction project and its multi-year timetable is overwhelmingly a problem of the Defendants' own creation.  The Defendants unilaterally and likely without lawful authority destroyed a large portion of the White House structure and dug an open pit in its place.  Then, after commencing a lengthy construction project, they publicly announced to the world the vulnerabilities that self-chosen endeavor has created.

94

More importantly, the Defendants' arguments avoid discussion of the comprehensive and fully protective security plan for the President and the White House that necessarily would have been put in place *before* destroying the East Wing. The presumption of regularity requires us to take as given that such plans were made, and it is not for this court to question the rigor and full sufficiency of those measures in ruling on a preliminary injunction record. The Defendants' arguments and declarations, in other words, do not speak to the relevant question, which is what unplanned-for harm to their multi-year security plans will occur pending the resolution of this case. That silence is telling.[16]

Similarly, the Defendants have made no showing that any "added costs associated with delay" amount to a serious burden. Defs.' Opening Br. 58. The project, after all, is not being funded by the government itself or by the taxpayers. Nor has the Defendants' conclusory assertion of harm been factually substantiated in any way that would demonstrate the type of irretrievable losses that might equitably weigh in their favor.

*Third*, the Defendants assert that the East Wing was in poor shape, that the President lacks an adequate space to host

---

[16] The dissenting opinion devotes pages to the Defendants' declarations about whether a completed ballroom is more secure than a construction site. Dissenting Op. 27–30. In doing so, the dissenting opinion sets the construction site as the baseline for its equities inquiry. *Given the construction site*, the dissenting opinion reasons, safety and security considerations favor continued construction. *Id.* at 30–31. That framing jumps right over how the construction site got there in the first place—through the Defendants' likely unlawful actions and intentional plans—and assumes that no sufficient security plan was made and is in place for the construction period.

95

important guests, and that the temporary tents used to host events on White House grounds are both costly and unsightly. *See* Defs.' Opening Br. 57–58.

That may well be.  Yet nowhere have the Defendants argued that they could not have done what every other President has done to obtain improvements to the White House: Ask Congress, which is the branch the Constitution tasks with making such decisions about federal property.

Further, as the National Park Service pointed out in its Finding of No Significant Impact, the erection of temporary tents is no new feature at the White House.  *See* FONSI at 5, 10; *see also* Stanwich Decl. ¶ 7 ("To accommodate [large] events, large tents are typically erected on the South Lawn of the White House."); Decl. of Matthew C. Quinn, ECF No. 30-2, at ¶ 10 ("[T]ents were often set up on the South Grounds of the White House Complex to host larger events.").  The preliminary injunction does nothing more than maintain the status quo temporarily while this litigation resolves.  To the extent the injunction harms the Defendants by potentially forcing them to continue hosting official events in formal tents on White House grounds for a few extra months, that harm would not alter the equities balance.

At bottom, the Defendants' position is that, once the district court credited their argument that the independent underground construction alone could go forward, the court surrendered all power to stop the ballroom's construction at all.  No matter how unlawful that construction likely is and no matter that the construction will, by the Defendants' own admission, cause permanent and irremediable harm, the Defendants insist that the ballroom project must be *fait accompli* and no injunction at all can or ever could issue.

96

Worse still, the Defendants argue that even if they are acting entirely without authority and lawlessly, no court—not the district court, this court, or the Supreme Court—has the power to stop them since the East Wing has already been destroyed.  When asked "[w]hen * * * it bec[a]me impossible for courts to stop this project," the Defendants stated point-blank:  "[I]t would have been improper to enjoin it even on day one."  Oral Arg. Tr. 77:2–5; *see id.* at 74:18–75:20 (Question: "And so your position is [that] this can't be stopped by a court? * * * That [the district] court, this [c]ourt, the Supreme Court, no court could stop the building of this today?"  Answer: "Yes."); *id.* at 76:3–17 (Question:  "[I]magine [that] you are wrong on the law.  * * *  [Imagine the] statutes were as clear as could be * * * [that] you have no authority to do this, and you've done it.  There's nothing to be done."  Answer: "That is our position."); *id.* at 77:7–15 (Question:  "So if this were complete lawlessness by the [g]overnment * * *, [it] couldn't be stopped?"  Answer:  "On these theories, I think that's right."); *id.* at 78:10–12 (Question:  "So this is really something that can't be stopped in courts."  Answer:  "I think that's right.").

That is wrong.  The bold assertion that the Executive can act with utter lawlessness, destroying treasured national landmarks and harming the interests of individuals, and that no court can stop it flouts our constitutional order.  And it is no basis on which to claim the favor of courts' equitable judgment.  While this court accords great weight and deference to invocations of national security and the safety of the President, such arguments are not an automatic get-out-of-law-free card.  Nor do they require courts to stand by while the Executive acts without authority.  That is especially true when (i) the Defendants' security claims have repeatedly and materially shifted in their content throughout this litigation, (ii) some of those claims were never even shared with the district court, (iii)

97

the Defendants have failed to substantiate the asserted security harms on this record given the district court's safety-and-security exception and the other identified gaps in the Defendants' arguments, and (iv) the preliminary injunction includes a safety-and-security exception that the Defendants largely ignore.

The Defendants' invocation of *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), does not help them. *See* Defs.' Opening Br. 59. In *Winter*, the Supreme Court held that the district court had abused its discretion by issuing a preliminary injunction restricting the use of certain sonar technology in Navy training exercises. 555 U.S. at 32–33. But that was because "the ultimate legal claim [was] that the Navy must prepare an [Environmental Impact Statement], not that it must cease sonar training[.]" *Id.* at 32.

Here the injury is not procedural; it is substantive: The Defendants likely lacked any statutory or constitutional authority to act at all. Also, in *Winter* the challenged "training ha[d] been going on for 40 years with no documented episode of harm[.]" 555 U.S. at 33. Here, the Defendants have taken unprecedented action without any claim of constitutional or likely showing of statutory authority.

No matter, say the Defendants. In their telling, the policy goals of having a ballroom are so imperative that construction must continue regardless of its legality. *See* Defs.' Opening Br. 57–59. But it "is not our role to weigh such" policy arguments when the Executive exceeds the limits Congress has imposed upon it. *NFIB*, 142 S. Ct. at 666. The Constitution expressly assigns authority over federal property to the Congress, not the President. U.S. CONST. Art. I, § 8, cl. 17; *id.* Art. IV, § 3, cl. 2. So the only thing standing between the Executive and its ballroom is congressional authorization.

98

Since the Nation's founding, Congress has regularly exercised its powers over federal property and the purse to authorize and fund improvements to the White House at the Executive's request. *See* Section I.A.1, *supra.* The Defendants make no argument that, if a massive ballroom is indispensable to national and presidential security, Congress would refuse to allow it. And the equities do not swing in the Defendants' favor merely because end-running the Constitution's allocation of powers apparently seemed a more expedient route to their desired goal. *Cf. Alabama Ass'n of Realtors v. Department of Health & Human Servs.*, 141 S. Ct. 2485, 2490 (2021) (per curiam) ("[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends."); *Huisha-Huisha*, 27 F.4th at 734 (same).

For all those reasons, the district court did not abuse its discretion in finding that the Defendants have not demonstrated harm sufficient to outweigh the permanent and irreparable injuries that construction of the ballroom will cause.

**2**

The district court appropriately concluded that the public interest weighs strongly in favor of the injunction.

To start, Congress has inscribed into law the weighty public interest in the preservation and conservation of historic sites on federal property. National parklands in the District are "unique resources that the Federal Government holds in trust for the American people." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 290 (1984). Congress established the National Park system to "*conserve*" our Nation's "scenery[ and] natural and historic objects" in order "to provide for the enjoyment * * * in such manner and by such

99

means as will leave them *unimpaired* for the enjoyment of future generations." 54 U.S.C. § 100101(a) (emphases added). Congress later added that National Parks are to be "preserved and managed for the benefit and inspiration of all the people of the United States[.]" *Id.* § 100101(b)(1)(C).

The Defendants' own Environmental Assessment and Finding of No Significant Impact show, with extensive factual findings, that far from conserving and preventing impairment, construction of the proposed ballroom on the East Wing site will permanently and irreparably harm the public interest in preserving the historic appearance of the White House, its architectural symmetry, and its Founding-Era role in anchoring the architectural layout of the District. FONSI at 6–7. As the Park Service summarized, "[t]hese changes would affect elements that have shaped the property's character since the early 20th century[,]" Env't Assessment at 15, and "depart[] from the traditional aesthetic values and architectural integrity" that have persisted throughout the White House's history, *id.* at 11.

The Defendants also emphasize that the ballroom project's nearly half-a-billion-dollar price tag is being privately funded by "American patriots." Defs.' Opening Br. 3. The United States is blessed to be filled with many patriots. But in this case, the Executive Branch's self-help trenches not only on Congress's control over federal property and historic sites, but also on Congress's power of the purse. The amount of private donations is unprecedented. *See* Press Release, Nat'l Park Serv., National Park Foundation Receives Historic $100 Million Grant from Lilly Endowment Inc. (Aug. 26, 2024) (celebrating a $100 million grant as "the largest ever received by [National Park Foundation] and the largest grant benefitting national parks"). By way of comparison, the $400 million projected cost of the ballroom project amounts to

100

approximately 8% of the Park Service's budget for Fiscal Year 2026, *see* NAT'L PARK SERV., BUDGET JUSTIFICATIONS AND PERFORMANCE INFORMATION FISCAL YEAR 2027, at 4 (2026), and exceeds 1,500 times the level requiring special scrutiny by the Department of Interior for conflicts of interest, *see* DEPARTMENT OF THE INTERIOR, 374 DM 6.10.E(2)(b).

In bypassing Congress's control at two levels, the ballroom project short-circuits congressional oversight, veteran preferences for work on federal properties, 38 U.S.C. § 4212(a)(1), and rules favoring the use of American sources for construction materials, especially at national sites and where national security is involved, *see, e.g.*, 3 U.S.C. § 110; 41 U.S.C. §§ 8302(a)(1), 8303(a).

Congress, after all, has its own expertise and constitutional role in matters of national security and safety, especially where public lands and properties are involved.  U.S. CONST. Art. I, § 8, cl. 1 ("The Congress shall have Power To * * * provide for the common Defence and general Welfare of the United States[.]"); *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34, 36 (2010) (affording Congress "deference" when an issue "implicates sensitive and weighty interests of national security and foreign affairs").  It is Congress's job to ensure that any major construction and security projects at the White House will protect the safety of all Presidents, present and future, while preserving the historical and architectural significance of that unique location.  Congress cannot perform its constitutional function when the Executive chooses to proceed wholly unilaterally.

The separation of powers, after all, exists not to protect the Branches *qua* Branches, but to ensure and preserve the liberty of the people of the United States.  *See Boumediene v. Bush*, 553 U.S. 723, 742 (2008) (The separation of powers "serves

101

not only to make Government accountable but also to secure individual liberty."); *Metropolitan Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 272 (1991) ("The ultimate purpose of this separation of powers is to protect the liberty and security of the governed."); THE FEDERALIST NO. 47 (James Madison) ("The accumulation of all powers, legislative, executive, and judiciary, in the same hands * * * may justly be pronounced the very definition of tyranny."); *see also Free Enter. Fund v. Public Co. Acct. Oversight Board*, 561 U.S. 477, 497 (2010) ("The separation of powers does not depend on * * * whether the encroached-upon branch approves the encroachment.") (formatting modified).

That is why, throughout history, Presidents have lived in the house the people built. Executive actions that take control of that property out of the hands of the people's representatives while irreparably harming the historical and visual architecture of perhaps the most prominent public building in the United States seriously intrude on the public interest.

Given all of those considerations, the district court did not abuse its discretion in entering its carefully tailored preliminary injunction with its safety-and-security exception.

**IV**

For the foregoing reasons, we affirm the district court's judgment issuing the modified preliminary injunction. The administrative stay entered by this court on April 17, 2026, is vacated. We hereby stay this ruling for fourteen days to allow the Defendants, if they choose, to seek Supreme Court review.

*So ordered.*

RAO, *Circuit Judge*, dissenting: Construction is underway at the White House to build underground security facilities covered by a large ballroom. The President has determined the ballroom is necessary for the overall security of the White House as well as to provide a secure space for hosting large presidential events.

Objecting to the design of the ballroom, the National Trust for Historic Preservation sued. The district court issued an extraordinary injunction halting all construction of the ballroom. This was a blatant abuse of discretion.

To begin with, the district court had no jurisdiction because the Trust has no standing to stop construction at the White House. The ballroom is also likely within the President's authority to make improvements to the Executive Residence at the White House. Finally, the balance of equities overwhelmingly favors the government. The district court elevated the aesthetic displeasure of a single passerby over the government's security interests in the ballroom and the security risks of leaving an open construction site at the President's home and office. These errors in equitable judgment require vacating the injunction.

The district court seized supervision of construction at the White House, and my colleagues affirm this judicial overreach. Because the injunction is beyond the proper province of the federal courts, construction should be allowed to continue. I respectfully dissent.

## I.

Last summer, President Trump announced plans to renovate the East Wing of the White House, a project that will include updated underground national security facilities, new offices, and a large ballroom for hosting official events. The project broke ground in October 2025. Because the White

2

House is situated within President's Park, a unit of the National Park System, the Office of the Executive Residence ("EXR") is managing the project in coordination with the National Park Service ("NPS"). The project is funded primarily with private donations to the NPS gift fund.

The Trust, a congressionally chartered nonprofit corporation, filed this lawsuit in December 2025 asserting claims under the Administrative Procedure Act ("APA") and the Constitution. The district court concluded the Trust had associational standing based on the alleged aesthetic injury of one of its members, Alison Hoagland, who claims the sight of the ballroom will harm her during monthly walks past the White House. *See Nat'l Tr. for Historic Pres. in the U.S. v. NPS* ("*National Trust I*"), 821 F. Supp. 3d 62, 68–71 (D.D.C. 2026). The district court denied the Trust's initial request for a preliminary injunction, however, because EXR was not an "agency" whose actions are reviewable under the APA and because the Trust failed to state a constitutional claim under *Dalton v. Specter*, 511 U.S. 462 (1994).

The Trust then amended its complaint to assert ultra vires claims that EXR lacked authority for the ballroom project. The district court granted a preliminary injunction. It held the Trust was likely to succeed in showing the ballroom project was not authorized by any statute and therefore barred by 40 U.S.C. § 8106, which requires the "express authority of Congress" to build on federal land in the District of Columbia. The district court also held the Trust had shown irreparable harm to Hoagland's aesthetic interests. Finally, the court concluded the balance of equities favored the Trust because the ballroom would "overshadow the White House and disrupt the appearance of a historic and cultural icon" and because "the White House does not belong to any one man—not even a president!" *Nat'l Tr. for Historic Pres. in the U.S. v. NPS*

3

("*National Trust II*"), 827 F. Supp. 3d 93, 116 (D.D.C. 2026) (cleaned up). The injunction barred further "physical development of the proposed ballroom," with an exception for actions "strictly necessary" to ensure the "security of the White House and … the personal safety of the President and his staff." J.A. 497.

The government appealed and sought a stay. Meanwhile, the Trust asked the district court to clarify that the injunction's security exception did not permit construction of the ballroom. My colleagues dismissed the government's emergency stay motion over my dissent and remanded for the district court to decide the motion for clarification. *See Nat'l Tr. for Historic Pres. in the U.S. v. NPS*, 2026 WL 980554, at *3 (D.C. Cir. Apr. 11, 2026); *id.* (Rao, J., dissenting).

On remand, the district court modified the injunction. The current injunction bars any "above-ground, physical construction of the proposed ballroom." J.A. 513. The injunction also contains a similar exception for measures "strictly necessary" for White House security and the President's safety as well as new exceptions for "below-ground construction of national security facilities" and "above-ground construction … that is strictly necessary to cover, secure, and protect such national security facilities." *Id.* These exceptions do not allow construction of the proposed ballroom. *Id.*

The government appealed and moved for a stay. We issued an administrative stay and expedited briefing to consider the merits of the government's challenge to the preliminary injunction.

II.

"A plaintiff seeking a preliminary injunction must make a clear showing that he is likely to succeed on the merits, that he

4

is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024) (cleaned up). A "preliminary injunction is an extraordinary remedy" that is "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). We review the grant of a preliminary injunction for abuse of discretion, which includes review for errors of law.

The district court's preliminary injunction halting construction of the ballroom is an abuse of discretion for three independent reasons. First, the Trust lacks standing to seek an injunction against the ballroom construction because it has failed to make the "clear showing" that it can bring this lawsuit. *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) (cleaned up). Second, the Trust cannot prevail on its ultra vires "Hail Mary pass" because EXR likely has statutory authority to construct the ballroom. *NRC v. Texas*, 145 S. Ct. 1762, 1776 (2025) (cleaned up). And third, the balance of equities overwhelmingly favors the safety and security of the President over the aesthetic interests of a single passerby.

A.

To demonstrate a likelihood of success on the merits, a plaintiff must first make a "clear showing" of Article III standing. *Murthy*, 144 S. Ct. at 1986. The Trust's attempt to show associational standing falls well short of this standard. A lawsuit to halt construction of the ballroom is not germane to the Trust's statutory purposes. Moreover, the Trust rests its standing on a single member whose aesthetic harm is insufficient to make out an injury in fact.

5

1.

Article III of the Constitution vests the Judiciary with the power to resolve specific "'Cases' or 'Controversies,'" not abstract "questions and issues." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 132 (2011) (quoting U.S. Const. art. III, § 2). The federal courts are not an "open forum" for "general complaints" from citizens who "roam the country in search of governmental wrongdoing." *FDA v. Alliance for Hippocratic Med.*, 144 S. Ct. 1540, 1554–55 (2024) (cleaned up). Plaintiffs must therefore demonstrate standing to sue, which requires an injury in fact caused by the defendant and redressable by the court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). This "irreducible constitutional minimum" ensures a proper party is seeking relief that may be properly issued by a federal court. *Id.* at 560.

As an association, the Trust must show that "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to [its] purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *SSM Litig. Grp. v. EPA*, 150 F.4th 593, 596 (D.C. Cir. 2025) (cleaned up). Because the Trust seeks a preliminary injunction, it must present evidence of specific facts clearly showing a substantial likelihood of standing. *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017); *see also Murthy*, 144 S. Ct. at 1986, 1990; *Obama v. Klayman*, 800 F.3d 559, 568 (D.C. Cir. 2015) (Op. of Williams, J.) (explaining the burden to show standing for a preliminary injunction is more demanding than the burden to survive summary judgment because the latter merely "preserve[s] the *question* of standing").

6

The Trust is not entitled to the extraordinary remedy of a preliminary injunction because it has failed to make a clear showing of associational standing.

2.

The fundamental problem for the Trust's standing is that this lawsuit is not germane to its purposes because Congress did not provide the Trust with any statutory authority or interest pertinent to the White House.

"The germaneness requirement mandates pertinence between litigation subject and organizational purpose." *Int'l Dark-Sky Ass'n, Inc. v. FCC*, 106 F.4th 1206, 1218 (D.C. Cir. 2024) (cleaned up). This requirement is "modest yet important." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015) (cleaned up). When assessing standing, courts normally require a litigant to assert "his or her own legal rights and interests," and prohibit claims based on the "legal rights or interests of third parties." *Hollingsworth v. Perry*, 570 U.S. 693, 708 (2013) (cleaned up). The germaneness requirement ensures that an association has, if not a concrete and particularized injury in fact, then at least a "stake in the resolution of the dispute."[1] *United Food & Commercial Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544,

---

[1] "Despite its continued reliance on associational standing, the [Supreme] Court has yet to explain how the doctrine comports with Article III." *Alliance*, 144 S. Ct. at 1569 (Thomas, J., concurring). Associational standing deviates from the ordinary rule that plaintiffs must assert claims based on their own injuries. Moreover, associational standing arguably lacks a basis in "historical practice [or] traditional equitable principles" and provides an end run around limitations on universal injunctions. Michael T. Morley & F. Andrew Hessick, *Against Associational Standing*, 91 U. Chi. L. Rev. 1539, 1545, 1593 (2024).

7

555–56 (1996). Private associations are generally afforded leeway to define their purposes, and germaneness is often easily established. *See, e.g.*, *Int'l Dark-Sky Ass'n*, 106 F.4th at 1218; *Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45, 59–60 (D.C. Cir. 1988) (finding germaneness in a lawsuit by a private nonprofit organization "despite the absence of an explicit reference to aesthetic interests in [its] certification of incorporation").

The Trust, however, is not a private association. It is a congressionally chartered nonprofit corporation that "owes its creation to an act of Congress" and "derives all of its capacities, faculties and powers" from statute. *Bankers Tr. Co. v. Tex. & Pac. Ry. Co.*, 241 U.S. 295, 308 (1916); *see* 54 U.S.C. § 312102(a). Government entities may exercise only those powers conferred by Congress. *Cf. La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) (explaining that an agency "literally has no power to act … unless and until Congress confers power upon it"). Congress has vested the Trust with certain statutory powers and has specified the actions it is authorized to pursue. *See* 54 U.S.C. §§ 312102(b), 312105(a); *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 46, 53–54 (2015) (explaining how Amtrak, a federally chartered corporation, "is required to pursue … goals defined by statute" instead of "its own private … interests"). As a congressionally chartered nonprofit, the Trust can sue only to vindicate its statutory authority.

The Trust's lawsuit is not germane to its statutory purposes and powers. Congress empowered the Trust to serve four enumerated "purposes": (1) receiving donations of historic sites, buildings, and objects; (2) preserving and administering those sites, buildings, and objects; (3) accepting and administering gifts to carry out its preservation efforts; and (4) executing other specified statutory functions. 54 U.S.C.

8

§ 312102(b). The list notably does not include any sweeping purposes and simply states the principal actions the Trust is authorized to take. Congress also provided more detail about the "powers" of the Trust, all of which may be exercised only "[t]o the extent necessary to enable it to carry out the functions vested in it by this chapter." *Id.* § 312105(a). Of particular relevance here, the Trust may acquire real property for preservation but is prohibited from acquiring property within the National Park System. *See id.* § 312105(g).

The White House is located within President's Park, which is part of the National Park System. The Trust therefore has no statutory authority related to the White House: it cannot acquire donations of real property within President's Park, and it cannot preserve or administer such property.[2] This limitation is reinforced by the fact that Congress has elsewhere provided special legislation regarding President's Park, which tasks NPS with administering the Park but preserves "the use and occupancy of the buildings and grounds as the home of the President and his family and for his official purposes." Pub. L. No. 87-286, 75 Stat. 586 (1961). Congress has specifically defined the Trust's powers, none of which are germane to a lawsuit challenging the building of a ballroom and updated security facilities on White House grounds.

The district court's contrary conclusions about germaneness are critically flawed. For evidence of the Trust's purposes, the district court relied on the association's amended

---

[2] Nor does this suit have anything to do with a cooperative agreement. *Contra* Majority Op. 48. That the Trust is authorized to execute cooperative agreements with other federal entities only underscores the inappropriateness of its current lawsuit seeking coercive injunctive relief against NPS and EXR. *See* 54 U.S.C. § 312105(h).

9

complaint. *National Trust I*, 821 F. Supp. 3d at 71; *see also* Majority Op. 45–46, 49 (similarly relying on the complaint and an October 2025 letter). Mere assertions, however, cannot establish germaneness because the Trust is a federal entity whose purposes and powers are defined by law.

Unable to rely on the Trust's statutory authority, the district court next invoked hortatory language about why Congress established the Trust. *National Trust I*, 821 F. Supp. 3d at 71 (citing 54 U.S.C. § 312102(a)); *see also* Majority Op. 45, 50 (same). But such generalities cannot expand the Trust's purposes and powers, which are specifically enumerated in other provisions. *See* 54 U.S.C. §§ 312102(b), 312105(a).

My colleagues offer new germaneness arguments not raised by the Trust. But these arguments in support of jurisdiction have been forfeited. *See Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 53 n.4 (D.C. Cir. 2016); *see also Clark v. Sweeney*, 146 S. Ct. 410, 412 (2025) (per curiam) (admonishing that "courts call balls and strikes; they don't get a turn at bat") (cleaned up). In any event, the majority's attempts to shore up the district court's deficient reasoning are unpersuasive.

The majority first concedes that the National Trust is "differently situated from some other associational plaintiffs because its purposes are statutorily defined." Majority Op. 47. But then, without explanation, the majority simply treats the Trust as though it was a private organization that may set its own mission. That equivalency is unjustified.

Although we have not squarely addressed the germaneness inquiry for public entities, it is fundamental to our constitutional order that creatures of federal law are limited by their statutory grants. The Trust is a congressionally chartered nonprofit and therefore has no authority to sue the federal

10

government to pursue unstated goals that may seem obvious to some federal judges but are found nowhere in the Trust's charter.

The majority next attempts to rely on the Trust's ownership of the Decatur House, a historic building off the northwest corner of Lafayette Park near the White House. But ownership of the Decatur House does not manufacture germaneness to challenge construction projects in President's Park, over which the Trust has no statutory authority. Congress explicitly conferred control over President's Park to NPS, subject to the President's use and occupancy, and specifically excluded the Trust from all land in the National Park System. The Trust may not circumvent these explicit statutory limitations simply by owning property near President's Park and then seeking an injunction against NPS and EXR. The majority's florid criticisms of the ballroom's design and its impact on the Lafayette Park area cannot make up for the lack of germaneness to the Trust's statutory interests.

Finally, the majority claims that our precedents establish the Trust has standing to pursue lawsuits for purposes unconnected to its statutory grant. *See* Majority Op. 50–51. But this is really grasping at straws. The majority cites three decisions: the first held that a large coalition of plaintiffs had standing but did not specifically consider the Trust's standing or discuss germaneness, and the other two cases did not mention standing at all.[3] The majority's authorities are thus worthy of no more precedential effect than a drive-by jurisdictional ruling, which is to say: none. *See Pennhurst State*

_____

[3] *See Sierra Club v. Jewell*, 764 F.3d 1 (D.C. Cir. 2014); *Nat'l Parks Conservation Ass'n v. Semonite*, 925 F.3d 500 (D.C. Cir. 2019) (per curiam); *Nat'l Trust for Historic Pres. in the U.S. v. Dole*, 828 F.2d 776 (D.C. Cir. 1987) (per curiam).

11

*Sch. & Hosp. v. Halderman*, 465 U.S. 89, 119 (1984) ("When questions of jurisdiction have been passed on in prior decisions sub silentio, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us.") (cleaned up).

Our associational standing precedents allow private entities some latitude to define their purposes. The Trust, however, is a federal entity limited to exercising the powers conferred by Congress. It cannot generate standing by redefining its purposes to include aesthetic oversight of the White House, property that Congress has explicitly withheld from the Trust's purview. This lawsuit is not germane to the Trust's statutory authority, and therefore the Trust lacks standing to challenge the building of the ballroom.

3.

In addition, the Trust identifies no member with standing to sue. The Trust rests its standing on a single member, Alison Hoagland, who alleges aesthetic harm that might arise from completion of the ballroom. The district court's standing analysis rests on an embellished account of Hoagland's declaration, filling in claims of harm that she perhaps could have made but did not. Looking at Hoagland's actual statements, she has failed to demonstrate an imminent and particularized injury in fact.

a.

An injury in fact must be concrete, particularized, and actual or imminent. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). The Supreme Court has recognized that harm to aesthetic interests can be an injury in fact that confers standing. *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972). In the typical aesthetic injury case, however, the plaintiff is not

12

directly regulated by government action, but instead complains about actions that cause harm elsewhere, for instance to the natural beauty of a national park or to the continued existence of wildlife. Standing is therefore "'substantially more difficult' to establish." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493–94 (2009) (quoting *Lujan*, 504 U.S. at 562). As the Court recently explained, "distress at or disagreement with the activities of others is not a basis under Article III for a plaintiff to bring a federal lawsuit." *Alliance*, 144 S. Ct. at 1561 n.3. When assessing aesthetic injuries, courts must especially scrutinize whether a plaintiff satisfies the requirements of imminence and particularization.

An aesthetic injury must be actual or imminent, and standing predicated on future aesthetic injury requires evidence detailing future plans. *See Lujan*, 504 U.S. at 564 (finding no standing based on vague "'some day' intentions"); *Summers*, 555 U.S. at 494 (finding standing based on "imminent plans" to visit the affected land). For example, any person could visit Yosemite National Park and have an aesthetic interest in viewing its landscapes, but not every person has standing to vindicate future aesthetic harm to the Park. By requiring that a plaintiff have "concrete plans" to visit the affected area, the judicial power is reserved for remedying actual or imminent injuries. *Lujan*, 504 U.S. at 564 & n.2.

Particularization requires that an aesthetic injury "affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (cleaned up). For instance, Yosemite is managed by the government for the benefit of all Americans, and so every American arguably holds a common and undifferentiated interest in its preservation. An injury to that shared public interest, however, would constitute only a generalized grievance that does not support Article III standing. After all, "[v]indicating the *public* interest (including

13

the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive," not the courts. *Lujan*, 504 U.S. at 576. The adjudication of a generalized grievance violates the separation of powers by turning the federal courts into "virtually continuing monitors of the wisdom and soundness of Executive action." *Id.* at 577 (cleaned up).

To demonstrate an aesthetic injury is particularized, a plaintiff must show she will "use the land" in a way that will be impaired by the challenged action. *Env't Def. Fund v. FERC*, 2 F.4th 953, 969 (D.C. Cir. 2021). For instance, stargazers and astronomers "'use' the sky" and thus have standing to challenge government action that will result in light pollution from satellites. *Int'l Dark-Sky Ass'n*, 106 F.4th at 1217; *see also Sierra Club v. Jewell*, 764 F.3d 1, 5–6 (D.C. Cir. 2014) (permitting standing for individuals who "view and enjoy" a battlefield). By contrast, someone who "incidentally views something unpleasant" while driving by does not "use" the relevant property and therefore lacks a particularized injury. *Env't Def. Fund*, 2 F.4th at 970. A person who merely passes by an eyesore possesses nothing more than a generalized grievance, which cannot support standing to sue.

b.

The Trust's only evidence of member standing is Hoagland's declaration. Her asserted aesthetic injury can be understood in two ways—as a speculative injury to her particular use of the White House, or as an imminent but generalized injury from incidentally viewing the ballroom. Either way, she lacks standing to sue.

If Hoagland's aesthetic injury is to her specific use and enjoyment of the White House, as the district court and majority maintain, she fails to demonstrate her harm is

14

imminent. In her declaration, she does not state any concrete plans to use and enjoy President's Park. Hoagland details her academic credentials, past academic work, and historical preservation efforts around Washington, D.C., but she nowhere states that her work or her other activities specifically require viewing the White House without the planned ballroom. *See* Hoagland Decl. ¶¶ 4–8, 10–11. Hoagland instead claims that she expects to "travel to the area around the White House … about once a month" to "attend functions in neighboring buildings." *Id.* ¶ 12. Her assertions about future use of President's Park are tenuous at best and do not satisfy the Trust's burden at the preliminary injunction stage to make a clear showing of imminent aesthetic injury to a member.

If Hoagland's aesthetic injury is instead incidentally viewing a ballroom she finds displeasing, her harm is imminent but not particularized. Her declaration merely states that about once a month she will walk by the White House on her way to other buildings. *Id.* On these walks, she anticipates being "impressed" with the White House but displeased with the planned ballroom. *Id*. These allegations mirror those of the petitioner in *Environmental Defense Fund*, who lacked standing because she complained only about an "eyesore" that she occasionally passed while traveling elsewhere. 2 F.4th at 968–69. Since Hoagland's objection to the appearance of the ballroom could be made by anyone planning to travel by the White House, it constitutes nothing more than a generalized grievance insufficient for Article III standing.

Because Hoagland's declaration is plainly insufficient on its own terms, the district court and the majority stretch to characterize her alleged harm as imminent and particularized. But courts may not manufacture standing by filling in the blanks for the plaintiff. The district court asserted that Hoagland will "visit President's Park 'about once a month' to

15

enjoy the historic character of the setting." *National Trust I*, 821 F. Supp. 3d at 70. The majority likewise tries to build up Hoagland's declaration with claims that she plans to "recreate[] by walking in front of the White House," "tour[]" viewpoints of the White House, and visit Lafayette Park to "enjoy [the] architectural simplicity and historical significance" of the White House. Majority Op. 31–32.

Hoagland simply does not make anything like these statements. Notably, Hoagland does not claim that taking in an unchanged view of the White House is the object of her future plans.[4] *See* Hoagland Decl. ¶ 12; *Env't Def. Fund*, 2 F.4th at 969 (requiring the petitioner to show her "planned future uses of the land have been foreclosed by the construction").

Hoagland's ambiguous declaration does not satisfy the demanding standard for showing standing to obtain a preliminary injunction. When seeking the extraordinary and coercive remedy of a preliminary injunction, a plaintiff must make a "clear showing" of a substantial likelihood of standing. *Murthy*, 144 S. Ct. at 1986 (cleaned up). By reading between the lines of Hoagland's declaration to uphold the preliminary injunction, the majority contravenes the Supreme Court's admonition in *Murthy*. We may not "gloss[] over complexities in the evidence" submitted by Hoagland, and courts cannot issue preliminary injunctions based on "murky" evidence of standing. *Id.* at 1988, 1992 n.8.

---

[4] To satisfy imminence and particularization, our precedents require relatively modest facts detailing future aesthetic use and enjoyment of land, such as a plane ticket to view endangered species. *See, e.g.*, *Lujan*, 504 U.S. at 564 & n.2. But the court should not lower the hurdle still further by compensating for a deficient declaration in order to open the courthouse doors to associations challenging government action.

16

By allowing standing for the Trust based only on Hoagland's declaration, the majority's reasoning would permit adjudication of any government action that a plaintiff finds unsightly. But that contravenes the settled understanding that "general emotional 'harm,' no matter how deeply felt, cannot suffice for injury-in-fact for standing purposes." *Humane Soc. of U.S. v. Babbitt*, 46 F.3d 93, 98 (D.C. Cir. 1995). I would decline the Trust's "unprecedented and limitless" assertion of standing, which would improperly convert the federal courts into a "vehicle for the vindication of the value interests of concerned bystanders." *Alliance*, 144 S. Ct. at 1556, 1562 (cleaned up).

In sum, Hoagland falls short of making a clear showing of standing for a preliminary injunction. And having failed to demonstrate it likely has a member with standing, the Trust lacks associational standing.

\* \* \*

Without a clear showing of standing for the Trust, the district court abused its discretion by halting construction of the ballroom.

B.

The construction of the ballroom is also likely within EXR's statutory authority. The Trust's ultra vires claims therefore fail and cannot justify issuance of the preliminary injunction. *See Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agriculture*, 573 F.3d 815, 832 (D.C. Cir. 2009) (holding that failure to demonstrate likelihood of success on the merits is sufficient to deny a preliminary injunction).

To prevail on an ultra vires claim, the plaintiff must demonstrate: (1) "the statutory preclusion of review is implied

17

rather than express"; (2) "there is no alternative procedure for review of the statutory claim"; and (3) "the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (cleaned up). The third element is "especially demanding" and requires an "extreme" statutory violation. *Id.* (cleaned up). For this reason, an ultra vires claim is "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *NRC*, 145 S. Ct. at 1776 (cleaned up).

1.

The district court erred in concluding that the Trust is likely to succeed on its ultra vires claims. The Trust's claims hinge on 40 U.S.C. § 8106, which requires "express authority of Congress" to erect a "building or structure … on any reservation, park, or public grounds of the Federal Government in the District of Columbia." Even assuming this provision applies to EXR, a point the government disputes, it cannot carry the ultra vires analysis on its own. Section 8106 is not a specific statutory prohibition against construction projects on federal lands in the District. Rather, it requires us to determine whether another statute expressly authorizes such construction by EXR. Section 8106 does not eliminate the requirement that to make out a successful ultra vires claim the Trust bears the burden of showing that EXR has acted "plainly … in excess of its delegated powers."[5] *Changji*, 40 F.4th at 722.

---

[5] To the extent the district court placed the burden of proof on the government, this was legal error. *See National Trust II*, 827 F. Supp. 3d at 104 ("[T]he President must identify some law that allows him to demolish the East Wing and construct his planned ballroom with private funds."); *see also* Majority Op. 63. The Trust bears the "stringent" burden of demonstrating that extraordinary preliminary

18

The Trust is unlikely to complete its Hail Mary pass. At the outset, the Trust "dress[es] up … typical statutory-authority argument[s]" as ultra vires claims, a common but ultimately futile maneuver. *NRC*, 145 S. Ct. at 1776. As the Supreme Court has consistently maintained, ultra vires review is a narrow exception to the rule that judicial review of executive action requires statutory authorization. The availability of such review rests on the principle that the statutory violation must be "so extreme that one may view it as jurisdictional or nearly so." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.) (cleaned up). Accordingly, the ultra vires exception "does not apply simply because an agency has arguably reached 'a conclusion which does not comport with the law.'" *NRC*, 145 S. Ct. at 1776 (quoting *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964)); *see also DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (recognizing that ultra vires review does not extend to "garden-variety errors of law or fact") (cleaned up).

The Trust's claims boil down to an assertion that EXR's statutory authorities are not sufficiently explicit to authorize the ballroom construction. In support of its claims, the Trust advances a range of typical statutory interpretation arguments about the scope of EXR's authority under 3 U.S.C. § 105(d) and the meaning of specific terms in that provision. The Trust's arguments that EXR has stretched its statutory authority too far are insufficient to sustain an ultra vires claim. *See NRC*, 145 S. Ct. at 1776.

In any event, the Trust's statutory arguments fail, and so the district court erred in concluding that construction of the

---

relief is warranted and that construction of the ballroom is an "extreme" statutory violation. *Changji*, 40 F.4th at 722–25.

19

ballroom plainly exceeds EXR's authority under section 105(d).

Section 105(d) authorizes appropriations for the President to undertake certain actions, including for the "care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence at the White House." 3 U.S.C. § 105(d)(1). Section 105(d) provides authority for EXR to build the ballroom because the ballroom qualifies as an "improvement" of the Executive Residence.

Because "improvement" has multiple definitions, we must determine which definition best comports with the "statutory scheme." *Jennings v. Rodriguez*, 138 S. Ct. 830, 845 (2018). Section 105(d)(1) enumerates modifications that can be made to real property, and so the provision is best read as incorporating the real property definition of "improvement." *See Sekhar v. United States*, 570 U.S. 729, 732 (2013) ("It is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses.") (cleaned up). In the context of real property, "improvement" means a "valuable addition made to property (usually real estate)" that "amount[s] to more than mere repairs or replacement." *Improvement*, Black's Law Dictionary (5th ed. 1979). The prototypical example is a "building[]," but the definition also includes "any permanent structure." *Id.*

Federal law confirms this understanding of "improvement." In numerous statutes dealing with real property, Congress has used "improvement" to include the construction of buildings. *See, e.g.*, 10 U.S.C. § 2687a(a)(3)(B)(i) (referring to "construction … or extension of a building, structure, or other improvement to real

20

property"); 16 U.S.C. § 666 (authorizing appropriations for the "construction of such facilities, buildings, and other improvements"). The district court never addressed the real property definition of "improvement," and my colleagues attempt to limit the meaning of "improvement" in a manner that is not supported by the common law.[6]

---

[6] The district court relied on the *noscitur a sociis* canon and adopted a more colloquial interpretation of "improvement" as akin to ordinary maintenance and upkeep. But limiting the scope of "improvement" to maintenance and upkeep creates a surplusage problem by rendering "improvement" wholly redundant with the terms "maintenance" and "repair," which are also listed in section 105(d)(1). *See Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 209 (1997) ("Statutes must be interpreted, if possible, to give each word some operative effect."). These competing canons reinforce how the Trust raises at most garden variety legal errors insufficient to support an ultra vires action.

My colleagues suggest that, at common law, an "improvement" of a building is a narrower concept than an "improvement" to land. *See* Majority Op. 80–81 & n.12. Yet the cases they cite show that even a "substantial addition[]" to a building qualifies as an "improvement" while the replacement of that building with a new one does not. *Anastasi v. Brunet*, 90 A.2d 636, 637 (Pa. Super. Ct. 1952); *see also Hanson Assoc., P.C. v. Gallery Plaza P'ship*, 32 Va. Cir. 356, at *3 (Feb. 9, 1994) (describing a sizeable "addition to [an] existing structure" and a "new back building" as "improvements to an existing building"); *Cinelli Builders, Inc. v. Ferris*, 78 A.D.3d 881, 882 (N.Y. App. Div. 2010) (concluding the "construction of [a] new home" was not "home improvement"). Consistent with this principle, courts often refer to new wings or extensions of existing buildings as "improvements" of those buildings. *See, e.g.*, *City of Buffalo v. J. W. Clement Co.*, 269 N.E.2d 895, 900 (N.Y. 1971) (referring to the "addition of a full wing" as an "improvement[]"). These cases and common law principles confirm the ballroom is an "improvement" because it is an addition to the Executive Residence.

21

The planned ballroom is a lawful improvement of the Executive Residence at the White House because it is a building or structure extending from and supporting the Residence. Even accepting the majority's premise that the Residence is limited to the central structure of the White House, the Residence is a multifunctional building with living spaces for the President and his family, as well as office space. The Residence also includes historic spaces, like the State Dining Room and the East Room, which are used for receiving and hosting foreign dignitaries and guests.

The ballroom is intended to increase capacity for official functions and events beyond what can be provided by existing facilities. To that end, the ballroom will be integrated with the Executive Residence, enabling both "direct ceremonial procession from the East Room" and "secure second-story access from" the Residence into the ballroom. NPS, White House East Wing Modernization & State Ballroom Env't Assessment 2 (Aug. 2025). Because the ballroom will adjoin the Executive Residence and expand its hosting capacity, it qualifies as an "improvement" under section 105(d)(1).

The best reading of section 105(d) is that it authorizes EXR's construction of the ballroom. Although my colleagues disagree, at a minimum the real property meaning of "improvement" demonstrates that EXR has not exceeded its authority in a manner "clearly in defiance of" section 105(d). *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988) (cleaned up). The Trust's ultra vires claims are therefore likely to fail.

2.

The district court also asserted in passing that the funding for the ballroom does not comport with section 105(d). But this argument misreads the statute. And the majority's efforts to weave together a wholly new rationale under the Economy

22

Act—neither raised by the Trust nor relied upon by the district court—cannot support the preliminary injunction.

The district court determined, with little analysis, that any funding for actions under section 105(d) must be appropriated explicitly under section 105(d). Since Congress appropriated only about $2.5 million explicitly for section 105(d) expenses, EXR lacks the funds to build the ballroom. To support this conclusion, the district court pointed to language in the statute addressing the President's authority to spend "[s]ums appropriated under" section 105(d). *See National Trust II*, 827 F. Supp. 3d at 107. When an appropriation is made under section 105(d), authorized actions may be undertaken "as the President may determine" with only limited oversight by the Comptroller General. 3 U.S.C. § 105(d). Read in context, this bookkeeping language simply *expands* the President's discretion to use these particular appropriations. Nothing in section 105(d) limits available appropriations to those made explicitly pursuant to section 105(d).

Therefore, improvements to the Residence may be funded with other available appropriations, and it is well established that NPS gift funds may qualify as an appropriation. An appropriation is "simply a law that authorizes expenditures from a specified source of public money for designated purposes." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 144 S. Ct. 1474, 1480 (2024). Appropriations are found not only in line-item spending bills, but also in statutes that identify a government revenue stream and authorize its expenditure for specified ends. *See id.* at 1486. Thus, when Congress authorizes the Executive to collect and spend private donations, such funds generally "constitute appropriated funds unless Congress provides otherwise." Gov't Accountability Off., Principles of Federal Appropriations Law 6-226 (3d ed. 2006).

23

Here, the NPS gift statute authorizes the collection of donations "for the purposes of" the National Park System, which includes President's Park and the White House. 54 U.S.C. § 101101(2). These donations are held in the NPS trust fund, and Congress has explicitly provided that those donations are "appropriated to be disbursed in compliance with the terms" of the trust. 31 U.S.C. § 1321(a)(17), (b)(1). Congress could not have been clearer that NPS gift funds are an appropriation. The donations the government claims it is using here are therefore an "appropriation" that can fund the ballroom.[7] The only legal argument supporting the district court's injunction with regard to the ballroom's funding is that gift funds cannot qualify as an appropriation capable of funding actions under section 105(d). But that argument contravenes the best reading of the statute as well as longstanding principles of appropriations law.

I recognize there is another step to this funding mechanism, namely that the NPS gift funds are being made available for use by EXR through an agreement with NPS under the Economy Act. Whether that particular transaction is lawful and comports with the Economy Act, however, is a question the district court did not reach because it was "not squarely at issue." *National Trust II*, 827 F. Supp. 3d at 108. Any claims about the Economy Act or the funding structure for EXR's use of the gift funds were not decided or relied upon by the district court in issuing the preliminary injunction.

My colleagues again try to fill in the gaps by arguing that the Economy Act does not permit EXR to use NPS gift funds to construct the ballroom. But in general, this court does not

---

[7] Because the NPS gift funds are an appropriation, the majority incorrectly assumes that the "privately donated funds" involved here are "not congressional appropriations." Majority Op. 64.

24

reach issues that were "neither raised nor decided below." *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) (cleaned up). Before the district court, the Trust never directly challenged the government's reliance on the Economy Act to finance EXR's construction under section 105(d) with NPS gift funds. The majority's reliance on the Economy Act goes beyond the issues (not just the arguments) presented by the Trust. But respect for party presentation should apply with special force to a motion for a preliminary injunction, where the plaintiff's burden is demanding and the requested relief is "a matter of discretion, not a question of right." *Sherley v. Sebelius*, 644 F.3d 388, 398 (D.C. Cir. 2011).

Furthermore, this court has declined to uphold a preliminary injunction "based upon a legal theory not embraced by the district court." *Id.* Here, the district court made clear that whether the NPS-EXR agreement complied with the Economy Act was "not squarely at issue" and therefore did not serve as a basis for the preliminary injunction. *National Trust II*, 827 F. Supp. 3d at 108. The majority spins out a series of original Economy Act arguments. But we cannot make up for the district court's errors and the Trust's forfeiture to save the preliminary injunction.[8]

---

[8] My colleagues also rely on a phantom concession to assert that the Trust's APA claims against NPS can independently support the injunction. *See* Majority Op. 70 n.11. Below, the Trust challenged only the authority of NPS to construct the ballroom, not its authority to fund EXR's construction under the NPS gift statute and the Economy Act. At oral argument, the government maintained that, regardless of NPS's construction authority, the NPS gift statute and EXR's authority under section 105(d) permit EXR to build the ballroom. *See* Oral Arg. Tr. 55:21–56:6 (acknowledging that "to use the gift funds," the ballroom project must satisfy the requirement of the "gift statute" that it "advance the purposes of the park system");

25

In sum, EXR's construction of the ballroom is likely authorized by section 105(d), and so it is neither prohibited under section 8106 nor ultra vires. Because the Trust's ultra vires claims are likely to fail, they cannot support the preliminary injunction.

C.

Because the government's interest in the security of the White House far outweighs any alleged harm to the Trust, the equitable balance favors the government and requires vacating the preliminary injunction.

"An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. at 32. The balance of equities and public interest factors may foreclose injunctive relief even if the plaintiff has a meritorious claim. *See id.* at 31–32; *see also Hecht Co. v. Bowles*, 321 U.S. 321, 329–31 (1944) (describing the "long tradition" of courts' discretion to deny injunctive relief based on the public interest, irrespective of the merits). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24

---

*see also* Gov't Br. 5 (arguing that section 105(d) "independently authorize[s] the Project").

I therefore need not address the Trust's APA challenge to NPS's construction authority, which the district court considered only "to the extent that NPS is directing or otherwise involved" in constructing the ballroom. *National Trust II*, 827 F. Supp. 3d at 113. Because EXR is managing the project and the role of NPS is limited to collecting donations and transferring them to EXR, the claims challenging the construction authority of NPS cannot independently support the preliminary injunction.

26

(cleaned up). The balance of equities and public interest factors merge here because the government opposes the injunction. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Because an injunction is a prospective remedy, we balance the equities in relation to the current state of the case, including the ongoing ballroom construction. *Cf. Pub. Utils. Comm'n of Ohio v. United Fuel Gas Co.*, 317 U.S. 456, 466 (1943) (explaining that "an appeal in an equity suit …. must be decided on the basis of the circumstances that exist now").

The district court found the equities favor the Trust because the ballroom will "overshadow the White House and disrupt [its] appearance" and because the "government's concerns regarding the safety and security of the White House … [are] a problem of the President's own making!" *National Trust II*, 827 F. Supp. 3d at 116 (cleaned up). Putting to one side the district court's aesthetic judgments and general outrage, the Trust's equitable interest boils down to the aesthetic preferences of a single individual.

The district court abused its discretion in concluding that the Trust's minimal harm outweighs the government's interest in the security and safety of the President, the First Family, and White House staff and visitors. First, the district court improperly glossed over, ignored, or discounted the government's evidence demonstrating the security harms from halting construction of the ballroom. Second, the district court cannot compensate for the slight aesthetic harm to a passerby by resorting to hyperbole and its view of the legal merits.

1.

Neither the district court nor the majority assign proper weight to the credible and detailed evidence—from the Secret Service, the Secretary of the Army, and the Army Corps of

27

Engineers—that halting construction of the ballroom impairs White House security. Weighed against aesthetic harm to a single passerby, this evidence compels the conclusion that the equities overwhelmingly favor the government.

To begin with, we must "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Winter*, 555 U.S. at 24 (cleaned up); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2422 (2018) (holding courts must give "appropriate weight" to "the Executive's evaluation of the underlying facts" in the context of national security). In matters involving White House security, we have emphasized that "reviewing courts [must] be appropriately deferential to the Secret Service's determination of what … constitutes a potential risk to the physical security of the President or his family." *Sherrill v. Knight*, 569 F.2d 124, 130 (D.C. Cir. 1977). Deferential review starts by fully considering the evidence put forward by the government.

The Deputy Director of the Secret Service has explained how the ongoing construction impairs the ability of the Service to "provide a secure 360-degree perimeter to safely protect the President, First Family, and residence." Quinn Decl. ¶ 4; *see also id.* (explaining "the current unfinished construction site compromises the ability of Secret Service personnel" to undertake "protective security operations"). The "current construction debris and large holes" also impair the ability of the Secret Service to "effectively secure[] the east side of the White House Building." *Id.* ¶ 5. The construction delay imposed by the preliminary injunction inevitably extends the time during which the President's residence remains less secure. "Every day added to the Project is another day impairing full security." *Id.* ¶ 9.

28

In addition to the security threat posed by the construction delay, the government has provided declarations from senior military and Secret Service officials thoroughly detailing the security benefits of the ballroom. These declarations explain how the ballroom will alleviate security vulnerabilities that currently impact large events involving the President, which must be hosted offsite or in soft tents.[9] *Id.* The ballroom is also uniquely designed to fortify the underground national security facilities beneath it. The ballroom "will provide a fixed structure equipped with … modern protective security measures, including threat-resistant building materials," and will "serve as a fortified structural buffer." *Id.* ¶ 10.

The Secretary of the Army has further explained why the underground national security facilities cannot be adequately protected by the concrete slab and modest topping structure allowed by the district court's injunction. Driscoll Decl. ¶ 4. The ballroom's dimensions and structure are essential for security. According to the Secretary, "[t]o provide adequate subterranean protection without" the "height and mass" of the ballroom, "engineers would need to dig impractically deep." *Id.* ¶ 6. The ballroom provides a critical "dual-layered system" of protection for the national security facilities, "comprising a sacrificial outer cover coupled with a hardened inner structural element." *Id.* ¶ 8; *see also id.* ¶¶ 8–12.

Corroborating the Secretary's account, the Commanding General of the U.S. Army Corps of Engineers has similarly described how the "height and mass" of the ballroom "provide crucial, physical layers to shield" the national security facilities

---

[9] The security risks presented by large offsite events involving the President were unfortunately confirmed by the assassination attempt against President Trump at the Washington Hilton during the White House Correspondents' Dinner. *See* Gov't Br. 1, 58–59.

29

beneath it. Graham Memorandum ¶ 4; *see also id.* ¶¶ 5–9. The height of the ballroom will also provide an "essential elevated platform to engage and neutralize aerial systems," such as drones, that pose an increasingly serious threat to White House security. *Id.* ¶ 4; *accord* Driscoll Decl. ¶ 6. There is no dispute that the Secretary's declaration and the Army Corps memorandum are authentic, credible, and "go[] to the heart of the contested issue," so it would be "inconsistent with this court's own equitable obligations to pretend that [they] do[] not exist."[10] *Colbert v. Potter*, 471 F.3d 158, 166 (D.C. Cir. 2006) (cleaned up).

---

[10] My colleagues simply assert they have "considered" these documents but say nothing about how the government's interests weigh in the equitable balance. *See* Majority Op. 92 n.15. They also maintain that no consideration is necessary because the government submitted the materials only on appeal when seeking a stay. But this court regularly considers additional evidence in assessing the asserted harms underlying a stay motion. *See* Fed. R. App. P. 27(a)(2)(B)(i) (allowing the submission of "[a]ny affidavit or other paper necessary to support a motion"). The new declarations specifically address the security deficiencies of the alternatives to the ballroom (such as a concrete slab) allowed by the district court's modified injunction.

Furthermore, the government preserved the argument that the ballroom is necessary to protect the national security facilities beneath it, an argument merely amplified by the additional factual evidence. We should not fault the government for limiting prior disclosure of sensitive information regarding White House security plans and vulnerabilities. The government has appropriately provided additional details in seeking a stay of the injunction, which the district court issued despite the declarations the government provided below about White House security and the President's safety.

30

The equities in this case turn on complex architectural and security determinations best made by the Secret Service and the military—not judges. Despite the evidence and technical analysis submitted by the government, the district court brushed off these security concerns as "problem[s] of the President's own making!" *National Trust II*, 827 F. Supp. 3d at 116. And the majority merely assumes that because there must be a "fully protective security plan" for the White House during construction, the injunction extending construction has no consequence for the President's security.[11] Majority Op. 94 & n.16. But that armchair judicial assumption directly contradicts the Secret Service's assessment that the ongoing construction impairs full security at the White House. Quinn Decl. ¶ 9.

The district court and the majority have "failed properly to defer to senior [Secret Service and Army] officers' specific, predictive judgments about how the preliminary injunction would reduce the effectiveness" of current efforts to secure the White House. *See Winter*, 555 U.S. at 27; *cf. Hawaii*, 138 S. Ct. at 2421 ("[W]e cannot substitute our own assessment for the Executive's predictive judgments on [national security] matters."). A judges-know-best approach to presidential security cannot support the preliminary injunction.

At bottom, the balance of equities turns on the "relative harms" incurred by the Trust and the government. *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (per

---

[11] Like the district court, the majority wrongly criticizes the government for asserting the security benefits of the ballroom after previously representing that below ground construction would not lock in the above ground design. There is nothing contradictory about stating the ballroom is designed to serve critical security functions while also recognizing that some design changes may be feasible.

31

curiam) (cleaned up). In this case, the current safety of the President, as well as his family, staff, and guests, clearly outweighs future aesthetic harm to Hoagland. The circumstances here parallel those in *Winter*, in which the Supreme Court vacated a preliminary injunction because the plaintiffs' "ecological, scientific, and recreational interests in marine mammals" were "plainly outweighed by the Navy's need" to adequately train its antisubmarine forces. 555 U.S. at 25–26, 33.

The government's serious and substantiated security interests in completing the ballroom plainly trump what the Trust has placed on the other side of the scale—the aesthetic preferences of one individual who walks by the White House about once a month. This minimal harm cannot justify a preliminary injunction that threatens the security and safety of the President of the United States.

2.

The district court's conclusion that the equitable balance favors the Trust was an abuse of discretion.

First, as already explained, the district court failed to properly balance the relative harms because it conspicuously disregarded the full extent of the security risks posed by halting construction of the ballroom. The majority doubles down on this error, even when faced with additional credible evidence from the government.

Second, perhaps because the actual harms overwhelmingly favor the government, the district court let the merits drive the equitable analysis by leaning on the government's alleged lack of statutory authority. *See National Trust II*, 827 F. Supp. 3d at 116 (claiming the government "cannot suffer harm from an injunction that merely ends an

32

unlawful practice") (cleaned up); *see also* Majority Op. 95–96 (similar). The district court also repeatedly exclaimed that the government lacks constitutional authority, even though the government has never claimed such authority. *See National Trust II*, 827 F. Supp. 3d at 116; *see also* Majority Op. 89, 97, 100.

This collapsing of the merits and the equities was an abuse of the district court's equitable discretion. While the merits may bear on the equities, the merits are not dispositive of the equities. On this, the Supreme Court has been clear: "As a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam). Rather, because an injunction is an equitable remedy, courts must exercise their "traditional equitable discretion" in deciding whether to grant such relief. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–13, 319 (1982). "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Int'l Refugee Assistance Project*, 582 U.S. at 579.

The importance of exercising equitable judgment beyond the merits is reflected in the fact that an injunction may be vacated solely for failing to strike the right equitable balance. *See Winter*, 555 U.S. at 23–24, 31 (vacating an injunction based only on the equities). Indeed, this court must "balance the equities of the parties and the public even when a party seeks to restrain the enforcement of an allegedly unconstitutional law." *Hanson v. District of Columbia*, 120 F.4th 223, 247 (D.C. Cir. 2024) (per curiam); *see also Benisek*, 585 U.S. at 158 (affirming denial of an injunction only on the equities despite claims asserting a constitutional injury). *Contra* Majority Op.

33

97 (attempting to limit *Winter*'s reliance on the balance of equities to procedural harms). The district court's double reliance on the merits cannot compensate for deficiencies in the Trust's equitable position.

Third, the district court emphasized the injunction's exception for construction strictly necessary for White House security. But this exception does not undermine the government's equitable interests. The exception does not permit construction of the ballroom despite the unique and essential security benefits it provides. Moreover, even if the exception could mitigate some safety concerns, its scope will ultimately be determined by the district court, not by those managing construction or overseeing the security of the White House. As in *Winter*, the fact the government "may return to the district court to request relief" if the injunction "actually results" in security harms provides "cold comfort." 555 U.S. at 31 (cleaned up). The government should not be forced to rely on the district court's architectural approval to secure the President's home and office.

Fourth, the equitable balance was heavily influenced by the district court's aesthetic judgments and failure to account for the benefits of the ballroom. For example, the district court assumed the proposed ballroom will "disrupt the appearance" of the White House. *National Trust II*, 827 F. Supp. 3d at 116. The majority also relies on its disapproval of the ballroom's design, commenting that the project is "destroying [a] treasured national landmark[]." Majority Op. 96. Putting aside that the old East Wing was treasured by few if any visitors, a judge's aesthetic opinions cannot compensate for the limited harm incurred by the Trust.

Moreover, if this injunction turns on choosing between the district court's assessment of the ballroom and the President's,

34

Congress has already made that choice. Congress expressly preserved the President's authority over President's Park. The statute creating the Park states, "nothing done under this Act shall conflict … with the use and occupancy of the buildings and grounds as the home of the President and his family and for his official purposes." 75 Stat. at 586.

Among the President's official uses for the Park is the hosting of state events that welcome foreign dignitaries. *See* Dep't of the Interior, Comprehensive Design Plan: The White House & President's Park 28, 51 (2000) (explaining that a central function of the White House and President's Park is to serve as the "setting for state events"); *cf.* U.S. Const. art. II, § 3 (providing the President "shall receive Ambassadors and other public Ministers"). As presidential administrations of both parties have recognized, current facilities are "inadequate" for large White House events. Comprehensive Design Plan, *supra*, at 102–03, 115, 121–22.

The ballroom serves the purposes of President's Park by fulfilling the longstanding need to accommodate large events. NPS determined that any effect of the ballroom on the architectural balance of the White House was outweighed by various benefits the ballroom provides President's Park and the public that enjoys it. Such benefits include "enhanced tour features," "upgraded visitor amenities," and "a permanent, secure event space … that provides increased capacity for official state functions … consistent with essential functional requirements of the Executive Office of the President" and with the "historic integrity and cultural landscape of the White House and its grounds." Env't Assessment, *supra*, at 2, 17. Importantly, the ballroom will alleviate the need for large events to rely on "huge, unsightly tents" that damage the Park, and unlike those tents, the ballroom will not disrupt the "long

35

vista linking the White House, Washington Monument, and Jefferson Memorial." *Id.* at 1–2, 8, 10.

Finally, this case is not about tearing down the White House and building a skyscraper or razing the Statue of Liberty. *Contra National Trust II*, 827 F. Supp. 3d at 107; Majority Op. 42. The equitable balance is between the asserted aesthetic harm to a single passerby and the safety and security of the President as well as his family, staff, and guests at the White House. In this case, the equities are squarely with the government, and therefore the district court abused its discretion in seizing control of construction at the President's home and office.

\* \* \*

In deciding the ballroom construction "has to stop!" the district court transgressed the equitable authority of the federal courts. The preliminary injunction is a clear abuse of discretion and must be vacated. I respectfully dissent.